UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF NEW MEXICO; MICHELLE LUJAN GRISHAM, in her Official Capacity as Governor of the State of New Mexico; RAUL TORREZ, in his Official Capacity as Attorney General of the State of New Mexico; CITY OF ALBUQUERQUE; TIMOTHY KELLER, in his Official Capacity as Mayor of the City of Albuquerque;<br><br>Defendants. | )<br>)<br>)<br>)<br>)  Civil Action No. 26-cv-1471<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff, the United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## PRELIMINARY STATEMENT

1.      Within hours of assuming the Presidency, President Donald J. Trump took immediate action to fulfill his campaign promise to the American people and declared that a "national emergency exists at the southern border of the United States" from the unprecedented "illegal entry of aliens." Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025). This declaration was necessary given the flood of illegal aliens into our Nation under the prior administration's open border policies incentivizing disregard for laws passed by Congress. As a result, millions of illegal aliens settled in American communities in flagrant violation of federal law, creating "significant

threats to national security and public safety" and resulting in aliens "committing vile and heinous acts against innocent Americans." Exec. Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025). This national crisis underscores the vital importance of the Executive duty to "[e]nforc[e] our Nation's immigration laws." *Id.*

2.    Under President Trump's leadership—and in response to the electoral mandate—the Federal Government, through the U.S. Department of Homeland Security and its components U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"), is employing all available legal measures to end that crisis, including by identifying and removing criminal illegal aliens from the United States in accordance with its well-established, preeminent, and preemptive authority to regulate immigration matters. This authority derives from the United States Constitution, numerous acts of Congress, and binding United States Supreme Court precedent. *See, e.g.*, U.S. Const. art. VI, cl. 2, art. I § 8, cl. 4; Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 163 (codified as amended at 8 U.S.C. § 1101, *et seq.*) ("INA"); *Arizona v. United States*, 567 U.S. 387, 394–95 (2012); *see also Lopez v. U.S. I.N.S.*, 758 F.2d 1390, 1392 (10th Cir. 1985) ("Congress has conferred upon [federal immigration officials] broad authority to address the problem of illegal aliens."). Indeed, Congress last year strengthened that authority with the enactment of the Laken Riley Act, S. 5, 119th Cong. (2025), which "mandates the federal detention of illegal immigrants who are accused of theft, burglary, assaulting a law enforcement officer, and any crime that causes death or serious bodily injury."[1]

3.    Among the legal measures authorized by Congress and available to the Federal Government to implement federal immigration law are voluntary written agreements between the

---

[1] Press Release, DHS, *President Trump Signs the Laken Riley Act into Law* (Jan. 29, 2025), https://www.dhs.gov/news/2025/01/29/president-trump-signs-laken-riley-act-law.

Federal Government and state or local governments whereby state or local government officials are trained on and empowered to carry out federal immigration enforcement activities under the color of federal law, including through the investigation, apprehension, transportation, and detention of aliens in the United States. *See* 8 U.S.C. § 1357(g). Congress further authorized the Federal Government to enter into agreements and make arrangements with state and local governments to facilitate the detention of aliens in the United States. *See id.* §§ 1103(a)(11)(B), 1231(g). The Federal Government depends on such agreements to carry out its immigration enforcement objectives. *See generally* 8 U.S.C. § 1231. Local governments and law enforcement agencies in New Mexico have entered into numerous such agreements with the Federal Government without issue for *decades*.

4.      Despite the ongoing threat that unvetted illegal aliens pose to American lives and communities and the comprehensive and exclusive authority of the Federal Government over immigration enforcement, the State of New Mexico and City of Albuquerque seek to intentionally obstruct federal law enforcement and thwart the constitutional obligation of the President of the United States to take care that the immigration laws enacted by Congress are enforced. *See* Exec. Order 14,287, *Protecting American Communities From Criminal Aliens*, 90 Fed. Reg. 18761 (Apr. 28, 2025). They seek to do so by effectively preventing cooperation between local governments and the Federal Government to achieve Congress's immigration objectives and barring immigration detention in New Mexico, all at the expense of the American people, including the people of Otero County.

5.      Specifically, on February 5, 2026, New Mexico Governor Michelle Lujan Grisham signed House Bill 9, entitled the "Immigrant Safety Act," ("HB9") (Exhibit A) into law, to take effect on May 20, 2026. HB9, which applies broadly to any "public body," bars future entry into

and requires immediate termination of existing agreements (i) "to detain individuals for federal civil immigration violations, including an intergovernmental services agreement to detain individuals for civil immigration violations[;]" (ii) "to investigate, apprehend, detain or transport individuals pursuant to 8 U.S.C. Section 1357(g) or 8 C.F.R. Section 287.7[;]" or (iii) "that deputize[] officers, employees or agents of the public body to perform a function of an immigration officer in relation to the investigation, apprehension, detention or transportation of noncitizens in the United States or the removal of noncitizens from the United States." HB9 §§ 3(A), (B), 4(A)–(C). HB9 further prohibits public bodies from "sell[ing], trad[ing], leas[ing] or otherwise dispos[ing] of any real property to be used for the detention of individuals for federal civil immigration violations." *Id.* § 3(C).

6. Not to be outdone, a month and a half later, on March 23, 2026, City of Albuquerque Mayor Timothy Keller signed O-26-15, entitled the "Safer Community Places Ordinance" ("SCPO") (Exhibit B) into law. The SCPO provides that "the City, its employees, contractors, or agents acting under the City's authority shall not approve any permit, contract or other agreement for use of City owned or controlled property or resources if the City, its employees, contractors, or agents have a reasonable belief the property or resources will be used for the purposes of facilitating immigration enforcement." SCPO § 5-1-5(B)(4).

7. The SCPO goes further than HB9 in its obstruction of federal immigration enforcement by also: (i) barring any use of city-owned property and resources from being used for immigration enforcement purposes, SCPO § 5-1-5(A); (ii) barring the use of city property or resources to "transport individuals for immigration enforcement purposes" or "facilitate custody transfer to federal immigration authorities absent a valid judicial warrant or court order[,]" *id.* § 5-1-5(B)(5); (iii) barring the use of city resources "for immigration enforcement" in specified places,

*id.* § 5-1-5(B)(6), *see also id.* § 13-17-3; (iv) prohibiting certain public and private entities "from providing voluntary consent to law enforcement agents engaged in or supporting immigration enforcement" to have access to certain properties and records, *id.* § 13-17-4(A); and (v) "[i]f a law enforcement agent engaging in or supporting immigration enforcement is present at a place of work," requiring the business to "provide notice" to all persons "performing work" at the business of the name, date, and nature of the law enforcement activity within 24 hours, *id.* § 13-17-6(C).

8.    Through HB9, New Mexico seeks to eliminate decades old voluntary agreements between localities and the Federal Government that are critical to federal immigration law enforcement and facilitate the cooperation envisioned by Congress's federal immigration system. HB9 and the SCPO go further to prevent federal law enforcement from using government property to fulfill the objectives of Congress. And the SCPO takes affirmative steps to provide aliens with safe harbor from federal law enforcement detection by requiring businesses to tip-off aliens of ongoing federal immigration activities, preventing certain public and private entities from voluntarily providing law enforcement access to certain property and records, and ordering the defiance of administrative warrants and detainers. Such blatant disregard for federal laws and voluntary agreements that have been in place for decades is not merely a political disagreement or passive abstention; it is deliberate, disruptive action that jeopardizes the public safety of all Americans, and violates the United States Constitution in several respects.

9.    First, HB9 and the SCPO violate long-settled principles of preemption embodied by the Supremacy Clause that bar state laws from conflicting with and standing as obstacles to the achievement of the goals and objectives of Congress. *See Arizona*, 567 U.S. at 399 ("state laws are preempted when they conflict with federal law" including "those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress[.]'") (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also Lopez*, 758 F.2d at 1392 ("Congress may entirely pre-empt state authority in immigration matters[.]").

10.    HB9 and the SCPO blatantly obstruct the accomplishment of the purposes and objectives of federal immigration law that are exclusively within the scope of Congressional authority by, for example, barring cooperation between the Federal Government and local governments in the enforcement of federal immigration laws, including by detaining aliens. *See Lopez*, 758 F.2d at 1392 ("This broad grant of authority [to regulate immigration matters] is exclusive to Congress."); 8 U.S.C. §§ 1103(a)(11)(B), 1231(g), 1357(g). States cannot ban civil immigration detention, yet that is exactly what HB9 and the SCPO seek to accomplish. *See CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325 (3d Cir. 2025); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022). Nor can they ban and thus defeat Congress's scheme for cooperative enforcement. *See City of N.Y. v. United States*, 179 F.3d 29, 35 (2d Cir. 1999); *Arizona*, 567 U.S. at 408–09. As stated by HB9 sponsor New Mexico Representative Eleanor Chavez "The Immigrant Safety Act is a straightforward bill. It gets New Mexico out of the business of immigration detention."[2] The SCPO further prevents certain public and private entities from voluntarily providing immigration law enforcement officials access to certain property and records and requires businesses to tip off aliens of ongoing immigration law enforcement activities, which has no legitimate purpose other than to harbor and conceal these aliens from detection by immigration authorities. *See* 8 U.S.C. § 1324(a). HB9 and the SCPO are preempted because they conflict with federal law by obstructing the achievement of the objectives of Congress expressed in the INA.

---

[2] Pat Davis, *Momentum builds in New Mexico legislature to ban ICE facilities statewide*, New Mexico Political Report (Jan. 28, 2026), https://nmpoliticalreport.com/2026/01/28/momentum-builds-in-new-mexico-legislature-to-ban-ice-facilities-statewide/

11.    Second, HB9 and the SCPO also violate long-settled principles of intergovernmental immunity embodied in the Supremacy Clause, under which States have no power to "in any manner control[] the operations of" the Federal Government. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819); *see also Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."). HB9 and SCPO seek to regulate the Federal Government by controlling the parties with whom the Federal Government may contract and the property and resources available to the Federal Government to perform the core government function of immigration enforcement and detention, despite express and unambiguous Congressional authorization to the contrary. The purpose and effect of these laws is to stop the Federal Government from detaining aliens and prevent the enforcement of immigration law, which is a central responsibility of the Federal Government.

