# Ex. C

70CDCR26DIG000010
INTERGOVERNMENTAL SERVICE AGREEMENT
BETWEEN THE
UNITED STATES DEPARTMENT OF HOMELAND SECURITY
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
AND
COUNTY OF OTERO, NM

████████████████████

This Intergovernmental Service Agreement (**"agreement"**) is entered into between United States (US) Department of Homeland Security (**"DHS"**), Immigration and Customs Enforcement ("**ICE**"), and Otero County, NM (**"service provider" or "contractor"**) for the detention and care of detained noncitizens (also referred to as "**noncitizens**" and "detainees"). The term "parties" is used in this agreement to refer jointly to ICE and the service provider.

**AGREEMENT SUMMARY:**

The service provider shall provide detention services for detained noncitizens at the following facility(s):

**Otero County Processing Center**
**26 McGregor Range Road**
**Chaparral, NM 88081**

The service provider shall house ICE noncitizens and perform related detention services, at a minimum, in accordance with PBNDS 2011 with 2016 revisions or most current version as outlined in a subsequent modification. The standards are available at www.ice.gov. The service provider will be required to provide service at the optimal level of the PBNDS.

The service provider shall provide ICE with 1,000 adult male and female beds. The total capacity of the facility is 1,000 adult male and female beds.

The agreement will remain in effect for a period not to exceed 60 months unless extended by bilateral modification or terminated in writing by ICE in accordance with the terms of Article 14 of this agreement.

Authorized Signatory: The following individual is appointed as the service provider's authorized signatory with full authority to bind the service provider regarding this agreement. The authorized signatory must be an employee and/or officer of the service provider (prime).

Name: Vickie Marquardt
Title: District 3 Commissioner
Email Address: vmarquardt@co.otero.nm.us
Phone: 575-491-3359

ATTACHMENT B

**Documents**

The following documents constitute the complete agreement and are hereby incorporated directly or by reference:

- A. Standard Form 1449 70CDCR26DIG0000010
- B. Intergovernmental Service Agreement (IGSA) 70CDCR26DIG0000010 (This document)


**Attachments**

- Attachment 1 – Title 29, Part 4 Labor Standards for Federal Service Contracts
- Attachment 2 – Wage Determination Number: 2015-5455, Rev 29
- Attachment 3 – Quality Assurance Surveillance Plan and Performance Requirements Summary (PBNDS 2011 with 2016 revisions)
  - Attachment 3A –Contract Discrepancy Report (CDR) Template
- Attachment 4 – Quality Control Plan
- Attachment 5 – Prison Rape Elimination Act (PREA) Regulations
- Attachment 6 – Detention-Transportation Invoice Supporting Documentation Template
- Attachment 7 – Combatting Trafficking in Persons
- Attachment 8 – ICE Privacy, Records Management, and Safeguarding of Sensitive Information
- Attachment 9 – Physical Plant Requirements
- Attachment 10 – Transportation Requirements
  - Attachment 10A – Transportation Summary
- Attachment 11 – Virtual Attorney Visitation
- Attachment 12 - Transgender Requirements
- Attachment 13 – Staffing Plan
  - Attachment 13a – Detention Facility Floor Plan
- Attachment 14 – Performance Work Statement (PWS)
- Attachment 15 -  Award Value

**IN WITNESS WHEREOF,** the undersigned, duly authorized officers, have subscribed their names on behalf of the Otero County, NM and the Department of Homeland Security, U.S. Immigration and Customs Enforcement.

**ACCEPTED:**                                              **ACCEPTED:**

Brittany Tobias                                            Vickie Marquardt
Contracting Officer (CO)                                   Chair
                                                          Otero County Board of County Commissioners

Signature: _____ Digitally signed by            Signature _____
                            BRITTANY M TOBIAS
Date: _____   Date: 2026.03.14              Date: ____3/13/26____
                            08:20:02 -04'00'

Version 2                                                                                      3

**Intergovernmental Service Agreement**

**Table of Contents**

Article 1. Purpose.................................................................................................... 5
Article 2. ICE Detention Standards and Other Applicable Standards,..................... 3
Article 3. Covered Services ..................................................................................... 4
Article 4. On-Call Guard Services............................................................................ 5
Article 5. Receiving and Discharging Noncitizens.................................................... 5
Article 6. Medical Services .......................................................................... 6
Article 7. Inspections and Audits............................................................................. 9
Article 8. Employment Screening Requirements..................................................... 10
Article 9. Records Management Obligations............................................................ 10
Article 10. Incident Reporting ................................................................................. 13
Article 11. Noncitizen Communication Services (NCS) ........................................... 13
Article 12. Government Use of Wireless Communication Devices ........................... 14
Article 13. ICE Furnished Property .......................................................................... 15
Article 14. Termination............................................................................................. 15
Article 15. Administrative ......................................................................................... 15
Article 16. Adjusting the Agreement Rates .............................................................. 16
Article 17. Modifications and Disputes ..................................................................... 17
Article 18. Enrollment, Invoicing, and Payment ....................................................... 18
Article 19. Hold Harmless Provisions ...................................................................... 19
Article 20. Financial Records................................................................................... 20
Article 21. Labor Standards and Wage Determination............................................. 21
Article 22. Notification and Public Disclosures ........................................................ 22
Article 23. Privacy .................................................................................................... 23
Article 24. Attestation of Pricing Data ..................................................................... 23
Article 25. Quality Control ........................................................................................ 31
Article 26. Quality Assurance Surveillance Plan (QASP)......................................... 31
Article 27. Exclusivity ............................................................................................... 33
Article 28. Use of Service Provider's Policies and Procedures ............................... 33
Article 29. ACA Accreditation .................................................................................. 33

4

**REQUIRED WORK PERFORMANCE**

**Article 1. Purpose**

A. <u>Purpose:</u>  The purpose of this IGSA is to establish an agreement between ICE and the service provider for the provision of the necessary physical structure, equipment, facilities, personnel, and services to provide ICE noncitizen detention in a secure environment under the authority of the Immigration and Nationality Act, as amended, 8 U.S.C. § 1103(a)(11)(A).

All persons in the custody of ICE are noncitizens. This term recognizes that ICE detained noncitizens are not charged with criminal violations and are only held in custody to ensure their presence throughout the administrative hearing process and to assure their presence for removal from the US pursuant to a lawful final order by the Immigration Court, the Board of Immigration Appeals, or other federal judicial bodies.

B. <u>Responsibilities:</u>  This agreement sets forth the responsibilities of ICE and the service provider. The service provider shall provide all personnel, management, equipment, supplies, and services necessary for performance of all aspects of the agreement and ensure that the safekeeping, housing, subsistence, medical, and other program services provided to ICE noncitizens housed in the facility are consistent with ICE's civil detention authority, IGSA requirements, ICE standards incorporated and referenced in this agreement, and all applicable state and local laws. The service provider must perform satisfactorily as described in the QASP to receive payment from ICE at the rate prescribed below.

C. <u>Rates:</u>  This is a fixed rate agreement, not a cost reimbursable agreement, with respect to the bed day rate. ICE will be responsible for reviewing and approving the costs associated with this agreement, and any subsequent modifications, in accordance with all applicable federal procurement laws, regulations and standards in determining the bed day rate.

See SF1449 for pricing details


*\* See Article 4, \*\*See Attachment 10 and 10A*

The "Facility Operating Charge" is defined as all costs that are fixed for providing services to ICE based on the expected usage of the facility. The price shall be firm fixed price and invoiced on a monthly basis.

The "Bed Day" is defined as general costs associated with one person per day. The service provider shall bill for the date of arrival but not the date of departure.

5

Version 2

The service provider shall not charge for costs that are not directly related to the housing and detention of noncitizens. Such unallowable costs include but are not limited to:

1) Salaries of elected officials
2) Salaries of employees not directly engaged in the housing and detention of noncitizens.
3) Indirect costs in which a percentage of all local government costs are pro-rated and applied to individual departments unless, those cost are allocated under an approved Cost Allocation Plan
4) Noncitizen services which are not provided to, or cannot be used by, Federal detained noncitizens.
5) Operating costs of facilities not utilized by federal detained noncitizens.
6) Interest on borrowing (however represented), bond discounts, costs of financing/refinancing, except as prescribed by OMB Circular A-87
7) Legal or professional fees (specifically legal expenses for prosecution of claims against the Federal Government, legal expenses of individual noncitizens or inmates)

D. ICE will not be responsible for paying any costs if ICE is unable to use the facility and such occurrence arises out of causes beyond the control and without the fault or negligence of ICE. Such causes may include but are not limited to acts of God or the public enemy, fires, flood, court orders, extraordinary severe weather, and failure to perform in accordance with ICE standards incorporated into this agreement.

**Article 2. ICE Detention Standards and Other Applicable Standards,**

A. The standards applicable to this agreement are referenced on page 1. DHS and ICE inspectors will conduct periodic inspections of the facility to assure compliance with ICE, DHS and other Federal standards.

B. The service provider shall comply with the American Correctional Association (ACA) Standards for Adult Local Detention Facilities (ALDF) or Core Jail Standards and supplements, and the National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Jails. Some ACA/NCCHC standards are augmented by ICE policy and/or procedures.

