UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF NEW MEXICO; MICHELLE LUJAN GRISHAM, in her Official Capacity as Governor of the State of New Mexico; RAUL TORREZ, in his Official Capacity as Attorney General of the State of New Mexico; CITY OF ALBUQUERQUE; TIMOTHY KELLER, in his Official Capacity as Mayor of the City of Albuquerque;<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  Civil Action No. 26-cv-1471<br><br>MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW |

Plaintiff United States of America hereby moves for the entry of a preliminary injunction and for such other relief that the Court deems appropriate. In support thereof, Plaintiff respectfully provides the following factual background and legal basis.

## INTRODUCTION

Since 2008, Otero County, New Mexico, has, without issue, provided civil immigration detention services and facilities to the U.S. Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), in exchange for significant monetary compensation pursuant to the terms of successive Intergovernmental Service Agreements, the latest of which became effective on March 16, 2026 ("Otero-ICE Contract"). ICE depends on this agreement and the Otero County Processing Center ("OCPC") to fulfill the immigration objectives established by Congress in the Immigration and Nationality Act ("INA"). OCPC is a unique detention facility that is critical to federal immigration operations; it houses up to 1,096 male and

female detainees in a location that is near vital ports of entry and infrastructure. It is consistently a high-quality facility, as it is well staffed and has a track record for safely and humanely handling detainees. Yet, on February 5, 2026, Governor Michelle Lujan Grisham signed House Bill 9 ("HB9") into law, to take effect on May 20, 2026. HB9 seeks to ban the Otero-ICE Contract and prohibit the use of the OCPC for civil immigration detention purposes altogether. Should HB9 be permitted to take effect, federal immigration operations will be significantly burdened and Otero County will be deprived of revenue, jobs, and economic activity. Thankfully, the U.S. Constitution prohibits state laws like HB9 for several reasons.

First, the Constitution protects agreements from impairment by fluctuating policies of temporary state legislative majorities. U.S. Const. art. I, § 10, cl. 1 ("No state shall . . . pass any . . . Law impairing the Obligation of Contracts."). HB9 is the epitome of legislation that the Contract Clause was intended to prevent. It makes it impossible for Otero County to perform its longstanding agreement with the Federal Government for no purpose other than to end "the business of immigration detention" in the State of New Mexico. As such, HB9 impairs the Otero-ICE Contract without a legitimate public purpose. Even if prohibiting the detention of aliens who violate federal immigration law was a legitimate public purpose, the categorical requirement that all agreements to detain alien violators of civil immigration law be terminated is not a reasonable condition appropriate to achieve any purported purpose justifying its adoption.

The Constitution further establishes a system of dual sovereignty. Under that system, federal law is "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus state governments "have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the

2

general government." *McCulloch v. Maryland*, 17 U.S. 316, 436 (1819); *see also Mayo v. United States*, 319 U.S. 441, 445 (1943). Under preemption principles, state law may not stand as an obstacle to the enforcement of federal law. And under intergovernmental immunity principles, state governments may not regulate or discriminate against the Federal Government. Yet that is exactly what HB9 does by prohibiting agreements between the Federal Government and local governmental entities for the detention of aliens who violate federal immigration law. Such a prohibition is preempted by federal immigration laws that specifically contemplate agreements between the Federal Government and state and local government entities to detain aliens. *See* 8 U.S.C §§ 1103(a)(11)(B), 1231(g); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 762 (9th Cir. 2022). Additionally, HB9's limit on the potential parties with whom the Federal Government may form agreements and property that may be used to achieve Congress's goals in a manner inconsistent with Congress's immigration scheme amounts to regulation of the Federal Government. *See CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325–28 (3d Cir. 2025); *Geo Grp.*, 50 F.4th at 760–61. Finally, HB9 unlawfully discriminates against the Federal Government because it singles out the Federal Government for worse treatment by imposing restrictions on the ability of local governmental entities to form contracts or to provide access to property for federal immigration detention purposes while imposing no such restrictions for other comparable law enforcement purposes. *See* HB9 § 3(E).

If HB9 is not enjoined by this Court before May 20, it will result in immediate and irreparable harm to the civil immigration system by jeopardizing and obstructing ICE's ability to detain and remove aliens nationwide. The balance of the equities also favors an injunction. New Mexico has no legitimate interest in its unconstitutional law, and there is significant public interest in enforcing federal immigration law and continuing the performance of the Otero-ICE Contract.

3

New Mexico will not be harmed by preliminary injunctive relief because the 18-year status quo will remain unchanged, as DHS will continue to pour money into Otero County, creating jobs and economic activity as it has for nearly two decades. The United States is entitled to a preliminary injunction before HB9 goes into effect.

## BACKGROUND

### I.      Federal Immigration Law.

As an independent sovereign, "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens," *Arizona v. United States*, 567 U.S. 387, 394–95 (2012), and an inherent obligation and broad authority to establish immigration laws. *See Lopez v. U.S. I.N.S.*, 758 F.2d 1390, 1392 (10th Cir. 1985) ("Congress has conferred upon [federal immigration officials] broad authority to address the problem of illegal aliens."). Congress has exercised its broad authority to make laws governing the entry, presence, status, detention, and removal of aliens within the United States by enacting an "extensive and complex" statutory scheme for the "governance of immigration and alien status," as reflected in the INA. *Arizona*, 567 U.S. at 395. Through the INA, Congress established a regulatory scheme granting the Executive the authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1224, 1225, 1226, 1227, 1228, and 1231. The Executive's authority to enforce the nation's immigration laws "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). DHS officers and agents, including ICE, are tasked with enforcing federal immigration law. *See* 8 U.S.C. § 1103(a)(3).

