**IN THE UNITED STATES COURT
FOR THE DISTRICT OF NEW MEXICO**

**THE UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**                                  **Case No. 1:26-CV-01471 KG/LF**

**THE STATE OF NEW MEXICO;**        **ORAL ARGUMENT REQUESTED**
**MICHELLE LUJAN GRISHAM, in her
Official Capacity as Governor of the
State of New Mexico; RAUL TORREZ,
in his Official Capacity as Attorney General
of the State of New Mexico; CITY OF
ALBUQUERQUE; TIMOTHY KELLER,
in his Official Capacity as Mayor of the
City of Albuquerque,**

      **Defendants.**

## CITY OF ALBUQUERQUE AND MAYOR TIMOTHY KELLER'S MOTION TO DISMISS

Defendants the City of Albuquerque and Timothy Keller, in his official capacity as Mayor of Albuquerque, respectfully move this Court to dismiss Plaintiff the United States' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) as set forth below and respectfully request oral argument. Pursuant to L.R. 7.1(a), the United States opposes this Motion.

### INTRODUCTION

The City of Albuquerque (the "City") has a responsibility to its residents that has been granted through the system of government established in this country. It is accountable to the people it serves, supreme within its own sphere. The City enacted the Safer Community Places Ordinance to honor exactly that responsibility: to ensure that its residents, regardless of background or immigration status, can safely access the City facilities, hospitals, schools, libraries, and community services that make civic life possible. The United States now asks this Court to

strip the City of that authority, demanding that the City subordinate its public safety judgments to a federal enforcement agenda the Constitution never required it to adopt. That demand is foreclosed by the text of the Immigration and Nationality Act ("INA"), by decades of consistent judicial precedent from courts across the country, and by the Tenth Amendment's fundamental guarantee that the federal government may not commandeer cities, counties, and states to carry out the federal government's work. This Court should reject the United States' claims in their entirety.

## BACKGROUND

The City has a long-standing commitment to protecting its immigrant residents, originally through its Immigrant Friendly Resolution (R-18-7) and now through the Safer Community Places Ordinance ("SCPO") (Council Bill No. O-26-15; Enactment No. O.2026.009, codified at ROA 1994, §§ 5-1-5 and 13-17-1 *et seq.*). Enacted on March 25, 2026, the SCPO is an integral component of Albuquerque's public safety and home rule authority. The SCPO has three core functions: (1) Chapter 5, Article 1 prohibits use of City-owned property, resources, or equipment for staging areas, processing locations, operations bases for immigration enforcement, and transportation of individuals for immigration enforcement purposes; (2) Chapter 13, Article 17 designates hospitals, schools, libraries, shelters, and other sensitive community spaces as protected locations, and directs the implementation of policies to prohibit voluntary consent at those locations to non-public entry by immigration enforcement agents without a judicial warrant; and (3) Chapter 13, Article 17 also provides worker notification rights for I-9 inspections and immigration enforcement activity at workplaces. *See* Compl. Ex. B.

The United States' Complaint makes three claims against the City and Mayor Keller: (1) that the SCPO is federally preempted; (2) that the SCPO violates the Supremacy Clause by

unlawful regulation of the Federal Government; and (3) that the SCPO violates the Supremacy Clause by unlawful discrimination against the Federal Government.

These measures are not preempted by federal law. The INA creates a system of voluntary state and local cooperation with federal immigration enforcement, not a system of compelled participation. The SCPO does not obstruct federal enforcement, but instead declines to conscript City property and community spaces in service of a federal regulatory program. It also does not regulate the federal government. The SCPO regulates City property and businesses within City limits. Any incidental burden on federal enforcement results from the City exercising its sovereign authority—authority the Tenth Amendment protects. Nor does the SCPO discriminate against the federal government; it is a neutral exercise of Albuquerque's home rule powers under Article X, Section 6 of the New Mexico Constitution.

Courts across the country have dismissed substantially identical claims brought by the United States.[1] This Court should do the same and dismiss the Complaint with prejudice as to the City of Albuquerque and Mayor Timothy Keller.

**LEGAL STANDARD**

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

---

[1] *See United States v. Illinois,* 796 F. Supp. 3d 494 (N.D. Ill. 2025); *United States v. New Jersey,* No. 20-1364 (FLW)(TJB), 2021 WL 252270 (D.N.J. Jan. 26, 2021); *McHenry Cnty. v. Raoul,* 574 F. Supp. 3d 571 (N.D. Ill. 2021), *aff'd,* 44 F.4th 581 (7th Cir. 2022); *Cnty. of Ocean v. Grewal,* 475 F. Supp. 3d 355, 375 (D.N.J. 2020), *aff'd sub nom. Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of State of N.J.*, 8 F.4th 176 (3d Cir. 2021); *United States v. California,* 314 F. Supp. 3d 1077 (E.D. Cal. 2018) (at preliminary injunction stage)*, aff'd in relevant part,* 921 F.3d 865 (9th Cir. 2019); *United States v. Colorado,* --- F. Supp. 3d ---, No. 25-cv-01391, 2026 WL 878882 (D. Colo. Mar. 31, 2026); *United States v. City of Boston*, --- F. Supp. 3d ---, No. 25-cv-12456, 2026 WL 1493706 (D. Mass. May 28, 2026).