12.    Third, the laws discriminate against the Federal Government because they explicitly regulate civil immigration detention and enforcement while simultaneously permitting law enforcement activity for other purposes. Civil immigration detention and enforcement are regulatory areas governed exclusively by federal law and enforced by the Federal Government. By applying solely to federal immigration enforcement activities, the laws single out federal law enforcement officers for worse treatment than state and local law enforcement officials performing other regulatory functions, including civil enforcement. For example, while contracts may not be formed between the Federal Government and localities for the purpose of civil immigration detention, no such prohibition exists for intergovernmental contracts for any other type of detention, including civil. While private businesses must tip off aliens of immigration enforcement activities and certain public and private entities cannot voluntarily provide immigration law enforcement officials access to property and records, no such notice or prevention of cooperation

is required of the same public and private entities in connection with other law enforcement activities. Put simply, no other law enforcement officials are subjected to the same discriminatory treatment as immigration law enforcement officials. As a result, HB9 and the SCPO unlawfully discriminate against the Federal Government in violation of the principles of intergovernmental immunity.

13.    Finally, HB9 violates the Contract Clause, which states "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]" U.S. Const. art. I, § 10, cl. 1. The Constitution prohibits states from passing laws that operate to impair contractual relationships, particularly if a state actor is a party, without advancing a significant and legitimate public purpose. *See Sveen v. Melin*, 584 U.S. 811, 819 (2018). Mandating that all public bodies terminate their existing cooperative agreements that facilitate the detention of aliens and enforcement of immigration law unequivocally amounts to impairment of those agreements. *See, e.g.*, *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247 (1978) ("the statute in question here nullifies express terms of the company's contractual obligations"). A blanket ban on agreements to detain violators of civil immigration law or to cooperate in the implementation and enforcement of federal immigration law, areas of law that the State of New Mexico has not historically regulated, does not advance any significant or legitimate public purpose. *See U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 29–32 (1977). And even if HB9 had a legitimate and significant public purpose, a wholesale ban requiring the unconditional termination of an agreement is not a reasonable condition "of a character appropriate to the public purpose justifying [the legislation's] adoption." *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 (1983) (quoting *U.S. Tr. Co.*, 431 U.S. at 22). Thus, HB9 violates the Contract Clause.

8

14. In sum, HB9 and the SCPO are preempted by the INA due to their obstruction of the achievement of Congress's federal immigration objectives, violate principles of intergovernmental immunity by unlawfully regulating and discriminating against the Federal Government, and violate the Contract Clause and Supremacy Clause of the Constitution.

15. Accordingly, the United States brings this action seeking a declaration that HB9 and the SCPO are unconstitutional and a preliminary and permanent injunction against the enforcement of HB9 and the SCPO.

## JURISDICTION AND VENUE

16. This action arises under Article I, Section 10, Clause 1 and Article VI, Clause 2 of the U.S. Constitution, and the INA. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

17. Venue is proper in under 28 U.S.C. §§ 1391(b)(1) and (b)(2) because all Defendants reside in the District of New Mexico, and the District of New Mexico is the judicial district in which a substantial part of the events or omissions giving rise to this action occurred. The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201, and 2202, the Supremacy Clause, the Contract Clause, and its inherent equitable powers.

18. The United States has standing to bring this lawsuit in accordance with the pre-enforcement standing principles articulated by the Tenth Circuit in *Rocky Mountain Gun Owners v. Polis* because (i) it "intend[s] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" and (ii) "there exists a credible threat of prosecution thereunder." 121 F.4th 96, 110 (10th Cir. 2024) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 160 (2014)). The United States actively enforces federal immigration law throughout the State of New Mexico and City of Albuquerque through its use of real property

and its agreements with local government entities concerning, for example, the detention of aliens; and (ii) the State of New Mexico and City of Albuquerque pose a credible threat of enforcement because they have not disavowed any intention of invoking either law against the United States. In fact, the State of New Mexico, through its Attorney General, has demonstrated an affirmative intent to enforce HB9 by petitioning the New Mexico Supreme Court for a writ of mandamus and stay to invalidate an Intergovernmental Services Agreement between Otero County, New Mexico and ICE concerning the civil immigration detention operations of the Otero County Processing Center. *See State of New Mexico ex re. Raul Torrez v. Bd. of Cnty. Comm'rs for Otero Cnty.*, S-1-SC-41362. These laws will terminate and prevent future cooperative contracts and severely hamper immigration enforcement in an important border state.

**PARTIES**

19.   Plaintiff, the United States of America, regulates immigration under its inherent, constitutional, and statutory authorities, and it enforces federal immigration laws through its Executive Branch agencies, including the Department of Justice, Department of State, and Department of Homeland Security ("DHS"), as well as DHS's component agencies ICE, CBP, and U.S. Citizenship and Immigration Services.

20.   Defendant State of New Mexico is a State of the United States.

21.   Defendant Michelle Lujan Grisham is the Governor of the State of New Mexico and is sued in her official capacity as the "[t]he supreme executive power of the state" and the officer tasked with "tak[ing] care that the laws be faithfully executed." N.M. Const. art. V, § 4. Governor Grisham "has control over" Attorney General Torrez "and, therefore, may direct whether and to what extent" HB9 is enforced. *Hernandez v. Grisham*, 499 F. Supp. 3d 1013, 1049 (D.N.M. 2020); *see Petrella v. Brownback*, 697 F.3d 1285, 1293–94 (10th Cir. 2012) ("It cannot seriously

be disputed that the proper vehicle for challenging the constitutionality of a state statute, where only prospective, non-monetary relief is sought, is an action against the state officials responsible for the enforcement of that statute. . . . Nor can it be disputed that the Governor and Attorney General of the state . . . have responsibility for the enforcement of the laws of the state.").

22.      Defendant Raul Torrez is the Attorney General of the State of New Mexico and is sued in his official capacity as the chief law enforcement officer of the State of New Mexico and the officer tasked with enforcement of state laws, including HB9. *See* HB9 § 5(A) ("The attorney general . . . may institute a civil action . . . if the attorney general . . . has reasonable cause to believe that a violation of the Immigrant Safety Act has occurred or to prevent a violation of that act from occurring."); N.M. Stat. Ann. § 8-5-2.

23.      Defendant City of Albuquerque is a city and political and geographical subdivision in the State of New Mexico.

24.      Defendant Timothy Keller is the Mayor of the City of Albuquerque and is sued in his official capacity as the director of the executive branch of the City of Albuquerque and the official tasked with the execution of all laws, ordinances, regulations, and regulations of the City of Albuquerque and State of New Mexico, including HB9 and the SCPO. *See* Charter of the City of Albuquerque, Art. V, §§ 3, 4(g); SCPO § 5-1-5(B).

### THE SUPREMACY CLAUSE, FEDERAL PREEMPTION, AND INTERGOVERNMENTAL IMMUNITY

25.      HB9 and the SCPO violate the principles embodied in Supremacy Clause because they obstruct the actions necessary to achieve the purposes and goals of federal immigration law, impose regulations on the Federal Government, and discriminate against the Federal Government.

**THE SUPREMACY CLAUSE**

26.     The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

27.     In *McCulloch v. Maryland*, the Supreme Court recognized that the Supremacy Clause restricts states from inhibiting the implementation of federal law, stating that "the States have no power, by taxation or otherwise, to retard, *impede, burden, or in any manner control*, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." 17 U.S. 316, 436 (1819) (emphasis added). "Because federal law is supreme, 'there is a plain repugnance' in letting states 'interfer[e] with or control[] the operations of the Federal Government.'" *CoreCivic*, 145 F.4th at 321 (quoting *McCulloch*, 17 U.S. at 431).

28.     Thus, legislation of a state or city is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67, "regulat[es] the United States directly," *United States v. Washington*, 596 U.S. 832, 838 (2022) (citation omitted), or "discriminate[s] against the United States or those with whom it deals." *South Carolina v. Baker*, 485 U.S. 505, 523 (1988). The Supremacy Clause incorporates both preemption and intergovernmental immunity.

29.     To implement federal law, federal law enforcement officers work throughout the entire country and are subject to the control of the Federal Government, not each individual state or locality. *See, e.g.*, 8 U.S.C. § 1103(a)(2) (giving the Secretary of DHS the power to "control, direct[], and supervis[e]" all DHS employees); 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department

[and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the DOJ in the Attorney General). Likewise, when it comes to liability, Federal law enforcement officers are subject to Federal law, not state law. *See, e.g.*, *Hernandez v. Mesa*, 589 U.S. 93, 101–102, 111 (2020) (explaining limited nature of Bivens and history leading to the Federal Tort Claims Act (FTCA) as the exclusive remedy for most claims against Government employees arising out of their official conduct).

## FEDERAL PREEMPTION

30. The preemption doctrine provides that federal interests overcome state interests when federal and state law "clash." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality); *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477–79 (2018). The Supreme Court has identified two general ways in which federal law can preempt state and local laws.

31. First, a federal statute can *expressly* preempt a state law when Congress includes express language within the federal statute indicating its preemptive intent. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). When Congress explicitly supersedes all state enactments in a particular area by statute, state enactments in that area are deemed expressly preempted. *See Pacific Gas & Elec. Co. v. State Energy Res. Conserv. & Develop. Comm'n*, 461 U.S. 190, 203–04 (1983); *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010) ("State laws are expressly preempted when they fall within the scope of a federal provision explicitly precluding state action."); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (finding express preemption where the federal law provided that "[N]o State . . . shall enact or enforce any law . . . relating to rates, routes, or services of any air carrier.").

32. Second, in the absence of express preemption, federal law can *impliedly* preempt state law when Congress's preemptive intent is implicit in the relevant federal law's structure and

purpose. State and local laws must yield to a federal statute when they are impliedly preempted. One form of implied preemption occurs when state or local laws conflict with a federal statute. *Crosby*, 530 U.S. at 372.