C. The service provider shall also comply with the requirements of Subpart A and Subpart C of the U.S. Department of Homeland Security Regulation titled *Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities,*" title 6 Code of Federal Regulation (C.F.R.) part 115 (DHS PREA)/79 Fed. Reg. 13100 (Mar. 7, 2014), and Attachment 5 to this agreement. If any requirements of the DHS PREA standards conflict with the terms of PBNDS 2011 with 2016 revisions, the DHS PREA standards shall prevail.

Version 2

D.  Order of Precedence:  In instances where other standards conflict with ICE policy or standards, ICE policy and standards take precedence. If the service provider believes there is a conflict in standards, the service provider shall immediately seek clarification from the CO.

**Article 3. Covered Services**

A.  Access: The facility shall be located within proximity and access to emergency services (medical, fire protection, law enforcement, etc.).

If applicable, the service provider shall ensure that adequate administrative space in accordance with the physical plant requirements is provided for ICE. The physical plant requirements are included in the attachments of this agreement.

B.  Basic Needs:  The service provider shall provide ICE noncitizens with safekeeping, housing, subsistence, medical and other services in accordance with this agreement. In providing these services, the service provider shall ensure compliance with all applicable laws, regulations, fire and safety codes, policies, and procedures. The types and levels of services shall be consistent with ICE detention standards and polices.

C.  All service providers are required to comply with any Enforcement and Removal Operations (ERO) pandemic guidance or instructions.

D.  Staffing:  The service provider shall have a staffing plan to effectively staff the facility in a safe and secure manner. The number, type and distribution of staff as described in the IGSA-staffing plan shall be maintained throughout the term of the IGSA. Written requests to change the number, type and/or distribution of staff described in the staffing plan must be submitted to the CO and the Contracting Officer's Representative (COR), for approval prior to implementation and incorporation into this IGSA. Staffing levels shall not fall below a monthly average of 85% for custody staff, 80% for health services staff, and 85% for all other departments of the approved staffing plan. The approved staffing levels for detention officers shall not fall below a monthly average of 85%. Staffing levels for all departments other than custody and health services will be calculated in the aggregate. If the service provider does not provide health services, the health services staffing level does not apply.

Each month, the service provider shall submit to the COR the current average monthly vacancy rate and indicate any individual positions that have been vacant more than 120 calendar days. Failure to fill any individual position within 120 calendar days of the vacancy may result in a deduction from the monthly invoice.

The service provider shall provide monthly status reports to the COR. Such reports will include a monthly key indicator report, which indicates the key personnel positions of the facility (e.g., position title, name of the employee, vacancies and length of vacancies, dates of service, additional comments). These monthly reports shall be submitted to the COR by the fifth of each month for the previous month's activities and staffing.

4

Version 2

As part of the justification package for a FOC, GM or bed rate increase request, along with the staffing plan, the service provider shall submit a detention facility floor plan which shows all detention guard posts and identifies the duration of each guard post and the number of shifts required in a 24-hour day. The detention facility floor plan should be color-coded so that each detention guard post can be easily mapped to the description of the duration of the guard post and the number of daily shifts required.

**Article 4. On-Call Guard Services**

A. The service provider agrees to provide on-call guard services, at a separately agreed hourly rate, on demand by the COR and shall include, but not limited to, escorting and guarding noncitizens to medical or doctor's appointments, hearings, ICE interviews, and any other offsite location as requested by the COR. Qualified detention officers employed by the service provider under its policies, procedures, and practices will perform such services. The service provider agrees to augment such practices as may be requested by CO or COR to enhance specific requirements for security, noncitizen monitoring, visitation, and contraband control. Visitation with ICE noncitizens at offsite locations is prohibited unless authorized in advance by the COR.

B. The service provider shall provide two officers for each offsite location, unless additional or fewer officers are required, per the direction of the COR or designated ICE officer. Except in cases of an emergency, one of the two above referenced officer(s) shall be of the same sex as the noncitizen being assigned to the offsite location The service provider shall not pull officers posts in order to fill on-call guard services. All posts shall be staffed and shall not be left vacant in order to meet on demand needs.

**Article 5. Receiving and Discharging Noncitizens**

A. <u>Required Activity:</u>  The service provider shall receive and discharge ICE noncitizens only to/ from properly identified ICE/ERO personnel or other properly identified Federal law enforcement officials with written authorization from ICE/ERO. Presentation of U.S. Government identification will constitute "proper identification."

B. The service provider shall furnish receiving and discharging services twenty-four (24) hours per day, seven  days per week. ICE will furnish the service provider with reasonable notice of receiving and discharging ICE noncitizens. The service provider shall ensure positive identification and recording of noncitizens and ICE officers. The service provider shall not permit medical or emergency discharges from the hospital except through coordination with ICE/ERO.

C. <u>Emergency Situations:</u>  ICE noncitizens shall not be released from the facility into the custody of other federal, state, or local officials for any reason, except for medical or emergency situations, without express authorization of ICE.

5

Version 2

D.  <u>Restricted Release of ICE Noncitizens:</u>  The service provider shall not release ICE noncitizens from its physical custody to any persons other than those described in Paragraph A of this Article, for any reason, except for either medical, other emergency situations (such as a hurricane evacuation or activation or an emergency plan), or in response to a federal writ of habeas corpus. If an ICE noncitizen is required for federal, state, or local proceedings, only ICE/ERO may authorize release of the noncitizen for such purposes. The service provider shall contact the COR or designated ICE official immediately regarding any such requests.

E.  <u>Service Provider Right of Refusal.</u> The service provider retains the right to refuse acceptance of any noncitizen if such refusal is supported by a valid justification and agreed to by the COR. Examples of such justification are any individual exhibiting violent or disruptive behavior, or any noncitizen found to have a medical condition that requires medical care beyond the scope of the service provider. In the case of a noncitizen already in custody, the service provider shall notify ICE and request transfer of the noncitizen from the facility. The service provider shall allow ICE reasonable time to make alternative arrangements for detention of the noncitizen.

F.  <u>Juveniles.</u> If the service provider determines that ICE has delivered a person for custody who is under the age of 18, the service provider shall not house that person with adults and shall immediately notify the COR or designated ICE official. ICE will relocate the juvenile within 72 hours.

G.  <u>Emergency Evacuation:</u>  In the event of an emergency requiring evacuation of the facility, the service provider shall evacuate ICE noncitizens in the same manner, and with the same safeguards, as it employs for persons detained under the service provider's authority. The service provider shall notify the ICE COR or designated ICE official within two (2) hours of evacuation.

**Article 6. Medical Services**

A.  The service provider shall not charge any ICE noncitizens a fee or co-payment for medical services or treatment, including medications and durable medical equipment provided at the facility. The service provider shall ensure that ICE noncitizens receive no lower level of on-site medical care and services than those it provides to local inmates, and as required by the ICE standards incorporated into this agreement as well as all Centers for Disease Prevention and Control (CDC) guidance and recommendations regarding infectious disease prevention and control. All medical-related costs will be included in the applicable rate for this agreement.

B.  The service provider ensures quality health care delivery and accountability in compliance with detention standards through a continuous quality improvement (CQI) system that includes risk management, patient safety, and health services delivery quality assurance programs. The CQI system identifies, addresses, and monitors health care delivery for undesired outcomes and trends, including but not limited to those due to near

6

Version 2

miss occurrences, adverse events, sentinel events, and systemic processes or outcomes. Concerns identified from the CQI system risk assessment are addressed through corrective action plans.

C.  The service provider is required to report all incidents, in accordance with ICE Health Service Corps (IHSC) incident reporting criteria, to the IHSC Field Medical Coordinator (FMC) immediately. Noncitizen deaths at the facility are subject to an IHSC directed mortality review, concurrent or subsequent root cause analysis for the purpose of identifying actual and potential process failures and errors.

D.  The service provider shall notify ICE/ERO and the IHSC FMC of noncitizen with serious medical conditions within 48 hours of identification of the case. Examples of cases include, but are not limited to: uncontrolled hypertension; uncontrolled diabetes; unable respiratory disease or any noncitizen requiring oxygen treatment; history of congestive heart failure complaining of shortness of breath; transgender; pregnancy; multiple unstable chronic conditions; liver failure; renal failure; infectious and communicable diseases (i.e., HIV/AIDS, viral hepatitis, varicella, measles, mumps, COVID-19); infectious disease outbreaks; acute mental health conditions (one or more psychiatric symptoms – disorganization, active hallucinations or delusions, sever depressive symptoms, suicidal ideation, marked anxiety or impulsivity); history of more than two psychiatric hospitalizations in the past three months and still presenting moderate to severe symptoms; presently taking psychiatric medications and still presenting active moderate to symptoms; continues to display self-harm to self or others in spite of treatment and/or hospitalization; serious limitations in mental functions due to mental disability or severe medical conditions impairing mental function.