Among the responsibilities of DHS is the detention of aliens. *See* 8 U.S.C. §§ 1226(a), (c), 1231(a)(2), (g), 1225(b)(1)(B)(ii), (b)(1)(B)(iii)(IV), (b)(2)(A), 1226a(a)(1). To fulfill the

mandates of the INA, Congress recognized that cooperation with state and local law enforcement is *essential*. *See Arizona*, 567 U.S. at 411 ("Consultation between Federal and state officials is an important feature of the immigration system."). Congress thus authorized the Federal Government to enter into agreements with state and local governments. *See* 8 U.S.C. §§ 1103(a)(11)(B) ("The Attorney General, in support of *persons in administrative detention in non-Federal institutions*, is authorized . . . *to enter into a cooperative agreement* with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required *to establish acceptable conditions of confinement and detention services* in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service.") (emphasis added); 1231(g) (authorizing the Executive Branch to "arrange for appropriate places of detention for aliens detained," and, when federal facilities are unavailable, to "expend . . . amounts necessary to acquire land and to . . . operate facilities . . . necessary for detention."). The Federal Government is also authorized to enter into cooperative agreements with local law enforcement, training and deputizing those officers to assist in the investigation, arrest, and detention of aliens. *See* 8 U.S.C. § 1357(g). Congress thus expressly contemplated and approved the use of voluntary agreements and property with local law enforcement to implement federal immigration detention operations.

## II.     The Otero-ICE Contract.

For nearly two decades, since 2008, Otero County has housed aliens and provided related civil immigration detention services to ICE through its operation of the OCPC pursuant to the terms of successive Intergovernmental Services Agreements ("IGSAs"). *See* Declaration of Jose P. Ortez ¶ 8 ("DHS Decl.") (attached hereto as Exhibit A); Declaration of William DeRevere ¶¶ 8-11 ("MTC Decl.") (attached hereto as Exhibit B). The first IGSA is Otero-ICE Contract, where

Otero County allows ICE to use OCPC in exchange for substantial revenue. *See* Compl., Ex. C at 1. The latest agreement, effective on March 16, 2026, has a term of 60 months and can be extended if both parties agree. *See* Compl., Ex. C at 1. However, only ICE can terminate the Otero-ICE Contract; Otero County expressly does not have the right to terminate it. *See id.* at Art. 14(B) ("The service provider shall not have the right to terminate this agreement"). Under the terms of the related Operations, Management, and Maintenance Agreement ("Otero-MTC Contract") between Management & Training Corporation ("MTC"), a private corporation, and Otero County, effective February 14, 2024, MTC is to perform necessary operational and management functions for the OCPC for a period of five years, by staffing the OCPC, providing food and medical services, and performing maintenance. *See generally* Compl., Ex. D; MTC Decl. ¶¶ 8-14, 21. Unlike the Otero-ICE Contract, Otero County can terminate the Otero-MTC Contract. *See* Compl., Ex. D at Art. IV, § D.1. Otero County does not have the operating capability of performing the Otero-ICE Contract itself; MTC provides all the staff and runs the facility. MTC Decl. ¶ 21. Without MTC or another private operator the OCPC could not function, and thus termination of the Otero-MTC Contract would result in Otero County's material breach of the Otero-ICE Contract and be tantamount to termination of the Otero-ICE Contract itself.

New Mexico law blesses these agreements with specific oversight from the New Mexico Attorney General, the Department of Finance and Administration, and the Risk Management Division of the General Services Department. NMSA 1978, Section 33-3-27 (2015); NMSA 1978, Section 33-3-2 (1989). Each has reputedly blessed these ISGAs without issue, including the current Attorney General, who approved of the Otero-MTC Contract in 2024. *See* Compl., Ex. C; MTC Decl. ¶¶ 10-11. No issues were raised before. Under these laws, New Mexico officials can provide

oversight of the ISGAs and set requirements. New Mexico inspectors and legislators can and do visit the facility. *Id.* ¶ 17. The facility regularly passes inspections and accreditation. *Id.* ¶¶ 16-19.

Thanks to the performance of the Otero-ICE Contract, ICE has benefited from access to a fully secure 1,096 bed facility that houses male and female detainees. DHS Decl. ¶¶ 8, 10. OCPC is critical to ICE's civil immigration operations, as it is geographically situated near the El Paso ERO Field Office, multiple Ports of Entry (e.g., OCPC is approximately 21 miles away from Ysleta, 24 miles away from Americas, 42 miles from Tornillo, and 46 miles from Santa Teresa), major highways, and an international airport. *Id.* ¶¶ 8, 11. OCPC is also the only civil immigration detention facility in New Mexico that can accommodate female detainees and higher risk individuals. *Id.* ¶ 10. Moreover, it is consistently a high-quality facility with the most staff, excellent conditions, and stellar track records for safely and humanely handling detainees. *Id.* ¶ 12; MTC Decl. ¶¶ 15-18. OCPC provides substantial jobs and revenue to the people of Otero Country. MTC Decl. ¶¶ 22-25; Affidavit of Panela Heltner ("Otero Decl.") ¶¶ 11-13 (attached hereto as Exhibit C).

### III.    House Bill 9.

On February 5, 2026, Governor Michelle Lujan Grisham signed HB9 into law. HB9 goes into effect on May 20, 2026. The "straightforward" purpose of HB9, according to its co-sponsor Representative Eleanor Chavez, is to "get[] New Mexico out of the business of immigration detention."[1] According to the Governor's Director of Communications, the purpose of HB9 is "to

---

[1] Pat Davis, *Momentum builds in New Mexico legislature to ban ICE facilities statewide*, New Mexico Political Report (Jan. 28, 2026), https://nmpoliticalreport.com/2026/01/28/momentum-builds-in-new-mexico-legislature-to-ban-ice-facilities-statewide/.

ensure New Mexico will not be complicit in discriminatory mass immigration enforcement . . .”[2] To achieve the purpose of ending civil immigration detention in New Mexico, HB9 requires, among other things, “public bodies”[3] to “terminate” agreements “to detain individuals for federal civil immigration violations including an intergovernmental services agreement to detain individuals for civil immigration violations.” HB9 §§ 3(A)–(B). It further prohibits public bodies from “sell[ing], trad[ing], leas[ing] or otherwise dispos[ing] of any real property to be used for the detention of individuals for federal civil immigration violations.” HB9 § 3(C). HB9 is enforceable by “[t]he attorney general or a district attorney” who are empowered to “institute a civil action in a district court if” they have “reasonable cause to believe that a violation of [HB9] has occurred or to prevent a violation of [HB9] from occurring.” *Id.* § 5(A). In such case, the district court “may award appropriate relief . . . to include declaratory and temporary, preliminary or permanent injunctive relief.” *Id.* § 5(B).