A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

Further, as the party invoking federal jurisdiction, the United States bears the burden of demonstrating that it has standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430 (2021) ("[A] plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'"); *id*. at 431 (quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992)); *Voter Reference Found., LLC v. Balderas*, 616 F. Supp. 3d 1132, 1199 (D.N.M. 2022); *see also Petrella v. Brownback*, 697 F.3d 1285, 1293-96 (10th Cir. 2012) (noting typical plausibility standard applies when evaluating standing at motion-to-dismiss stage). This burden of demonstrating standing "is not dispensed in gross." *Davis v. Fed. Election Comm'n,* 554 U.S. 724, 734 (2008). Instead, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.*

Motions to dismiss for lack of standing are "properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Hernandez v. Grisham*, 499, F. Supp. 1013, 1047 (D.N.M. 2020), citing *Ballentine v. United States,* 486 F. 3d 806, 810 (3d Cir. 2007). In making such a motion, parties "may go beyond the complaint's allegations to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or other evidence properly before the court," without transforming a motion to dismiss into a motion for summary judgment. *Hernandez,* 499 F.Supp at 1044. Such evidence includes matters of which a court may take judicial notice, such as city and county ordinances. *Zimomra v. Alamo Rent-A-Car, Inc.*, 111 F.3d 1495, 1503 (10th Cir. 1997).

**ARGUMENT**

The Complaint's claims fail because the SCPO governs matters traditionally reserved to local government, falling squarely within Albuquerque's authority to manage and direct the use of municipal property and resources, protect access to essential community institutions to ensure public safety, and regulate employment relationships to protect workers. Federal law does not require the City to dedicate its property, personnel, or resources to federal immigration enforcement, and nothing in the ordinance prohibits federal immigration enforcement, regulates federal officers, or interferes with the execution of federal law. Instead, it establishes rules governing City-owned property, City personnel, designated community spaces, and employer obligations while preserving full compliance with judicial process and applicable federal requirements. The United States seeks to transform statutes authorizing local cooperation into mandates requiring municipal participation. Neither the text of those statutes nor constitutional principles of federalism support that result.

Because the SCPO neither conflicts with federal law, regulates federal operations, nor discriminates against the federal government, the United States' preemption and Supremacy Clause claims fail as a matter of law. The United States also lacks standing to challenge provisions in the SCPO that overlap with a similar ordinance in Bernalillo County, because the United States' claims will not provide it relief for the injuries it alleges as a result of those provisions. In addition, the official-capacity claims against Mayor Keller are duplicative of the claims against the City, and the Complaint fails to establish any basis for maintaining separate claims against him. Accordingly, the Complaint should be dismissed with prejudice.

I.      **The SCPO is Not Preempted by Federal Law**.

The United States incorrectly asserts that the SCPO stands as an obstacle to enforcement of the INA and certain other federal immigration statutes, and is thus impliedly preempted by federal law.[2]  Conflict preemption occurs where state or local law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399-400 (2012). A "high threshold must be met"; the obstacle must be concrete, not merely in tension with statutory objectives. *See Chamber of Com. of the U.S. v. Whiting*, 563 U.S. 582, 599 (2011) (plurality opinion). No such obstacle exists here.

The SCPO conflicts with none of the United States' identified statutes, for one overriding reason: every single one of them creates *permissive* federal authority to seek voluntary local partnerships, not mandatory obligations on local governments.  This permissive construction is not an accident; it reflects the anticommandeering principles in the Tenth Amendment, which a compulsory construction would violate. Thus, the provision of the SCPO limiting use of City property and resources to facilitate immigration enforcement cannot be in conflict with federal law. Similarly, the provisions of the SCPO limiting non-City entities from voluntarily consenting to certain access and records requests by ICE do not impose any limits directly on ICE; instead, they limit voluntary conduct by non-federal parties, and expressly carve out cooperation by those entities that is required by judicial warrants, subpoenas, or orders. Lastly, any possible impact of the challenged SCPO's employee-notification provision on federal immigration enforcement activities (of which the United States cannot identify with any particularity) is far too speculative and hypothetical to support a finding of preemption.

---

[2] Although the United States outlines the standard for a finding of express preemption, *see* Compl. ¶ 31, the Complaint does not bring an allegation as to the SCPO on this ground. "[C]ourts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona v. United States,* 567 U.S. at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  The United States has made no attempt to demonstrate that the INA or any other federal statutes meet this high bar for express preemption.

**A.  The INA Authorizes Voluntary Partnerships, Not Compelled Assistance.**

The crux of the Complaint's preemption arguments is that the INA set up an immigration enforcement system that relies on state and local cooperation. *See* Compl. ¶ 80. But the INA makes local cooperation with immigration enforcement voluntary, and nothing in the Complaint alleges otherwise.  The provisions of the INA cited in the Complaint speak to permissive local cooperation, or do not affect obligations of local governments at all.  *See, e.g.*, Compl. ¶ 129 (citing 8 U.S.C. §§ 1357(g), 1103(a)(11)(B), 1231(g)). Those provisions therefore cannot conflict with the SCPO, which reflects the City's decision—as permitted by the INA—not to divert City resources towards immigration enforcement.

For example, § 1357(g) does not conflict with the SCPO because it does not require what the SCPO withholds. Section 1357(g) allows the Attorney General to invite localities into 287(g) agreements for immigration enforcement cooperation. But it expressly states: "Nothing in this subsection shall be construed to *require* any State or political subdivision of a State to enter into an agreement." 8 U.S.C. § 1357(g)(9) (emphasis added). Thus, the SCPO's withholding of cooperation is not and cannot be in conflict with 1357(g), which imposes no requirement that the City offer its cooperation. As the Seventh Circuit explained, "[i]t would make no sense to hold that a federal statute premised on State cooperation preempts a State law withholding that cooperation." *McHenry Cnty.*, 44 F.4th at 592.