33.     A state or local law may conflict with a federal statute where the challenged law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *Crosby*, 530 U.S. at 372–73; *United States v. Locke*, 529 U.S. 89, 109 (2000); *Hines*, 312 U.S. at 67; *see Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995); *Edmondson*, 594 F.3d at 767 (If a state law "provision interferes with Congress' chosen methods" it "is thus conflict preempted."); *Kidneigh v. Unum Life Ins. Co. of Am.*, 345 F.3d 1182, 1185 (10th Cir. 2003); *cf. Savage v. Jones*, 225 U.S. 501, 533 (1912) ("If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power.").

## INTERGOVERNMENTAL IMMUNITY

34.     The Constitution's Supremacy Clause also embodies the doctrine of intergovernmental immunity, which "generally immunizes the Federal Government from state laws that directly regulate or discriminate against it." *Washington*, 596 U.S. at 835 (citing *Baker*, 485 U.S. at 523). A state enactment is invalid under principles of intergovernmental immunity if it "regulat[es] the United States directly or discriminat[es] against the Federal Government or those with whom it deals[.]" *Washington*, 596 U.S. at 838.

35.     The doctrine of intergovernmental immunity prohibits regulation by the states of the Federal Government. A state or city law violates this doctrine if it "regulates the United States directly . . ." *North Dakota*, 495 U.S. at 435; *CoreCivic*, 145 F.4th at 327 (stating that when state,

14

county, city, or other local governments "substantially interfer[e] with [the federal government's] operations," they "directly regulate[] the federal government[.]"); *Hancock v. Train*, 426 U.S. 167, 180 (1976) (State governments impermissibly regulate the Federal Government when "the State places a prohibition on the Federal Government."); *Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a state."). "If a state law directly regulates the conduct of the United States, it is void irrespective of whether the regulated activities are essential to federal functions or operations, and irrespective of the degree to which the state law interferes with federal functions or operations." *United States v. California*, 2026 WL 1088674, at *5 (9th Cir. Apr. 22, 2026).

36.    The doctrine of intergovernmental immunity also prevents discrimination against the Federal Government. "[P]reventing discrimination against the Federal Government lies at the heart of the Constitution's intergovernmental immunity doctrine." *Washington*, 596 U.S. at 841. Discrimination occurs when a state or city "treats someone else better than" the federal government or singles out the federal government for "less favorable 'treatment.'" *Id.* at 839. "Without the prohibition on discrimination, what prevents a State from imposing unduly high costs on the Federal Government for the benefit of the State's own citizens?" *Id.* at 841.

37.    These intergovernmental immunity principles against regulation and discrimination operate even in the absence of a specific conflicting federal law, ensuring that "federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993), *aff'd*, 54 F.3d 825 (D.C. Cir. 1995) (citing *In Re Neagle*, 135 U.S. 1, 10 (1890)).

**THE CONTRACT CLAUSE**

38.     The Contract Clause prohibits states from enacting legislation that disrupts contractual arrangements, providing that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. Art. I, § 10, cl. 1; *see also* N.M. Const. art. II, § 19 ("[n]o . . . law impairing the obligation of contracts shall be enacted by the legislature."). The Contract Clause seeks to protect contracts from interference by "the fluctuating policy" enacted by temporary legislative majorities and to "banish speculations on public measures, inspire a general prudence and industry, and give a regular course to the business of society." The Federalist No. 44 (James Madison).

39.     The Contract Clause "applies to any kind of contract" and "restricts the power of States to disrupt contractual arrangements." *Sveen*, 584 U.S. at 818. State legislation violates the Contract Clause if it substantially impairs a contractual relationship and is not an appropriate or reasonable way to advance a significant and legitimate public purpose. *Id.* at 819 (quoting *Energy Rsrvs.*, 459 U.S. at 411–412). "The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Energy Rsrvs.*, 459 U.S. at 411.

40.     "When a state actor is a party to a contract at issue, typically courts have determined such legislation is subject to 'stricter scrutiny.'" *A.L. v. Martin*, No. 23-CV-127-WJ-SCY, 2023 WL 7279318, at *4 (D.N.M. Nov. 3, 2023) (citation omitted); *see U.S. Tr. Co.*, 431 U.S. at 26 ("complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. . . . If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all."). Under this stricter standard, if the legislation has a sufficient public purpose, "the next inquiry is whether the adjustment of 'the rights and

16

responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *Energy Rsrvs.*, 459 U.S. at 412 (quoting *U.S. Tr. Co.*, 431 U.S. at 22).

### FEDERAL IMMIGRATION LAW AND ENFORCEMENT

41.    As an independent sovereign, the United States has broad inherent authority to conduct relations with foreign nations, establish immigration laws, maintain control over its borders, and ensure the safety and flourishing of its citizens. *See generally Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893); *Ping v. United States*, 130 U.S. 581, 603–04 (1889); *Landon v. Plasencia*, 459 U.S. 21, 34 (1982); *Arizona*, 567 U.S. at 394–95; *North Dakota*, 495 U.S. at 435; *id.* at 444–47 (Scalia, J., concurring); *Tayyari v. New Mexico State Univ.*, 495 F. Supp. 1365, 1377 (D.N.M. 1980) ("federal power over foreign affairs, including the power to regulate immigration, is an inherent one which antedated the Constitution").

42.    The Constitution also explicitly grants Congress the power to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3. It also grants the President the authority to "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3.

43.    Based on its enumerated constitutional and sovereign powers to control and conduct relations with foreign nations, "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens," *Arizona*, 567 U.S. at 394, and an inherent obligation and broad authority to establish immigration laws, *see Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952).

44.    Congress has exercised its broad authority to make laws governing the entry, presence, status, detention, and removal of aliens within the United States by enacting an

"extensive and complex" statutory scheme for the "governance of immigration and alien status," as reflected in the various provisions of the INA. *See Arizona*, 567 U.S. at 395. Through the INA, Congress established a regulatory scheme granting the Executive the authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1224, 1225, 1226, 1227, 1228, and 1231.

45.    Taken together, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. Indeed, "the Supreme Court has 'repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." *Lopez*, 758 F.2d at 1392 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)).

46.    The States cannot obstruct or take discriminatory action against the execution of those laws, *see Arizona*, 567 U.S. at 394–95; *North Dakota*, 495 U.S. at 435; *id.* at 444–47 (Scalia, J., concurring), as only the Federal Government maintains the authority to grant an alien the privilege to enter our nation and controls the terms and conditions of such privilege. *See U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950); *Lopez*, 758 F.2d at 1392 ("This broad grant of authority is exclusive to Congress."); *Tayyari*, 495 F. Supp. at 1376 (discussing "the superior right of the federal government to exercise exclusive power and control over aliens and to dictate foreign policy without interference from the states.").

47.    DHS is authorized to inspect all applicants for admission and take appropriate action against inadmissible aliens, even ones who are transferred to State or local custody pending prosecution. *See* 8 U.S.C. §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. And ICE is authorized "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United

States." 8 U.S.C. § 1357(a)(1). Any state law or policy that prevents federal law enforcement from such inspection or interrogation stands as an obstacle to ICE's statutory and regulatory mandate.

48.     Moreover, because immigration control and management is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program," *Shaughnessy*, 338 U.S. at 543 (internal citations omitted), Congress vested substantial discretion in the President of the United States and the administering federal agencies to adjust the balance of these multiple interests as appropriate—both globally and in individual cases. For example, the Secretary of DHS is vested with the power to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the [INA]." 8 U.S.C. § 1103(a)(3).

49.     Although the Federal Government possesses broad power over immigration, enforcing immigration laws is a formidable challenge with significant complexities. To meet that challenge, Congress recognized that cooperation with state and local law enforcement is *essential* to enable the Federal Government to implement the INA. As a result, Congress codified basic principles of cooperation and comity between state and local authorities and the Federal Government. *See, e.g.*, 8 U.S.C. § 1226(d). The Federal Government regularly works with state and local governments to achieve Congress's stated immigration objectives.

50.     As the Supreme Court acknowledged, "[c]onsultation between Federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. Absent any cooperation at all from "local officials," the immigration system—like other federal programs— "may fail or fall short of [its] goals[.]" *City of NY v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

51.    Cooperative efforts between Federal officials and state and local officials are critical to enabling the Federal Government to identify, process for removal, and thereafter remove the hundreds of thousands of aliens who violate immigration (and other) laws each year.

52.    To facilitate the enforcement of federal immigration law, Congress authorized states and localities to "cooperate with the [Federal Government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B).

53.    Cooperating allows ICE to take into custody aliens convicted of crimes after the completion of their criminal sentence and to detain other aliens pending removal proceedings. *Id.* §§ 1225(b)(2)(A), 1226(c); *see id.* § 1231. And federal authorities must "make available" to state, county, city, and other local authorities "investigative resources … to determine whether individuals arrested by such authorities for aggravated felonies are aliens[.]" 8 U.S.C. § 1226(d)(1)(A). Likewise, federal officials must also "designate and train officers and employees … to serve as a liaison to" state, county, city, and other local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B); *see id.* §§ 1226(c), 1231(a). Congress further sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii).

54.    Cooperation is a key component of the decision Congress made to permit states and localities to impose criminal punishment on an alien, and to have an alien serve that punishment, before the alien is removed from the country. *See* 8 U.S.C. § 1231(a)(1)(B)(iii) (providing that the

20

removal period does not begin until an alien in state custody is "released from detention or confinement").

55.     Courts have recognized, moreover, that ICE may avail itself of publicly owned property for the purpose of carrying out its statutorily assigned mission. *See, e.g.*, *United States v. King Cnty., Wash.*, 122 F.4th 740, 758 (9th Cir. 2024) ("Requiring this form of non-discriminatory access to [public] property consistent with the intergovernmental immunity doctrine does not create a back-end anti-commandeering problem. [The court] would not perceive a threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways.").

56.     Federal law contemplates and authorizes these cooperative efforts in service of the interests of the Federal Government, states and localities, and the American public. Because the Federal Government has a regulatory relationship with all aliens within the United States, its grant of permission to states and localities to pursue their criminal-enforcement interests does not affect the Federal Government's ultimate authority over criminal aliens. *Cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).