E.  Prescription medications that must be filled at a retail pharmacy location, are available through and paid for by the IHSC pharmacy benefits program. The FMC in conjunction with the IHSC Managed Care Coordinators will be the service provider's point of contact for the IHSC pharmacy benefits program. The service provider is required to follow IHSC processes regarding filling of prescriptions through the pharmacy benefits program including processes for non-formulary medications requiring prior authorization and overrides for travel medications. Vaccines are also provided through the IHSC pharmacy benefits program as per the Non-IHSC Staffed Facility Medication Formulary. Durable medical equipment (DME) identified as medically necessary by a medical provider shall be covered by IHSC Medical Payment Authorization Request (MedPAR) or through coordination with the FMC when/if the facility is unable to provide the DME though existing stock supplies covered in the applicable rate for this agreement.

F.  The service provider is required to follow all MedPAR guidance and requirements available https://medpar.ice.gov. If the MedPAR is cancelled, the service provider is required to notify the FMC. The service provider is required to provide the approved authorization to all off-site medical providers (i.e., emergency medical services, hospital, diagnostic or laboratory service provider, independent medical providers who provided care while at the hospital or in the community) to assist with the medical claims processes to ensure payment to the off-site provider for the services rendered. Payment is

7

made directly to the off-site provider by the Veteran's Affairs Financial Services Center (VAFSC) on behalf of IHSC. VAFSC contact information is below. The VAFSC, ICE and IHSC cannot reimburse the service provider for services rendered by these providers.

> IHSC VA Financial Services Center
> PO Box 149345
> Austin, TX 78714-9345
> Phone: (800) 479-0523
> Fax: (512) 460-5538

G. In the event of a medical emergency, the service provider shall immediately proceed to provide necessary emergency medical treatment, including initial on-site stabilization and off-site transport, if required. The service provider shall notify ICE and the IHSC FMC immediately regarding the nature of the transferred noncitizen illness or injury and the type of treatment provided. The cost of all emergency medical services provided off-site will be the responsibility of IHSC. The IHSC FMC assigned to this facility will be the point of contact for obtaining the approval for the emergency off-site care. Utilizing the IHSC MedPAR system, the request for approval for the emergency care shall be submitted no more than 72 hours from receipt of the care.

H. Utilizing the IHSC MedPAR, the service provider will request prior approval for all non-emergent off-site medical care and requests for durable medical equipment (DME). The primary POC for obtaining pre-approval will be the IHSC FMC assigned to this location.

I. The service provider is required to maintain agreements with community providers including hospitals and specialty providers to provide healthcare to ICE noncitizens. The service provider is required to provide a listing of those providers to and to notify the IHSC FMC of new community providers in order for IHSC to begin the new provider recruitment process.

J. The service provider shall retain, at a minimum, medical staffing levels as approved by IHSC and incorporated into this IGSA in accordance with Article 3 above. The service provider shall ensure that all health care providers utilized for ICE noncitizens hold current licenses, certifications, and/or registrations within the state, county and/or city where they treat the ICE detained noncitizens.

K. If the service provider determines that an ICE noncitizen has a medical condition which renders the individual unacceptable for detention under this agreement, (for example, serious contagious disease, condition needing life support, uncontrollable violence, or serious mental health condition), the service provider shall notify ICE COR. Upon such notification, the service provider shall allow ICE reasonable time to make the proper arrangements for further detention of that individual.

L. The service provider shall release  all medical information in person, electronically or virtually for ICE noncitizens to IHSC representatives upon request, including but not

8

Version 2

limited to: IHSC FMC, IHSC Managed Care Coordinators, Behavioral Health Unit Staff, IHSC Pharmacy Staff, or other IHSC staff as requested.

M.   The service provider shall submit a MedPAR to IHSC for payment for offsite medical care (e.g., offsite lab testing, eyeglasses, prosthetics, hospitalizations, emergency visits). The service provider shall enter payment authorization requests electronically as outlined in the MedPAR User Guide.

N.   The service provider shall allow IHSC FMCs, Managed Care Coordinators, Referral Coordinators, IHSC personnel, DHS, ICE personnel reasonable access to its facility, medical records, and electronic health record (EHR) system records of ICE noncitizen for the purpose of liaison activities with the local IGSA Health Authority and associated service provider departments. The access is in accordance with Health Insurance Portability and Accountability Act (HIPAA) privacy exception at 45 C.F.R. §§ 164.512 (k)(5)(i) which allows disclosure without consent to a correctional institution or a law enforcement official having lawful custody of an inmate or other individual if the correctional institution or such law enforcement official represents that such protected health information is necessary for:

   a.   The provision of health care to such individuals;
   b.   The health and safety of such individual or other inmates;
   c.   The health and safety of the officers or employees of or others at the correctional institution;
   d.   The health and safety of such individuals and officers or other persons responsible for the transporting of inmates or their transfer from one institution, facility, or setting to another;
   e.   Law enforcement on the premises of the correctional institution;
   f.   The administration and maintenance of the safety, security, and good order of the correctional institution; and
   g.   Conducting a quality improvement / quality of care review consistent with an established quality improvement (medical quality management) program and interfacing with the IHSC quality improvement program consistent with federal, state, and local laws.

O.   The service provider shall provide ICE noncitizen medical records to ICE, whether created by the service provider or any medical subcontractor, upon request from the COR or CO within seven business days of the request. The service provider shall respond in a timely manner to ICE requests for reporting, documentation and other data required to respond to pending and current litigation, Congressional inquiries, other Federal, state or local entity request for information.

**Article 7. Inspections and Audits**

A.   <u>Facility Inspections and Oversight:</u>  The service provider shall allow DHS, ICE, DHS Office of the Inspector General, DHS Office of Civil Rights and Civil Liberties, DHS Office of the Detention Ombudsman (OIDO), the Government Accountability Office,

9

Version 2

Members of Congress or any entity or organization approved by ICE to conduct inspections of the facility to ensure an acceptable level of service and acceptable conditions of detention. There will be both announced and unannounced inspections. No notice to the service provider is required prior to an unannounced inspection For ICE-directed inspections or audit, ICE will share findings of the inspection with the authorized signatory.

B. In accordance with Congressional mandate, ICE cannot house noncitizens in any facility that has received two most recent overall performance evaluations of less than "adequate" or the equivalent median score . Upon notice that the second overall rating is less than "adequate", ICE will relocate all noncitizens from the facility within 7 calendar days. Should noncitizens be relocated because of two most recent performance evaluations of less than "adequate", the FOC will no longer be applicable the day after the last noncitizen has been removed.  Accordingly, the invoice for the FOC that month will be prorated. A unilateral modification will be processed to memorialize the removal of the FOC.

C. Possible Termination:  Following a DHS or ICE inspection, if the service provider, after being afforded reasonable time to comply, fails to remedy deficient service identified through a DHS or ICE inspection, ICE may terminate this agreement without regard to any other provisions in this agreement.

D. Share Findings: The service provider shall provide ICE copies of facility inspections, reviews, examinations, and surveys performed by state, local, or accreditation sources.

**Article 8. Reserved**

**Article 9. Records Management Obligations**

A. Applicability: This article applies to all service providers whose employees create, work with, or otherwise handle Federal records, as defined in Section B, regardless of the medium in which the record exists.

B. Definitions

"Federal record" as defined in 44 U.S.C. § 3301, includes all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the US Government or because of the informational value of data in them.

The term Federal record:
1. includes DHS or ICE records.
2. does not include personal materials.

10

Version 2

3.  applies to records created, received, or maintained by a service provider pursuant to their ICE agreement.

4.  may include deliverables and documentation associated with deliverables.

C.  Requirements

1.  The service provider shall comply with all applicable records management laws and regulations, as well as National Archives and Records Administration (NARA) records policies, including but not limited to the Federal Records Act (44 U.S.C. chs. 21, 29, 31, 33), NARA regulations at 36 CFR Chapter XII Subchapter B, and those policies associated with the safeguarding of records covered by the Privacy Act of 1974 (5 U.S.C. 552a). These policies include the preservation of all records, regardless of form or characteristics, mode of transmission, or state of completion.

2.  In accordance with 36 CFR 1222.32, all data created for Government use and delivered to, or falling under the legal control of, the Government are Federal records subject to the provisions of 44 U.S.C. chapters 21, 29, 31, and 33, the Freedom of Information Act (FOIA) (5 U.S.C. 552), as amended, and the Privacy Act of 1974 (5 U.S.C. 552a), as amended and must be managed and scheduled for disposition only as permitted by statute or regulation.

3.  In accordance with 36 CFR 1222.32, service provider shall maintain all records created for Government use or created in the course of performing the agreement and/or delivered to, or under the legal control of the Government and must be managed in accordance with Federal law. Electronic records and associated metadata must be accompanied by sufficient technical documentation to permit understanding and use of the records and data.

4.  ICE and its service providers are responsible for preventing the alienation or unauthorized destruction of records, including all forms of mutilation. Records may not be removed from the legal custody of ICE or destroyed except for in accordance with the provisions of the agency records schedules and with the written concurrence of the Head of the Contracting Activity (HCA). Willful and unlawful destruction, damage or alienation of Federal records is subject to the fines and penalties imposed by 18 U.S.C. 2701. In the event of any unlawful or accidental removal, defacing, alteration, or destruction of records, the service provider must report to ICE. The agency must report promptly to NARA in accordance with 36 CFR 1230.