## LEGAL STANDARD

To obtain a preliminary injunction, the United States must establish: (1) a substantial likelihood that it will ultimately succeed on the merits of its suit; (2) that it is likely to suffer irreparable harm without preliminary relief; (3) this threatened harm outweighs the harm a preliminary injunction may pose to the opposing party; and, (4) if issued, the injunction will not adversely affect the public interest. *Ortega v. Grisham*, 148 F.4th 1134, 1141–42 (10th Cir. 2025)

---

[2] Alex Ross, *Lujan Grisham to push immigrant detention ban in next legislative session*, New Mexico Political Report (Sept. 8, 2025), https://nmpoliticalreport.com/2025/09/08/lujan-grisham-to-push-immigrant-detention-ban-in-next-legislative-session/.

[3] Public body is defined expansively to include “a state or local government, a sheriff’s department, an advisory board, a commission, an agency or an entity created by the constitution of New Mexico or any branch of government that receives public funding, including political subdivisions, special tax districts, school districts and institutions of higher education” as well as “an entity or individual acting on behalf of or within the scope of the authority of the public body.” HB9 § 2.

(citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "When a plaintiff is asserting an injury in the form of a violated constitutional right, we presume that the injury will be irreparable if it exists." *Id*. "Similarly, the third and fourth factors 'merge' when, as here, the government is the opposing party." *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## ARGUMENT

### I.    The United States Has Pre-Enforcement Standing

The United States has standing to bring this lawsuit to enjoin HB9 before it takes effect on May 20, 2026. *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 110 (10th Cir. 2024). Article III requires a plaintiff to demonstrate a concrete injury that is fairly traceable to the conduct of the defendant and judicially redressable. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To satisfy this requirement based on the threatened enforcement of a law, "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Rather, that requirement is satisfied where the plaintiff alleges "(1) 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the challenged] statute,' and (2) that 'there exists a credible threat of prosecution thereunder.'" *Polis*, 121 F.4th at 110 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

The United States easily satisfies these requirements. First, the United States "must present 'concrete plans to engage in conduct that ha[s] [the] potential to violate' the challenged statute once it goes into effect." *Polis*, 121 F.4th at 110 (quoting *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016)). DHS and Otero County just recently extended the Otero-ICE Contract for 60 months and both parties fully intend to perform under that contract. However, once HB9 takes effect, New Mexico may attempt to enforce HB9 against the Otero-ICE Contract. New

9

Mexico may also attempt to require Otero County to terminate the Otero-MTC Contract, which retains a termination clause. *See* Compl., Ex. D at Art. IV, § D.1. If it does, Otero County will not be able to provide replacement management and operational services for the OCPC under HB9. *See* HB9 §§ 3(A)–(C). Without a service provider for the OCPC, Otero County will not be able to perform the Otero-ICE Contract, and the OCPC will not be usable for the detention of aliens. MTC Decl. ¶ 21. Yet neither Otero County, MTC, nor ICE plans on terminating either contract or voluntarily complying with HB9. MTC Decl. ¶ 14. Instead, all parties intend to continue to perform under the contracts and to use the OCPC for civil immigration detention. *Id.*

Second, "there exists a credible threat of prosecution" under HB9. *Driehaus*, 573 U.S. at 159. "The threat of prosecution is generally credible where the defendant 'has not disavowed any intention of invoking' the statute against the plaintiff." *Polis*, 121 F.4th at 110 (quoting *Babbitt*, 442 U.S. at 302). Defendants have not disavowed enforcing HB9 against the Contract. *See Polis*, 121 F.4th at 111 ("Nothing indicates that Governor Polis has disavowed enforcing SB 23-169 against Pineda. As such, Pineda faces a credible threat of future enforcement . . ."). Moreover, to Plaintiff's knowledge, OCPC is the only detention facility with contracts that would be subject to the law. Presumably New Mexico would not have passed a law it does not intend to enforce.

Thus, there is a real risk of imminent enforcement. Indeed, HB9 authorizes "[t]he [New Mexico] attorney general . . . [to] institute a civil action in [state] district court . . . to prevent a violation of [HB9] from occurring" and "the court may award appropriate relief . . . to include declaratory and temporary, preliminary or permanent injunctive relief." HB9 § 5. And the New Mexico Attorney General has already demonstrated hostility to the Otero-ICE Contract that indicates an affirmative intent to enforce HB9 by petitioning the New Mexico Supreme Court for a writ of mandamus and stay to invalidate the Otero-ICE Contract. *See State of New Mexico ex re.*

10

*Raul Torrez v. Bd. of Cnty. Comm'rs for Otero Cnty.*, S-1-SC-41362. Though the New Mexico Supreme Court unanimously denied the petition, the Attorney General cited heavily to HB9 and has raised an Open Meetings Act violation along with additional arguments to Otero County. Thus, the United States faces a credible threat of future enforcement of HB9 against the ICE-Otero or MTC Contracts. Such enforcement would terminate an important contract and deprive DHS of the OCPC, which DHS relies upon to enforce immigration laws in New Mexico. *See* DHS Decl. ¶¶ 8, 10–12, 16–26. As a result, DHS's ability to arrest and detain illegal aliens in New Mexico would be diminished, detainees would have to be moved far distances, and resources would have to be diverted. *Id.* The United States thus has pre-enforcement standing to challenge HB9.

## II.    The United States is Likely to Succeed on the Merits

The United States is likely to succeed in showing that HB9 substantially impairs the Otero-ICE Contract without a significant or legitimate public purpose in violation of the Contract Clause. The United States is also likely to succeed in showing that HB9 poses an obstacle to the immigration objectives of Congress in the INA and is thus preempted. The United States is also likely to show that HB9 violates the Supremacy Clause by attempting to regulate the property and parties available to the Federal Government to use and contract for civil immigration detention purposes. Finally, the United States is likely to show that HB9 discriminates against the Federal Government by singling out civil immigration enforcement for worse treatment while permitting the use and contracting of local detention facilities for state and local civil and criminal detainees.