Similarly, § 1103(a)(11)(B) of Title 8 allows for "cooperative agreements" between the federal government and state and local agencies but does not impose any duty on localities to enter into such agreements. Specifically, the statute authorizes the Attorney General to enter cooperative agreements with localities that agree to provide guaranteed detention bed space. By its plain terms, it applies only when a local government has already chosen to participate: "any State or unit of

7

local government which *agrees* to provide guaranteed bed space." *Id.* (emphasis added). There is no obligation on any locality to agree. The statute cannot conflict with the SCPO because the statute creates no duty the SCPO interferes with.[3] *See McHenry Cnty*., 44 F.4th at 589 ("Section 1103(a)(11)(B) thus contemplates discretionary and voluntary choices by States or local entities to assist the federal government with immigration detention, or not. It simply does not command that they do so.").

Section 1231(g), in turn, places its duties squarely on the federal government, specifically the Attorney General, to "arrange for appropriate places of detention." 8 U.S.C. § 1231(g). There is no language in § 1231(g) that commands any localities, municipal or otherwise, to commit to this arrangement. When federal government facilities are unavailable, § 1231(g) authorizes the Attorney General to expend federal funds to acquire land and build or lease facilities. The statute thus assigns the cost and burden of detention to the federal government. This is precisely the scheme the *County of Ocean* court recognized: the "clear command" of the INA places the burden of immigration enforcement "on the federal government, not state and local authorities." *Cnty. of Ocean,* 475 F. Supp. 3d at 382. The SCPO does not prevent the federal government from arranging for its own detention facilities. It simply ensures that City-owned properties are not conscripted for that purpose. Federal agents remain entirely free to use federal facilities, to rent privately-owned property, to acquire land, or to build facilities pursuant to § 1231(g)'s own terms. The SCPO creates no obstacle to any of that. The fact that the federal government may face additional cost or inconvenience when a locality declines to supply its property is not preemption, but instead is the ordinary consequence of the structure Congress itself built into § 1231(g). *Cf. United States*

---

[3] Moreover, the SCPO primarily restricts the use of City-owned parks, parking lots, and garages as ICE staging areas, which is categorically different from the detention bed-space contracting § 1103(a)(11)(B) contemplates.

*v. California*, 921 F.3d 865, 888 (9th Cir. 2019) (quoting *California*, 314 F. Supp. 3d at 1104) ("[R]efusing to help is not the same as impeding.").

Beyond the explicitly voluntary provisions contained in the INA, the INA does not impose any affirmative obligation on local governments or officials. In fact, courts have consistently held that the INA does not require local governments to assist in immigration enforcement. *See McHenry Cnty.*, 44 F.4th at 589 ("Section 1103(a)(11)(B) contemplates discretionary and voluntary choices by States or local entities to assist the federal government with immigration detention, or not."); *California*, 921 F.3d at 889 ("Federal law provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities.").

Courts addressing similar challenges have consistently recognized the distinction between declining assistance and obstructing enforcement. A locality does not interfere with federal immigration operations merely because it chooses not to contribute personnel, facilities, funding, or logistical support. The federal government remains free to carry out its statutory responsibilities using its own officers and resources. For that reason, courts have repeatedly rejected the argument that nonparticipation alone creates a preemptive conflict. *See McHenry Cnty.*, 44 F.4th at 592 ("It would make no sense to hold that a federal statute premised on State cooperation preempts a State law withholding that cooperation. "); *California*, 921 F.3d at 888 ("[R]efusing to help is not the same as impeding. "); *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Federal law does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement."); *Illinois*, 796 F. Supp. 3d at 530 n.18 ("The United States repeatedly conflates the INA's 'codification of comity,' with a *requirement* that States facilitate federal immigration enforcement. This is incorrect. Comity by definition is not a legal requirement."). The "clear command" of the INA places the burden of

9

immigration enforcement "on the federal government, not state and local authorities." *Cnty. of Ocean*, 475 F. Supp. 3d at 382.

Perhaps because of these limitations in the statutory text, the Complaint contains only conclusory factual allegations about how the SCPO conflicts with federal immigration enforcement law and creates obstacles to enforcement. *See* Compl. ¶¶ 95-97. At most, the Complaint alleges that the SCPO prohibits certain voluntary actions the City could undertake if it wanted to participate in immigration enforcement. That does not explain how the City's choice not to participate in any way obstructs federal enforcement of immigration law. Courts have consistently rejected the theory that a locality's refusal to provide resources for federal immigration enforcement creates the kind of "direct" and "concrete" obstacle required for conflict preemption. *See Cnty. of Ocean*, 475 F. Supp. 3d at 381-82; *Illinois*, 796 F. Supp. 3d at 529. Beyond its complaints about lack of cooperation, the United States provides only bare allegations that the SCPO presents an obstacle.

Further, the United States cannot manufacture a conflict by pointing to federal operational inconvenience. Even if ICE would prefer access to City property for staging operations, the INA's comprehensive scheme assigns to the federal government the responsibility and cost of arranging its own enforcement infrastructure. "The possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020); *see Illinois*, 796 F. Supp. 3d at 529 (same).[4]

---

[4] While the Complaint references 8 U.S.C. §§ 1373 and 1644, *see* Compl. ¶ 67-69, it does not allege that those statutes are a source of conflict, nor could it. Sections 1373 and 1644 prohibit government entities from restricting voluntary communication with federal immigration officers of, respectively, "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373(a), and "information regarding the immigration status, lawful or unlawful, of an alien in the United States," 8 U.S.C. § 1644. Nothing in the SCPO prohibits the sharing of citizenship or immigration status—the only information addressed by §§ 1373 and 1644. See *Cnty. of Ocean*, 475 F. Supp. 3d at 374-76 ("[A] plain reading of sections 1373(a) and 1644 reflects that the only information that state and local governments are required to share is the legal status—*i.e.*, citizenship or immigration status—of an individual.") (collecting cases).