57.     To cement the cooperative spirit of the INA and to facilitate the achievement of Congress's immigration goals, Congress expressly authorized state and federal officials to enter into agreements whereby state officials are given the powers of federal immigration officials to assist in the enforcement of federal immigration law. "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer," a "principal example" of which is "when the Attorney General has granted that authority to specific officers in a formal agreement with a state or local government." *Arizona*, 567 U.S. at 408–09 (citing 8 U.S.C. § 1357(g)); *see also United States v. Alas*, 63 F.4th 269, 274 (4th Cir. 2023).

21

58.    Section 287(g) of the INA specifically provides that "the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1); *see also id.* § 1231(i)(1)(A).

59.    Congress added Section 287(g) to the INA as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). Pub. L. No. 104-208, div. C, sec. 113, 110 Stat. 3009, 3009–546 (1996). The law was designed to "strengthen[] the rule of law by cracking down on illegal immigration at the border, in the workplace, and in the criminal justice system— without punishing those living in the United States legally." President William J. Clinton, *Statement on Signing the Omnibus Appropriations Act*, 1996 U.S.C.C.A.N. 3388, 3391 (Sept. 30, 1996); *see* H.R. Rep. 104-828 (Sept. 24, 1996) (Conf. Rep.) (describing IIRIRA as a bill "to improve deterrence of illegal immigration to the United States" and "to reform the legal immigration system").

60.    Pursuant to Section 287(g) agreements, qualified state and local officers designated by the Secretary of Homeland Security[3] may perform specified immigration-enforcement functions relating to investigating, apprehending, and detaining aliens. 8 U.S.C. § 1357(g)(1)–(9). Section 287(g) requires that the specified officers "have knowledge of, and adhere to, Federal law"

---

[3] Following the Homeland Security Act of 2002, many references in the INA to the "Attorney General" are now read to mean the Secretary of DHS. *See Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

relating to immigration enforcement and that they receive "adequate training regarding the enforcement of relevant Federal immigration laws." 8 U.S.C. § 1357(g)(2); *see also Alas*, 63 F.4th at 274; *Arizona*, 567 U.S. at 409 (citing § 1357(g)(2); 8 CFR §287.5(c) (arrest power contingent on training), *id.* § 287.1(g) (defining the training)).

61.     "In short, Section 287(g) 'permits ICE to deputize local law enforcement officers to perform immigration enforcement activities pursuant to a written agreement,' and 'ICE trains the local law enforcement officers who participate.'" *Alas*, 63 F.4th at 274 (quoting *United States v. Sosa-Carabantes*, 561 F.3d 256, 257 (4th Cir. 2009)); *see id.* at 275 (describing § 287(g) agreement as "crafted to ensure that each HCSO officer or employee tasked with enforcing Federal immigration law is well-trained, tested, and certified.").

62.     Such cooperation occurs under color of Federal authority, not state authority: "An officer or employee of a State or political subdivision of a State acting under color of authority under this subsection, or any agreement entered into under this subsection, shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law." 8 U.S.C. § 1357(g)(8). Section 1357(g)(1) thus grants local officers the powers and immunities of Federal immigration officials.

63.     Congress also authorized "cooperative agreement[s]" between States and the Federal Government necessary to detain aliens. *See* 8 U.S.C. § 1103(a)(11)(B) ("The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized- to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any

State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service.").

64.     Federal law further contemplates the detention of aliens during removal proceedings. *See* 8 U.S.C. §§ 1226(a) ("[A]n alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."), (c), 1231(a)(2) ("During the removal period, the [Secretary of DHS] shall detain the alien."), (g) ("The [Secretary of DHS] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal.").

65.     Congress vested the Federal Government with broad and exclusive discretion to determine the manner and location of immigration detention, including by authorizing the Executive Branch to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," and, when federal facilities are unavailable to "expend . . . amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities . . . necessary for detention." 8 U.S.C. § 1231(g)(1), *see id.* § 1231(g)(2) (before constructing a facility, DHS shall "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for [detention].").

66.     Congress thus expressly contemplated and approved the use of voluntary agreements to implement federal immigration detention operations.

67.     To facilitate the federal immigration enforcement scheme, Congress directed that a state, county, city, or other local government official or agency may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* § 1644 (same); *see also id.* § 1357(g)(10)(A) (providing for state, county, city,

24

and other local "communicat[ion] with [DHS] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States").

68. Likewise, "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from," among other things, "[m]aintaining" "information regarding the immigration status, lawful or unlawful, of any individual," or "[e]xchanging such information with any other Federal, State, or local government entity." *Id.* § 1373(b).

69. Congress passed § 1373 to fix a specific problem, after it observed "certain states and localities were restricting their officials' cooperation with federal immigration authorities." *New York v. U.S. Dep't of Justice*, 951 F.3d 84, 96 (2d Cir. 2020); *see City of NY*, 179 F.3d at 35. Thus, in enacting Section 1373, "Congress sought to give state and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary." *New York*, 951 F.3d at 97 (citations omitted).

## FACTUAL BACKGROUND

### THE STATE OF NEW MEXICO AND HB9

70. Governor Michelle Lujan Grisham signed HB9 into law on February 5, 2026. HB9 will go into effect 90 days after the Legislature adjourns, currently scheduled for May 20, 2026.

71. HB9 applies to "public bodies," which is defined expansively to include "a state or local government, a sheriff's department, an advisory board, a commission, an agency or an entity created by the constitution of New Mexico or any branch of government that receives public funding, including political subdivisions, special tax districts, school districts and institutions of higher education" as well as "an entity or individual acting on behalf of or within the scope of the authority of the public body." HB9 § 2.

72.    HB9 concerns three types of agreements. First, it applies to agreements "to detain individuals for federal civil immigration violations, including an intergovernmental services agreement to detain individuals for civil immigration violations." HB9 §§ 3(A), (B). Second, it applies to agreements "to investigate, apprehend, detain or transport individuals pursuant to 8 U.S.C. Section 1357(g) or 8 C.F.R. Section 287.7" HB9 §§ 4(A), (C). Third, it applies to agreements "that deputize[] officers, employees or agents of the public body to perform a function of an immigration officer in relation to the investigation, apprehension, detention or transportation of noncitizens in the United States or the removal of noncitizens from the United States." *Id.* § 4(B).

73.    HB9 prevents public bodies from forming new, or extending existing, agreements for any of these federal immigration enforcement purposes, stating that "[a] public body shall not enter into, extend, renew or otherwise agree to be a party" to any type of agreement. HB9 §§ 3(A), 4(A); *see id.* § 4(B) ("A public body shall not agree to be a party to an agreement . . .").

74.    HB9 also requires the termination of existing agreements, stating that "[a] public body that is a party to an existing agreement . . . shall . . . terminate the agreement upon the earliest date permissible under the terms of the agreement" and requires public bodies to "invoke exigent circumstances" to affect such termination. HB9 § 4(C); *see id.* §§ 3(A) ("A public body shall not enter into, extend, renew or otherwise agree to a rider, amendment, supplement or other modification to an agreement . . ."), (B) ("A public body that is a party to an existing agreement . . . shall . . . terminate the agreement upon the earliest date permissible under the terms of the agreement, with respect to all provisions that relate to the detention of individuals for federal civil immigration violations.").

75.     In addition to the restrictions placed on a public body's ability to form a contract for federal immigration enforcement purposes, HB9 imposes restrictions on the real property of public bodies by preventing them from allowing their property to be used to detain aliens for civil immigration violations, stating that "[a] public body shall not sell, trade, lease or otherwise dispose of any real property to be used for the detention of individuals for federal civil immigration violations." HB9 § 3(C).

76.     Yet, HB9 does not "limit the ability of law enforcement personnel to detain individuals or to perform brief investigative stops as permitted by state law." HB9 § 3(E).

77.     HB9 is enforceable by "[t]he attorney general or a district attorney" who are empowered to "institute a civil action in a district court if" they have "reasonable cause to believe that a violation of [HB9] has occurred or to prevent a violation of [HB9] from occurring." *Id.* § 5(A). In such case, the district court "may award appropriate relief . . . to include declaratory and temporary, preliminary or permanent injunctive relief." *Id.* § 5(B).

### THE CITY OF ALBUQUERQUE AND THE SCPO

78.     On March 23, 2026, Albuquerque Mayor Timothy Keller signed the SCPO. On March 25, 2026, the SCPO was published and on March 30, 2026, it became effective. *See* SCPO, § 13-17-7(5).

79.     The SCPO broadly prohibits the use of Albuquerque property for federal immigration enforcement purposes, stating "[n]o City-owned and operated structure or venue . . . shall be used for immigration enforcement purposes, including as a staging area, processing location, or operations base." SCPO § 1-5-1(A). The term "staging area" is defined as "an area that is used to assemble, mobilize, and deploy vehicles, equipment, or materials, and related personnel, for the purpose of carrying out immigration enforcement." *Id.* § 1-5-1(A); *see also id.* § 1-5-1(B)(6)

27

(restricting use of certain "resources to be used for immigration enforcement" on non-City property).

80.    To enforce this prohibition, the SCPO requires the "identif[ication of] City-owned and controlled structure[s] or venue[s] . . . that either have been used, or are likely to be used in the future, as a staging area, processing location, or operations base for the purpose of immigration enforcement" and demands that such areas have posted signs stating that they "may not be used for immigration enforcement" and that such areas be physically "secured . . . by means including, but not limited to, locked gates or barriers." *Id.* §§ 1-5-1(B)(1)–(2). Further, City employees are required to report "the attempted or actual use" of such properties "to their supervisor, who will communicate with the Mayor and the City Attorney." *Id.* § 1-5-1(B)(3).

81.    The SCPO additionally bars the approval of "any permit, contract or other agreement for use of City owned or controlled property or resources if . . . the property or resources will be used for the purposes of facilitating immigration enforcement." *Id.* § 5-1-5(B)(4).

82.    The SCPO restricts the "use" of "any City resources, including, but not limited to, moneys, equipment, personnel, vehicles, or facilities . . . to be used to transport individuals for immigration enforcement purposes," and prohibits the use of "City property or resources" to "be used to facilitate custody transfer or transport to federal immigration authorities absent a valid judicial warrant or court order." *Id.* § 5-1-5(B)(5); *see id.* § 5-1-5(B)(6).