5.  The service provider shall immediately notify the appropriate CO upon discovery of any inadvertent or unauthorized disclosures of information, data, documentary materials, records or equipment. Disclosure of non-public information is limited to authorized personnel with a need-to-know as described in the IGSA. The service provider shall ensure that the appropriate personnel, administrative, technical, and physical safeguards are established to ensure the security and confidentiality of this information, data, documentary material, records and/or equipment is properly protected. The service provider shall not remove material from Government facilities

11

or systems, or facilities or systems operated or maintained on the Government's behalf, without the express written permission of the HCA. When information, data, documentary material, records and/or equipment is no longer required, it shall be returned to ICE control, or the service provider must hold it until otherwise directed. Items returned to the Government shall be hand carried, mailed, emailed, or securely electronically transmitted to the CO or address prescribed in the IGSA.  Destruction of records is EXPRESSLY PROHIBITED unless in accordance with Paragraph (4).

6. The service provider is required to obtain the CO's approval prior to engaging in any contractual relationship (sub-contractor) in support of this agreement requiring the disclosure of information, documentary material and/or records generated under, or relating to, contracts. The service provider (and any sub-contractor) is required to abide by Government and ICE guidance for protecting sensitive, proprietary information, classified, and controlled unclassified information.

7. The service provider shall only use Government IT equipment for purposes specifically tied to or authorized by the agreement and in accordance with ICE policy.

8. The service provider shall not create or maintain any records containing any non-public ICE information that are not specifically tied to or authorized by the agreement.

9. The service provider shall not retain, use, sell, or disseminate copies of any deliverable that contains information covered by the Privacy Act of 1974 or that which is generally protected from public disclosure by an exemption to the FOIA.

10. Training.  All service provider employees assigned to this agreement who create, work with, or otherwise handle records are required to take ICE-provided records management training. The service provider is responsible for confirming training has been completed according to agency policies, including initial training and any annual or refresher training.

D. Flow down of requirements to subcontractors

1. The service provider shall incorporate the substance of this Article, its terms and requirements including this paragraph, in all subcontracts under this IGSA, and require written subcontractor acknowledgment of same.

2. Violation by a subcontractor of any provision set forth in this Article will be attributed to the service provider.

E. ICE Access to Noncitizen and Facility Records:  The service provider shall, upon request, grant ICE access to any record in its possession, regardless of whether the service provider created the record, concerning any ICE noncitizen. This right of access includes, but is not limited to, incident reports, records relating to suicide attempts, and behavioral assessments and other records relating to the noncitizen while in the service provider's

12

Version 2

custody; provided, however that access to medical and mental health record information be provided in accordance with Article 6. Retention of records requirements can be found in Attachment 8.

**Article 10. Incident Reporting**

A. The COR shall be immediately notified in the event of all serious incidents. The COR will provide any additional contact information for outside-working-hours to the service provider at the time of award.

B. Serious incidents include, but are not limited to: activation of disturbance control team(s); disturbances (including gang activities, group demonstrations, food boycotts, work strikes, work-place violence, civil disturbances/protests); staff use of force including use of lethal and less-lethal force (includes noncitizens in restraints more than eight hours); assaults on staff/population resulting in injuries requiring medical attention (does not include routine medical evaluation after the incident); fights resulting in injuries requiring medical attention; fires; full or partial lock down of the facility; escape; weapons discharge; suicide attempts; deaths; declared or non-declared hunger strikes; adverse incidents that attract unusual interest or significant publicity; adverse weather (e.g., hurricanes, floods, ice/snow storms, heat waves, tornadoes); fence damage; power outages; bomb threats; noncitizens admitted to a community hospital; witness security cases taken outside the facility; significant environmental problems that impact the facility operations;  transportation accidents (i.e. airlift, bus) resulting in injuries, death or property damage; and sexual assaults.

C. The service provider agrees to cooperate with any Federal investigation concerning incidents and treatment involving ICE noncitizens to the full extent of its authorities, including providing access to any relevant databases, CCTV recordings, personnel, and documents.

D. The ICE noncitizen and the public are the ultimate recipients of the services identified in this agreement. Any complaints made known to the COR will be logged and forwarded to the service provider for remedy. Upon notification, the service provider shall be given a pre-specified number of hours after verbal notification from the COR to address the issue. The service provider shall submit documentation to the COR regarding the actions taken to remedy the situation. If the complaint is found to be invalid, the service provider shall document its findings and notify the COR.

**Article 11. Noncitizen Communication Services (NCS)**

A. Video phones, portable electronics or other enhanced telecommunications features provided by the ICE NCS contractor to ICE noncitizens, based upon concurrence between ICE and the service provider, may be utilized at this facility, and their distribution will be coordinated with the service provider. These features may not in any way compromise the safety and security of the inmates/prisoners/noncitizens, staff or the facility. Any new or enhanced telecommunications features will be integrated within the

13

NCS service and shall NOT be a separate system or software from the NCS service. Such capabilities may include: video visitation; web access for law library; email; kites; commissary ordering; educational tools; news; sports; and video games. Pricing for noncitizen use of these technologies will be set by the NCS provider.

B.  Should ICE determine that ICE will fund phone or tablet costs for ICE noncitizens, the service provider will work with ICE to determine how to best provide, account, track and invoice for these services.

C.  <u>For dedicated Facilities (delete if shared facility)</u>:  The ICE NCS contractor shall be the exclusive provider of detained noncitizen telephones and electronic media such as tablets at this facility. Any current contract between the service provider and its telecommunications company shall be terminated and replaced by the ICE NCS contractor within 30 calendar days of award of this IGSA. Prior to replacement by the ICE NCS contractor, and notwithstanding any existing telecommunications contract, the service provider shall require its telecommunications company to provide connectivity to the ICE NCS contractor for noncitizen pro bono telephone calls. The service provider is responsible for making all arrangements with the ICE NCS contractor. The ICE NCS contractor shall receive 100 percent of all revenues collected by sale of prepaid debit services. The NCS contractor shall be responsible for furnishing all inventory and supply of all NCS services to the service provider. The NCS contractor shall be responsible for the costs incurred for installation of the equipment, any monthly telephone charges incurred from the operation of the NCS, and the maintenance and operation of the system. The service provider shall not be entitled to any commissions, fees, or revenues generated by the use of the NCS or the noncitizen telephones or electronic media to include tablets.

D.  The service provider shall inspect telephones for serviceability, in accordance with ICE standards, policies and procedures. The service provider shall notify the COR or ICE designee of any inoperable telephones.

ICE NCS Contractor Information:

Talton Communications
910 Ravenwood Dr.
Selma, AL  36701

Robin Howell                           Mike Oslund
Customer Relations Manager             Operations Manager
(214) 293-1793                         334-412-4506
robin@talton.com                       mike@talton.com

**Article 12. Government Use of Wireless Communication Devices**

14

Version 2

A. All personnel possessing a Federally owned wireless communication device, including but not limited to, cellular telephones, pagers or wireless Internet devices, shall be authorized to possess and use those items in all areas of the facility.

## Article 13. ICE Furnished Property

A. <u>ICE Property Furnished to the Service Provider</u>:  ICE may furnish Federal property and equipment to the service provider. Accountable property remains titled to ICE and shall be returned to the custody of ICE upon termination of the agreement or as requested. The suspension of use of bed space is grounds for the recall and return of any or all ICE furnished property.

B. <u>Service Provider Responsibility</u>:  The service provider shall not remove ICE property from the facility without the prior written approval of the COR. The service provider shall report any loss or destruction of any ICE property immediately to ICE and may be responsible for replacement costs.

## Article 14. Termination

A. The period of performance for this agreement is referenced on page 1 of the Agreement Summary. This agreement becomes effective upon the date of final signature by the ICE CO, which shall occur after the authorized signatory of the service provider.

B. Except for as described in Article 7, Inspections & Audits, Paragraph C, ICE may terminate this agreement by providing written notice of intention to terminate the agreement, a minimum of 60 calendar days in advance of the effective date of termination, provided that the parties may agree to a shorter period under the procedures described in Article 17. Modifications and Disputes. The service provider shall not have the right to terminate this agreement. If this agreement is terminated by ICE under this Article, ICE will be under no financial obligation for any costs after the date of termination. The service provider will only be paid for services provided to ICE up to and including the day of termination.

### ADMINISTRATION

## Article 15. Administrative

C. <u>Contracting Officer's Representative</u>: The COR will be designated by the CO. When the COR duties are reassigned, an administrative modification will be issued to reflect the changes. This designation does not include authority to sign contractual documents or to otherwise commit to, or issue changes, which could affect the price, quantity, or performance of this agreement.

Should the service provider believe it has received direction that is not within the scope of the agreement; the service provider shall not proceed with any portion that is not

15

Version 2

within the scope of the agreement without first contacting the CO. The service provider shall continue performance of efforts that are deemed within the scope.

D.  <u>Commencement of Services:</u>  ICE is under no obligation to utilize the beds identified herein until the need for detention services has been identified, funding has been identified and made available, and the facility meets ICE requirements and the applicable ICE standards delineated in this agreement. ICE may perform numerous assessments to ensure compliance prior to housing noncitizens in the facility.

Should there be a need for a ramp-up plan, the effective start date of the plan is the effective date of the award or modification authorizing the ramp up plan.