### A.  HB9 Violates the Contract Clause.

The United States is likely to succeed on the merits of its Contract Clause claim because HB9 impairs the Otero-ICE Contract and lacks a significant or legitimate purpose. The Contract Clause provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts."

U.S. Const. Art. I, § 10, cl. 1.[4] State legislation like HB9 violates the Contract Clause if it substantially impairs a contractual relationship and is not an appropriate or reasonable way to advance a significant and legitimate public purpose. *See Sveen v. Melin*, 584 U.S. 811, 819 (2018). "The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983). And "[w]hen a state actor is a party to a contract at issue, typically courts have determined such legislation is subject to 'stricter scrutiny.'" *A.L. v. Martin*, No. 23-CV-127-WJ-SCY, 2023 WL 7279318, at *4 (D.N.M. Nov. 3, 2023).

As a preliminary matter, the Otero-ICE Contract is clearly an agreement where ICE pays for the use of Otero County's detention facility and is thus a traditional contract protected from impairment by the Contract Clause. *See Sveen*, 584 U.S. at 818 (stating that the Contract Clause "applies to any kind of contract"). HB9 will impair the Otero-ICE Contract by either requiring its termination or preventing its renewal. HB9 will also prevent Otero County from performing its obligations under the Otero-ICE Contract because HB9 likely requires Otero to terminate existing contracts or forgo renewing contracts to serve the OCPC because they will facilitate the detention of aliens who violate federal immigration law, such as the MTC Contract. *See* HB9 §§ 3(A), (B). So, if HB9 is permitted to take effect, the Otero-ICE Contract will be impaired in the most severe manner possible because HB9 prevents its performance and impairs the parties' reasonable expectations despite the fact it is operational for 60 more months. *See, e.g.*, *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247 (1978) (finding impairment where "the statute in question here

---

[4] The Contract Clause seeks to protect contracts from interference by "the fluctuating policy" enacted by temporary legislative majorities and to "banish speculations on public measures, inspire a general prudence and industry, and give a regular course to the business of society." The Federalist No. 44 (James Madison).

nullifies express terms of the company's contractual obligations"); *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 630 (5th Cir. 2010) ("These impairments are substantial and disrupt the purpose of the contracts at issue here; that is, to allow the parties to rely on their contractual expectations of approximate numbers of enrollees and the approximate expense of administering the plans.").

The Federal Government has relied to its detriment in performing and arranging to perform under the Otero-ICE Contract to ensure that federal immigration law will be enforced and aliens who violate federal immigration law will be detained in the OCPC in a manner consistent with Congress's statutory scheme and goals. DHS Decl. ¶¶ 8–12. If HB9 is permitted to take effect, the inability to use the OCPC would cause significant financial losses and impose significant operational burdens on the Federal Government. *Id.* ¶¶ 19–26. DHS relies on OCPC to house up to 1,096 detainees. *Id.* ¶¶ 8, 10. It is the only one in New Mexico that can detain women and high-risk individuals. *Id.* ¶ 10. And OCPC is in an important area near several ports of entry, an international airport, and major highways. *Id.* ¶ 11. Without it, DHS will have to transfer potentially hundreds of detainees potentially hundreds of miles away to other states, such as Camp East Montana in Texas. *Id.* ¶¶ 19–26. This drain on resources and limit on detention capacity will hamper immigration enforcement in New Mexico and require DHS to scramble to find alternative solutions. *Id.* at ¶ 25-26.

HB9's severe impairment of the Otero-ICE Contract is also unsupported by any significant or legitimate public purpose. While HB9 does not profess any purported purpose, statements made by New Mexico state legislators make clear that HB9 is intended solely to eliminate civil immigration detention (i.e., the implementation of federal law) in New Mexico. Specifically, New Mexico Representative Eleanor Chavez, a co-sponsor of HB9, expanded on the purpose of HB9,

13

stating that HB9 "is a straightforward bill. It gets New Mexico out of the business of immigration detention."[5] Governor Grisham's Director of Communications also elaborated on the purpose of HB9, stating that "Gov. Lujan Grisham wants to ensure New Mexico will not be complicit in discriminatory mass immigration enforcement . . . ."[6] The sole purpose of HB9 (and its effect) is thus to impede the President's policies that enforce Congress's immigration law. That cannot be a legitimate state interest.

If anything, prohibiting public bodies from continuing to perform under decades-old voluntary agreements specifically authorized by federal law harms the public interest and people of New Mexico. *See* 8 U.S.C. §§ 1103(a)(11)(B), 1231(g); *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 29–32 (1977). For example, Otero County will suffer the loss of significant capital inflows, jobs, productive use of its property, and economic activity. MTC Decl. ¶¶ 21-23; Otero Decl. ¶¶ 11-15. It will also result in Otero defaulting on bonds, harming the bond holders, County, and employees. Otero Decl. ¶¶ 7-9, 14. The mere threat of enforcement has undermined the bonds. *Id.* If these agreements drained local resources or were contrary to the interests of the communities, the local entities could choose not to enter or extend such agreements. There is no basis for New Mexico to decide *all* such agreements are contrary to the public interest. If anything, the opposite is true: the Otero-ICE Contract greatly benefits the community. Otero Decl. ¶¶ 11-15.

Moreover, HB9 does not even help the aliens it is ostensibly trying to assist. While the intended effect is to impede federal law enforcement (which is never in the public interest), the law will also cause detainees to be transferred to far-flung facilities that may be further from relatives and make contact more difficult. DHS Decl. ¶¶ 23–25; Otero Decl. ¶ 16. Furthermore,

---

[5] *See* Davis, *supra*, note 1.
[6] *See* Ross, *supra*, note 2.

14

New Mexico can conduct health and safety inspections, engage in political oversight and visitations, review agreements, and ensure Otero County is complying with state law. MTC Decl. ¶¶ 11-12, 15; Otero Decl. ¶ 16. If the Contract is terminated, those 1,096 detainees will likely end up in other states where New Mexico has no oversight authority. DHS Decl. ¶¶ 20, 25. It is thus difficult to imagine the legitimate state interest New Mexico has in forcefully terminating the long-standing Otero-ICE and Otero-MTC Contracts that multiple New Mexico Attorneys General have approved. MTC Decl. ¶¶ 10-12. The only possible purpose is what New Mexico lawmakers said: to actively try to obstruct lawful immigration enforcement. That is not legitimate and is completely contrary to the public interest. *See United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest.").