### B. The Tenth Amendment Bars the United States from Compelling Local Governments to Assist with Immigration Enforcement.

The United States' argument that the SCPO's limits on City cooperation are preempted rests on a reading of the INA that is not only contrary to its plain text but is fundamentally unconstitutional. The Tenth Amendment preserves a sphere of local autonomy that prevents Congress from shifting the operational burdens of federal programs onto state and municipal governments: in fact, the federal government "may not 'command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018) (quoting *Printz v. United States*, 521 U.S. 898, 935 (1997)). This anti-commandeering principle is fundamental to the federal system and democratic accountability: it prevents Congress from shifting the costs of regulation to the States, and promotes political accountability by ensuring residents know whether actions reflect local or federal choices.

Numerous courts have rejected the United States' preemption theory with respect to the provisions of the SCPO that regulate the use of the City's property and resources. Embracing such a theory would allow passing responsibilities of immigration enforcement onto local governments, which would violate the Tenth Amendment. *See, e.g.*, *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) ("The federal government cannot merely conscript the police forces of the state or local governments to achieve its ends."); *California*, 921 F.3d at 888 (concluding the United States' obstruction claim "runs directly afoul of the Tenth Amendment"); *McHenry Cnty.*, 44 F.4th at 590-92 (similar); *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1059-60 (D. Colo. 2020) (similar, in Tenth Circuit). The SCPO's limits on use of City property and resources reflects Albuquerque's determination regarding how municipal resources should be used. Federal law leaves those choices to local government, and the Constitution independently protects them. The

United States therefore cannot transform voluntary opportunities for cooperation into legally enforceable obligations.

### C.   There is No Conflict Between the SCPO and DHS Contracting Authority.

The United States additionally alleges that the SCPO conflicts with 6 U.S.C. § 112(b)(2) by restricting the federal government's ability to carry out its functions by contracting with private parties. Compl. ¶ 132. But there is no conflict between that provision and the SCPO.

6 U.S.C. § 112(b)(2) is a general secretarial contracting authority provision that imposes no obligation on anyone outside the Department of Homeland Security. It authorizes the Secretary to make contracts and cooperative agreements necessary to carry out the Secretary's homeland security responsibilities. It is an inward-facing grant of contracting power that tells the Secretary what the Secretary may do, not what states or localities must do. Nothing in § 112(b)(2) requires any state or local government to accept a contract, enter an agreement, or make property available for federal use. A general contracting authority statute that authorizes the federal executive to enter voluntary agreements cannot preempt a local ordinance that declines to participate in those agreements. To hold otherwise would transform every general federal contracting power into a mandate wholly incompatible with the anti-commandeering doctrine. *See Murphy,* 584 U.S. at 473; *Printz v. United States*, 521 U.S. 898, 935 (1997).

### D.   The SCPO's Prohibition on Voluntary Consent to Entry of Non-Public Areas Does Not Conflict with Federal Law.

In addition to the limits on use of City property and resources to facilitate federal immigration enforcement, the SCPO directs the City to designate certain sensitive locations such as schools, hospitals, courthouses, and libraries as "Safer Community Places." SCPO § 13-17-3. It also directs the City to develop policies prohibiting such designated locations from providing voluntary consent to immigration enforcement agents to (1) enter nonpublic areas, or (2) access

sensitive records. SCPO § 13-17-4(A). The United States characterizes § 13-17-4(A) as "prohibiti[ng] certain public and private entities 'from providing voluntary consent to law enforcement agents engaged in or supporting immigration enforcement'" to have access to certain properties and records. Compl. ¶ 83. This framing exposes rather than supports the United States' claim that this provision is preempted: the provision regulates the giving of voluntary consent by non-federal actors, not the conduct of federal agents, and poses no obstacle to Congressional aims compared to what the Fourth Amendment already requires.

Where § 13-17-4(A) affects City property, it does not conflict with federal law for the reasons discussed above. Where it affects non-City property or entities[5], the Fourth Amendment provides the baseline for the limits on entry. Federal agents generally may not enter non-public areas of private buildings, such as a hospital ward, a school's administrative offices, or a shelter's residential quarters, without either a warrant or the consent of someone authorized to give it. *See Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528–29 (1967); *Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 842-45 (10th Cir. 2005). The SCPO codifies this constitutional requirement. Section 13-17-4(A) instructs designated local businesses and properties not to give the voluntary consent to access private areas that would otherwise waive the warrant requirement. The result is that federal agents must do what the Constitution already requires them to do in the absence of consent: obtain a warrant that satisfies the Fourth Amendment's requirements. The SCPO does not prohibit or limit compliance with a judicial warrant or other court order, and therefore cannot stand as an obstacle to accomplishing the will of Congress. *See* SCPO § 13-17-4(A)(a) ("This section does not prevent a Safer Community Place from complying with a valid

---

[5] Private entities not City-owned or controlled that are subject to the SCPO may include private hospitals, private or charter schools, daycares, and other listed entities that provide services to the community.

13

judicial warrant authorizing a search of such records or a valid judicial subpoena or judicial order compelling production of such records[.]").

No provision of the INA, including 8 U.S.C. § 1357(g), nor of any other federal statute cited by the United States, requires private facilities to consent to warrantless entry by immigration agents. Section 1357(g) authorizes immigration officers to conduct investigations and make arrests, but says nothing about commanding private entities to waive their Fourth Amendment rights. The United States' theory would convert a Constitutional right, such as the right to withhold consent to warrantless entry, into a federal obstacle whenever immigration enforcement is at issue. However, that is not the law.