83.    The SCPO also prohibits certain public and private entities "from providing voluntary consent to law enforcement agents engaged in or supporting immigration enforcement from: (1) Entering non-public areas; or (2) Accessing, reviewing, or obtaining student or patient records." *Id.* § 13-17-4(A)(1), (2).

84.    The SCPO further contains a tip-off requirement that "businesses . . . provide notice to all current employees, contractors, and others performing work for the employer for remuneration . . . within 24 hours of a law enforcement agent engaging in or supporting immigration enforcement being present at a place of work[,]" which notice includes the name of the agency, date the actor was present, and the nature of the actor's actions. *See id.* §§ 13-7-6(C)(1).

## THE OTERO-ICE CONTRACT

85.    For nearly two decades, since 2008, Otero County has arranged for the housing of aliens and provision of related civil immigration detention services to ICE through its operation of the Otero County Processing Center ("OCPC") pursuant to the terms of successive Intergovernmental Service Agreements ("IGSAs") with ICE. In that time, multiple Attorneys General and other officials have blessed the IGSAs, as well as agreements between Otero County and Management and Training Corporation ("MTC"), a private entity that manages and operates the OCPC.

86.    Thanks to the performance of the IGSAs, and consequent operation of the OCPC, ICE has benefited from access to a fully secure 1,096 bed facility that houses male and female detainees. The OCPC is critical to ICE's civil immigration operations, as it is geographically situated near the El Paso ERO Field Office, multiple Ports of Entry (e.g., OCPC is approximately 21 miles away from Ysleta, 24 miles away from Americas, 42 miles from Tornillo, and 46 miles from Santa Teresa), major highways, and an international airport. OCPC is also the only civil immigration detention facility in New Mexico that can accommodate female detainees and higher risk individuals. Moreover, it is consistently one of the best facilities with the most staff, best conditions, and track records for safely and humanely handling detainees.

87.     The most recent IGSA became effective on March 16, 2026 ("Otero-ICE Contract") (Exhibit C). Under the terms of the Otero-ICE Contract, Otero County is to house ICE detainees and perform related detention services, including 1,096 adult male and female beds. The Otero-ICE Contract is effective for 60 months unless extended by the parties.

88.     To operate, manage, and maintain the OCPC, Otero County engages the MTC pursuant to the terms of the related Operations, Management, and Maintenance Agreement ("Otero-MTC Contract") (Exhibit D). Without the Otero-MTC Contract, Otero County would not be able to fulfill its obligations under the Otero-ICE Contract.

### HB9 AND THE SCPO ARE PREEMPTED BY FEDERAL IMMIGRATION LAW

89.     HB9 and the SCPO are preempted by the INA because they conflict with federal immigration law and stand as an obstacle to the achievement of Congress's immigration goals and objectives. HB9 and the SCPO impede the access to property and cooperation between local law enforcement and federal immigration authorities necessary to enforce federal immigration law. "Such interference with the discretion that federal law delegates to federal officials goes to the heart of obstacle preemption." *Geo Grp.*, 50 F.4th at 762. Consequently, the laws are preempted by federal law in numerous respects.

90.     First, HB9 and the SCPO prevent the Federal Government from entering into agreements with local entities to facilitate the detention of aliens and the enforcement of federal immigration law. *See* HB9 §§ 3(A)–(C), 4(A)–(C); SCPO 5-1-5(B)(4). As explained *supra*, Congress created a comprehensive immigration system that contemplated cooperation between the Federal Government and states and localities to ensure uniform enforcement of federal law. *See* 8 U.S.C. § 1357(g). Congress also authorized the formation of agreements with localities to facilitate the detention of violators of civil immigration law. *See* 8 U.S.C. § 1103(a)(11)(B); 1231(g). While

30

states and localities are permitted to choose to work with federal immigration enforcement authorities under this scheme, states are not permitted to hamper federal immigration enforcement efforts, including efforts to accomplish Congress's comprehensive detention goals. *See generally, e.g.*, 8 U.S.C. §§ 1231(a)(2)(A), (g), 1226(a)(1), (b), (c).

91.     If the Otero County detention agreement is terminated or cannot be extended, DHS will have extremely limited capacity within the state to detain illegal aliens. It will also lose a high-quality facility in the state, the one closest to the border in New Mexico, and the only one that can detain women and high-risk individuals. This will require DHS to transfer aliens to facilities in other states, sometimes hundreds of miles away. Transferring these detainees and having the transport new detainees to far flung facilities will significantly hamper the ability of DHS to enforce immigration law within New Mexico. Thus, banning all detention agreements for immigration detention with public bodies thus creates a significant impediment to the enforcement of immigration laws and defeats the flexibility of Congress's cooperative detention scheme.

92.     Part of Congress's immigration enforcement scheme envisioned the formation of Section 287(g) agreements so that state and local officers could assist with national immigration enforcement initiatives under the direction of the Federal Government. Such assistance includes transferring detainees, serving warrants, determining immigration status, or working as part of a task force. *See* 8 U.S.C. § 1357(g). Indeed, that model was discussed in *Arizona*, in which the Supreme Court rejected the State of Arizona's attempt to alter the federal immigration scheme by providing greater immigration enforcement authorities to its officers than Congress envisioned, without Federal oversight. The Court explained that "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer" and one such

31

circumstances is when "the Attorney General has granted that authority to specific officers in a formal agreement with a state or local government." *Arizona*, 567 U.S. at 408 (citing § 1357(g)).

93.    Despite Congress's comprehensive federal immigration enforcement scheme and stated intent that states and localities have the ability to enter into such agreements, HB9 does not permit *any* agreements to facilitate immigration enforcement, whether currently existing or existing in the future. The SCPO further bars any permit, contract, or other agreement for the use of Albuquerque property or resources to be "used for the purposes of facilitating immigration enforcement." SCPO § 5-1-5(B)(5). HB9 and the SCPO thus pose an obstacle to the goals and objectives of federal law by preventing cooperation between localities and the Federal Government that are specifically contemplated by Congress. *See* 8 U.S.C. § 1357(g)(2); *see also Alas*, 63 F.4th at 274; *Arizona*, 567 U.S. at 409.

94.    Congress wanted local law enforcements to voluntarily cooperate with DHS in the enforcement of immigration laws through 287(g) agreements. By terminating the existing agreement with Curry County and preventing future ones, New Mexico has made it impossible to deputize local law enforcement to help enforce federal law in their communities where they are most trusted. This adds a significant strain on resources and the ability to enforce the law while effectively destroying Congress cooperative scheme.

95.    Second, the SCPO prohibits the use of real property for immigration enforcement purposes, including detention of aliens who violate federal immigration law. *See* SCPO §§ 5-1-5(A), (B), 13-17-4(A)(1). As explained *supra*, Congress enacted a statutory scheme that requires the detention of aliens for federal civil immigration violations and specifically authorized the Federal Government to agree with local government entities to provide detention services. *See* 8 U.S.C. §§ 1101(a)(11)(B), (b), 1226(a), (c), 1231(a)(2), (g). By prohibiting real property to be used

for purposes of federal civil immigration detention, the SCPO poses an obstacle to the enforcement of federal immigration law.

96.    Third, the SCPO requires "a valid judicial warrant or court order" to justify the use of Albuquerque resources "to transport individuals for immigration enforcement purposes" or "to facilitate custody transfer or transport to federal immigration authorities." SCPO § 5-1-5(B)(5). The SCPO further requires "a valid judicial warrant . . . or a valid judicial subpoena or judicial order" to permit certain public and private entities to provide "voluntary consent to law enforcement agents engaged in or supporting immigration enforcement" to "[e]nter non-public areas" or "[a]ccess[], review[], or obtain[] student or patient records." *Id.* § 5-1-5(A). As explained *supra*, Congress specifically contemplated that the Federal Government and state and local governments would share information, coordinate, and cooperate concerning the transfer of removable aliens in state custody to federal custody. *See* 8 U.S.C. §§ 1226(c), (d)(1), 1231(a)(1)(B)(iii), (a)(4), 1357(g). Further, Congress authorized the Federal Government to use administrative warrants and similar requests to obtain access to aliens and related information while in state custody. *See* 8 U.S.C. §§ 1103(a)(3), 1225(d)(4), 1226(a), 1231(a), 1357(a), (c), (d), 8 C.F.R. § 287.7(a). Congress even sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." 8 U.S.C. § 1324(a)(1)(A)(iii). By requiring judicial warrants, subpoenas, and orders to compel compliance with Congress's immigration enforcement objectives, the SCPO is preempted by federal law.

97.    Fourth, the SCPO compels private businesses to notify aliens "[i]f a law enforcement agent engaging in or supporting immigration enforcement is present at a place of

work" by providing, within 24 hours, the name of the immigration enforcement agency, date of the immigration enforcement activities, and nature of the immigration enforcement activities. *See* SCPO § 13-17-6(C). By requiring businesses to tip off aliens as to immigration enforcement activities, the SCPO attempts to harbor and shield aliens from detection by federal immigration authorities and poses an obstacle to the enforcement of federal immigration law the enforcement of federal law. *See* 8 U.S.C. § 1324(a)(1)(A). As a result, it is preempted.

## HB9 AND THE SCPO VIOLATE THE PRINCIPLES OF INTERGOVERNMENTAL IMMUNITY

98.     HB9 and the SCPO also violate principles of intergovernmental immunity because they seek to regulate and discriminate against the Federal Government.