E.  <u>Funding:</u>  The obligation of ICE to make payments to the service provider is contingent upon the availability of Federal funds. ICE will neither present noncitizens to the service provider nor direct performance of any other services until ICE has appropriate funding. Task orders will be placed under this agreement when specific requirements have been identified and funding obligated. Performance under this agreement is not authorized until the CO issues a task order in writing. Task orders issued against this IGSA have a period of performance that extend up to one year after the end of the IGSA period of performance. The effective date of the services will be negotiated and specified in this agreement. The service provider shall be prepared to accept noncitizens immediately upon issuance of task order in accordance with the agreed upon ramp-up plan. In the event of a federal lapse of funding, please consult with the CO .

F.  <u>Subcontractors:</u>  The service provider shall obtain the CO's approval before subcontracting the detention and care of noncitizens to another entity. The CO has the right to deny, withhold, or withdraw approval of the proposed subcontractor. Upon approval by the CO, the service provider shall ensure that any subcontract includes all provisions of this agreement. ICE only has privity of contract with the service provider therefore, all payments will be made to the service provider. If the facility, or any future facility, is operated by an entity other than the service provider, ICE will treat the entity as a subcontractor of the service provider. ICE will not accept invoices from, or make payments to, a subcontractor. Subcontractors that perform under this agreement are subject to all terms and conditions of this IGSA.

G.  <u>Consistent with Law:</u>  This agreement is permitted under applicable statutes, regulations, policies, and judicial mandates. Any provision of this agreement contrary to applicable statutes, regulation, policies, or judicial mandates is null and void and shall not necessarily affect the balance of the agreement.

## Article 16. Adjusting the Agreement Rates

A.  ICE will reimburse the service provider at the rates shown in Article 1, Paragraph C. except as provided in Article 21, Labor Standards and Wage Determination, the service provider may request a rate adjustment no less than thirty-six (36) months after the effective date of the agreement or subsequent rate increase unless required by law or

16

Version 2

otherwise provided herein. After 36 months, the service provider may request a rate adjustment by submitting a new Detention Services Cost Statement (DSCS) with a summary of the rate adjustment, break-out of the requested increase amount, and back-up documentation necessary to support the request. The parties agree to base the cost portion of the rate adjustment on the principles of allowability and allocability as set forth in OMB Circular A-87, Cost Principles for State, Local, and Indian Tribal Governments, Federal procurement law, regulations, and standards in arriving at the rate. If ICE does not receive an official request for a rate adjustment that is supported by the information provided, the fixed rates as stated in this agreement will be in place indefinitely.

B. ICE reserves the right to audit the actual and/or prospective costs upon which the rate adjustment request is based. All rate adjustments are prospective, there are no retroactive adjustment(s).

## Article 17. Modifications and Disputes

A. <u>Modifications:</u>  Actions, other than those designated in this agreement, will not bind or incur liability on behalf of either party. Either party may request a modification to this agreement by submitting a written request to the other party. A modification will become a part of this agreement only after the CO has approved the modification in writing.

B. <u>Change Orders</u>:

1. The CO may at any time, by written order, and without notice to the service provider, make changes within the general scope of this agreement:

   (a) to the description of services to be performed,

2. Should any such change cause an increase or decrease in the cost of the services under the agreement, the service provider may request, and the CO may approve an equitable adjustment and will modify the agreement accordingly.

3. The service provider must assert its right to an adjustment under this article within 30 calendar days from the date of receipt of the written order including a proposal addressing the cost impacts and detailed supporting data.

4. If the service provider's proposal includes costs that are determined unreasonable and/or unsupportable, as determined by the CO, the CO will disallow those costs when determining a revised rate, if any.

5. Failure to agree to any adjustment will be a dispute under the Disputes section of this Article. However, nothing in this Article excuses the service provider from proceeding with the agreement as changed.

C. <u>Disputes:</u>  The CO and the authorized signatory of the service provider will settle disputes, questions, and concerns arising from this agreement. Settlement of disputes will

17

Version 2

be memorialized in a written modification between the ICE CO and authorized signatory of the service provider. In the event a dispute is not able to be resolved between the service provider and the ICE CO, the ICE CO will make the final decision. If the service provider does not agree with the final decision, the matter may be appealed to the ICE HCA for resolution. The ICE HCA may employ all methods available to resolve the dispute including alternative dispute resolution techniques. The service provider shall proceed diligently with performance of this agreement pending final resolution of any dispute.

### Article 18. Enrollment, Invoicing, and Payment

A. <u>Enrollment in Electronic Funds Transfer:</u>  The service provider shall provide ICE with the information needed to make payments by electronic funds transfer (EFT). The service provider shall identify their financial institution and related information on Standard Form 3881, Automated Clearing House (ACH) Vendor Miscellaneous Payment Enrollment Form https://www.gsa.gov/forms-library/ach-vendormiscellaneous-payment-enrollment  The service provider shall submit a completed SF 3881 to ICE payment office prior to submitting its initial request for payment under this agreement. If the EFT data changes, the service provider shall be responsible for providing updated information to the ICE payment office.

B. <u>SAM Registration:</u> The service provider shall maintain an active registration in System for Award Management (SAM) at the time of award and throughout the life of this agreement. The service provider shall be registered to receive "All Awards" in their SAM registration. The SAM website can be found at www.sam.gov.

C. <u>Consolidated Invoicing</u>:  The service provider shall submit a monthly itemized invoice within the first ten (10) business days of the month following the calendar month when it provided the services. Invoice instructions can be found on the SF 1449.

D. <u>On-call Guard Hours:</u> The itemized monthly invoice for on-call guard services shall state the number of hours being billed, the duration of the billing (times and dates) and the mission/trip number. Such services shall be denoted as a separate item on submitted invoices. ICE agrees to reimburse the service provider for actual on-call guard services provided during the invoiced period.

E. <u>Payment:</u>  ICE will transfer funds electronically through either an Automated Clearing House subject to the banking laws of the US, or the Federal Reserve Wire Transfer System. The Prompt Payment Act applies to this agreement. The Prompt Payment Act requires ICE to make payments under this agreement the thirtieth (30th) calendar day after the Burlington Finance Office receives a proper invoice. Either the date on the Government's check, or the date it executes an electronic transfer of funds, constitutes the payment date. The Prompt Payment Act requires ICE to pay interest on overdue payments to the service provider. ICE will determine any interest due in accordance with

18

Version 2

the Prompt Payment Act provided the service provider maintains an active registration in the SAM and all information is accurate.

F.   Robotics Process Automation Requirement:  The Detention Facility Robotics Process Automation (RPA) process requires that data supporting detention bed space, ground transportation costs and any other additional costs covered by the current agreement will be recorded utilizing the Detention-Transportation Invoice Supporting Documentation Template (Attachment 6). This data template shall be completed in its entirety in the established format once all data supporting the monthly operations is available. Once completed, the Detention-Transportation Template must be submitted to both the COR and the ERO RPA Team Mailbox (erorpa@ice.dhs.gov). Please also note that the requirement for submission of the Detention-Transportation Template is prior to and in addition to the invoice submission requirement already included in this agreement. Any required updates/adjustments will be identified and sent to the service provider within 48 hours of submission to the mailbox. The Detention-Transportation Template updates may be requested by the COR and will require timely resubmission to the COR and the ERO RPA Team Mailbox. For ground transportation services, the G-391 portion of the Detention-Transportation Template must be completed and validated by the service provider on a monthly basis so that there are no errors for each of the trips in the G-391 upload template. Errors are indicated by rows, columns, and cells that are highlighted when the vendor checks the validation using the tool. If the COR identifies errors that have not been corrected, they will resend the report within 48 hours to the vendor to fix and resubmit within 5 business days. All reports must align with invoice amounts and dollar values.

The Government reserves the right to update the detention facility invoice process, templates or other related documents, in order to fix issues, expand capabilities, and improve performance of the reconciliation process.

**Article 19. Hold Harmless Provisions**

Unless specifically addressed by the terms of this agreement, the parties agree to be responsible for the negligent or wrongful acts or omissions of their respective employees to the extent authorized under the applicable law.

A.   Service Provider Held Harmless:  ICE liability for any injury, damage or loss to persons or property caused by the negligent or tortuous conduct of its own officers, employees, and other persons provided coverage pursuant to Federal law is governed by the Federal Tort Claims Act, 28 USC 2691 *et seq.* (FTCA). Compensation for work related injuries for ICE's officers, employees and covered persons is governed by the Federal Employees Compensation Act (FECA). The service provider shall promptly notify ICE of any claims or lawsuits filed against any ICE employees of which service provider is notified.

B.   Federal Government Held Harmless:  Service provider liability for any injury, damage or loss to persons or property arising out of the performance of this agreement and caused by the negligence of its own officers, employees, agents and representatives is governed

19

Version 2

by the applicable State and/or local law. ICE will promptly notify the service provider of any claims filed against any of service provider's employees of which ICE is notified. The Federal Government will be held harmless for any injury, damage or loss to persons or property caused by a service provider employee arising in the performance of this agreement.