Moreover, because the Otero-ICE Contract is entirely impaired, and because HB9 regulates federal immigration detention, an area that is not historically subject to legislation by New Mexico, the public purpose requiring its impairment must be extremely significant to pass constitutional muster. *See Energy Rsrvs.*, 459 U.S. at 411. And because Otero County (a state entity) is a party to the Otero-ICE Contract (and Otero-MTC Contract), the Court may not simply defer to the legislature's purported public purpose. *See A.L.*, 2023 WL 7279318, at *4; *U.S. Tr. Co.*, 431 U.S. at 26 ("complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake."). Given that HB9 lacks a valid public purpose in the first instance, it certainly lacks a sufficient legitimate or significant public purpose to justify wholesale termination of a decades-old contract.

Finally, even assuming that HB9 had a legitimate and significant purpose sufficient to warrant the termination of the Otero-ICE Contract or Otero-MTC Contract, HB9 must be tailored to meet that purpose based on reasonable, limited conditions. *See Energy Rsrvs.*, 459 U.S. at 412

15

("the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'") (quoting *U.S. Tr. Co.*, 431 U.S. at 22). Yet, HB9 requires the *categorical* termination of existing immigration detention and law enforcement agreements without any conditions, let alone reasonable conditions appropriate to address the supposed public purpose justifying its enactment. *Cf. U.S. Tr. Co.*, 431 U.S. at 29–30 ("it cannot be said that total repeal . . . was essential; a less drastic modification would have permitted the contemplated plan without entirely removing the . . . limitations . . ."). A wholesale ban requiring the unconditional termination of an agreement cannot be said to be a reasonable condition "of a character appropriate to the public purpose justifying [the legislation's] adoption." *Energy Rsrvs.*, 459 U.S. at 412 (quoting *U.S. Tr. Co.*, 431 U.S. at 22). Again, New Mexico can and does have reasonable oversight and requirements placed on OCPC, which are much more effective and tailored means of ensuring the health and safety of aliens in the state. MTC Decl. ¶¶ 11-12, 15; Otero Decl. ¶ 16.

On a fundamental level, the Otero-ICE Contract is completely voluntary. If it was problematic because, for example, Otero County lacked sufficient resources or its constituents disapproved, Otero County could simply have exercised its discretion and declined to renew it. Yet, the State of New Mexico seeks to remove that discretion by instituting a blanket policy requiring the immediate termination of all existing agreements, regardless of the specific circumstances applicable to each. In HB9, New Mexico thus takes the most extreme and broad action possible to address its purported purpose of banning civil immigration detention. In doing so, New Mexico causes irreparable harm to both the United States and Otero County. There is no justification for such an extreme measure. HB9 thus violates the Contract Clause and is invalid.

16

**B. HB9 is Preempted by Federal Law.**

HB9 is preempted because it stands as an obstacle to Congress's immigration purposes and objectives as set forth in the INA. The preemption doctrine provides that federal interests overcome state interests when federal and state law "clash." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality). When a state law conflicts with a federal statute, the state law is impliedly preempted. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). A state law conflicts with a federal statute where the law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *Crosby*, 530 U.S. at 372–73; *Cerveny v. Aventis, Inc.*, 855 F.3d 1091, 1098 (10th Cir. 2017) (describing "obstacle" preemption as "when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.").

To achieve Congress's immigration objectives, the INA requires that aliens be detained in various circumstances. *See* 8 U.S.C. §§ 1226(a), (c), 1231(a)(2), (g), 1225(b)(1)(B)(ii), (b)(1)(B)(iii)(IV), (b)(2)(A), 1226a(a)(1). To effectuate such detention, the INA gives broad discretion to the Executive to "arrange for appropriate places of detention for aliens detained," and, when federal facilities are unavailable, to "expend . . . amounts necessary to acquire land and to . . . operate facilities . . . necessary for detention." 8 U.S.C. § 1231(g). That includes the ability "to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service." 8 U.S.C. § 1103(a)(11)(B). Thus, to fulfill those purposes and objectives, Congress permitted state and local officials to voluntarily agree and work with the Federal Government to

17

provide detention facilities and services. *See* 8 U.S.C. §§ 1231(g); 1103(a)(11)(B); *see also* 6 U.S.C. § 112(b)(2) (granting the DHS Secretary "the authority to make contracts, grants, and cooperative agreements . . . as may be necessary and proper to carry out the Secretary's responsibilities . . ."). HB9 stands as an obstacle to the accomplishment and execution of those congressional objectives by dramatically curtailing the Federal Government's congressionally delegated discretion to select, locate, and contract with local governments to provide facilities and services for immigration detention. *See* HB9 §§ 3(A)–(C). HB9 directly frustrates Congress's delegation of authority to ICE to determine what facilities are appropriate for immigration detention and to secure such facilities through purchase, lease, or contract. *See* HB9 §§ 3(A)–(C). HB9 substitutes New Mexico's policy judgment in place of the Federal Government's determination of how best to house individuals subject to federal immigration proceedings and with whom the Federal Government can contract to achieve those ends. HB9 likewise conflicts with 6 U.S.C. § 112(b)(2) by impermissibly regulating and restricting the Federal Government's ability to carry out its functions through contracts with non-federal parties, including Otero County. This is unconstitutional, as "the Supremacy Clause . . . bars states from taking actions that frustrate federal laws and regulatory schemes." *City of N.Y. v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

If the Otero-ICE Contract is impaired (or if Otero County's performance is made impossible by the termination of the Otero-MTC Contract), DHS will have extremely limited capacity within New Mexico to detain illegal aliens. DHS Decl. ¶ 20. DHS will also lose a high-quality facility in the state, the one closest to the border, and the only one that can detain women and high-risk individuals in New Mexico. *Id.* ¶¶ 8–12. This will require DHS to transfer aliens to facilities in other states, sometimes hundreds of miles away. *Id.* ¶¶ 20–26. Transferring these detainees and having to transport new detainees to far flung facilities significantly hampers the

18

ability of DHS to enforce immigration law within New Mexico and throughout the United States. *Id*. As a result, this law also impedes DHS' ability to detain aliens in the first place, even when mandated by Congress. *See* 1226(a), (c), 1231(a)(2), (g), 1225(b)(1)(B)(ii), (b)(1)(B)(iii)(IV), (b)(2)(A), 1226a(a)(1). And it makes it harder for DHS to enforce immigration laws more generally, including by diverting valuable resources. DHS Decl. ¶¶ 22–26. Banning all detention agreements for immigration detention with public bodies creates a significant impediment to the enforcement of immigration laws and defeats the flexibility of Congress's cooperative detention scheme. *Id.* As a result, HB9 conflicts with the objectives and purposes of Congress and is preempted by the INA.