Further, administrative immigration warrants issued by DHS (Form I-200 (warrant for arrest) and Form I-205 (warrant of removal)) are not judicial warrants issued by an Article III court. They are internal executive branch documents that carry no greater legal authority than a civil detainer: they do not authorize forced entry into private premises, they do not compel a private party to surrender custody of an individual, and they are not backed by the constitutional authority of a court. *See Morales v. Chadbourne*, 793 F.3d 208, 216–17 (1st Cir. 2015); *see also Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 978-79 (C.D. Cal. 2024) ("[A]n administrative warrant is insufficient to enter the constitutionally protected areas of a home."); *cf. Colorado*, 2026 WL 878882, at *4 (reasoning that like civil immigration detainers, "administrative warrants are issued by a federal agency rather than a judge, which multiple courts have held to mean that state and local cooperation is voluntary").

As for the record production limitation, SCPO restricts only voluntary consent by certain City and non-City entities to access, review, or obtain student or patient records, but it does not

restrict compliance with a lawful subpoena or judicial order. The SCPO simply instructs entities not to volunteer access beyond what law already requires them to provide.

In *United States v. California*, the district court preliminarily enjoined a provision in a California statute that prohibited voluntary consent by employers to immigration agents to access nonpublic areas in a place of labor to review employee records. 314 F. Supp. 3d 1077 (E.D. Cal. 2018), *aff'd in part, rev'd in part*, 921 F.3d 865 (9th Cir. 2019). The decision in that case is illustrative here. While the United States claimed preemption by the Immigration Reform and Control Act and the INA, the court "hesitate[d] to find the statutes preempted," noting that "Congress has not expressly authorized immigration officers to enter places of labor upon employer consent, nor has Congress authorized immigration enforcement officers to wield authority coextensive with the Fourth Amendment." *Id.* at 1095. Here, nothing in the Complaint alleges that Congress authorized immigration agents to enter nonpublic parts of the identified Safer Community Places, or that Congress intended to provide that degree of authority to immigration officers.

The *California* court ultimately found that the restrictions on consent likely discriminated against the United States, because the law at issue "impose[d] significant and escalating fines" on employers who chose to consent. *See id.* at 1096. The challenged SCPO provisions impose no such burden on the restricted entities, including the non-City entities. All that the SCPO does is direct the City to develop policies that prohibit voluntary consent, without specifying any penalty, much less significant or escalating fines. Compl. Ex. B.

Nor does the government's invocation of 8 U.S.C. § 1324(a), the "alien harboring statute," convert the SCPO's judicial-warrant requirement into a crime. Compl. ¶ 96. The statute prohibits "conceal[ing], harbor[ing], or shield[ing] from detection" any unauthorized alien. 8 U.S.C. §

15

1324(a)(1)(A)(iii). Declining to commit City resources to transport an individual to ICE custody absent judicial process is not concealment or harboring. The City is not hiding anyone. It is simply requiring the federal government to obtain the same judicial authorization it would need to compel any other involuntary custody transfer. *See Kearns v. Cuomo*, 981 F.3d 200, 208 (2d Cir. 2020) (noting that Section 1324(a) targets affirmative acts of concealment, not passive non-cooperation with federal enforcement).

### E. The SCPO's Employee-Notification Requirement Does Not Conflict with Federal Law.

Section 13-17-6(C) of the SCPO requires businesses to notify workers within 24 hours when an immigration enforcement agent is present at the workplace, other than as part of an I-9 inspection. The United States baselessly asserts that this provision is in conflict with federal law, and thus preempted by it. Compl. ¶¶ 84, 97.

Pre-emption cannot be implied absent an "actual conflict." *English v. Gen. Elec. Co.,* 496 U.S. 72, 90 (1990). Speculative, hypothetical, or potential conflicts are "insufficient to warrant the preemption of the state statute." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982). The United States offers no concrete explanation as to how the SCPO's employee-notification requirement in any way conflicts with federal enforcement, providing only one conclusory sentence stating that the requirement constitutes an obstacle to federal immigration enforcement by "attempt[ing] to harbor and shield aliens from detection." Compl. ¶ 97. "Harboring," within the meaning of the INA, is "conduct which is intended to facilitate an alien's remaining in the United States illegally and to prevent detection by the authorities of the alien's unlawful presence." *Kearns*, 981 F.3d at 208.  How a notification to employees that occurs *after* an agent has already been present in the workplace shields anyone from detection remains entirely unspecified in the Complaint. The SCPO's notification provision requires that employers include the name of the

16

agency, the date the actor was present, and the nature of their actions. *See* SCPO § 13-17-6(C)(1)(a)–(c). The Complaint utterly fails to allege how employers providing this notification to employees could facilitate the evasion of any ongoing enforcement action.

Instead, the requirement serves a legitimate labor-protection interest by memorializing that an enforcement event occurred and ensuring workers are aware of it. Worker notification requirements sit squarely within state and local labor law authority. States and localities have historically regulated employer-employee communications, workplace rights, and the conditions under which workers are informed of actions affecting their employment. *See Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985)*; see also DeCanas v. Bica,* 424 U.S. 351, 356 (1976) ("States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State."), *superseded by statute*, Immigrant Reform and Control Act, Pub. L. No. 99-603, 100 Stat. 3359, *as recognized in Kansas v. Garcia*, 589 U.S. 191, 195 (2020). Nothing in the INA conflicts with or otherwise preempts state and local employer notification requirements; to the contrary, the Immigration Reform and Control Act's (IRCA) preemption clause is narrow, targeting only state laws that "impos[e] civil or criminal sanctions . . . upon those who employ" unauthorized aliens.  8 U.S.C. § 1324a(h)(2).