## HB9 AND THE SCPO UNLAWFULLY REGULATE THE FEDERAL GOVERNMENT

99.     HB9 seeks to directly regulate the Federal Government by controlling the potential entities with whom the Federal Government may form voluntary agreements to perform the core government function of enforcing civil immigration law, including Section 287(g) agreements and detention agreements. *See CoreCivic*, 145 F.4th at 319 (state "law with the 'intent' to forbid new contracts for civil immigration detention" was considered unlawful regulation of the Federal Government because it "interfere[d] with the federal government's core power to enforce immigration laws."); *see also Geo Grp.*, 50 F.4th at 757 (state law that "would give California the power to control ICE's immigration detention operations in the state by preventing ICE from hiring the personnel of its choice" deemed impermissible regulation of the Federal Government). While federal law authorizes the formation of agreements with state and local entities to assist in the enforcement of federal immigration law, the State of New Mexico seeks to limit and narrow the entities available to assist the Federal Government with the enforcement of federal immigration law. HB9 removes potential entities from the pool of entities with whom the Federal Government

34

may form cooperative agreements. *See CoreCivic*, 145 F.4th at 325 ("The law prevents the federal government from choosing how and through whom it will carry out a core federal function."). The elimination of potential counterparties to agreements that Congress specifically authorized and contemplated as part of the cooperative civil immigration enforcement scheme amounts to regulation of the Federal Government, as it imposes conditions upon the Federal Government (i.e., limits and controls the state and local entities with which the Federal Government may contract) that are inconsistent with federal immigration law or Congressional intent. *See id.* ("Only the federal government has the power to decide whether, how, and why to hold aliens for violating immigration law. It alone has the power to make these contracts in the first place."). Congress did not enact a law that stated "the Federal Government may contract with state and local governments to enforce federal immigration law, except state and local governments within New Mexico." By adding this limitation to federal law, the State of New Mexico seeks to regulate the Federal Government in a manner that conflicts with express congressional intent, which does not limit the Federal Government in this respect. *See id.* at 326 ("this ban is in substance a direct regulation; it destroys the federal government's marketplace."); *id.* ("it directly regulates the federal government by telling it how to carry out a core function. It is a direct regulation in everything but name."); *see also id.* at 327 ("the law directly regulates the federal government twice over by substantially interfering with its operations.").

100. HB9 and the SCPO also regulate the Federal Government by controlling the property that the Federal Government may use to perform its immigration enforcement operations. While Congress authorized the Federal Government to cooperate with state and local governmental entities to enforce federal immigration law, including by using real property to detain aliens, New Mexico and Albuquerque seek to limit and control the real property available to the

Federal Government to implement federal immigration law and to require judicial warrants to access property when Congress authorized the use of administrative warrants. HB9 and the SCPO also regulate the Federal Government by controlling the personnel available to the Federal Government to enforce federal immigration law. *See* HB9 §§ 4(A)–(C); [SCPO PROVISIONS RE/ USE OF RESOURCES]. This amounts to unlawful regulation of the Federal Government in violation of the principles of intergovernmental immunity.

**HB9 AND THE SCPO DISCRIMINATE AGAINST THE FEDERAL GOVERNMENT**

101.    The challenged laws also unlawfully discriminate against the Federal Government by applying solely to the area of civil immigration enforcement, which is a core federal governmental function by nature, while simultaneously permitting the same law enforcement activities for other purposes. State and local governments throughout New Mexico are not barred from forming agreements to facilitate the detention of individuals for non-immigration purposes and with other entities. Indeed, Otero County has another facility next door that detains individuals on behalf of other local and state entities. HB9 does not affect those arrangements. Chapter 11 of the New Mexico Statutes expressly pertains to Intergovernmental Agreements and Authorities. *See* N.M. Stat. Ann. §§ 1-1-1–11-20-4. In fact, New Mexico law specifically provides that "[i]f authorized by their legislative or other governing bodies, two or more public agencies by agreement may jointly exercise any power common to the contracting parties, even though one or more of the contracting parties may be located outside this state" assuming certain conditions are satisfied. N.M. Stat. Ann. § 11-1-3. Similarly, local law enforcement entities such as the Curry County Sherriff can and do enter into Memoranda of Understanding with other state and local law enforcement to assist with warrants, arrests, information sharing, and detention. They can even do

so for civil matters. MOUs are common between New Mexico Counties and local entities for various law enforcement purposes.

102. Yet state and local governments are strictly barred from forming agreements with the Federal Government for purposes of immigration detention and other immigration enforcement initiatives. The same is true for agreements between local government entities and the Federal Government to use property and to cooperate with federal immigration enforcement initiatives, as local government entities can form agreements to use property and cooperate with other law enforcement initiatives without violating HB9 or the SCPO, while forming the same agreements to facilitate federal immigration law enforcement is prohibited. Indeed, nothing about HB9 or the SCPO would bar New Mexico or Albuquerque law enforcement agencies from contracting with private entities to use a prison for civil detention purposes unrelated to immigration, yet DHS is barred from contracting with New Mexico governmental entities to use detention facilities for civil immigration detention purposes.

103. HB9 specifically singles out federal civil immigration enforcement officers for treatment worse than state and local law enforcement officers by permitting agreements and the use of property for detention and state law enforcement purposes not involving federal immigration detention, adding that "[n]othing in this section shall be construed to limit the ability of law enforcement personnel to detain individuals or to perform brief investigative stops *as permitted by state law*." HB9 at § 3(E) (emphasis added). By including a carveout that permits detention and investigation for purposes of state law, HB9 embodies New Mexico's intent to limit law enforcement detention authority in a manner that applies solely to federal immigration law enforcement officials, while permitting detention and investigation for comparable state law purposes.

104.    The Federal Government is the sole entity that is tasked with the enforcement of federal immigration law. Among the enforcement mechanisms authorized by Congress are the formation of cooperative agreements between state and local entities and the Federal Government concerning the enforcement of immigration law. By requiring the immediate termination of these agreements and barring all future agreements, and while allowing agreements of other kinds between governmental entities to achieve other goals, HB9 unlawfully discriminates against the Federal Government.

105.    The SCPO discriminates against the Federal Government by requiring businesses to notify aliens of federal immigration enforcement operations, while allowing other law enforcement operations to proceed without any notice. This includes state and local criminal enforcement operations and even civil enforcement, such as regulatory actions. The SCPO thus singles out the Federal Government for significantly worse treatment when conducting federal immigration enforcement activities, as private businesses are not required to tip off employees as to other law enforcement activities. The SCPO further discriminates against the Federal Government by permitting certain public and private entities to voluntarily cooperate with law enforcement officials through the provision of access to property and certain records but denies the same public and private entities the right to provide the same voluntary access to immigration law enforcement officials absent a judicial warrant, subpoena, or order. As a result, the SCPO unlawfully discriminates against the Federal Government, in violation of the principles of intergovernmental immunity.

## HB9 VIOLATES THE CONTRACT CLAUSE

106.    HB9 requires local government entities to terminate their existing agreements that are intended to facilitate the detention of aliens who violate federal immigration law and to

facilitate the enforcement of federal immigration law. *See* HB9 §§ 3(B), 4(C). By doing so, instead of permitting the parties to continue to perform their mutually beneficial bargained-for obligations or entering into modifications, extensions, or renewals of existing agreements, HB9 unequivocally impairs existing agreements between county governments, the Federal Government, and other entities made to detain aliens and otherwise enforce federal immigration law.

107.    The Federal Government has relied to its detriment in performing and arranging to perform under the mutually beneficial promises made in its agreements to ensure that federal immigration law will be enforced and aliens who violate federal immigration law will be detained in a manner consistent with Congress's statutory scheme and goals. If HB9 is permitted to take effect, the termination of existing agreements intended to further federal immigration enforcement purposes would cause significant financial losses and impose significant operational burdens on the Federal Government.

108.    Moreover, HB9 requires the termination of existing agreements without a legitimate or significant public purpose, let alone a public purpose sufficient to overcome the imposition of the most severe impairment possible on the existing agreements between the Federal Government, county governments, and other entities.

109.    While HB9 does not profess any purported purpose, statements made by New Mexico state legislators make clear that HB9 is intended to eliminate civil immigration detention in New Mexico and to obstruct cooperation between state and federal authorities enforcing federal immigration law. Specifically, New Mexico Representative Eleanor Chavez, a co-sponsor of HB9, expanded on the purpose of HB9, stating that HB9 "is a straightforward bill. It gets New Mexico

out of the business of immigration detention."[4] Governor Michelle Lujan Grisham's Director of Communications also elaborated on the purpose of HB9, stating that "Gov. Lujan Grisham wants to ensure New Mexico will not be complicit in discriminatory mass immigration enforcement . . ."[5]

110.    Preventing public bodies from continuing to perform under decades-old voluntary agreements that are consistent with, and specifically authorized by, federal law does not advance any significant nor legitimate public purpose. *See* 8 U.S.C. §§ 1357(g), 1103(a)(11)(B). And even if HB9 had a significant and legitimate public purpose, that purpose is not a sufficiently significant or legitimate purpose to justify the severe impairment (i.e., forced termination) of existing agreements with the Federal Government that the federal government has long relied on.

111.    Even assuming HB9 had a sufficient public purpose, it is not tailored to address that purpose. HB9 requires the *categorical* termination of existing immigration detention and law enforcement agreements without any conditions, let alone reasonable conditions appropriate to address the ostensible public purpose justifying its enactment. *Cf. U.S. Tr. Co.*, 431 U.S. at 29–30 ("it cannot be said that total repeal . . . was essential; a less drastic modification would have permitted the contemplated plan without entirely removing the . . . limitations . . ."); *id.* at 30 ("the States could have adopted alternative means of achieving their . . . goals"); *id.* at 31 ("a State is

---

[4] Pat Davis, *Momentum builds in New Mexico legislature to ban ICE facilities statewide*, New Mexico Political Report (Jan. 28, 2026), https://nmpoliticalreport.com/2026/01/28/momentum-builds-in-new-mexico-legislature-to-ban-ice-facilities-statewide/; *see also* Patrick Lohmann, *NM lawmakers add ban on law enforcement agreements with ICE to Immigrant Safety Act*, Source New Mexico (Jan. 28, 2026, at 5:57 AM), https://sourcenm.com/2026/01/28/nm-lawmakers-add-ban-on-law-enforcement-agreements-with-ice-to-immigrant-safety-act/ ("'We want to create a situation where it's consistent throughout the state, where public entities are not cooperating with ICE enforcement,' [Rep. Chavez] said. 'It's really plain and simple.'").