C. Defense of Suit:  In the event an ICE detained noncitizen files suit against the service provider contesting the legality of the noncitizen's ICE detention under this agreement and/or immigration/citizenship status, or a noncitizen files suit as a result of an administrative error or omission of the Federal Government, ICE will request that the United States Department of Justice (DOJ), as appropriate, move either to have the service provider dismissed from such suit; to have ICE substituted as the proper party defendant; or to have the case removed to a court of proper jurisdiction. Regardless of the decision on any such motion, ICE will request that DOJ be responsible for the defense of any suit on these grounds. Nothing in this agreement limits the discretion of DOJ on any litigation matters.

D. ICE Recovery Right:  The service provider shall do nothing to prejudice ICE's right to recover against third parties for any loss, destruction of, or damage to U.S. Government property. Upon request from the CO, the service provider shall furnish to ICE all reasonable assistance and cooperation, including assistance in the prosecution of suit and execution of the instruments of assignment in favor of ICE in obtaining recovery.

E. Service Provider Insurance:  The service provider and any subcontractor(s) shall maintain insurance and/or be self-insured in an amount not less than $1,000,000 to protect the service provider from claims under workman's compensation acts and from any other claims for damages for personal injury, including death which may arise from operations under this contract whether such operations by the service provider itself or by any subcontractor or anyone directly or indirectly employed by either business entity. The service provider and its subcontractor(s) shall maintain General Liability insurance: bodily injury liability coverage written on a comprehensive form of policy of at least $500,000 per occurrence is required.

Additionally, an automobile liability insurance policy and/or self-insurance providing for bodily injury and property damage liability covering automobiles operated in the US shall provide coverage of at least $200,000 per person and $500,000 per occurrence for bodily injury and $20,000 per occurrence for property coverage. Certificates of such insurance shall be subject to the approval of the CO for adequacy of protection. All insurance certificates required under this contract shall provide 30 days advance notice to the Government of any contemplated cancellation.

## Article 20. Financial Records

A. Retention of Records:  All financial records, supporting documents, statistical records, and other records pertinent to contracts or subordinate agreements under this agreement

20

Version 2

shall be retained by the service provider in accordance with the NARA records schedule for purposes of federal examinations and audit. The retention period begins at the end of the first year of completion of service under the agreement. If any litigation, claim, negotiation, audit, or other action involving the records has been started before the expiration of the retention period, the records must be retained until completion of the action and resolution of all issues which arise from it or until the end of the regular NARA record retention period, whichever is later. Retention of records requirements can be found in Attachment 8.

B.  Access to Records:  ICE and the Comptroller General of the United States, or any of their authorized representatives, have the right of access to any pertinent books, documents, papers or other records of the service provider or its subcontractors, which are pertinent to this agreement's administration and compliance,, to make audits, examinations, excerpts, and transcripts. The rights of access must not be limited to the required retention period but shall last as long as the records are retained.

C.  Delinquent Debt Collection:  ICE will hold the service provider accountable for any overpayment, or any breach of this agreement that results in a debt owed to the Federal Government. ICE will apply interest, penalties, and administrative costs to a delinquent debt owed to the Federal government by the service provider pursuant to the Debt Collection Improvement Act of 1982, as amended.

**Article 21. Labor Standards and Wage Determination**

A.  The Service Contract Act, 41 U.S.C. 351 et seq., Title 29, Part 4 Labor Standards for Federal Service Contracts, is hereby incorporated as Attachment 1. These standards and provisions are included in every contract and IGSA entered by the United States or the District of Columbia, in excess of $2,500, or in an indefinite amount, the principal purpose of which is to furnish services through the use of service employees.

B.  Wage Determination:  Each service employee employed in the performance of this agreement shall be paid not less than the minimum prevailing wages and shall be furnished fringe benefits in accordance with the wages and fringe benefits determined by the Secretary of Labor or authorized representative, as specified in any wage determination applicable under this agreement. The wage determination, issued under the Service Contract Labor Standards statute, by the Administrator, Wage and Hour Division, U.S. Department of Labor, will be updated on the annual anniversary of the IGSA agreement with the most recent applicable wage determination.

C.  The service provider shall notify the CO of any increase claimed within 30 calendar days after receiving a new wage determination unless this notification period is extended in writing by the CO. The contract price will be adjusted to reflect the service provider's actual increase in applicable wages and fringe benefits to the extent the increase is made to comply with the new wage determination.  Any adjustment will be limited to increases or decreases in wages and fringe benefits, and the accompanying increases or decreases in social security and unemployment taxes and workers' compensation insurance, but

21

shall not otherwise include any amount for general and administrative costs, overhead, or profit.

D.

**Article 22. Notification and Public Disclosures**

A.  Information obtained or developed because of this IGSA is under the control of ICE and is subject to public disclosure only pursuant to the provisions of applicable Federal laws (such as the FOIA), regulations, and Executive Orders or as ordered by a Court. The Service provider is prohibited from disclosing any information relating to ICE noncitizens pursuant to 8 C.F.R § 236.6. If the service provider receives a request for such information through, for example relevant State sunshine laws or another mechanism, the service provider shall promptly notify the ICE FOIA Officer and inform the requester to submit a FOIA request directly to the ICE FOIA Office. To the extent the service provider intends to release the IGSA or any information relating to, or exchanged under, this IGSA, the service provider agrees to coordinate with the ICE FOIA Officer prior to such release. The service provider may, at its discretion, communicate the substance of this IGSA when requested. ICE understands that this IGSA will become a public document when presented to the service provider's governing body for approval.

B.  The CO shall be notified in writing of all litigation pertaining to this IGSA and provided copies of any pleadings filed or said litigation within five business days of the receipt of service. The service provider shall cooperate with government legal staff and/or the United States Attorney regarding any requests pertaining to Federal or service provider litigation.

C.  The service provider shall notify the ICE Office of Congressional Relations when a member of the United States Congress requests information, or the CO and the ICE Office of Congressional Relations when he/she makes a request to visit the facility. The service provider shall coordinate all public information related issues pertaining to ICE noncitizens with ICE. The service provider shall promptly make public announcements stating the facts of unusual or newsworthy incidents to local media. Examples of such events include, but are not limited to deaths, escapes from custody, and facility emergencies. All press statements and releases shall be cleared, in advance, with the ICE Office of Public Affairs.

D.  With respect to public announcements and press statements, the service provider shall ensure employees agree to use appropriate disclaimers clearly stating the employees' opinions do not reflect the position of the United States government in any public presentations they make or articles they write that relate to any aspect of performance or the facility operations.

E.  Facility Access: The facility's perimeter will ensure that public access is denied without proper authorization. Visitation and/or tours of the facility shall be conducted as directed by ICE.

22

Version 2

F.  For the safety and privacy of the ICE noncitizens, no videotaping is permitted by visitors or others (including the service provider) without prior approval from ICE, except for CCTV cameras operated by the service provider or the Government for security purposes. No video or audio recording devices will be allowed within the secure perimeter, except in accordance with court order or Federal law. Uses of force are excluded from this provision in accordance with the applicable ICE standards.

## Article 23. Privacy

A.  The service provider shall comply with the Privacy Act of 1974 ("the Act") and the agency rules and regulations issued under the Act in the design, development, or operation of any system of records on individuals to accomplish an agency function when the agreement specifically identifies (i) the systems of records; and (ii) the design, development, or operation work that the service provider is to perform. The service provider shall also include the Privacy Act into all subcontracts when the work statement in the proposed subcontract requires the redesign, development, or operation of a system of records on individuals that is subject to the Act; and

B.  In the event of violations of the Act, a civil action may be brought against the agency involved when the violation concerns the design, development, or operation of a system of records on individuals to accomplish an agency function, and criminal penalties may be imposed upon the officers or employees of the agency when the violation concerns the operation of a system of records on individuals to accomplish an agency function. For purposes of the Act, when the agreement is for the operation of a system of records on individuals to accomplish an agency function, the service provider is considered to be an employee of the Agency.

   1.  "Operation of a system of records," as used in this article, means performance of any of the activities associated with maintaining the system of records, including the collection, use, and dissemination of records.

   2.  "Record," as used in this article, means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, education, financial transactions, medical history, and criminal or employment history and that contains the person's name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a fingerprint or voiceprint or a photograph.

   3.  "System of records on individuals," as used in this article, means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual.

## Article 24. Attestation of Pricing Data

A. Requirements for Attested Pricing Data and Data Other Than Attested Pricing Data

23

Version 2

(a) *Exceptions from attested pricing data.*

(1) In lieu of submitting attested pricing data, service providers may submit a written request for exception by submitting the information described in the following subparagraphs. The CO may require additional supporting information, but only to the extent necessary to determine whether an exception should be granted, and whether the price is fair and reasonable.

(i) *Identification of the law or regulation establishing the price offered.* If the price is controlled under law by periodic rulings, reviews, or similar actions of a governmental body, attach a copy of the controlling document.

(ii) *Commercial item exception.* For a commercial item exception, the service provider shall submit, at minimum, information on prices at which the same item or similar items have previously been sold in the commercial market that is adequate for evaluating the reasonableness of the price for this acquisition. Such information may include –

(A) For catalog items, a copy of or identification of the catalog and its date, or the appropriate pages for the offered items, provide a copy or describe current discount policies and price lists (published or unpublished), *e.g.*, wholesale, original equipment manufacturer, or reseller. Also explain the basis of each offered price and its relationship to the established catalog price, including how the proposed price relates to the price of recent sales in quantities similar to the proposed quantities.