### C. HB9 Unlawfully Regulates the Federal Government.

The Constitution's Supremacy Clause embodies the doctrine of intergovernmental immunity, which "generally immunizes the Federal Government from state laws that directly regulate or discriminate against it." *Washington*, 596 U.S. at 835 (citing *Baker*, 485 U.S. at 523). As the Supreme Court put it nearly a century ago: "The United States may perform its functions without conforming to the police regulations of a state." *Arizona v. California*, 283 U.S. 423, 451 (1931). "If a state law directly regulates the conduct of the United States, it is void irrespective of whether the regulated activities are essential to federal functions or operations, and irrespective of the degree to which the state law interferes with federal functions or operations." *United States v. California*, 2026 WL 1088674, at *5 (9th Cir. Apr. 22, 2026); *see North Dakota*, 495 U.S. at 435; *CoreCivic*, 145 F.4th at 327 (stating that when state, county, city, or other local governments "substantially interfer[e] with [the federal government's] operations," they "directly regulate[] the federal government[.]"). These intergovernmental immunity principles against regulation operate even in the absence of a specific conflicting federal law, ensuring that "federal officers are immune

19

from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993), *aff'd*, 54 F.3d 825 (D.C. Cir. 1995) (citing *In Re Neagle*, 135 U.S. 1, 10 (1890)).

HB9 seeks to directly regulate the Federal Government by controlling the potential entities with whom the Federal Government may form voluntary agreements to perform the core government function of enforcing civil immigration law. *See* HB9 §§ 3(A)–(C); *CoreCivic*, 145 F.4th at 327 (finding that a state law "directly regulates the federal government by substantially interfering with a core federal function" by banning immigration detention facilities). Here, the law removes Otero County as a potential counterparty to form a civil immigration detention agreement like the Otero-ICE Contract even though it is a willing participant. HB9 also regulates the Federal Government by controlling the property that the Federal Government may use to perform its immigration enforcement operations, including the detention of aliens. *See* HB9 § 3(C). While Congress authorized the Federal Government to cooperate with state and local governmental entities to use real property to detain aliens, New Mexico seeks to limit and control the real property available to the Federal Government to implement federal immigration law. *Compare* 8 U.S.C. §§ 1231(g), 1103(a)(11)(B), *with* HB9 § 3(C). A state law unlawfully regulates the United States when it "'places [either] a prohibition' or mandate on the federal government." *CoreCivic*, 145 F.4th at 321 (quoting *Hancock v. Train*, 426 U.S. 167, 180 (1976)). HB9 regulates the Federal Government by placing a prohibition on the parties and property available to it.

While federal law specifically authorizes the formation of agreements with state and local entities to assist in the enforcement of federal immigration law, the State of New Mexico seeks to limit and narrow the entities available to assist the Federal Government with the enforcement of federal immigration law. HB9 removes potential entities, including Otero County, from the pool

20

of entities with whom the Federal Government may form cooperative agreements. The elimination of potential counterparties to agreements that Congress specifically authorized and contemplated as part of the cooperative civil immigration enforcement scheme amounts to regulation of the Federal Government, as it imposes conditions upon the Federal Government (i.e., limits and controls the state and local entities with which the Federal Government may contract) that are inconsistent with federal immigration law or Congressional intent. By adding this limitation to federal law, New Mexico seeks to regulate the Federal Government in a manner that conflicts with express congressional intent, which does not limit the Federal Government in this respect.

By comparison, in *Geo Grp., Inc. v. Newsom*, the *en banc* Ninth Circuit invalidated a California statute that phased out all private detention facilities in the state. 50 F.4th at 751. Because the statute would have prevented ICE's contractors from continuing to run detention facilities for federal purposes, requiring ICE either to transform its approach to detention in California or abandon its California facilities, the statute directly regulated the Federal Government and was therefore unconstitutional. *Id.* Further, in *CoreCivic*, the Third Circuit invalidated a state law that banned state and local governments and private parties from making, renewing, or extending contracts to detain people for civil immigration violations. 145 F.4th 315, 319 (2025). Although the law did not name the Federal Government in its text, Third Circuit probed the purpose and self-evident operation of the statute, "easily see[ing] the law for what it really [was]: a regulation" of the Federal Government. *Id.* at 325; *see also Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189 (1956) (holding that a state law requiring building contractors to obtain a state license could not be enforced against a contractor hired on a federal construction project); *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920) (States cannot "control the conduct of [individuals] . . .

21

acting under and in pursuance of the laws of the United States"). Here, state legislators have not been shy about HB9's purpose of ending civil immigration detention in New Mexico.

For these reasons, HB9 threatens to "destroy the federal function" of civil immigration detention in the State of New Mexico. *United States v. Fresno Cnty.*, 429 U.S. 452, 463 n.11, 464 (1977). Because the Framers of our Constitution "did not intend" for federal operations to "depend on the discretion of the state governments," *McCulloch*, 17 U.S. at 327, 362, New Mexico cannot unilaterally apply its policy preferences to the Federal Government. A "concurrent power in the [S]tates" to regulate federal operations "would bring back all the evils and embarrassments, which the uniform rule of the [C]onstitution was designed to remedy." 2 J. Story, Commentaries on the Constitution § 1099 (3d ed. 1858). HB9 thus amounts to unlawful regulation of the Federal Government in violation of the principles of intergovernmental immunity.