It is in part due to this long-established authority that even employee-notification requirements in *advance* of immigration enforcement events in the workplace have been consistently upheld, much less the type of post-action notification challenged here. *See, e.g.*, *California,* 921 F.3d at 881 (rejecting a preemption challenge to California's AB 450, which requires employers to inform their workers within 72 hours of receiving an I-9 inspection notice, because the requirement "imposes no additional or contrary obligations that undermine or disrupt the activities of federal immigration authorities"); *United States v. Illinois*, 795 F. Supp. 3d 1057,

17

1072 (N.D. Ill. 2025) (rejecting a preemption challenge to the Illinois Right to Privacy in the Workplace Act, because the proposition that an advanced warning provision "obstructs Congress's purpose of ensuring lawful employment in the United States" by prompting employees to "abscond indefinitely in order to avoid detection by immigration authorities" was speculative and unsupported by facts.).[6]

## II.   The SCPO Does Not Violate the Intergovernmental Immunity Doctrine.

The United States brings two claims under the Supremacy Clause, alleging that the SCPO violates intergovernmental immunity principles by unlawfully regulating the activities of the federal government, and by unlawfully discriminating against the federal government. Compl. Counts II & III. A state or local law violates the intergovernmental immunity doctrine only if it "regulate[s] the United States directly or discriminate[s] against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022). The SCPO does neither. The United States' intergovernmental immunity arguments have been rejected by every court to consider them in analogous cases. *See, e.g.*, *McHenry Cnty.*, 44 F.4th at 592-94; *Cnty. of Ocean*, 475 F. Supp. 3d at 385; *California*, 921 F.3d at 881, 891; *Illinois*, 796 F. Supp. 3d at 533-36. The Court should do the same here.

### A.  The SCPO Does Not Regulate the Federal Government.

The United States claims that the City is regulating the United States primarily by limiting civil immigration staging areas on City property and instructing City employees not to expend

---

[6] Finally, to the extent cited provisions of the INA or any other cited statute do not regulate private actors, they cannot have preemptive effect under the Supreme Court's *Murphy* decision. *Murphy* holds that "every form of preemption is based on a federal law that regulates the conduct of private actors, not the States." 584 U.S. at 479. Because the Constitution "confers upon Congress the power to regulate individuals, not States," only federal statutes "that regulate[] . . . private actors" satisfy the requirements necessary to preempt state law. *Id.* at 472, 479 (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)). Numerous courts have applied *Murphy* to reject preemption challenges to state laws limiting participation in federal immigration enforcement. *See, e.g.*, *Ocean Cnty.*, 8 F.4th at 181-82 (relying on *Murphy* to reject preemption claim based on § 1373 and § 1644 since a "federal statute that does not regulate private actors cannot serve as a basis for preemption"); *Colorado*, 455 F. Supp. 3d at 1059 (similar).

municipal resources on federal immigration enforcement. Compl. ¶ 100. Not so. A state or local law violates the intergovernmental immunity doctrine only when it "regulate[s] the United States directly." ; that is, when it "places a prohibition on the Federal Government." *McHenry Cnty.*, 44 F.4th at 592. The SCPO does no such thing. By its plain terms, it regulates only the conduct of City officials, employees, and local entities. For example, the SCPO directs "City Departments" to identify "City-owned and controlled" locations that have or are likely to be used for staging, and add signage, and to secure City-owned and controlled property. SCPO § 5-1-5(B)(1)-(2). The SCPO prevents City employees, contractors, and agents from approving permits or contracts for use of City property or resources for immigration enforcement. SCPO § 5-1-5(B)(4). It directs the City not to use City resources for transportation for immigration enforcement or for enforcement in identified community spaces. § 5-1-5(B)(5)-(6). None of these provisions directly regulate the federal government in any way.

Courts have consistently rejected attempts to characterize internal local resource decisions as direct regulation of the federal government. *See McHenry Cnty.,* 44 F.4th at 593 (no direct regulation where state statute limiting cooperation with immigration enforcement "regulate[d] only State and local entities and law enforcement—not the federal government"); *Cnty. of Ocean,* 475 F. Supp. 3d at 385 (no direct regulation where state directive "regulate[d] only the conduct of state and local law enforcement agencies"); *Illinois*, 796 F. Supp. 3d at 535 (finding no direct regulation where policies "directly regulate[d] only state and local law enforcement entities, while "indirectly affect[ing] ICE's operations"); *New Jersey*, 2021 WL 252270, at *13 (finding no direct regulation where state directive "regulate[d] only state and local law enforcement agencies").

The fact that, as a consequence of the SCPO, the federal government cannot conscript City officials into its immigration enforcement efforts or require access to private spaces does not

amount to direct regulation of the federal government. The SCPO imposes no direct limitation on any federal official's exercise of authority. Federal agents remain entirely free to conduct immigration enforcement in Albuquerque; they simply cannot require the City to dedicate its resources to those efforts or participate.[7] Moreover, by adopting the SCPO, Albuquerque made a decision it is entitled to make under both the INA and the Tenth Amendment.

The United States also makes passing reference to the SCPO regulating the federal government by "requir[ing] judicial warrants to access property." Compl. ¶ 100. Here, the SCPO prohibits the use of "*City* property or resources" to facilitate custody transfer or transportation without a valid judicial warrant or court order. SCPO § 5-1-5(B)(5). It also prevents certain designated community locations from providing voluntary access to sensitive records and specifically notes that the SCPO does not prohibit compliance with a valid judicial warrant for such records. Neither of these provisions directly regulate the federal government, and instead seek to limit voluntary compliance by the *City* and by designated *non-federal entities* with federal requests that are not accompanied by a judicial warrant. *See United States v. New York*, 810 F. Supp. 3d 329, 352 (N.D.N.Y. 2025) (rejecting the claim that a state requirement for judicial warrants violated intergovernmental immunity where state was not attempting to regulate federal agents and was not prohibiting the federal government from enforcing immigration law).