[5] Alex Ross, *Lujan Grisham to push immigrant detention ban in next legislative session*, New Mexico Political Report (Sept. 8, 2025), https://nmpoliticalreport.com/2025/09/08/lujan-grisham-to-push-immigrant-detention-ban-in-next-legislative-session/.

not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well.").

112.    On a fundamental level, these agreements are completely voluntary for local governmental entities. If localities viewed them as problematic, lacked sufficient resources, or their constituents disapproved of such arrangements, localities could simply exercise their discretion and decline to enter into them or terminate them on their own initiative. Yet, the State of New Mexico seeks to remove that discretion by instituting a blanket policy requiring the immediate termination of existing agreements and banning all future agreements, regardless of the local circumstances.

113.    The sole purpose of HB9 is to express discontent with the federal immigration policies of the current administration. However, immigration is subject to broad federal regulation and is within the ambit of comprehensive federal power and authority. Policy disagreements are not a legitimate or sufficiently significant basis to require termination of all existing agreements and ban all future agreements, much less a basis to frustrate and actively obstruct federal immigration law enforcement.

114.    There is simply no significant or legitimate public purpose in passing a law that bars all existing and future agreements to detain violators of civil immigration law or coordinate local enforcement of federal immigration law.

115.    Moreover, if Otero County is forced to terminate the Otero-ICE Contract, or if the purpose of the Otero-ICE Contract is frustrated by the termination of the Otero-MTC Contract, and if future agreements are prohibited, DHS will be forced to transfer many detainees hundreds of miles away to other states, such as the Fort Bliss facility in Texas. This forced relocation drains Federal Government resources and will result in the placement of detainees further away from

relatives. Furthermore, New Mexico can conduct some oversight and inspections of the facility in Otero Country through health, safety, and political inspections. New Mexico can also review the agreements and demand various requirements be included and enforced by the County. New Mexico would lack such authority and oversight for facilities in other states where many of the detainees would have to be moved. Otero Country, on the other hand, would lose significant revenue and jobs for its people. It is thus difficult to imagine the legitimate state interest New Mexico has in forcefully terminating this long-standing agreement other than to actively try and obstruct lawful immigration enforcement in the state. That is anything but legitimate and is completely contrary to the public interest.

116.    If the State of New Mexico caused the termination of the Otero-ICE Contract or the Otero-MTC Contract, ICE would be significantly and irreparably harmed because ICE would no longer be able to utilize the OCPC to detain and remove illegal aliens in accordance with the mandates of federal immigration law. Loss of the OCPC would be devastating to ICE's operations, as no facilities exist to immediately accommodate the alien population currently housed at the OCPC. Enforcement of HB9 would significantly obstruct ICE's achievement of Congress's immigration objectives and goals by hampering ICE's ability to detain and remove aliens. Again, many aliens would have to be transferred many miles to facilities in other states.

117.    Similarly, there are two counties in New Mexico (Curry County and Torrance County) that have engaged with ICE's 287(g) Program with a memorandum of agreement (MOA). The Curry County Sheriff's Office and Torrance County Sheriff's Office have approved MOAs to participate in the 287(g) Warrant Service Officer (WSO) Program. These agreements require DHS to train and certify their officers on immigration enforcement. As a result, their officers are deputized under the color of federal law to help enforce immigration warrants. Having locally

accountable law enforcement operating in their own communities has many benefits and can increase trust and effectiveness in enforcing immigration laws. There is no legitimate reason other than obstruction to require the termination of such voluntary agreements and force federal officers into every county.

118. In effect, HB9 bans all agreements that promote necessary cooperation between state and local governments and federal civil immigration authorities, whether for detention purposes or law enforcement purposes. By requiring the immediate termination of existing immigration detention and cooperation agreements, HB9 interferes with and substantially impairs all civil immigration enforcement and detention agreements between the Federal Government and any local entity in New Mexico. Accordingly, HB9 violates the Contract Clause and is invalid.

**THE IMPACT OF THE ENFORCEMENT OF HB9 AND THE SCPO**

119. The State of New Mexico will enforce HB9. While HB9 will not take effect until May 20, 2026, New Mexico has already manifested animosity to civil immigration detention agreements by attempting to nullify the latest extension of Otero-ICE Contract between ICE and Otero County through its Emergency Petition for Writ of Mandamus. While unsuccessful, the Petition cites HB9 repeatedly and alleges that Otero County entered into the latest Otero-ICE Contract extension to avoid the applicability of HB9, expressing clear frustration with the Otero-ICE Contract. The Attorney General is empowered to sue Otero County to enforce HB9 and seek an injunction requiring the termination of the Otero-ICE Contract or Otero-MTC Contract. HB9 § 5.

120. In addition to its overt attempt to nullify a civil immigration detention agreement between ICE and Otero County, New Mexico has never disclaimed its intent to enforce HB9. Nor has the City of Albuquerque expressed an intent not to enforce the SCPO. The United States

believes that New Mexico will enforce HB9 and Albuquerque will enforce HB9. Both New Mexico and Albuquerque have passed a series of sanctuary policies. Presumably, neither government would pass such laws if they did not plan on enforcing them.

121.    Should HB9 be enforced, it will result in the termination of numerous agreements between ICE, New Mexico local governmental entities, and private entities, depriving these local government entities and private companies of revenue, and depriving the communities that they serve of jobs and economic activity. If local governmental entities refuse to comply with HB9, the New Mexico Attorney General is empowered to seek injunctive relief to force compliance with HB9. *See* HB9 § 5.

122.    The Federal Government depends on these agreements to operate civil immigration detention facilities and to enforce civil immigration law throughout the State of New Mexico. Consequently, HB9 has the purpose and will have the imminent result of impeding federal immigration enforcement in New Mexico.

123.    The United States is irreparably harmed by HB9 and the SCPO because they seek to (i) obstruct and conflict with federal immigration law; (ii) control and regulate federal functions and operations carried out through the Executive agencies of the United States, in violation of the Supremacy Clause; and (iii) void contracts with federal agencies in violation of the Contract Clause.

124.    All of these measures make enforcing federal law more difficult and dangerous in the State of New Mexico and divert important law enforcement resources. These laws disrupt important coordination between state and local officials and purposefully make the enforcement of federal law more difficult.

44

125.    States may not adopt laws that violate the Constitution, including laws that upset the federal system and the existing agreements and ongoing cooperation between state and local entities and the Federal Government, nor dictate the parties with whom the Federal Government may contract, particularly in the context of sovereign functions such as immigration enforcement.

126.    The United States is further irreparably harmed absent an injunction because a failure to enjoin this law will encourage other states to enact similar unconstitutional laws. There is no adequate remedy at law for such violations of the Constitution.

**<u>CLAIMS FOR RELIEF</u>**

**COUNT I – FEDERAL PREEMPTION OF HB9 AND THE SCPO**
**(AGAINST ALL DEFENDANTS)**

127.    Plaintiff hereby incorporates foregoing paragraphs of the Complaint as if fully stated herein.

128.    By virtue of the Supremacy Clause of the United States Constitution, HB9 and the SCPO are impliedly preempted, unconstitutional, invalid, and unenforceable because they conflict with federal law by obstructing the accomplishment and execution of Congress's full immigration purposes and objectives.

129.    Through the INA, Congress codified its federal immigration purposes and objectives. To fulfill those purposes and objectives, Congress permitted state and local officials to voluntarily agree with the Federal Government to implement federal immigration law by performing federal immigration functions under the color of federal law as well providing detention facilities and services. *See* 8 U.S.C. §§ 1357(g), 1103(a)(11)(B), 1231(g); *see also* 6 U.S.C. § 112(b)(2).

130.    HB9 and the SCPO obstruct the accomplishment and execution of the full purposes and objectives of Congress as codified in the INA by dramatically curtailing the Federal

Government's congressionally delegated discretion to select, locate, and contract with local governments to provide facilities and services for immigration detention. *See* HB9 §§ 3(A)–(C), 4(A)–(C), SCPO §§ 5-1-5(A), (B). By prohibiting or severely restricting the ability of the Federal Government to contract for and to use government property to detain aliens, HB9 and the SCPO stand as an obstacle to the enforcement of federal immigration law. *See* 8 U.S.C. §§ 1231(g), 1103(a)(11)(B).

131. Further, HB9 and the SCPO directly frustrate Congress's delegation of authority to ICE to determine what facilities are appropriate for immigration detention and to secure such facilities through purchase, lease, or contract. *See* HB9 §§ 3(A)–(C); SCPO §§ 5-1-5(B)(4), (5). HB9 substitutes New Mexico's policy judgment in place of the Federal Government's determination of how best to house individuals subject to federal immigration proceedings and with whom the Federal Government can contract to achieve those ends. *See* 8 U.S.C. §§ 1231(g), 1103(a)(11)(B).

132. HB9 and the SCPO likewise conflict with 6 U.S.C. § 112(b)(2) by impermissibly regulating and restricting the Federal Government's ability to carry out its functions through contracts with non-federal parties, including Otero County.

133. HB9 and the SCPO also obstruct the achievement of Congress's federal immigration purposes and objectives by limiting the property and resources accessible and available federal immigration authorities to be used to implement federal immigration law, as well as ordering defiance of administrative warrants and detainers and instead requiring judicial warrants. *See* HB9 §§ 3(A)–(C); SCPO §§ 5-1-5(A), (B), 13-17-4(A)(1); 8 U.S.C. § 1357.

134. The SCPO further obstructs the achievement of Congress's federal immigration purposes and objectives by (i) requiring businesses to notify aliens of ongoing federal immigration

enforcement operations, and (ii) denying certain public and private entities the right to voluntarily cooperate with federal immigration enforcement officials by providing access to property and certain records, both of which are designed to facilitate the evasion of law enforcement. SCPO §§ 13-17-4(A), 13-17-6(C); *see* 8 U.S.C. § 1324(a)(1)(A)(iii) (prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation."); *Kearns v. Cuomo*, 981 F.3d 200, 208 (2d Cir. 2020) ("Examples [of harboring] also include attempts to alert undocumented immigrants to the physical approach of immigration authorities.").