(B) For market-priced items, the source and date or period of the market quotation or other basis for market price, the base amount, and applicable discounts. In addition, describe the nature of the market.

(C) For items included on an active Federal Supply Service Multiple Award Schedule contract, proof that an exception has been granted for the schedule item.

(2) The service provider grants the CO or an authorized representative the right to examine, at any time before award, books, records, documents, or other directly pertinent records to verify any request for an exception under this provision, and the reasonableness of price. For items priced using catalog or market prices, or law or regulation, access does not extend to cost or profit information or other data relevant solely to the service provider's determination of the prices to be offered in the catalog or marketplace.

(b) *Requirements for attested pricing data.* If the service provider is not granted an exception from the requirement to submit attested pricing data, the following applies:

(1) The service provider shall prepare and submit attested pricing data, and data other than attested pricing data, and supporting attachments.

Version 2

(2) As soon as practicable after agreement on price, but before IGSA award, the service provider shall submit an Attestation of Current Pricing Data, the format of which is at the end of this article.

B. Requirements for Attested Pricing Data and Data Other Than Attested Pricing Data – Modifications

(a) *Exceptions from attested pricing data.*

(1) In lieu of submitting attested pricing data for modifications under this IGSA, for price adjustments expected to exceed $750,000 on the date of the agreement on price or the date of the award, whichever is later, the service provider may submit a written request for exception by submitting the information described in the following subparagraphs. The CO may require additional supporting information, but only to the extent necessary to determine whether an exception should be granted, and whether the price is fair and reasonable –

(i) *Identification of the law or regulation establishing the price offered.* If the price is controlled under law by periodic rulings, reviews, or similar actions of a governmental body, attach a copy of the controlling document.

(2) The service provider grants the CO or an authorized representative the right to examine, at any time before award, books, records, documents, or other directly pertinent records to verify any request for an exception under this Article, and the reasonableness of price. For items priced using catalog or market prices, or law or regulation, access does not extend to cost or profit information or other data relevant solely to the service provider's determination of the prices to be offered in the catalog or marketplace.

(b) *Requirements for attested pricing data.* If the service provider is not granted an exception from the requirement to submit attested pricing data, the following applies:

(1) The service provider shall submit attested pricing data, data other than attested pricing data, and supporting attachments.

(2) As soon as practicable after agreement on price, but before award, the service provider shall submit an Attestation of Current Pricing Data. The form is included at the end of this Article.

C. Subcontractor Attested Pricing Data

(a) Before awarding any subcontract expected to exceed $750,000 on the date of agreement on price or the date of award, whichever is later; or before pricing any subcontract modification involving a pricing adjustment expected to exceed $750,000, the service provider shall require the subcontractor to submit attested pricing data (actually or by specific identification in writing), to include any information reasonably required to explain the subcontractor's estimating process such as the judgmental factors applied and the mathematical or other methods used in the estimate, including those used in projecting from known data, and the nature and amount of any

25

contingencies included in the price, unless (1) the prices are based upon adequate price competition, or (2) if a waiver has been granted.

(b) The service provider shall require the subcontractor to attest in substantially the form at the end of this article that, to the best of its knowledge and belief, the data submitted under paragraph (a) of this Article were accurate, complete, and current as of the date of agreement on the negotiated price of the subcontract or subcontract modification.

(c) In each subcontract that exceeds $750,000, when entered into, the service provider shall insert either -

    (1) The substance of this Article, including this paragraph (c), if paragraph (a) of this Article requires submission of attested pricing data for the subcontract; or

    (2) The substance of the Section below entitled "Subcontractor Attested Pricing Data - Modifications."

D. Subcontractor Attested Pricing Data – Modifications

(a) The requirements of paragraphs (b) and (c) of this Section shall –

    (1) Become operative only for any modification to this IGSA involving a pricing adjustment expected to exceed $700,000; and

    (2) Be limited to such modifications.

(b) Before awarding any subcontract expected to exceed $750,000, on the date of agreement on price or the date of award, whichever is later; or before pricing any subcontract modification involving a pricing adjustment expected to exceed $750,000, the service provider shall require the subcontractor to submit attested pricing data (actually or by specific identification in writing), to include any information reasonably required to explain the subcontractor's estimating process such as the judgmental factors applied and the mathematical or other methods used in the estimate, including those used in projecting from known data, and the nature and amount of any contingencies included in the price, unless (1) prices of the modification are based upon adequate price competition, or (2) if a waiver has been granted.

(c) The service provider shall require the subcontractor to certify in substantially the form at the end of this article that, to the best of its knowledge and belief, the data submitted under paragraph (b) of this Article were accurate, complete, and current as of the date of agreement on the negotiated price of the subcontract or subcontract modification.

(d) The service provider shall insert the substance of this article, including this paragraph (d), in each subcontract that exceeds $750,000 on the date of agreement on price or the date of award, whichever is later.

E. Price Reduction for Defective Attested Pricing Data

26

Version 2

(a) If any price, including profit or fee, negotiated in connection with this IGSA, or any cost reimbursable under this IGSA, was increased by any significant amount because –

(1) The service provider or a subcontractor furnished attested pricing data that were not complete, accurate, and current as attested in its Attestation of Pricing Data;

(2) A subcontractor or prospective subcontractor furnished the service provider attested pricing data that were not complete, accurate, and current as attested in the service provider's Attested of Current Pricing Data; or

(3) Any of these parties furnished data of any description that were not accurate, the price or cost shall be reduced accordingly and the IGSA shall be modified to reflect the reduction.

(b) Any reduction in the IGSA price under paragraph (a) of this Article due to defective data from a prospective subcontractor that was not subsequently awarded the subcontract shall be limited to the amount, plus applicable overhead and profit markup, by which (1) the actual subcontract or (2) the actual cost to the service provider, if there was no subcontract, was less than the prospective subcontract cost estimate submitted by the service provider; provided, that the actual subcontract price was not itself affected by defective attested pricing data.

(c)

(1) If the CO determines under paragraph (a) of this Article that a price or cost reduction should be made, the service provider agrees not to raise the following matters as a defense:

(i) The service provider or subcontractor was a sole source supplier or otherwise was in a superior bargaining position and thus the price of the IGSA would not have been modified even if accurate, complete, and current attested pricing data had been submitted.

(ii) The CO should have known that the attested pricing data in issue were defective even though the service provider or subcontractor took no affirmative action to bring the character of the data to the attention of the CO.

(iii) The IGSA was based on an agreement about the total cost of the IGSA and there was no agreement about the cost of each item procured under the IGSA.

(iv) The service provider or subcontractor did not submit a Attestation of Current Pricing Data.

(2)

(i) Except as prohibited by subdivision (c)(2)(ii) of this Article, an offset in an amount determined appropriate by the CO based upon the facts shall be allowed against the amount of a IGSA price reduction if –

27

Version 2

(A) The service provider certifies to the CO that, to the best of the service provider's knowledge and belief, the service provider is entitled to the offset in the amount requested; and

(B) The service provider proves that the attested pricing data were available before the "as of" date specified on its Attestation of Current Pricing Data, and that the data were not submitted before such date.

(ii) An offset shall not be allowed if –

(A) The understated data were known by the service provider to be understated before the "as of" date specified on its Attestation of Current Pricing Data; or

(B) The Government proves that the facts demonstrate that the IGSA price would not have increased in the amount to be offset even if the available data had been submitted before the "as of" date specified on its Attestation of Current Pricing Data.

(d) If any reduction in the IGSA price under this Article reduces the price of items for which payment was made prior to the date of the modification reflecting the price reduction, the service provider shall be liable to and shall pay the United States at the time such overpayment is repaid –

(1) Simple interest on the amount of such overpayment to be computed from the date(s) of overpayment to the service provider to the date the Government is repaid by the service provider at the applicable underpayment rate effective for each quarter prescribed by the Secretary of the Treasury under 26 U.S.C. 6621(a)(2); and

(2) A penalty equal to the amount of the overpayment, if the service provider or subcontractor knowingly submitted attested pricing data that were incomplete, inaccurate, or noncurrent.

F. Price Reduction for Defective Attested Pricing Data - Modifications

(a) Section F shall become operative only for any modification to this IGSA involving a pricing adjustment expected to exceed $720,000, except that this section does not apply to any modification (1) where prices of the modification are based upon adequate price competition, or (2) when a waiver has been granted.

(b) If any price, including profit or fee, negotiated in connection with any modification under this Article, or any cost reimbursable under this IGSA, was increased by any significant amount because

(1) the service provider or a subcontractor furnished attested pricing data that not complete, accurate, and current as attested in its Attestation of Current Pricing Data,

28

Version 2

(2) a subcontractor or prospective subcontractor furnished the service provider attested data that were not complete, accurate, and current as attested in the service provider's Attestation of Current Pricing Data, or

(3) any of these parties furnished data of any description that were not accurate, the price or cost shall be reduced accordingly and the IGSA shall be modified to reflect the reduction. This right to a price reduction is limited to that resulting from defects in data relating to modifications for which this Article becomes operative under paragraph (a) of this Article.