### D.  HB9 Unlawfully Discriminates Against the Federal Government.

The doctrine of intergovernmental immunity also prevents discrimination against the Federal Government. *See Washington*, 596 U.S. at 841. Discrimination occurs when a state "treats someone else better than" the federal government or "singl[es] out the Federal Government for unfavorable treatment," *id.* at 839, or imposes a discriminatory burden on the Federal Government, *see Dawson v. Steager*, 586 U.S. 171, 175 (2019). "Without the prohibition on discrimination, what prevents a State from imposing unduly high costs on the Federal Government for the benefit of the State's own citizens?" *Washington*, 596 U.S. at 841.

HB9 discriminates against the Federal Government because it explicitly regulates civil immigration detention while simultaneously permitting law enforcement activity and detention for other regulatory purposes. *See* HB9 § 3(E). HB9 specifically singles out federal civil immigration enforcement officers for treatment worse than state and local law enforcement officers by

permitting agreements and the use of property for detention and state law enforcement purposes not involving federal immigration detention, adding that "[n]othing in this section shall be construed to limit the ability of law enforcement personnel to detain individuals or to perform brief investigative stops *as permitted by state law*." HB9 at § 3(E) (emphasis added). Civil immigration detention is a regulatory area governed exclusively by federal law and enforced by the Federal Government. By including a carveout that permits detention and investigation for purposes of state law, HB9 embodies New Mexico's intent to limit law enforcement detention authority in a manner that applies solely to federal immigration law. *See Washington*, 596 U.S. at 839 (deeming law discriminatory because "[o]n its face" it "explicitly treats federal workers differently than state or private workers"); *United States v. King County*, 122 F.4th 740 (9th Cir. 2024) (ban on servicing ICE charter flights was unlawful because it "burden[ed] federal operation, and only federal operation."). In treating its own state law enforcement purposes and entities better than the Federal Government, New Mexico unlawfully discriminates against the United States. Preventing this sort of "discrimination against the Federal Government lies at the heart of the Constitution's intergovernmental immunity doctrine." *Washington*, 596 U.S. at 841.

The discrimination is apparent in practice. For example, New Mexico law allows state and local entities to enter into intergovernmental agreements and memoranda of understanding for all sorts of purposes. *See* N.M. Stat. Ann. 1-11-1 *et seq.* So while contracts may not be formed between the Federal Government and localities for the purpose of civil immigration detention, no such prohibition exists for intergovernmental contracts for any other type of detention. Indeed, Otero County operates another detention facility with MTC next door (the Otero County Prison Facility) under the same MTC-Otero Agreement. MTC Decl. ¶ 13. That facility accommodates detainees

for other state and local entities. *Id.* That is perfectly fine under HB9. But doing the exact same thing for federal immigration enforcement is banned by HB9. That is blatant discrimination.

### E.  The Tenth Amendment Does Not Justify HB9.

New Mexico cannot rely on the Tenth Amendment to salvage HB9. It is inapplicable because the states do not have the power to pass legislation that impairs contracts without a legitimate public purpose, conflicts and stands as an obstacle to the objectives of federal law, or regulates or discriminates against the Federal Government. Moreover, the Tenth Amendment prohibits the Federal Government from commandeering states, but the INA regulates aliens, not states. *See, e.g.*, 8 U.S.C. § 1226(a) ("an *alien* may be arrested and detained"), 1231(a)(2)(A) ("the Attorney General shall detain the *alien*.") (emphasis added). Invalidating HB9 would also not amount to commandeering of New Mexico; it would prevent New Mexico from controlling the Federal Government's lawful exercise of its own sovereign authority. *See New York v. United States*, 505 U.S. 144, 156 (1992). In seeking this injunction, the United States is not forcing New Mexico to do anything; it simply demands that New Mexico allow the voluntary agreements formed by counties to be performed (in exchange for compensation from the Federal Government). *See City of N.Y.*, 179 F.3d at 35 ("states do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs."). New Mexico cannot hide behind the Tenth Amendment.

### III.   The Remaining Equitable Factors Favor a Preliminary Injunction.

### A. The United States Will Suffer Irreparable Harm Absent a Preliminary Injunction.

Irreparable harm is presumed when the Constitution is violated. *Ortega*, 148 F.4th at 1142. "The difficulty in calculating or determining adequate monetary damages for a constitutional injury is so well-settled that 'the principle collapses the first and second preliminary-injunction

factors, equating likelihood of success on the merits with a demonstration of irreparable injury.'" *Id.* (quoting *Free the Nipple v. City of Fort Collins*, 916 F.3d 792 (10th Cir. 2019)). As established, *supra* II, HB9 violates the Contract Clause and Supremacy Clause of the U.S. Constitution. Moreover, irreparable harm necessarily results from the enforcement of a preempted state law. *See New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 366–67 (1989). On those alone, the United States satisfies this element of the preliminary injunction standard.

In addition, HB9 will substantially hamper federal immigration operations in New Mexico and nationwide, irreparably harming the United States. *Supra* II.A. Without the OCPC, DHS's ability to arrest and detain illegal aliens in New Mexico would be diminished, detainees would have to be moved far distances, and resources would have to be diverted. DHS Decl. ¶¶ 19–26. Further, if HB9 is not enjoined, other States could be emboldened to impose similar unconstitutional restraints on the Federal Government. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (allowing a State to act unconstitutionally "would allow other States to do the same"). This could in turn create a "patchwork" system of laws, *id.*, under which federal immigration agents would be subject to different regulations in each state, severely undermining the Federal Government's ability to uniformly enforce federal immigration law. The United States will thus suffer irreparable harm sufficient for the Court to preliminarily enjoin HB9.

### B. The Equities and Public Interest Weigh in Favor of the United States

The balance of equities and the public interest likewise favor the United States. Those factors "merge" when the United States is a party. *Ortega*, 148 F.4th at 1142 (quoting *Nken*, 556 U.S. at 435). "Frustration of federal statutes and prerogatives are not in the public interest." *Alabama*, 691 F.3d at 1301; *see Edmondson*, 594 F.3d at 771 ("Oklahoma does not have an interest in enforcing a law that is likely constitutionally infirm."). The INA specifically contemplates

cooperation between the Federal Government and local governmental entities to detain aliens. *See* 8 U.S.C. §§ 1231(g); 1103(a)(11)(B); *see also* 6 U.S.C. § 112(b)(2). Yet, HB9 seeks to categorically bar this cooperation in an unconstitutional manner, and seeks to do so despite the tremendous burdens that would be imposed on the Federal Government and its enforcement of federal immigration law. *Supra* II.B.