### B.  The SCPO Does Not Discriminate Against the Federal Government.

---

[7] The SCPO differs in kind from state and local laws that other courts, in cases cited by the federal government, have held constitute unlawful regulation of the federal government. *See* Compl. ¶ 99 (citing *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 319 (3d Cir. 2025) and *Geo Grp., Inc. v. Newsom*, 50 F.4 745, 757 (9th Cir. 2022)). Those cases held that laws regulating private contractors can amount to direct regulation of the federal government where they "substantially interfere with" or effectively control the federal government's conduct. *See CoreCivic*, 145 F.4th at 327. The SCPO regulates only City employees and does not purport to regulate federal contractors, so those cases are inapposite. And in any case, as explained above, the SCPO does not "substantially interfere" with federal immigration enforcement; it merely instructs City employees to decline the voluntary offer to participate in that federal program. *See supra* Section I.A.

A state or local law "does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington v. United States*, 460 U.S. 536, 544-45 (1983). "[A] comparator is necessary; 'the mere fact that the [state law] touches on an exclusively federal sphere is not enough to establish discrimination.'" *Illinois*, 796 F. Supp. 3d at 533 (quoting *McHenry Cnty.*, 44 F.4th at 594).

The United States cannot identify any similarly situated entity here, because there isn't one. The SCPO implements a neutral policy preventing City personnel from engaging in civil immigration enforcement. *See McHenry Cnty.*, 44 F.4th at 594 n.7 ("The State's refusal to cooperate in the immigration context—a possibility contemplated by the relevant federal statutes—does not constitute discrimination against the federal government."); *California*, 921 F.3d at 881; *Cnty. of Ocean*, 475 F. Supp. 3d at 385.

To the extent the Complaint attempts to identify a comparator by asserting that the SCPO favors criminal law enforcement officials over civil immigration officers, that effort fails. Civil immigration enforcement and criminal law enforcement are not similarly situated functions. Where those functions do overlap, like when federal and local officers work together on criminal matters, the SCPO treats them equally. *See Illinois*, 796 F. Supp. 3d at 534; *New Jersey,* 2021 WL 252270, at *14 ("[C]ivil immigration operations and criminal law enforcement are not similarly situated.").

Further, Section 13-17-4(A) of the SCPO applies to "law enforcement agents engaged in or supporting immigration enforcement," which is a function description, not a federal-versus-local distinction. The provision does not permit hospitals and schools to grant voluntary warrantless access to state police for general criminal enforcement while denying it only to federal immigration agents. Rather, it addresses a specific type of enforcement (civil immigration) that, as

a matter of federal law, is the exclusive domain of the federal government. The fact that the provision necessarily affects only federal agents is a consequence of the federal government's exclusive jurisdiction over civil immigration and not evidence of discrimination against a similarly situated comparator. *See McHenry Cnty.*, 44 F.4th at 594 ("[T]he mere fact that the Act touches on an exclusively federal sphere is not enough to establish discrimination.").

Lastly, the United States alleges that the SCPO's employee-notification provision discriminates by singling out the Federal Government for "significantly worse treatment" than other law enforcement operations. Compl. ¶ 105. Again, the fact that a notification provision concerning immigration enforcement action touches on an exclusively federal sphere presents no evidence of discrimination, and is a natural consequence of the function of the federal government. *See McHenry Cnty.*, 44 F.4th at 594. The requirement that businesses notify workers of immigration enforcement activity within 24 hours is a neutral policy regulating the employer-employee relationship that is applied equally to all employers in the state regardless of who does or does not have dealings with the federal government. *See North Dakota v. United States,* 495 U.S. 423, 437-38 (1990) (plurality opinion).

It bears repeating that any burden the SCPO may incidentally place on the federal government by requiring it to use its own resources to do its own job is not an impermissible one. A municipality declining to participate in a federal regulatory program is not discrimination; it is a sovereign exercise protected by the Tenth Amendment. *See Murphy*, 584 U.S. at 471-73; *California*, 921 F.3d at 890-91.

III.    **The United States Lacks Standing to Bring its Claims Against the City and the Mayor to the Extent its Alleged Harms Cannot Be Redressed by the Relief it Seeks.**

The party invoking federal jurisdiction (here, the United States) bears the burden to establish the "irreducible constitutional minimum" of Article III standing—that it (1) has suffered

a cognizable injury in fact that is both (2) traceable to the challenged conduct of the defendant and (3) likely to be redressed by a favorable judicial decision. *See Spokeo Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992)). The United States must demonstrate its standing for each claim it brings. *Davis v. Fed. Election Comm'n,* 554 U.S. 724, 734 (2008). Here, the Court should dismiss the United States' claims as to the limits on voluntary consent to access certain spaces and produce certain records by non-City entities, and the SCPO's requirement that employers provide notice to current employees, because of an existing County ordinance that contains those same limitations and requirements

To show its claims are redressable, the United States must show that the relief requested would redress the professed injury. *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005). "To determine whether an injury is redressable," courts "consider the relationship between the judicial relief requested and the injury suffered." *Murthy v. Missouri*, 603 U.S. 43, 73 (2024) (quoting *California v. Texas,* 593 U.S. 659, 671 (2021)) (citation modified). Redress needs to be "likely," though it need not be complete. *See Lujan*, 504 U.S. at 560–61 (quoting *Simon v. Eastern Ky. Welfare Rts. Org.,* 426 U.S. 26, 38 (1976)). "The primary goals of [the redressability] requirement are to ensure that plaintiffs do not sue the wrong parties and that courts do not issue advisory opinions." *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 120 (2025).