135.    Because HB9 and the SCPO stand as obstacles to the full accomplishment and execution of Congress's objectives in administering a nationwide immigration detention system, they are preempted by federal law and are unconstitutional and invalid.

### COUNT II – VIOLATION OF THE SUPREMACY CLAUSE
### (UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT
### AGAINST ALL DEFENDANTS)

136.    Plaintiff hereby incorporates foregoing paragraphs of the Complaint as if fully stated herein.

137.    HB9 and the SCPO violate basic principles of intergovernmental immunity by unlawfully regulating the Federal Government. Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445.

138.    HB9 regulates the Federal Government by imposing restrictions on the parties with whom the Federal Government can contract to detain aliens for civil immigration violations and to implement federal immigration law, including by deputizing state officials.

139.    HB9 and the SCPO regulate the Federal Government by imposing restrictions on the property available to be used for federal civil immigration detention purposes.

47

140.    The purpose and design of HB9 and the SCPO are to prevent federal immigration detention by removing local entities and property available to be used for federal immigration detention purposes.

141.    HB9 and the SCPO therefore purport to directly regulate the Federal Government in violation of the intergovernmental immunity doctrine and are invalid under the Supremacy Clause.

**COUNT III – VIOLATION OF THE SUPREMACY CLAUSE**
**(UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT**
**AGAINST ALL DEFENDANTS)**

142.    Plaintiff hereby incorporates foregoing paragraphs of the Complaint as if fully stated herein.

143.    HB9 and the SCPO "single out" federal immigration authorities for disfavored treatment, expressly and impliedly, which is exactly what intergovernmental-immunity principles bar. *Dawson v. Steager*, 586 U.S. 171, 178 (2019).

144.    The Federal Government is tasked by Congress with implementing and enforcing federal immigration law.

145.    HB9 restricts public bodies from continuing to perform under and from entering into Section 287(g) agreements and agreements to detain aliens for civil immigration enforcement purposes while allowing public bodies to form agreements for other functions unrelated to federal immigration law. This includes detention and cooperation between state and local law enforcement, including for civil purposes.

146.    HB9 makes clear that it is meant to solely apply to federal immigration enforcement functions by limiting its application to other law enforcement personnel. *See* HB9 § 3(E) ("Nothing

48

in this section shall be construed to limit the ability of law enforcement personnel to detain individuals or to perform brief investigative stops as permitted by state law.").

147.    The SCPO restricts public bodies from using government resources and property to assist in federal immigration law enforcement activities, while permitting such resources and property to be used for other law enforcement purposes.

148.    The SCPO requires that private businesses provide notice to aliens of active federal immigration enforcement activities, while permitting other law enforcement activities to proceed without requiring any notification. This includes state and local criminal and civil enforcement actions.

149.    The SCPO prohibits certain public and private entities from voluntarily cooperating with immigration law enforcement officials through the provision of access to certain property and records, while permitting the same public and private entities to voluntarily cooperate with other law enforcement officials for other law enforcement purposes.

150.    HB9 and the SCPO do not require the termination of existing agreements, bar entry into future agreements, restrict the use of property, restrict voluntary cooperation, or require notice to subjects of investigation for other law enforcement functions civil or otherwise. Instead, HB9 and the SCPO single out the Federal Government, responsible for the implementation and enforcement of federal immigration law, for worse treatment.

151.    Accordingly, HB9 and the SCPO are invalid because they violate the Supremacy Clause and principles of intergovernmental immunity.

## COUNT IV – VIOLATION OF THE CONTRACT CLAUSE
### (AGAINST DEFENDANTS STATE OF NEW MEXICO, GOVERNOR MICHELLE LUJAN GRISHAM, AND ATTORNEY GENERAL RAUL TORREZ)

152.    Plaintiff hereby incorporates foregoing paragraphs of the Complaint as if fully stated herein.

153.    The Contract Clause of the United States Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts . . ."  U.S. Const. art. I, § 10, cl. 1. "The Contracts Clause restricts the power of States to disrupt contractual arrangements." *Sveen*, 584 U.S. at 818.

154.    Federal law authorizes agreements between the Federal Government and state and local governments to facilitate the detention of aliens and the enforcement of federal immigration laws. *See* 8 U.S.C. §§ 1357(g), 1231(g), 1103(a)(11)(B); 6 U.S.C. § 112(b)(2).

155.    Congress thus expressly contemplated and approved the use of agreements, such as the Otero-ICE Contract, to implement federal immigration detention operations and enforce federal immigration law.

156.    HB9 substantially impairs existing contracts between local governmental entities in New Mexico and the Federal Government concerning the detention of aliens and enforcement of federal immigration laws by requiring the immediate termination of such agreements, by prohibiting the use of county property and facilities to house civil immigration detainees, and by prohibiting intergovernmental services agreements to detain individuals for civil immigration violations and requiring termination of such agreements. HB9 thus nullifies key aspects of agreements to implement federal immigration detention operations and enforce federal immigration law, including the Otero-ICE Contract. The same is true for the existing 287(g) agreement with Curry County.

157.    HB9 also impairs and disrupts the Federal Government's ability to freely contract with local government entities in New Mexico to implement federal immigration law, including, for example, to contract with Otero County to use OCPC as a detention facility, thereby violating the Contract Clause.

158.    HB9 lacks any sufficiently significant or legitimate public purpose to justify terminating voluntary agreements between local New Mexico entities and the Federal Government made pursuant to federal law.

159.    HB9 impairs agreements between local governmental entities in New Mexico and the Federal Government concerning the detention of aliens and enforcement of federal immigration laws in a manner that is neither reasonable nor necessary.

160.    HB9 is not a legitimate exercise of State power.

161.    HB9 is therefore unconstitutional and invalid under the Contract Clause.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests that this Court enter a judgment:

A.    Declaring that HB9 and the SCPO are preempted by federal law and are therefore unconstitutional, invalid, and unenforceable;

B.    Declaring that HB9 and the SCPO violate the Supremacy Clause and principles of intergovernmental immunity by unlawfully regulating and discriminating against and the Federal Government and are therefore unconstitutional, invalid, and unenforceable;

C.    Declaring that HB9 violates the Contract Clause and is therefore unconstitutional, invalid, and unenforceable;

D.    Preliminarily and permanently enjoining the operation and enforcement of HB9 and the SCPO, including by prohibiting lawsuits, enforcement, actions, investigations, or any other

51

actions by Defendants or their agents or successors to enforce or achieve the goals of HB9 and the

SCPO;

      E.      Awarding the United States its costs and fees in this action; and

      F.      Awarding any other relief it deems just and proper.


DATED: May 8, 2026                    Respectfully Submitted,


TODD BLANCHE                  */s/ Robert O. Lindefjeld*
Acting Attorney General            Assistant Director
                            U.S. Department of Justice, Civil Division
BRETT A. SHUMATE            Enforcement & Affirmative Litigation Branch
Assistant Attorney General         P.O. Box 386
Civil Division                   Washington, DC 20044-0386
                            Telephone: (202) 451-7488
TIBERIUS DAVIS              Email: robert.o.lindefjeld@usdoj.gov
Counsel to the Assistant Attorney General

                            EMIL J. KIEHNE
RYAN ELLISON               Assistant U.S. Attorney
First Assistant United States Attorney    U.S. Attorney's Office,
District of New Mexico          District of New Mexico
                            201 3rd Street NW, Suite 900
JACKSON M. STORY            Albuquerque, New Mexico 87102
Trial Attorney                   Telephone: (505) 346-6855
U.S. Department of Justice, Civil Division  Email: emil.kiehne@usdoj.gov
Enforcement & Affirmative Litigation Branch


                            *Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2026, I served copies of the foregoing Complaint to the following Parties via electronic mail and certified mail (with return receipt):

PARTIES: State of New Mexico and Governor Michelle Lujan Grisham, in her Official Capacity as Governor of New Mexico
c/o Honorable Holly Agajanian
Chief General Counsel to Governor Michelle Lujan Grisham
Office of the Governor
490 Old Santa Fe Trail, Suite 400
Sante Fe, NM 87501-2794
holly.agajanian@exec.nm.gov

PARTIES: State of New Mexico and Governor Michelle Lujan Grisham, in her Official Capacity as Governor of New Mexico
c/o Honorable Kyle P. Duffy
Deputy General Counsel to Governor Michelle Lujan Grisham
Office of the Governor
490 Old Sante Fe Trail, Suite 400
Sante Fe, NM 87501-2704
kyle.duffy@exec.nm.gov

PARTIES: City of Albuquerque and Timothy Keller, in his Official Capacity as Mayor of the City of Albuquerque
c/o Honorable Lauren Keefe
City Attorney for the City of Albuquerque
P.O. Box 2248
Albuquerque, NM 87103-2248
lkeefe@cabq.gov

PARTIES: City of Albuquerque and Timothy Keller, in his Official Capacity as Mayor of the City of Albuquerque
c/o Honorable Ethan Watson
City Clerk for the City of Albuquerque
P.O. Box 1293
Albuquerque, NM 87103-1293
cityclerk@cabq.gov

PARTY: Honorable Raúl Torrez, in his Official Capacity as Attorney General for the State of New Mexico
New Mexico Department of Justice
201 3rd Street NW, Suite 300
Santa Fe, NM 87102
rtorrez@nmag.gov

PARTY: Honorable Raúl Torrez, in his Official Capacity as Attorney General for the State of New Mexico
c/o Honorable James W. Grayson
Chief Deputy Attorney General
New Mexico Department of Justice
P.O. Box 1508
Sante Fe, NM 87504-1508
jgrayson@nmdoj.gov

PARTY: Honorable Raúl Torrez, in his Official Capacity as Attorney General for the State of New Mexico
c/o Honorable Billy J. Jimenez
Deputy Attorney General, Civil Affairs
New Mexico Department of Justice
P.O. Box 1508
Sante Fe, NM 87504-1508
bjimenez@nmdoj.gov

/s/ Robert O. Lindefjeld
ROBERT O. LINDEFJELD
Assistant Director
United States Department of Justice
Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044-0386
Phone: (202) 451-7488
Email: rlindefjeld.o.lindefjeld@usdoj.gov

53