(c) Any reduction in the IGSA price under paragraph (b) of this Article due to defective data from a prospective subcontractor that was not subsequently awarded the subcontract shall be limited to the amount, plus applicable overhead and profit markup, by which (1) the actual subcontract or (2) the actual cost to the service provider, if there was no subcontract, was less than the prospective subcontract cost estimate submitted by the service provider; provided, that the actual subcontract price was not itself affected by defective attested pricing data.

(d)

(1) If the CO determines under paragraph (b) of this Article that a price or cost reduction should be made, the service provider agrees not to raise the following matters as a defense:

(i) The service provider or subcontractor was a sole source supplier or otherwise was in a superior bargaining position and thus the price of the IGSA would not have been modified even if accurate, complete, and current attested pricing data had been submitted.

(ii) The CO should have known that the attested pricing data in issue were defective even though the service provider or subcontractor took no affirmative action to bring the character of the data to the attention of the CO.

(iii) The IGSA was based on an agreement about the total cost of the IGSA and there was no agreement about the cost of each item procured under the IGSA.

(iv) The service provider or subcontractor did not submit an Attestation of Current Pricing Data.

(2)

(i) Except as prohibited by subdivision (d)(2)(ii) of this Article, an offset in an amount determined appropriate by the CO based upon the facts shall be allowed against the amount of a IGSA price reduction if -

(A) The service provider certifies to the CO that, to the best of the service provider's knowledge and belief, the service provider is entitled to the offset in the amount requested; and

29

Version 2

(B) The service provider proves that the attested pricing data were available before the "as of" date specified on its Attestation of Current Pricing Data, and that the data were not submitted before such date.

(ii) An offset shall not be allowed if -

(A) The understated data were known by the service provider to be understated before the "as of" date specified on its Attestation of Current Pricing Data; or

(B) The Government proves that the facts demonstrate that the IGSA price would not have increased in the amount to be offset even if the available data had been submitted before the "as of" date specified on its Attestation of Current Pricing Data.

(e) If any reduction in the IGSA price under this Article reduces the price of items for which payment was made prior to the date of the modification reflecting the price reduction, the service provider shall be liable to and shall pay the United States at the time such overpayment is repaid the following:

(1) Simple interest on the amount of such overpayment to be computed from the date(s) of overpayment to the service provider to the date the Government is repaid by the service provider at the applicable underpayment rate effective for each quarter prescribed by the Secretary of the Treasury under 26 U.S.C. 6621(a)(2); and
(2) A penalty equal to the amount of the overpayment, if the service provider or subcontractor knowingly submitted attested pricing data that were incomplete, inaccurate, or noncurrent.

Prior to the award of any modification exceeding $750,000.00, the service provider shall submit a signed copy of the following statement to the CO:

*Note: The initial attestation is found in the RFP letter to the vendor.

### Attestation of Current Pricing Data for Modifications (if applicable)

This is to attest that, to the best of my knowledge and belief, the pricing data submitted, either actually or by specific identification in writing, to the CO or to the CO's representative in support of ____* are accurate, complete, and current as of ____**. This attestation includes the pricing data supporting requests for equitable adjustments between the service provider and the Government that are part of the proposal.

Service Provider _____

Signature _____

Name _____

Title _____

30

Version 2

Date of execution*** _____

\* Identify the proposal, request for price adjustment, or other submission involved, giving the appropriate identifying number (*e.g.*, RFP No.).

\*\* Insert the day, month, and year when price negotiations were concluded and price agreement was reached or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price.

\*\*\* Insert the day, month, and year of signing, which should be as close as practicable to the date when the price negotiations were concluded, and the contract price was agreed to.

## QUALITY CONTROL

### Article 25. Quality Control

A.  The service provider is responsible for management and quality control actions necessary to meet the quality standards set forth in the agreement. The service provider shall provide a Quality Control Plan (QCP) that meets the requirements specified in the Performance Requirements Summary (PRS), (included in Attachment 3) to the CO for concurrence prior to award of the IGSA (or as directed by the CO). The CO will notify the service provider of concurrence or required modifications to the plan before the agreement start date. If a modification to the plan is required, the service provider shall make appropriate modifications and obtain concurrence of the revised plan by the CO before the IGSA start date.

B.  The service provider shall provide a QCP that addresses critical operational performance standards for the services required under this IGSA. The QCP shall ensure that services will be maintained at a uniform and acceptable level. At a minimum, the service provider shall periodically review and update the QCP policies and procedures at least on an annual basis. The service provider shall audit the facility's operations monthly for compliance with the QCP. The service provider shall notify the Government 48 hours in advance of the audit to ensure the COR is available to participate. The service provider's QCP shall identify deficiencies, appropriate corrective action(s), and timely implementation plans to the COR.

C.  If the service provider proposes changes in the QCP after IGSA award, the service provider shall submit them to the COR for review. If the COR concurs with the changes, the COR shall submit the changes to the CO. The CO may modify the contract to include these changes.

### Article 26. Quality Assurance Surveillance Plan (QASP)

A.  The Government's QASP is based on the premise that the service provider, and not the Government, is responsible for management and quality control actions to meet the terms

31

Version 2

of the agreement. The QASP procedures recognize that unforeseen problems do occur. Good management and use of an adequate QCP will allow the facility to operate within acceptable quality levels. See Attachment 3 for the Government's QASP.

B.  All services rendered under this agreement are subject to inspection both during the service provider's operations and after completion of the tasks.

C.  When the service provider is advised of any unsatisfactory condition(s), the service provider shall submit a written report to the COR addressing corrective/preventive actions taken. The QASP is not a substitute for quality control by the service provider.

D.  The COR may check the service provider's performance and document any noncompliance; only the CO may take formal action against the service provider for unsatisfactory performance.

E.  The Government may apply various inspection and extrapolation techniques (i.e., 100 % surveillance, random sampling, planned sampling, unscheduled inspections) to determine the quality of services, the appropriate reductions, and the total payment due.

F.  The QASP sets forth the procedures and guidelines that ICE will use to inspect the technical performance of the service provider. It presents the financial values and mechanisms for applying adjustments to the service provider's invoices as dictated by work performance measured to the desired level of accomplishment.

    1.  The purpose of the QASP is to:

        a.  Define the roles and responsibilities of participating Government officials.
        b.  Define the types of work to be performed.
        c.  Describe the evaluation methods that will be employed by the Government in assessing the service provider's performance.
        d.  Describe the process of performance documentation.

    2.  Roles and Responsibilities of Participating Government Officials

        a.  The COR(s) will be responsible for monitoring, assessing, recording, and reporting on the technical performance of the service provider on a day-to-day basis. The COR(s) will have primary responsibility for documenting their inspection and evaluation of the service provider's work performance.

        b.  The CO or designee has overall responsibility for evaluating the service provider's performance in areas of contract compliance, contract administration, and cost and property control. The CO shall review the COR's evaluation of the service provider's performance and invoices. If applicable, deductions or withholdings will be assessed in accordance with

32

Version 2

the evaluation of the service provider's performance, e.g., monetary adjustments for inadequate performance.

G.  The rights of the Government and remedies described in this section are in addition to all other rights and remedies set forth in this agreement. Any reductions in the service provider's invoice shall reflect the contract's reduced value resulting from the service provider's failure to perform required services. The service provider shall not be relieved of full performance of the services hereunder and may be terminated based upon inadequate performance of services, even if a reduction was previously taken for any inadequate performance.

## DEDICATED FACILITIES

## Article 27. Exclusivity

A.  The service provider agrees that the facility is to be for the exclusive use of ICE and its detained population. No other agency shall be allowed to use the facility to house its detained noncitizen, prisoners, or inmates without prior approval of the CO. If given approval, a separate bed day rate shall be negotiated with the other agency and ICE shall not be responsible for payment related to beds used by another agency. The other agency shall be separately invoiced for the beds it uses. The duration of the use of beds will be determined on a case-by-case basis.

B.  An appropriate portion of the FOC may be applicable to the other agency and will be negotiated with that agency by the CO before providing approval for use. The applicable portion of the FOC due the other agency will be separately invoiced directly to that agency and reduced from ICE's cost via bilateral contract modification.

## Article 28. Use of Service Provider's Policies and Procedures

A.  All policies and procedures shall meet all standards and requirements of this agreement. The COR shall review the service provider's policies and procedures for compliance with the agreement. The COR may seek clarifications, if necessary. Any requested changes shall be negotiated and agreed upon. After COR review, the service provider is authorized to use its policies and procedures in conjunction with Standards mandated under this agreement. The COR will not review the service provider's policies and procedures for compliance with law or regulation, nor will the COR approve the service provider's policies and procedures beyond the minimum requirements as required by the agreement.

## Article 29. ACA Accreditation

A.  The service provider shall have eighteen (18) months from issuance of the initial task order to fund this agreement to become ACA accredited. Once full accreditation has been obtained, the service provider shall maintain this accreditation throughout the life of the agreement, inclusive of any extensions. The service provider shall provide the CO with

33

Version 2

written proof of ACA application within 5 business days of the application and written proof of its accreditation within 5 business days of notification of accreditation.

34

Version 2