HB9 is also contrary to the public interest because it would deprive Otero County of revenue, jobs, productive use of its property, and economic activity as a whole. Otero Decl. ¶¶ 10-17. Further, repayment of the municipal bonds that financed the construction and maintenance of the OCPC is secured by the revenue derived from the operation of the OCPC. *Id.* ¶¶ 7-9, 14. If the OCPC is not used for civil immigration detention purposes, Otero County will default on its payment obligations, harming its ability to borrow for similar purposes in the future, and leaving bondholders without repayment. *Id.*; MTC Decl. ¶ 24. Moreover, it would not help the very aliens it is designed to assist, as it requires DHS to transfer them miles away to facilities in other states, over which New Mexico lacks oversight. DHS Decl. ¶¶ 20–25; Otero Decl. ¶ 16. Entering an injunction to preserve the status quo before the Federal Government and Otero County suffer irreparable harm by virtue of HB9 would serve the public interest. *See Edmondson*, 594 F.3d at 771.

Conversely, it is difficult to conceive of the burdens that would be imposed on New Mexico should HB9 be enjoined. The Otero-ICE Contract has been in place for decades without any complaints by state authorities, much to the benefit of both the Federal Government and Otero County. Otero Decl. ¶¶ 11-17. In fact, multiple Attorneys General approved of the Contracts. MTC Decl. ¶ 11. While HB9 requires the termination of the Otero-ICE Contract, it is unclear how preliminary injunctive relief would harm New Mexico while the Court determines whether HB9

26

comports with the Constitution. While New Mexico may disagree with the United States' priorities, it has no legitimate interest in interfering with the enforcement of federal law and detention of violators of federal immigration law. Nor can it have a legitimate interest in enforcing invalid legislation. Thus, the balance of equities supports entry of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiff hereby moves for the entry of a preliminary injunction prohibiting the State of New Mexico and its officials from enforcing the challenged provisions of HB9 against the Federal Government, and awarding any other relief the Court deems appropriate.

DATED: May 8, 2026                          Respectfully Submitted,


TODD BLANCHE                                /s/ Robert O. Lindefjeld
Acting Attorney General                     Assistant Director
                                            U.S. Department of Justice, Civil Division
BRETT A. SHUMATE                            Enforcement & Affirmative Litigation Branch
Assistant Attorney General                  P.O. Box 386
Civil Division                              Washington, DC 20044-0386
                                            Telephone: (202) 451-7488
YAAKOV M. ROTH                              Email: robert.o.lindefjeld@usdoj.gov
Principal Deputy Assistant Attorney General
Civil Division                              EMIL J. KIEHNE
                                            Assistant U.S. Attorney
RYAN ELLISON                                U.S. Attorney's Office,
First Assistant United States Attorney      District of New Mexico
District of New Mexico                      201 3rd Street NW, Suite 900
                                            Albuquerque, New Mexico 87102
TIBERIUS DAVIS                              Telephone: (505) 346-6855
Counsel to the Assistant Attorney General   Email: emil.kiehne@usdoj.gov


JACKSON M. STORY
Trial Attorney                              *Attorneys for the United States of America*
U.S. Department of Justice, Civil Division
Enforcement & Affirmative Litigation Branch

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2026, I served copies of the foregoing Motion for Preliminary Injunction and Incorporated Memorandum of Law to the following Parties via electronic mail and certified mail (with return receipt):

PARTIES: State of New Mexico and Governor Michelle Lujan Grisham, in her Official Capacity as Governor of New Mexico
c/o Honorable Holly Agajanian
Chief General Counsel to Governor Michelle Lujan Grisham
Office of the Governor
490 Old Santa Fe Trail, Suite 400
Sante Fe, NM 87501-2794
holly.agajanian@exec.nm.gov

PARTIES: State of New Mexico and Governor Michelle Lujan Grisham, in her Official Capacity as Governor of New Mexico
c/o Honorable Kyle P. Duffy
Deputy General Counsel to Governor Michelle Lujan Grisham
Office of the Governor
490 Old Sante Fe Trail, Suite 400
Sante Fe, NM 87501-2704
kyle.duffy@exec.nm.gov

PARTIES: City of Albuquerque and Timothy Keller, in his Official Capacity as Mayor of the City of Albuquerque
c/o Honorable Lauren Keefe
City Attorney for the City of Albuquerque
P.O. Box 2248
Albuquerque, NM 87103-2248
lkeefe@cabq.gov

PARTIES: City of Albuquerque and Timothy Keller, in his Official Capacity as Mayor of the City of Albuquerque
c/o Honorable Ethan Watson
City Clerk for the City of Albuquerque
P.O. Box 1293
Albuquerque, NM 87103-1293
cityclerk@cabq.gov

PARTY: Honorable Raúl Torrez, in his Official Capacity as Attorney General for the State of New Mexico
New Mexico Department of Justice
201 3rd Street NW, Suite 300
Santa Fe, NM 87102
rtorrez@nmag.gov

PARTY: Honorable Raúl Torrez, in his Official Capacity as Attorney General for the State of New Mexico
c/o Honorable James W. Grayson
Chief Deputy Attorney General
New Mexico Department of Justice
P.O. Box 1508
Sante Fe, NM 87504-1508
jgrayson@nmdoj.gov

PARTY: Honorable Raúl Torrez, in his Official Capacity as Attorney General for the State of New Mexico
c/o Honorable Billy J. Jimenez
Deputy Attorney General, Civil Affairs
New Mexico Department of Justice
P.O. Box 1508
Sante Fe, NM 87504-1508
bjimenez@nmdoj.gov

/s/ Robert O. Lindefjeld
ROBERT O. LINDEFJELD
Assistant Director
United States Department of Justice
Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044-0386
Phone: (202) 451-7488
Email: rlindefjeld.o.lindefjeld@usdoj.gov

28