In November 2025, Bernalillo County, the county in which Albuquerque is located, passed an amendment to its County Code *See* Declaration of Devon King ¶ 2 & Ex. A ("County Ordinance"), dated June 8, 2026. Like the SCPO, the County Ordinance limits voluntary consent for immigration enforcement agents to access designated "safer community places" or certain records contained therein, and requires employers to notify employees within 24 hours after immigration officials are present in the workplace. Thus, any non-City entities that are impacted

by the SCPO are subject to the same limitations under the County Ordinance, which is not challenged in this case. The relief in this case that the United States seeks, invalidation of the SCPO, would not modify those non-City entities' obligations to avoid voluntary consent to access and record production, or to provide the notice required by the County Ordinance. Thus, the United States' claimed injuries from those provisions of the SCPO would not be redressed by the relief sought in this case as to the City and Mayor, and the United States lacks standing as to those claims. *United States v. City of Boston*, --- F. Supp. 3d ---, No. 25-cv-12456, 2026 WL 1493706, at *9-11 (D. Mass. May 28, 2026).

**IV.     The United States Cannot Maintain Its Claims Against the Mayor.**

Mayor Keller must be dismissed from this lawsuit for a separate and additional reason: because the claims against the Mayor are wholly redundant of the claims against the City. "[A]n official-capacity suit is . . . treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 166 (1985); *accord Johnson v. Bd. of Cnty. Comm'rs for Cnty. of Fremont*, 85 F.3d 489, 493 (10th Cir. 1996). The United States' official-capacity claims against Mayor Keller are duplicative of its claims against the City. "[W]here a plaintiff chooses to sue both the municipality and municipal official in an official capacity, courts consistently dismiss the official capacity claim as 'duplicative' or 'redundant' of the claim against the municipal entity." *N.F. ex rel. M.F. v. Albuquerque Pub. Schs.*, No. 14-cv-699, 2015 WL 13662805, at *2 (D.N.M. May 4, 2015) (citing *McDonald v. Wise*, 769 F.3d 1202, 1214-15 (10th Cir. 2014)). The Complaint fails to make any allegations concerning Mayor Keller's role regarding the SCPO beyond signing it into law. *See* Compl. ¶¶ 6, 78. This is not sufficient to state a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Thus, the Complaint fails to "allege injuries traceable to [each]

individual defendant" – a prerequisite for standing. *See Illinois*, 796 F. Supp. 3d at 511-12 (dismissing similar claims against individual defendants).

All claims against Mayor Keller should be dismissed.

**V.      The SCPO Is Severable, and the United States Is Not Entitled to Invalidation of the Entire Ordinance.**

The United States seeks relief declaring the entirety of the SCPO invalid and unenforceable, and a corresponding injunction. Compl. ¶¶ 51-52.  It is not entitled to such broad relief for three reasons. First, the United States has not challenged all parts of the SCPO. Second, for the reasons detailed herein, the United States fails to state any claim for relief as to the parts of the SCPO it has challenged. Third, even if the Court determines that some aspect of the United States' claims may proceed, the SCPO contains an express severability provision that allows all other provisions to stand. Compl. Ex. B. at 8.

Whether any preempted provisions of an ordinance are severable from the remainder of the ordinance "is of course a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam). New Mexico law dictates that "the effect of a declaration of severability in the ordinance creates a presumption that the ordinance is divisible." *City of Albuquerque v. Cauwels & Davis Mgmt. Co.*, 96 N.M. 494, 496 (1981)*. See also Giant Indus. Ariz., Inc. v. Taxation & Revenue Dep't*, 110 N.M. 442, 444 (N.M. App. 1990)  (concluding that "[i]t is a fundamental principle that a part of a statute may be invalid and the remainder valid, where the invalid part can be separated from other portions, without impairing the force and effect of the remaining portions").

The SCPO clearly and expressly declares the City Council's intent for the provisions of the ordinance to be severable should any element be struck down, indicating that the Council "would have passed this Ordinance and each…section…irrespective of any provision declared unconstitutional or invalid." SCPO § 3. Thus, any relief granted to Plaintiff must be limited to the

25

specific provisions of the SCPO where there is a legitimate basis for challenge, and the Court should accordingly dismiss any aspect of the Complaint seeking broader relief.

### CONCLUSION

For the foregoing reasons, the Court should dismiss this Complaint with prejudice.

Respectfully Submitted,

*/s/Devon P. King*
Devon P. King
Deputy City Attorney
Lauren Keefe
City Attorney
One Civil Plaza NW
P.O. Box 2248
Albuquerque, New Mexico 87103
(505) 768-4628
lkeefe@cabq.gov
dking@cabq.gov

*/s/Toby Merrill*
Toby Merrill* (MA Bar # 601071)
Litigation Director
Public Rights Project
Sai Mohan* (CA Bar # 350675)
Kayla Svihovec* (DC Bar # 735588)
Patrick Archer* (NY Bar # 6194757)
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
Toby.Merrill@publicrightsproject.org
Sai.Mohan@publicrightsproject.org
Kayla.Svihovec@publicrightsproject.org
Patrick.Archer@publicrightsproject.org

*Counsel for the City of Albuquerque and Timothy Keller*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2026, I filed the foregoing via the CM/ECF filing system,

which caused all counsel of record to be served by electronic means.

Respectfully submitted,

*/s/ Devon P. King*
Devon P. King