UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF NEW MEXICO; MICHELLE LUJAN GRISHAM, in her Official Capacity as Governor of the State of New Mexico; RAÚL TORREZ, in his Official Capacity as Attorney General of the State of New Mexico; CITY OF ALBUQUERQUE; TIMOTHY KELLER, in his Official Capacity as Mayor of the City of Albuquerque; DOÑA ANA COUNTY; SCOTT ANDREWS, in his Official Capacity as Manager of Doña Ana County; BERNALILLO COUNTY; CINDY CHAVEZ, in her Official Capacity as Manager of Bernalillo County;<br><br>Defendants. | Civil Action No. 1:26-cv-01471-KG-LF |

## FIRST AMENDED COMPLAINT

Plaintiff, the United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## PRELIMINARY STATEMENT

1.      Within hours of assuming the Presidency, President Donald J. Trump took immediate action to fulfill his campaign promise to the American people and declared that a "national emergency exists at the southern border of the United States" from the unprecedented "illegal entry of aliens." Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025). This declaration was necessary given the flood of illegal aliens into our Nation under the prior administration's open

border policies incentivizing disregard for laws passed by Congress. As a result, millions of illegal aliens settled in American communities in flagrant violation of federal law, creating "significant threats to national security and public safety" and resulting in aliens "committing vile and heinous acts against innocent Americans." Exec. Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025). This national crisis underscores the vital importance of the Executive duty to "[e]nforc[e] our Nation's immigration laws." *Id.*

2.     Under President Trump's leadership—and in response to the electoral mandate— the Federal Government, through the U.S. Department of Homeland Security and its components U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"), is employing all available legal measures to end that crisis, including by identifying and removing criminal illegal aliens from the United States in accordance with its well-established, preeminent, and preemptive authority to regulate immigration matters. This authority derives from the United States Constitution, numerous acts of Congress, and binding United States Supreme Court precedent. *See, e.g.*, U.S. Const. art. VI, cl. 2, art. I § 8, cl. 4; Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 163 (codified as amended at 8 U.S.C. § 1101, *et seq.*) ("INA"); *Arizona v. United States*, 567 U.S. 387, 394–95 (2012); *see also Lopez v. U.S. I.N.S.*, 758 F.2d 1390, 1392 (10th Cir. 1985) ("Congress has conferred upon [federal immigration officials] broad authority to address the problem of illegal aliens."). Indeed, Congress last year strengthened that authority with the enactment of the Laken Riley Act, S. 5, 119th Cong. (2025), which "mandates the federal detention of illegal immigrants who are accused of theft, burglary, assaulting a law enforcement officer, and any crime that causes death or serious bodily injury."[1]

---

[1] Press Release, DHS, *President Trump Signs the Laken Riley Act into Law* (Jan. 29, 2025), https://www.dhs.gov/news/2025/01/29/president-trump-signs-laken-riley-act-law.

3.      Among the legal measures authorized by Congress and available to the Federal Government to implement federal immigration law are voluntary written agreements between the Federal Government and state or local governments whereby state or local government officials are trained on and empowered to carry out federal immigration enforcement activities under the color of federal law, including through the investigation, apprehension, transportation, and detention of aliens in the United States. *See* 8 U.S.C. § 1357(g). Congress further authorized the Federal Government to enter into agreements and make arrangements with state and local governments to facilitate the detention of aliens in the United States. *See id.* §§ 1103(a)(11)(B), 1231(g). The Federal Government depends on such agreements to carry out its immigration enforcement objectives. *See generally* 8 U.S.C. § 1231. Local governments and law enforcement agencies in New Mexico have entered into numerous such agreements with the Federal Government without issue for *decades*.

4.      Despite the ongoing threat that unvetted illegal aliens pose to American lives and communities and the comprehensive and exclusive authority of the Federal Government over immigration enforcement, New Mexico, Albuquerque, Doña Ana County, and Bernalillo County seek to intentionally obstruct federal law enforcement and thwart the constitutional obligation of the President of the United States to take care that the immigration laws enacted by Congress are enforced. *See* Exec. Order 14,287, *Protecting American Communities From Criminal Aliens*, 90 Fed. Reg. 18761 (Apr. 28, 2025). They seek to do so by effectively preventing cooperation between local governments and the Federal Government to achieve Congress's immigration objectives and barring immigration detention in New Mexico (and their respective local jurisdictions), all at the expense of the American people, including the people of Otero County.

5.      Specifically, on February 5, 2026, New Mexico Governor Michelle Lujan Grisham signed House Bill 9, entitled the "Immigrant Safety Act," ("HB9") (Exhibit A) into law, that took effect on May 20, 2026.[2] HB9, which applies broadly to any "public body," bars future entry into and requires immediate termination of existing agreements (i) "to detain individuals for federal civil immigration violations, including an intergovernmental services agreement to detain individuals for civil immigration violations[;]" (ii) "to investigate, apprehend, detain or transport individuals pursuant to 8 U.S.C. Section 1357(g) or 8 C.F.R. Section 287.7[;]" or (iii) "that deputize[] officers, employees or agents of the public body to perform a function of an immigration officer in relation to the investigation, apprehension, detention or transportation of noncitizens in the United States or the removal of noncitizens from the United States." HB9 §§ 3(A), (B), 4(A)–(C). HB9 further prohibits public bodies from "sell[ing], trad[ing], leas[ing] or otherwise dispos[ing] of any real property to be used for the detention of individuals for federal civil immigration violations." *Id.* § 3(C).

6.      Not to be outdone, a month and a half later, on March 23, 2026, City of Albuquerque Mayor Timothy Keller signed O-26-15, entitled the "Safer Community Places Ordinance" ("ASCPO") (Exhibit B) into law. The ASCPO provides that "the City, its employees, contractors, or agents acting under the City's authority shall not approve any permit, contract or other agreement for use of City owned or controlled property or resources if the City, its employees, contractors, or agents have a reasonable belief the property or resources will be used for the purposes of facilitating immigration enforcement." ASCPO § 5-1-5(B)(4).

---

[2] Defendants State of New Mexico and New Mexico Attorney General agreed not to enforce HB9 against certain contracts at issue in this matter until the entry of a final judgment on the merits. *See* Dkt. No. 10, 12.

7.      The ASCPO goes further than HB9 in its obstruction of federal immigration enforcement by also: (i) barring any use of city-owned property and resources from being used for immigration enforcement purposes, ASCPO § 5-1-5(A); (ii) barring the use of city property or resources to "transport individuals for immigration enforcement purposes" or "facilitate custody transfer to federal immigration authorities absent a valid judicial warrant or court order[,]" *id.* § 5-1-5(B)(5); (iii) barring the use of city resources "for immigration enforcement" in specified places, *id.* § 5-1-5(B)(6), *see also id.* § 13-17-3; (iv) prohibiting certain public and private entities "from providing voluntary consent to law enforcement agents engaged in or supporting immigration enforcement" to have access to certain properties and records, *id.* § 13-17-4(A); and (v) "[i]f a law enforcement agent engaging in or supporting immigration enforcement is present at a place of work," requiring the business to "provide notice" to all persons "performing work" at the business of the name, date, and nature of the law enforcement activity within 24 hours, *id.* § 13-17-6(C).

8.      The ASCPO borrows from the Bernalillo County "Safer Community Places Ordinance," enacted by the Bernalillo County Board of County Commissioners in November 2025. *See* Bernalillo County Ord. No. 2025-33 ("BSCPO") (Exhibit C), Bernalillo County Code of Ordinances §§ 51-1–51-6. Although the ASCPO imposes greater burdens on the Federal Government than the BSCPO, the BSCPO also burdens federal immigration enforcement by prohibiting certain public and private entities "from providing voluntary consent to law enforcement agents engaged in or supporting immigration enforcement" to have access to certain properties and records, *id.* §§ 51-2, 51-3; and (v) "[i]f a law enforcement agent engaging in or supporting immigration enforcement is present at a place of work," requiring the business to "provide notice" to all persons "performing work" at the business of the name, date, and nature of the law enforcement activity within 24 hours, *id.* § 51-5(b).

9.    On May 12, 2026, the Doña Ana County Board of County Commissioners approved and adopted the Amended Resolution Calling for Doña Ana County Employees to Support the Conditions Needed to Create "Safe Communities for All Residents," No. 2026-67 ("SCAR" and, together with the ASCPO, and the BSCPO, the "Local Laws") (Exhibit D). Like the ASCPO, the SCAR provides that "[t]he County, its employees, contractors, or agents acting under the County's authority shall not approve any permit, contract or other agreement for use of County owned or controlled property or resources if the County, its employees, contractors, or agents have a reasonable belief the property or resources will be used for the purposes of facilitating immigration enforcement." SCAR § 2(I).

10.    Like the ASCPO, the SCAR goes further than HB9 in its obstruction of federal immigration enforcement by also: (i) barring any use of city-owned property and resources from being used for immigration enforcement purposes, SCAR § 2; (ii) barring the transmission and dissemination of information regarding immigration status, *id.* § 2(A); barring the assistance and cooperation with any ICE or CBP immigration enforcement operations relating to violations of federal immigration law, *id.* § 2(C); and (iii) barring the use of county property to carry out immigration enforcement, *id.* §§ 2(D)–(H). Under the SCAR, Doña Ana County prevents "all County owned or operated facilities" from "providing voluntary consent to law enforcement agents engaged in or supporting immigration enforcement" access to certain property and records. *Id.* §§ 3–4.

11.    Through HB9, New Mexico seeks to eliminate decades old voluntary agreements between localities and the Federal Government that are critical to federal immigration law enforcement and facilitate the cooperation envisioned by Congress's federal immigration system. HB9 and the Local Laws (together, the "Challenged Laws") go further to prevent federal law

enforcement from using government property to fulfill the objectives of Congress. The ASCPO and BSCPO take affirmative steps to provide aliens with a safe harbor from federal law enforcement detection by requiring businesses to tip-off aliens of ongoing federal immigration activities.  The Local Laws prevent certain public and, in the case of the ASCPO and BSCPO, private entities from voluntarily providing law enforcement access to certain property and records, and ordering the defiance of administrative warrants and detainers. The SCAR also prevents public entities from voluntarily cooperating with immigration law enforcement operations by prohibiting the collection and transmission of information concerning immigration status. Such blatant disregard for federal laws and voluntary agreements that have been in place for decades is not merely a political disagreement or passive abstention; it is deliberate, disruptive action that jeopardizes the public safety of all Americans, and violates the United States Constitution in several respects.

12.     First, the Challenged Laws violate long-settled principles of preemption embodied by the Supremacy Clause that bar state laws from conflicting with and standing as obstacles to the achievement of the goals and objectives of Congress. *See Arizona*, 567 U.S. at 399 ("state laws are preempted when they conflict with federal law" including "those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]'") (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also Lopez*, 758 F.2d at 1392 ("Congress may entirely pre-empt state authority in immigration matters[.]").

13.     The Challenged Laws blatantly obstruct the accomplishment of the purposes and objectives of federal immigration law that are exclusively within the scope of Congressional authority by, for example, barring cooperation between the Federal Government and local governments in the enforcement of federal immigration laws, including detaining aliens. *See*

7

*Lopez*, 758 F.2d at 1392 ("This broad grant of authority [to regulate immigration matters] is exclusive to Congress."); 8 U.S.C. §§ 1103(a)(11)(B), 1231(g), 1357(g). States and localities cannot ban civil immigration detention, yet that is exactly what the Challenged Laws seek to accomplish. *See CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325 (3d Cir. 2025); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022). Nor can they ban and thus defeat Congress's scheme for cooperative enforcement. *See City of N.Y. v. United States*, 179 F.3d 29, 35 (2d Cir. 1999); *Arizona*, 567 U.S. at 408–09. As stated by HB9 sponsor New Mexico Representative Eleanor Chavez, "The Immigrant Safety Act is a straightforward bill. It gets New Mexico out of the business of immigration detention."[3]

14.     The Local Laws further prevent public entities from voluntarily cooperating with and providing immigration law enforcement officials access to certain property and records and order defiance of the administrative warrants authorized by Congress. The ASCPO and BSCPO require businesses to tip off illegal aliens of ongoing immigration law enforcement activities, which requirement has no legitimate purpose other than to harbor and conceal these aliens from detection by immigration authorities by telling these aliens to avoid coming into work to avoid being subject to detection by federal authorities. *See* 8 U.S.C. § 1324(a). The Challenged Laws are preempted because they conflict with federal law by obstructing the achievement of the objectives of Congress expressed in the INA. In addition to being impliedly preempted, the SCAR is expressly preempted by the INA because it prohibits the collection and transmission of information concerning immigration status, which Congress expressly sought to prevent. *See* 8 U.S.C. §§ 1373(a), (b); 1644 (same); *see also id.* § 1357(g)(10)(A).

---

[3] Pat Davis, *Momentum builds in New Mexico legislature to ban ICE facilities statewide*, New Mexico Political Report (Jan. 28, 2026), https://nmpoliticalreport.com/2026/01/28/momentum-builds-in-new-mexico-legislature-to-ban-ice-facilities-statewide/

15.     Second, the Challenged Laws also violate long-settled principles of intergovernmental immunity embodied in the Supremacy Clause, under which States have no power to "in any manner control[] the operations of" the Federal Government. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819); *see also Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."). The Challenged Laws seek to regulate the Federal Government by controlling the parties with whom the Federal Government may contract and the property and resources available to the Federal Government to perform the core government function of immigration enforcement and detention, despite express and unambiguous Congressional authorization to the contrary. The purpose and effect of these laws is to stop the Federal Government from detaining aliens and prevent the enforcement of immigration law, which is a central responsibility of the Federal Government.

16.     Third, the Challenged Laws discriminate against the Federal Government because they explicitly regulate and burden civil immigration detention and enforcement while simultaneously permitting law enforcement activity for other purposes without restraint. Civil immigration detention and enforcement are regulatory areas governed exclusively by federal law and enforced by the Federal Government. By applying solely to federal immigration enforcement activities, the laws single out federal law enforcement officers for worse treatment than state and local law enforcement officials performing other regulatory functions, including civil enforcement. For example, while contracts may not be formed between the Federal Government and localities for the purpose of civil immigration detention, no such prohibition exists for intergovernmental contracts for any other type of detention, including civil. While private businesses must tip off aliens of immigration enforcement activities and certain public and private entities cannot voluntarily provide immigration law enforcement officials access to property and records, no such

notice or prevention of cooperation is required of the same public and private entities in connection with other law enforcement activities. Put simply, no other law enforcement officials are subjected to the same discriminatory treatment as immigration law enforcement officials. As a result, the Challenged Laws unlawfully discriminate against the Federal Government in violation of the principles of intergovernmental immunity.

17.    Finally, HB9 violates the Contract Clause, which states "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]" U.S. Const. art. I, § 10, cl. 1. The Constitution prohibits states from passing laws that operate to impair contractual relationships, particularly if a state actor is a party, without advancing a significant and legitimate public purpose. *See Sveen v. Melin*, 584 U.S. 811, 819 (2018). Mandating that all public bodies terminate their existing cooperative agreements that facilitate the detention of aliens and enforcement of immigration law unequivocally amounts to impairment of those agreements. *See, e.g.*, *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247 (1978) ("the statute in question here nullifies express terms of the company's contractual obligations"). A blanket ban on agreements to detain violators of civil immigration law or to cooperate in the implementation and enforcement of federal immigration law, areas of law that the State of New Mexico has not historically regulated, does not advance any significant or legitimate public purpose. *See U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 29–32 (1977). And even if HB9 had a legitimate and significant public purpose, a wholesale ban requiring the unconditional termination of an agreement is not a reasonable condition "of a character appropriate to the public purpose justifying [the legislation's] adoption." *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 (1983) (quoting *U.S. Tr. Co.*, 431 U.S. at 22). Thus, HB9 violates the Contract Clause.

18. In sum, the Challenged Laws are preempted by the INA due to their obstruction of the achievement of Congress's federal immigration objectives, violate principles of intergovernmental immunity by unlawfully regulating and discriminating against the Federal Government, and violate the Contract Clause and Supremacy Clause of the Constitution.

19. Accordingly, the United States brings this action seeking a declaration that the Challenged Laws are unconstitutional and a preliminary and permanent injunction against the enforcement of the Challenged Laws.

## JURISDICTION AND VENUE

20. This action arises under Article I, Section 10, Clause 1 and Article VI, Clause 2 of the U.S. Constitution, and the INA. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

21. Venue is proper in under 28 U.S.C. §§ 1391(b)(1) and (b)(2) because all Defendants reside in the District of New Mexico, and the District of New Mexico is the judicial district in which a substantial part of the events or omissions giving rise to this action occurred. The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201, and 2202, the Supremacy Clause, the Contract Clause, and its inherent equitable powers.

22. The United States has standing to bring this lawsuit in accordance with the pre-enforcement standing principles articulated by the Tenth Circuit in *Rocky Mountain Gun Owners v. Polis* because (i) it "intend[s] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" and (ii) "there exists a credible threat of prosecution thereunder." 121 F.4th 96, 110 (10th Cir. 2024) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 160 (2014)). The United States actively enforces federal immigration law throughout the State of New Mexico, City of Albuquerque, Bernalillo County, and Doña Ana

County through its use of real property and its agreements with local government entities concerning, for example, the detention of aliens; and the State of New Mexico, City of Albuquerque, Bernalillo County, and Doña Ana County pose a credible threat of enforcement because they have not disavowed any intention of invoking the Challenged Laws against the United States.

23.    In fact, the State of New Mexico, through its Attorney General, has demonstrated an affirmative intent to enforce HB9 by petitioning the New Mexico Supreme Court for a writ of mandamus and stay to invalidate an Intergovernmental Services Agreement between Otero County, New Mexico and ICE concerning the civil immigration detention operations of the Otero County Processing Center. *See State of New Mexico ex re. Raul Torrez v. Bd. of Cnty. Comm'rs for Otero Cnty.*, S-1-SC-41362. These laws will terminate and prevent future cooperative contracts and severely hamper immigration enforcement in an important border state. Additionally, the State of New Mexico, through its Attorney General, brought lawsuits against Curry and Torrance Counties seeking to invalidate contractual agreements between the respective counties and ICE based on HB9's purported prohibition of such contracts. *See State of New Mexico ex rel. Raul Torrez, Attorney General v. Board of County Commissioners for Curry County and Sheriff Michael Brockett*, No. D-909-cv-2026; *State of New Mexico ex rel. Raul Torrez, Attorney General v. Board of County Commissioners for Torrance County and David Frazee*, D-707-cv-2026. Both lawsuits further demonstrate New Mexico's affirmative intent to enforce HB9.

## **PARTIES**

24.    Plaintiff, the United States of America, regulates immigration under its inherent, constitutional, and statutory authorities, and it enforces federal immigration laws through its Executive Branch agencies, including the Department of Justice, Department of State, and

Department of Homeland Security ("DHS"), as well as DHS's component agencies ICE, CBP, and U.S. Citizenship and Immigration Services.

25.     Defendant State of New Mexico is a State of the United States.

26.     Defendant Michelle Lujan Grisham is the Governor of the State of New Mexico and is sued in her official capacity as the "[t]he supreme executive power of the state" and the officer tasked with "tak[ing] care that the laws be faithfully executed." N.M. Const. art. V, § 4. Governor Lujan Grisham "has control over" Attorney General Torrez "and, therefore, may direct whether and to what extent" HB9 is enforced. *Hernandez v. Grisham*, 499 F. Supp. 3d 1013, 1049 (D.N.M. 2020); *see Petrella v. Brownback*, 697 F.3d 1285, 1293–94 (10th Cir. 2012) ("It cannot seriously be disputed that the proper vehicle for challenging the constitutionality of a state statute, where only prospective, non-monetary relief is sought, is an action against the state officials responsible for the enforcement of that statute. . . . Nor can it be disputed that the Governor and Attorney General of the state . . . have responsibility for the enforcement of the laws of the state."). Governor Lujan Grisham directs the enforcement of HB9 through her control over the Attorney General of New Mexico and has helped enforce HB9 by corresponding with New Mexico citizens concerning the limited ability of state law enforcement to intervene in immigration enforcement activities.

27.     Defendant Raúl Torrez is the Attorney General of the State of New Mexico and is sued in his official capacity as the chief law enforcement officer of the State of New Mexico and the officer tasked with enforcement of state laws, including HB9. *See* HB9 § 5(A) ("The attorney general . . . may institute a civil action . . . if the attorney general . . . has reasonable cause to believe that a violation of the Immigrant Safety Act has occurred or to prevent a violation of that act from occurring."); N.M. Stat. Ann. § 8-5-2.

28.     Defendant City of Albuquerque is a city and political and geographical subdivision in the State of New Mexico.

29.     Defendant Timothy Keller is the Mayor of the City of Albuquerque and is sued in his official capacity as the director of the executive branch of the City of Albuquerque and the official tasked with the execution of all laws, ordinances, regulations, and regulations of the City of Albuquerque and State of New Mexico, including HB9 and the ASCPO. *See* Charter of the City of Albuquerque, Art. V, §§ 3, 4; ASCPO § 5-1-5(B). Mayor Keller enforces the ASCPO by controlling and directing the actions of all Albuquerque city departments. *See* Charter of the City of Albuquerque, Art. V §§ 4(b), (l). Mayor Keller has further enforced the ASCPO by corresponding with Albuquerque citizens concerning the requirements and objectives of the ASCPO.

30.     Defendant Bernalillo County is a county and political and geographical subdivision in the State of New Mexico.

31.     Defendant Cindy Chavez is the County Manager of Bernalillo County and is sued in her official capacity as the chief executive officer of Bernalillo County. County Manager Chavez is the official tasked with the execution of all policies enacted by the Bernalillo County Board of County Commissioners, including the execution, implementation, and enforcement of the Bernalillo SCPO. *See* Bernalillo County Charter Art. IV § A; Bernalillo County Code of Ordinances Art. III, Div. 2, § 2-63; BSCPO §§ III(A), (B). Bernalillo County Manager Chavez has implemented and enforced the BSCPO.

32.     Defendant Doña Ana County is a county and political and geographical subdivision in the State of New Mexico.

14

33.    Defendant Scott Andrews is the County Manager of Doña Ana County and is sued in his official capacity as the chief executive officer of Doña Ana County. County Manager Andrews is the official tasked with the execution of all policies enacted by the Doña Ana County Board of County Commissioners, including the execution, implementation, and enforcement of the SCAR, as well as the employment and discharge of all Doña Ana County employees pursuant to the Doña Ana County Human Resources Policies. *See* Doña Ana County Code § 45-10; SCAR §§ 1, 5; Doña Ana County Human Resources Policies Manual §§ 6.15, 10. Doña Ana County Manager Andrews has implemented and enforced the SCAR.

## THE SUPREMACY CLAUSE, FEDERAL PREEMPTION, AND INTERGOVERNMENTAL IMMUNITY

34.    The Challenged Laws violate the principles embodied in Supremacy Clause because they obstruct the actions necessary to achieve the purposes and goals of federal immigration law, impose regulations on the Federal Government, and discriminate against the Federal Government.

## THE SUPREMACY CLAUSE

35.    The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

36.    In *McCulloch v. Maryland*, the Supreme Court recognized that the Supremacy Clause restricts states from inhibiting the implementation of federal law, stating that "the States have no power, by taxation or otherwise, to retard, *impede, burden, or in any manner control*, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." 17 U.S. 316, 436 (1819) (emphasis added). "Because federal law is

15

supreme, 'there is a plain repugnance' in letting states 'interfer[e] with or control[] the operations of the Federal Government.'" *CoreCivic*, 145 F.4th at 321 (quoting *McCulloch*, 17 U.S. at 431).

37.     Thus, legislation of a state or city is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67, "regulat[es] the United States directly," *United States v. Washington*, 596 U.S. 832, 838 (2022) (citation omitted), or "discriminate[s] against the United States or those with whom it deals." *South Carolina v. Baker*, 485 U.S. 505, 523 (1988). The Supremacy Clause incorporates both preemption and intergovernmental immunity.

38.     To implement federal law, federal law enforcement officers work throughout the entire country and are subject to the control of the Federal Government, not each individual state or locality. *See, e.g.*, 8 U.S.C. § 1103(a)(2) (giving the Secretary of DHS the power to "control, direct[], and supervis[e]" all DHS employees); 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the DOJ in the Attorney General). Likewise, when it comes to liability, Federal law enforcement officers are subject to Federal law, not state law. *See, e.g.*, *Hernandez v. Mesa*, 589 U.S. 93, 101–102, 111 (2020) (explaining limited nature of Bivens and history leading to the Federal Tort Claims Act (FTCA) as the exclusive remedy for most claims against Government employees arising out of their official conduct).

## FEDERAL PREEMPTION

39.     The preemption doctrine provides that federal interests overcome state interests when federal and state law "clash." *North Dakota v. United States*, 495 U.S. 423, 435 (1990)

(plurality); *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477–79 (2018). The Supreme Court has identified two general ways in which federal law can preempt state and local laws.

40.    First, a federal statute can *expressly* preempt a state law when Congress includes express language within the federal statute indicating its preemptive intent. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). When Congress explicitly supersedes all state enactments in a particular area by statute, state enactments in that area are deemed expressly preempted. *See Pacific Gas & Elec. Co. v. State Energy Res. Conserv. & Develop. Comm'n*, 461 U.S. 190, 203–04 (1983); *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010) ("State laws are expressly preempted when they fall within the scope of a federal provision explicitly precluding state action."); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (finding express preemption where the federal law provided that "[N]o State . . . shall enact or enforce any law . . . relating to rates, routes, or services of any air carrier.").

41.    Second, in the absence of express preemption, federal law can *impliedly* preempt state law when Congress's preemptive intent is implicit in the relevant federal law's structure and purpose. State and local laws must yield to a federal statute when they are impliedly preempted. One form of implied preemption occurs when state or local laws conflict with a federal statute. *Crosby*, 530 U.S. at 372.

42.    A state or local law may conflict with a federal statute where the challenged law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *Crosby*, 530 U.S. at 372–73; *United States v. Locke*, 529 U.S. 89, 109 (2000); *Hines*, 312 U.S. at 67; *see Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995); *Edmondson*, 594 F.3d at 767 (If a state law "provision interferes with Congress' chosen methods" it "is thus conflict preempted."); *Kidneigh v. Unum Life*

*Ins. Co. of Am.*, 345 F.3d 1182, 1185 (10th Cir. 2003); *cf. Savage v. Jones*, 225 U.S. 501, 533 (1912) ("If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power.").

**INTERGOVERNMENTAL IMMUNITY**

43.     The Constitution's Supremacy Clause also embodies the doctrine of intergovernmental immunity, which "generally immunizes the Federal Government from state laws that directly regulate or discriminate against it." *Washington*, 596 U.S. at 835 (citing *Baker*, 485 U.S. at 523). A state enactment is invalid under principles of intergovernmental immunity if it "regulat[es] the United States directly or discriminat[es] against the Federal Government or those with whom it deals[.]" *Washington*, 596 U.S. at 838.

44.     The doctrine of intergovernmental immunity prohibits regulation by the states of the Federal Government. A state or city law violates this doctrine if it "regulates the United States directly . . ." *North Dakota*, 495 U.S. at 435; *CoreCivic*, 145 F.4th at 327 (stating that when state, county, city, or other local governments "substantially interfer[e] with [the federal government's] operations," they "directly regulate[] the federal government[.]"); *Hancock v. Train*, 426 U.S. 167, 180 (1976) (State governments impermissibly regulate the Federal Government when "the State places a prohibition on the Federal Government."); *Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a state."). "If a state law directly regulates the conduct of the United States, it is void irrespective of whether the regulated activities are essential to federal functions or operations, and irrespective of the degree to which the state law interferes with federal functions or operations." *United States v. California*, 2026 WL 1088674, at *5 (9th Cir. Apr. 22, 2026).

18

45. The doctrine of intergovernmental immunity also prevents discrimination against the Federal Government. "[P]reventing discrimination against the Federal Government lies at the heart of the Constitution's intergovernmental immunity doctrine." *Washington*, 596 U.S. at 841. Discrimination occurs when a state or city "treats someone else better than" the federal government or singles out the federal government for "less favorable 'treatment.'" *Id.* at 839. "Without the prohibition on discrimination, what prevents a State from imposing unduly high costs on the Federal Government for the benefit of the State's own citizens?" *Id.* at 841.

46. These intergovernmental immunity principles against regulation and discrimination operate even in the absence of a specific conflicting federal law, ensuring that "federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993), *aff'd*, 54 F.3d 825 (D.C. Cir. 1995) (citing *In Re Neagle*, 135 U.S. 1, 10 (1890)).

## THE CONTRACT CLAUSE

47. The Contract Clause prohibits states from enacting legislation that disrupts contractual arrangements, providing that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. Art. I, § 10, cl. 1; *see also* N.M. Const. art. II, § 19 ("[n]o . . . law impairing the obligation of contracts shall be enacted by the legislature."). The Contract Clause seeks to protect contracts from interference by "the fluctuating policy" enacted by temporary legislative majorities and to "banish speculations on public measures, inspire a general prudence and industry, and give a regular course to the business of society." The Federalist No. 44 (James Madison).

48. The Contract Clause "applies to any kind of contract" and "restricts the power of States to disrupt contractual arrangements." *Sveen*, 584 U.S. at 818. State legislation violates the

Contract Clause if it substantially impairs a contractual relationship and is not an appropriate or reasonable way to advance a significant and legitimate public purpose. *Id.* at 819 (quoting *Energy Rsrvs.*, 459 U.S. at 411–412). "The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Energy Rsrvs.*, 459 U.S. at 411.

49.    "When a state actor is a party to a contract at issue, typically courts have determined such legislation is subject to 'stricter scrutiny.'" *A.L. v. Martin*, No. 23-CV-127-WJ-SCY, 2023 WL 7279318, at *4 (D.N.M. Nov. 3, 2023) (citation omitted); *see U.S. Tr. Co.*, 431 U.S. at 26 ("complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. . . . If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all."). Under this stricter standard, if the legislation has a sufficient public purpose, "the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *Energy Rsrvs.*, 459 U.S. at 412 (quoting *U.S. Tr. Co.*, 431 U.S. at 22).

## FEDERAL IMMIGRATION LAW AND ENFORCEMENT

50.    As an independent sovereign, the United States has broad inherent authority to conduct relations with foreign nations, establish immigration laws, maintain control over its borders, and ensure the safety and flourishing of its citizens. *See generally Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893); *Ping v. United States*, 130 U.S. 581, 603–04 (1889); *Landon v. Plasencia*, 459 U.S. 21, 34 (1982); *Arizona*, 567 U.S. at 394–95; *North Dakota*, 495 U.S. at 435; *id.* at 444–47 (Scalia, J., concurring); *Tayyari v. New Mexico State Univ.*, 495 F. Supp. 1365, 1377

(D.N.M. 1980) ("federal power over foreign affairs, including the power to regulate immigration, is an inherent one which antedated the Constitution").

51.     The Constitution also explicitly grants Congress the power to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3. It also grants the President the authority to "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3.

52.     Based on its enumerated constitutional and sovereign powers to control and conduct relations with foreign nations, "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens," *Arizona*, 567 U.S. at 394, and an inherent obligation and broad authority to establish immigration laws, *see Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952).

53.     Congress has exercised its broad authority to make laws governing the entry, presence, status, detention, and removal of aliens within the United States by enacting an "extensive and complex" statutory scheme for the "governance of immigration and alien status," as reflected in the various provisions of the INA. *See Arizona*, 567 U.S. at 395. Through the INA, Congress established a regulatory scheme granting the Executive the authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1224, 1225, 1226, 1227, 1228, and 1231.

54.     Taken together, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. Indeed, "the Supreme Court has 'repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.'" *Lopez*, 758 F.2d at 1392 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)).

55.    The States cannot obstruct or take discriminatory action against the execution of those laws, *see Arizona*, 567 U.S. at 394–95; *North Dakota*, 495 U.S. at 435; *id.* at 444–47 (Scalia, J., concurring), as only the Federal Government maintains the authority to grant an alien the privilege to enter our nation and controls the terms and conditions of such privilege. *See U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950); *Lopez*, 758 F.2d at 1392 ("This broad grant of authority is exclusive to Congress."); *Tayyari*, 495 F. Supp. at 1376 (discussing "the superior right of the federal government to exercise exclusive power and control over aliens and to dictate foreign policy without interference from the states.").

56.    DHS is authorized to inspect all applicants for admission and take appropriate action against inadmissible aliens, even ones who are transferred to State or local custody pending prosecution. *See* 8 U.S.C. §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. And ICE is authorized "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). Any state law or policy that prevents federal law enforcement from such inspection or interrogation stands as an obstacle to ICE's statutory and regulatory mandate.

57.    Moreover, because immigration control and management is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program," *Shaughnessy*, 338 U.S. at 543 (internal citations omitted), Congress vested substantial discretion in the President of the United States and the administering federal agencies to adjust the balance of these multiple interests as appropriate—both globally and in individual cases. For example, the Secretary of DHS is vested with the power to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the [INA]." 8 U.S.C. § 1103(a)(3).

58.     Although the Federal Government possesses broad power over immigration, enforcing immigration laws is a formidable challenge with significant complexities. To meet that challenge, Congress recognized that cooperation with state and local law enforcement is *essential* to enable the Federal Government to implement the INA. As a result, Congress codified basic principles of cooperation and comity between state and local authorities and the Federal Government. *See, e.g.*, 8 U.S.C. § 1226(d). The Federal Government regularly works with state and local governments to achieve Congress's stated immigration objectives.

59.     As the Supreme Court acknowledged, "[c]onsultation between Federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. Absent any cooperation at all from "local officials," the immigration system—like other federal programs— "may fail or fall short of [its] goals[.]" *City of NY v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

60.     Cooperative efforts between Federal officials and state and local officials are critical to enabling the Federal Government to identify, process for removal, and thereafter remove the hundreds of thousands of aliens who violate immigration (and other) laws each year.

61.     To facilitate the enforcement of federal immigration law, Congress authorized states and localities to "cooperate with the [Federal Government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B).

62.     Cooperating allows ICE to take into custody aliens convicted of crimes after the completion of their criminal sentence and to detain other aliens pending removal proceedings. *Id.* §§ 1225(b)(2)(A), 1226(c); *see id.* § 1231. And federal authorities must "make available" to state, county, city, and other local authorities "investigative resources … to determine whether individuals arrested by such authorities for aggravated felonies are aliens[.]" 8 U.S.C.

23

§ 1226(d)(1)(A). Likewise, federal officials must also "designate and train officers and employees … to serve as a liaison to" state, county, city, and other local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B); *see id.* §§ 1226(c), 1231(a). Congress further sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii).

63.     Cooperation is a key component of the decision Congress made to permit states and localities to impose criminal punishment on an alien, and to have an alien serve that punishment, before the alien is removed from the country. *See* 8 U.S.C. § 1231(a)(1)(B)(iii) (providing that the removal period does not begin until an alien in state custody is "released from detention or confinement").

64.     Courts have recognized, moreover, that ICE may avail itself of publicly owned property for the purpose of carrying out its statutorily assigned mission. *See, e.g.*, *United States v. King Cnty., Wash.*, 122 F.4th 740, 758 (9th Cir. 2024) ("Requiring this form of non-discriminatory access to [public] property consistent with the intergovernmental immunity doctrine does not create a back-end anti-commandeering problem. [The court] would not perceive a threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways.").

65.     Federal law contemplates and authorizes these cooperative efforts in service of the interests of the Federal Government, states and localities, and the American public. Because the Federal Government has a regulatory relationship with all aliens within the United States, its grant of permission to states and localities to pursue their criminal-enforcement interests does not affect

the Federal Government's ultimate authority over criminal aliens. *Cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).

66.    To cement the cooperative spirit of the INA and to facilitate the achievement of Congress's immigration goals, Congress expressly authorized state and federal officials to enter into agreements whereby state officials are given the powers of federal immigration officials to assist in the enforcement of federal immigration law. "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer," a "principal example" of which is "when the Attorney General has granted that authority to specific officers in a formal agreement with a state or local government." *Arizona*, 567 U.S. at 408–09 (citing 8 U.S.C. § 1357(g)); *see also United States v. Alas*, 63 F.4th 269, 274 (4th Cir. 2023).

67.    Section 287(g) of the INA specifically provides that "the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1); *see also id.* § 1231(i)(1)(A).

68.    Congress added Section 287(g) to the INA as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). Pub. L. No. 104-208, div. C, sec. 113, 110 Stat. 3009, 3009–546 (1996). The law was designed to "strengthen[] the rule of law by cracking down on illegal immigration at the border, in the workplace, and in the criminal justice system— without punishing those living in the United States legally." President William J. Clinton,

*Statement on Signing the Omnibus Appropriations Act*, 1996 U.S.C.C.A.N. 3388, 3391 (Sept. 30, 1996); *see* H.R. Rep. 104-828 (Sept. 24, 1996) (Conf. Rep.) (describing IIRIRA as a bill "to improve deterrence of illegal immigration to the United States" and "to reform the legal immigration system").

69.    Pursuant to Section 287(g) agreements, qualified state and local officers designated by the Secretary of Homeland Security[4] may perform specified immigration-enforcement functions relating to investigating, apprehending, and detaining aliens. 8 U.S.C. § 1357(g)(1)–(9). Section 287(g) requires that the specified officers "have knowledge of, and adhere to, Federal law" relating to immigration enforcement and that they receive "adequate training regarding the enforcement of relevant Federal immigration laws." 8 U.S.C. § 1357(g)(2); *see also Alas*, 63 F.4th at 274; *Arizona*, 567 U.S. at 409 (citing § 1357(g)(2); 8 CFR §287.5(c) (arrest power contingent on training), *id.* § 287.1(g) (defining the training).

70.    "In short, Section 287(g) 'permits ICE to deputize local law enforcement officers to perform immigration enforcement activities pursuant to a written agreement,' and 'ICE trains the local law enforcement officers who participate.'" *Alas*, 63 F.4th at 274 (quoting *United States v. Sosa-Carabantes*, 561 F.3d 256, 257 (4th Cir. 2009)); *see id.* at 275 (describing § 287(g) agreement as "crafted to ensure that each HCSO officer or employee tasked with enforcing Federal immigration law is well-trained, tested, and certified.").

71.    Such cooperation occurs under color of Federal authority, not state authority: "An officer or employee of a State or political subdivision of a State acting under color of authority under this subsection, or any agreement entered into under this subsection, shall be considered to

---

[4] Following the Homeland Security Act of 2002, many references in the INA to the "Attorney General" are now read to mean the Secretary of DHS. *See Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law." 8 U.S.C. § 1357(g)(8). Section 1357(g)(1) thus grants local officers the powers and immunities of Federal immigration officials.

72.    Congress also authorized "cooperative agreement[s]" between States and the Federal Government necessary to detain aliens. *See* 8 U.S.C. § 1103(a)(11)(B) ("The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized- to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service.").

73.    Federal law further contemplates the detention of aliens during removal proceedings. *See* 8 U.S.C. §§ 1226(a) ("[A]n alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."), (c), 1231(a)(2) ("During the removal period, the [Secretary of DHS] shall detain the alien."), (g) ("The [Secretary of DHS] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal.").

74.    Congress vested the Federal Government with broad and exclusive discretion to determine the manner and location of immigration detention, including by authorizing the Executive Branch to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," and, when federal facilities are unavailable to "expend . . . amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities . . .

necessary for detention." 8 U.S.C. § 1231(g)(1), *see id.* § 1231(g)(2) (before constructing a facility, DHS shall "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for [detention].").

75.     Congress thus expressly contemplated and approved the use of voluntary agreements to implement federal immigration detention operations.

76.     To facilitate the federal immigration enforcement scheme, Congress directed that a state, county, city, or other local government official or agency may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* § 1644 (same); *see also id.* § 1357(g)(10)(A) (providing for state, county, city, and other local "communicat[ion] with [DHS] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States").

77.     Likewise, "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from," among other things, "[m]aintaining" "information regarding the immigration status, lawful or unlawful, of any individual," or "[e]xchanging such information with any other Federal, State, or local government entity." *Id.* § 1373(b).

78.     Congress passed § 1373 to fix a specific problem, after it observed "certain states and localities were restricting their officials' cooperation with federal immigration authorities." *New York v. U.S. Dep't of Justice*, 951 F.3d 84, 96 (2d Cir. 2020); *see City of NY*, 179 F.3d at 35. Thus, in enacting Section 1373, "Congress sought to give state and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary." *New York*, 951 F.3d at 97 (citations omitted).

## FACTUAL BACKGROUND

### THE STATE OF NEW MEXICO AND HB9

79.   Governor Michelle Lujan Grisham signed HB9 into law on February 5, 2026. HB9 will go into effect 90 days after the Legislature adjourns, currently scheduled for May 20, 2026.

80.   HB9 applies to "public bodies," which is defined expansively to include "a state or local government, a sheriff's department, an advisory board, a commission, an agency or an entity created by the constitution of New Mexico or any branch of government that receives public funding, including political subdivisions, special tax districts, school districts and institutions of higher education" as well as "an entity or individual acting on behalf of or within the scope of the authority of the public body." HB9 § 2.

81.   HB9 concerns three types of agreements. First, it applies to agreements "to detain individuals for federal civil immigration violations, including an intergovernmental services agreement to detain individuals for civil immigration violations." HB9 §§ 3(A), (B). Second, it applies to agreements "to investigate, apprehend, detain or transport individuals pursuant to 8 U.S.C. Section 1357(g) or 8 C.F.R. Section 287.7" HB9 §§ 4(A), (C). Third, it applies to agreements "that deputize[] officers, employees or agents of the public body to perform a function of an immigration officer in relation to the investigation, apprehension, detention or transportation of noncitizens in the United States or the removal of noncitizens from the United States." *Id.* § 4(B).

82.   HB9 prevents public bodies from forming new, or extending existing, agreements for any of these federal immigration enforcement purposes, stating that "[a] public body shall not enter into, extend, renew or otherwise agree to be a party" to any type of agreement. HB9 §§ 3(A), 4(A); *see id.* § 4(B) ("A public body shall not agree to be a party to an agreement . . .").

83.     HB9 also requires the termination of existing agreements, stating that "[a] public body that is a party to an existing agreement . . . shall . . . terminate the agreement upon the earliest date permissible under the terms of the agreement" and requires public bodies to "invoke exigent circumstances" to affect such termination. HB9 § 4(C); *see id.* §§ 3(A) ("A public body shall not enter into, extend, renew or otherwise agree to a rider, amendment, supplement or other modification to an agreement . . ."), (B) ("A public body that is a party to an existing agreement . . . shall . . . terminate the agreement upon the earliest date permissible under the terms of the agreement, with respect to all provisions that relate to the detention of individuals for federal civil immigration violations.").

84.     In addition to the restrictions placed on a public body's ability to form a contract for federal immigration enforcement purposes, HB9 imposes restrictions on the real property of public bodies by preventing them from allowing their property to be used to detain aliens for civil immigration violations, stating that "[a] public body shall not sell, trade, lease or otherwise dispose of any real property to be used for the detention of individuals for federal civil immigration violations." HB9 § 3(C).

85.     Yet, HB9 does not "limit the ability of law enforcement personnel to detain individuals or to perform brief investigative stops as permitted by state law." HB9 § 3(E).

86.     HB9 is enforceable by "[t]he attorney general or a district attorney" who are empowered to "institute a civil action in a district court if" they have "reasonable cause to believe that a violation of [HB9] has occurred or to prevent a violation of [HB9] from occurring." *Id.* § 5(A). In such case, the district court "may award appropriate relief . . . to include declaratory and temporary, preliminary or permanent injunctive relief." *Id.* § 5(B).

## THE CITY OF ALBUQUERQUE AND THE ASCPO

87. On March 23, 2026, Albuquerque Mayor Timothy Keller signed the ASCPO. On March 25, 2026, the ASCPO was published and on March 30, 2026, it became effective. *See* ASCPO § 13-17-7(5).

88. The ASCPO broadly prohibits the use of Albuquerque property for federal immigration enforcement purposes, stating "[n]o City-owned and operated structure or venue . . . shall be used for immigration enforcement purposes, including as a staging area, processing location, or operations base." ASCPO § 1-5-1(A). The term "staging area" is defined as "an area that is used to assemble, mobilize, and deploy vehicles, equipment, or materials, and related personnel, for the purpose of carrying out immigration enforcement." *Id.* § 1-5-1(A); *see also id.* § 1-5-1(B)(6) (restricting use of certain "resources to be used for immigration enforcement" on non-City property).

89. To enforce this prohibition, the ASCPO requires the "identif[ication of] City-owned and controlled structure[s] or venue[s] . . . that either have been used, or are likely to be used in the future, as a staging area, processing location, or operations base for the purpose of immigration enforcement" and demands that such areas have posted signs stating that they "may not be used for immigration enforcement" and that such areas be physically "secured . . . by means including, but not limited to, locked gates or barriers." *Id.* §§ 1-5-1(B)(1)–(2). Further, City employees are required to report "the attempted or actual use" of such properties "to their supervisor, who will communicate with the Mayor and the City Attorney." *Id.* § 1-5-1(B)(3).

90. The ASCPO additionally bars the approval of "any permit, contract or other agreement for use of City owned or controlled property or resources if . . . the property or resources will be used for the purposes of facilitating immigration enforcement." *Id.* § 5-1-5(B)(4).

31

91.    The ASCPO restricts the "use" of "any City resources, including, but not limited to, moneys, equipment, personnel, vehicles, or facilities . . . to be used to transport individuals for immigration enforcement purposes," and prohibits the use of "City property or resources" to "be used to facilitate custody transfer or transport to federal immigration authorities absent a valid judicial warrant or court order." *Id.* § 5-1-5(B)(5); *see id.* § 5-1-5(B)(6).

92.    The ASCPO also prohibits certain public and private entities "from providing voluntary consent to law enforcement agents engaged in or supporting immigration enforcement from: (1) Entering non-public areas; or (2) Accessing, reviewing, or obtaining student or patient records." *Id.* § 13-17-4(A)(1), (2).

93.    The ASCPO further contains a tip-off requirement that "businesses . . . provide notice to all current employees, contractors, and others performing work for the employer for remuneration . . . within 24 hours of a law enforcement agent engaging in or supporting immigration enforcement being present at a place of work[,]" which notice includes the name of the agency, date the actor was present, and the nature of the actor's actions. *See id.* §§ 13-7-6(C)(1).

## BERNALILLO COUNTY AND THE BSCPO

94.    On November 18, 2025, the Bernalillo County Board of County Commissioners enacted the BSCPO. *See* Bernalillo County Ordinance No. 2025-33.

95.    Like the ASCPO, the BSCPO prohibits certain public and private entities "from providing voluntary consent to law enforcement agents engaged in or supporting immigration enforcement from: (1) Entering non-public areas; or (2) Accessing, reviewing, or obtaining student or patient records." *See* BSCPO §§ 51-2, 51-3.

96.    The BSCPO further contains a tip-off requirement that "businesses . . . provide notice to all current employees, contractors, and others performing work for the employer for

32

remuneration . . . within 24 hours of a law enforcement agent engaging in or supporting immigration enforcement being present at a place of work[,]" which notice includes the name of the agency, date the actor was present, and the nature of the actor's actions. *See* BSCPO §§ 51-2, 51-5(b).

## DOÑA ANA COUNTY AND THE SCAR

97.    On May 12, 2026, the Doña Ana County Commission approved and adopted Resolution No. 2026-67, the SCAR.

98.    The SCAR broadly prohibits the use of Doña Ana County property for federal immigration enforcement purposes, stating "no department, agency, commission, officer or employee of Doña Ana County shall use any County funds or resources to assist in the enforcement of federal immigration law." SCAR § 2. The SCAR specifically bars the "[u]tilizing any County-owned and operated structures or venues . . . for the purpose of carrying out immigration enforcement." SCAR § 2(D). To enforce this prohibition, the SCAR requires that County departments "collaborate to identify County-owned and controlled structures or venues . . . that either have been used, or are likely to be used in the future, as a staging area, processing location, or operations base for the purpose of immigration enforcement" and demands that such areas have "clear signage" stating that they "may not be used for immigration enforcement" and that such areas be physically secured "by means including, but not limited to, locked gates or barriers." *Id.* § 2(E). Further, County employees are required to "immediately report" the "attempted or actual use" of such properties "to their supervisor, who will communicate with the Board of County Commissioners and the County Attorney." *Id.* §§ 2(E)–(H).

99.    The SCAR further prohibits so-called "Safer Community Places," which include "all County owned or operated facilities" against "providing voluntary consent to law enforcement

33

agents engaged in or supporting immigration enforcement" by preventing immigration enforcement authorities from "[e]ntering non-public areas" and "[a]ccessing, reviewing, or obtaining student or patient records." *Id.* §§ 3, 4(A). While these entities are permitted to comply with judicial warrants and subpoenas for such access and information, administrative warrants authorized by federal law and utilized by federal law enforcement officials are not mentioned among such exceptions.

100.    The SCAR additionally bars the approval of "any permit, contract or other agreement for use of County owned or controlled property or resources if . . . the property or resources will be used for the purposes of facilitating immigration enforcement." *Id.* § 2(I).

101.    The SCAR also prohibits the collection, transmission, and dissemination of information concerning immigration status. Specifically, it bars the use of "any County funds or resources . . . to gather, transmit or disseminate information regarding the immigration status of individuals," which includes "[r]equesting information about, transmitting or disseminating information regarding the immigration status of any individual." *Id.* §§ 2, 2(A). It further bars county officials from "[a]ssisting or cooperating . . . with any [ICE] or [CBP] investigation, detention, or arrest procedures, public or clandestine, related to alleged violations of the civil provisions of the federal immigration law." *Id.* § 2(C).

102.    Concerning its enforcement, the SCAR provides that "[v]iolations of the [SCAR] will be processed in accordance with the provisions for misconduct in Doha [sic] Ana County's Human Resources Policies and Procedures." *Id.* § 5. According to the Doña Ana County Human Resources Policies and Procedures Manual, "no County employee or officer will use County resources to enforce federal immigration laws or gather, transmit or disseminate immigration status

information." *See* Doña Ana County Human Resources Policies and Procedures Manual § 6.15(B). Employees who violate this policy may be disciplined and terminated. *See id.* § 6.15(D).

## THE OTERO-ICE CONTRACT

103.   For nearly two decades, since 2008, Otero County has arranged for the housing of aliens and provision of related civil immigration detention services to ICE through its operation of the Otero County Processing Center ("OCPC") pursuant to the terms of successive Intergovernmental Service Agreements ("IGSAs") with ICE. In that time, multiple Attorneys General and other officials have blessed the IGSAs, as well as agreements between Otero County and Management and Training Corporation ("MTC"), a private entity that manages and operates the OCPC. *See* Declaration of Jose P. Ortez (Exhibit E) ("DHS Decl.") ¶ 8; Declaration of William Derevere (Exhibit F) ("MTC Decl.") ¶¶ 8–12; Affidavit of Pamela Heltner (Exhibit G) ("Otero Decl.") ¶ 4.[5]

104.   Thanks to the performance of the IGSAs, and consequent operation of the OCPC, ICE has benefited from access to a fully secure 1,096 bed facility that houses male and female detainees. *See* DHS Decl. ¶¶ 8, 10; MTC Decl. ¶ 20. The OCPC is critical to ICE's civil immigration operations, as it is geographically situated near the El Paso ERO Field Office, multiple Ports of Entry (e.g., OCPC is approximately 21 miles away from Ysleta, 24 miles away from Americas, 42 miles from Tornillo, and 46 miles from Santa Teresa), major highways, and an international airport. DHS Decl. ¶¶ 11; MTC Decl. ¶ 19. OCPC is also the only civil immigration detention facility in New Mexico that can accommodate female detainees and higher risk individuals. DHS Decl. ¶¶ 8, 16; MTC Decl. ¶ 19. Moreover, it is consistently one of the best

---

[5] The DHS Decl., MTC Decl., and Otero Decl., are incorporated by reference as if fully set forth herein.

35

facilities with the most staff, best conditions, and track records for safely and humanely handling detainees. DHS Decl. ¶ 12; MTC Decl. ¶¶ 15–18.

105.    The most recent IGSA became effective on March 16, 2026 ("Otero-ICE Contract") (Exhibit H). Under the terms of the Otero-ICE Contract, Otero County is to house ICE detainees and perform related detention services, including 1,096 adult male and female beds. The Otero-ICE Contract is effective for 60 months unless extended by the parties.

106.    To operate, manage, and maintain the OCPC, Otero County engages the MTC pursuant to the terms of the related Operations, Management, and Maintenance Agreement ("Otero-MTC Contract") (Exhibit I). Without the Otero-MTC Contract, Otero County would not be able to fulfill its obligations under the Otero-ICE Contract. *See* Otero Decl. ¶¶ 10–17.

## THE CHALLENGED LAWS ARE PREEMPTED BY FEDERAL IMMIGRATION LAW

107.    The Challenged Laws are preempted by the INA because they conflict with federal immigration law and stand as an obstacle to the achievement of Congress's immigration goals and objectives. The Challenged Laws impede the access to property and cooperation between local law enforcement and federal immigration authorities necessary to enforce federal immigration law. "Such interference with the discretion that federal law delegates to federal officials goes to the heart of obstacle preemption." *Geo Grp.*, 50 F.4th at 762. Consequently, the Challenged Laws are preempted by federal law in numerous respects.

108.    First, HB9 prevents the Federal Government from entering into agreements with local entities to facilitate the detention of aliens and the enforcement of federal immigration law. *See* HB9 §§ 3(A)–(C), 4(A)–(C). As explained *supra*, Congress created a comprehensive immigration system that contemplated cooperation between the Federal Government and states and localities to ensure uniform enforcement of federal law. *See* 8 U.S.C. § 1357(g). Congress also

authorized the formation of agreements with localities to facilitate the detention of violators of civil immigration law. *See* 8 U.S.C. § 1103(a)(11)(B); 1231(g). While states and localities are permitted to choose to work with federal immigration enforcement authorities under this scheme, states are not permitted to hamper federal immigration enforcement efforts, including efforts to accomplish Congress's comprehensive detention goals. *See generally, e.g.*, 8 U.S.C. §§ 1231(a)(2)(A), (g), 1226(a)(1), (b), (c). Yet, that is exactly what HB9 does by categorically banning voluntary cooperation between localities that desire to enforce federal immigration law and federal immigration enforcement officials.

109.   If the Otero-ICE Contract or Otero-MTC Contract is terminated or cannot be extended, DHS will have extremely limited capacity within the state to detain illegal aliens. DHS Decl. ¶¶ 8, 13–19. It will also lose a high-quality facility in the state, the one closest to the border in New Mexico, and the only one that can detain women and high-risk individuals. DHS Decl. ¶¶ 8–12. This will require DHS to transfer aliens to facilities in other states, sometimes hundreds of miles away. DHS Decl. ¶¶ 19, 20. Transferring these detainees and having the transport new detainees to far flung facilities will significantly hamper the ability of DHS to enforce immigration law within New Mexico. DHS Decl. ¶¶ 20–26. Banning all detention agreements for immigration detention with public bodies thus creates a significant impediment to the enforcement of immigration laws and defeats the flexibility of Congress's cooperative detention scheme.

110.   Part of Congress's immigration enforcement scheme envisioned the formation of Section 287(g) agreements so that state and local officers could assist with national immigration enforcement initiatives under the direction of the Federal Government. Such assistance includes transferring detainees, serving warrants, determining immigration status, or working as part of a task force. *See* 8 U.S.C. § 1357(g). Indeed, that model was discussed in *Arizona*, in which the

37

Supreme Court rejected the State of Arizona's attempt to alter the federal immigration scheme by providing greater immigration enforcement authorities to its officers than Congress envisioned, without Federal oversight. The Court explained that "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer" and one such circumstances is when "the Attorney General has granted that authority to specific officers in a formal agreement with a state or local government." *Arizona*, 567 U.S. at 408 (citing § 1357(g)).

111.    Despite Congress's comprehensive federal immigration enforcement scheme and stated intent that states and localities be able to enter into such agreements, HB9 does not permit *any* agreements to facilitate immigration enforcement, whether currently existing or existing in the future, even if the local government, like Otero County, desired such an agreement. These restrictions impede the voluntary cooperation desired by Congress to enforce federal immigration law. HB9 thus poses an obstacle to the goals and objectives of federal law by preventing cooperation between localities and the Federal Government that are specifically contemplated and permitted by Congress. *See* 8 U.S.C. § 1357(g)(2); *see also Alas*, 63 F.4th at 274; *Arizona*, 567 U.S. at 409.

112.    Congress further expressed its desire for local law enforcement entities to voluntarily cooperate with DHS in the enforcement of immigration laws through 287(g) agreements. By filing lawsuits against Curry and Torrance Counties that seek to terminate the existing Section 287(g) agreements with both counties and preventing future ones, New Mexico has made it impossible to deputize local law enforcement to help enforce federal law in their communities where they are most trusted. This adds a significant strain on resources and the ability to enforce the law while effectively destroying Congress cooperative scheme.

113.    Second, the Local Laws prevent federal immigration authorities from entering, accessing, or using certain public and private properties for the purposes of immigration enforcement, including courthouses. ASCPO §§ 5-1-5(A)–(B), 13-17-4(A); BSCPO §§ 51-2, 51-3; SCAR §§ 3, 4(A)(1). Yet, federal immigration enforcement authorities routinely enter, access, and use such properties, including courthouses, to conduct civil immigration enforcement operations. Federal immigration enforcement authorities may avail themselves of publicly owned property to carry out federal immigration enforcement objectives. *See, e.g.*, *King Cnty.*, 122 F.4th at 758 ("We would not perceive a threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways.").

114.    By prohibiting federal immigration enforcement officers from accessing certain public and private properties, including courthouses, which are used by federal immigration enforcement officers to enforce federal immigration law, the Local Laws "substantially interfere" with and stand as obstacles to civil immigration enforcement operations. *See Core Civic*, 145 F.4th at 327; *see id.* at 321 ("'the very essence of supremacy' empowers the federal government to 'remove all obstacles to its action within its own sphere ... [and] exempt its own operations from [state] influence.'") (quoting *McCulloch*, 17 U.S. at 427); *see Arizona*, 567 U.S. at 406.

115.    Third, the ASCPO requires "a valid judicial warrant or court order" to justify the use of resources "to transport individuals for immigration enforcement purposes" or "to facilitate custody transfer or transport to federal immigration authorities." ASCPO § 5-1-5(B)(5). The Local Laws further require "a valid judicial warrant . . . or a valid judicial subpoena or judicial order" to permit certain public and private entities to provide "voluntary consent to law enforcement agents engaged in or supporting immigration enforcement" to enter non-public areas or "[a]ccess[],

39

review[], or obtain[] student or patient records." ASCPO § 5-1-5(A); BSCPO § 51-3(a); SCAR § 4(A). As explained *supra*, Congress specifically contemplated that the Federal Government and state and local governments would share information, coordinate, and cooperate concerning the transfer of removable aliens in state custody to federal custody. *See* 8 U.S.C. §§ 1226(c), (d)(1), 1231(a)(1)(B)(iii), (a)(4), 1357(g). Further, Congress authorized the Federal Government to use administrative warrants and similar requests to obtain access to aliens and related information while in state custody. *See* 8 U.S.C. §§ 1103(a)(3), 1225(d)(4), 1226(a), 1231(a), 1357(a), (c), (d), 8 C.F.R. § 287.7(a). Congress even sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." 8 U.S.C. § 1324(a)(1)(A)(iii). Because the Local Laws require judicial warrants, subpoenas, and orders to compel compliance with Congress's immigration enforcement objectives while Congress specifically authorized the use of non-judicial warrants, subpoenas, and orders, the Local Laws pose an obstacle to federal law and are preempted.

116.    Fourth, the ASCPO and BSCPO compel private businesses to notify aliens "[i]f a law enforcement agent engaging in or supporting immigration enforcement is present at a place of work" by providing, within 24 hours, the name of the immigration enforcement agency, date of the immigration enforcement activities, and nature of the immigration enforcement activities. *See* ASCPO § 13-17-6(C); BSCPO § 51-5(b). By requiring businesses to tip off aliens as to immigration enforcement activities, the ASCPO and BSCPO require businesses to warn aliens to avoid coming into work so that they may evade detection by immigration enforcement authorities. Specifically requiring businesses to help aliens evade detection by immigration enforcement authorities amounts to mandated harboring and shielding of aliens from federal immigration

authorities and poses an obstacle to the enforcement of federal immigration law. *See* 8 U.S.C. § 1324(a)(1)(A); *Kearns v. Cuomo*, 981 F.3d 200, 208 (2d Cir. 2020) ("Examples [of harboring] also include attempts to alert undocumented immigrants to the physical approach of immigration authorities."). As a result, these requirements are preempted.

117.    Fifth, the SCAR prohibits the "requesting" of and "transmitting or disseminating information regarding the immigration status of any individual[.]" SCAR § 2(A); *see* Doña Ana County Human Resources Manual § 6.15(B). Yet, Congress expressly barred this type of information sharing prohibition stating that "local government entit[ies] or official[s] may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* § 1644 (same); *see also id.* § 1357(g)(10)(A) (providing for state, county, city, and other local "communicat[ion] with [DHS] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States" even in the absence of an agreement with the Federal Government). Similarly, Congress expressly barred "local government entit[ies] from," among other things, enacting laws that prevent "[m]aintaining" "information regarding the immigration status, lawful or unlawful, of any individual," or "[e]xchanging such information with any other Federal, State, or local government entity." *Id.* § 1373(b). Because the information sharing restrictions embodied in the SCAR are expressly barred by federal law, they are expressly preempted. *See New York*, 951 F.3d at 96; *see City of NY*, 179 F.3d at 35.

118.    Finally, the SCAR places a blanket prohibition on the use of resources to assist or cooperate with any ICE or CBP "investigation, detention, or arrest procedures, public or clandestine, relating to alleged violations of the civil provisions of the federal immigration law."

41

SCAR § 2(C). The ASCPO also restricts the use of resources to be used in certain cooperative immigration enforcement activities. *See* ASCPO §§ 5-1-5(B)(4)–(6). These prohibitions blatantly stand as obstacles to the Federal Government's immigration scheme by preventing local governmental entities from cooperating or assisting with several federal immigration objectives, including investigations, detentions, and arrests. *See, e.g.*, 8 U.S.C. §§ 1182, 1125(b)(2), 1226, 1231. As a result, they are preempted.

## THE CHALLENGED LAWS VIOLATE THE PRINCIPLES OF INTERGOVERNMENTAL IMMUNITY

119.    The Challenged Laws also violate principles of intergovernmental immunity because they seek to regulate and discriminate against the Federal Government.

## THE CHALLENGED LAWS UNLAWFULLY REGULATE THE FEDERAL GOVERNMENT

120.    The Challenged Laws unlawfully regulate the Federal Government by restricting and controlling federal immigration enforcement agents' use of the tools authorized by Congress to facilitate the enforcement of federal immigration law. *See Mayo*, 319 U.S. at 445 ("[T]he activities of the Federal Government are free from regulation by any state."); *see also McCulloch*, 17 U.S. at 436 (explaining that the states have no power to "in any manner control" the operations of the Federal Government). Further, "even in the absence of a specific federal law, federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993), *aff'd* 54 F.2d 825 (D.C. Cir. 1995) (citing *Cunningham v. Neagle*, 135 U.S. 1 (1890)).

121.    HB9 seeks to directly regulate the Federal Government by controlling the potential entities with whom the Federal Government may form voluntary agreements to perform the core government function of enforcing civil immigration law, including Section 287(g) agreements and

detention agreements. *See CoreCivic*, 145 F.4th at 319 (state "law with the 'intent' to forbid new contracts for civil immigration detention" was considered unlawful regulation of the Federal Government because it "interfere[d] with the federal government's core power to enforce immigration laws."); *see also Geo Grp.*, 50 F.4th at 757 (state law that "would give California the power to control ICE's immigration detention operations in the state by preventing ICE from hiring the personnel of its choice" deemed impermissible regulation of the Federal Government). While federal law authorizes the formation of agreements with state and local entities to assist in the enforcement of federal immigration law, the State of New Mexico seeks to limit and narrow the entities available to assist the Federal Government with the enforcement of federal immigration law. HB9 removes potential entities from the pool of entities with whom the Federal Government may form cooperative agreements. *See CoreCivic*, 145 F.4th at 325 ("The law prevents the federal government from choosing how and through whom it will carry out a core federal function."). The elimination of potential counterparties to agreements that Congress specifically authorized and contemplated as part of the cooperative civil immigration enforcement scheme amounts to regulation of the Federal Government, as it imposes conditions upon the Federal Government (i.e., limits and controls the state and local entities with which the Federal Government may contract) that are inconsistent with federal immigration law or Congressional intent. *See id.* ("Only the federal government has the power to decide whether, how, and why to hold aliens for violating immigration law. It alone has the power to make these contracts in the first place."). Congress did not enact a law that stated, "the Federal Government may contract with state and local governments to enforce federal immigration law, except state and local governments within New Mexico." By adding this limitation to federal law, the State of New Mexico seeks to regulate the Federal Government in a manner that conflicts with express congressional intent, which does not limit the

Federal Government in this respect. *See id.* at 326 ("this ban is in substance a direct regulation; it destroys the federal government's marketplace."); *id.* ("it directly regulates the federal government by telling it how to carry out a core function. It is a direct regulation in everything but name."); *see also id.* at 327 ("the law directly regulates the federal government twice over by substantially interfering with its operations.").

122.    The Challenged Laws also regulate the Federal Government by controlling the property that the Federal Government may use to perform its immigration enforcement operations. While Congress authorized the Federal Government to cooperate with state and local governmental entities to enforce federal immigration law, including by using real property to detain aliens, New Mexico, Albuquerque, Bernalillo County, and Doña Ana County seek to limit and control the real property available to the Federal Government to implement federal immigration law. *See* HB9 § 3; ASCPO §§ 5-1-5, 13-17-4(A); BSCPO §§ 51-2, 51-3, 51-4; SCAR §§ 2, 2(D)–(I), 3, 4; *cf. CoreCivic, Inc. v. Murphy*, 690 F. Supp. 3d 467, 478 (D.N.J. 2023) ("a state law that wholesale deprives the federal government of its chosen method of detaining individuals for violating federal law cannot survive Supremacy Clause scrutiny."). The Challenged Laws also regulate the Federal Government by controlling the personnel available to the Federal Government to enforce federal immigration law. *See* HB9 §§ 4(A)–(C); ASCPO §§ 5-1-5(B)(3)–(6), 13-17-4, 13-17-5; BSCPO §§ 51-2, 51-3; SCAR §§ 2, 2(A)–(C).[6]

---

[6] Indeed, at the May 12, 2026, Doña Ana County Board of County Commissioners meeting, when discussing the SCAR, County Attorney Neil stated that "Doña Ana County employees are not to assist with immigration enforcement" and "should not be assisting federal agents" and Board Chair Sanchez repeatedly stated, "our role is not immigration enforcement." Doña Ana County Government, *Board of County Commissioners Regular Meeting - May 12, 2026*, at 3:46:05, 3:46:25 (May 12, 2026), www.youtube.com/live/qe1gIPoiNlw?si=Yb0T3gemDVGgLyZn&t=13472.

123.     The Local Laws further regulate the Federal Government by placing additional burdens on federal immigration officials' ability to access property and records beyond those required by Congress. The Local Laws require judicial warrants to access property when Congress authorized the use of administrative warrants. Congress expressly provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). The Supreme Court has acknowledged the role that administrative warrants play in the detention and removal process. *See Arizona*, 567 U.S. at 407–08 (noting that the Attorney General has discretion to issue warrants, which are executed by federal officers). Whereas administrative warrants issue on probable cause that the individual is an alien subject to removal (which does not necessarily require that the alien committed a criminal offense, *see, e.g.*, 8 U.S.C. §§ 237(a)(1)(C), (D)), criminal judicial warrants issue on probable cause that the subject has committed a crime, *see Berger v. New York*, 388 U.S. 41, 55 (1967). Congress allows federal agents to detain illegal aliens under the former standard, but the Local Laws prevent federal agents from doing so unless they satisfy the latter, higher standard. These requirements foreclose federal immigration authorities' use of the methods Congress authorized and directly impose a different method—with a different and higher standard—on the Federal Government. Defendants have no such power to prevent federal agents from carrying out their duties "until they satisfy a state officer." *See Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956); *see also Arizona*, 567 U.S. at 406 (recognizing that "a conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy" (alterations and citation omitted)). Again, "Federal officers are immune from state interference with acts necessary and proper to the accomplishment of their federal duties." *Ferrara*, 847 F. Supp. at 968 (internal quotation omitted)

45

124.    This amounts to unlawful regulation of the Federal Government in violation of the principles of intergovernmental immunity. *See CoreCivic*, 145 F.4th at 321 ("the very essence of supremacy empowers the federal government to remove all obstacles to its action within its own sphere . . . [and] exempt its own operations from [state] influence.").

125.    The Local Laws further regulate the Federal Government by obstructing and prohibiting federal immigration enforcement operations from taking place on public property, including courthouses, and by eliminating nonpublic spaces as permissible locations for facilitating federal enforcement of civil immigration law. *See* ASCPO §§ 5-1-5(A)–(B), 13-17-3, 13-17-4; BSCPO §§ 51-2, 51-3; SCAR §§ 3, 4(A)(1). In doing so, the Local Laws unlawfully prevent the Federal Government from carrying out the INA's command that aliens in this country "shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). The Local Laws further limit the location in which federal immigration authorities may interrogate illegal aliens, even though the text of the INA itself imposes no such limitations. *See id.* § 1357(a)(3). The Local Laws thus "directly regulate[] the federal government by substantially interfering with a core federal function." *CoreCivic*, 145 F.4th at 327.

126.    As a result of the Challenged Laws, the United States has suffered and continue to suffer harm. Specifically, the Challenged Laws threaten and harm the United States' sovereign interest in the supremacy and enforcement of federal law, particularly the INA. The Challenged Laws also undermine and conflict with federal immigration enforcement policy and imposes financial harm on the United States and taxpayers by increasing the costs of immigration enforcement. A favorable ruling would redress the United States' harms.

**THE CHALLENGED LAWS DISCRIMINATE AGAINST THE FEDERAL GOVERNMENT**

127.    The Challenged Laws also unlawfully discriminate against the Federal Government by applying solely to the area of civil immigration enforcement, which is a core federal governmental function by nature, while simultaneously permitting the same law enforcement activities for other purposes. For example, state and local governments throughout New Mexico are not barred from forming agreements to facilitate the detention of individuals for non-immigration purposes, including civil purposes, and with other entities. Indeed, Otero County has another facility next door that detains individuals on behalf of other local and state entities. HB9 does not affect those arrangements. Chapter 11 of the New Mexico Statutes expressly pertains to Intergovernmental Agreements and Authorities. *See* N.M. Stat. Ann. §§ 1-1-1–11-20-4. In fact, New Mexico law specifically provides that "[i]f authorized by their legislative or other governing bodies, two or more public agencies by agreement may jointly exercise any power common to the contracting parties, even though one or more of the contracting parties may be located outside this state" assuming certain conditions are satisfied. N.M. Stat. Ann. § 11-1-3. Similarly, local law enforcement entities such as the Curry County Sherriff can and do enter into Memoranda of Understanding with other state and local law enforcement to assist with warrants, arrests, information sharing, and detention. They can even do so for civil matters. MOUs are common between New Mexico Counties and local entities for various law enforcement purposes.

128.    Yet, under HB9, the ASCPO, and the SCAR, state and local governments are strictly barred from forming agreements with the Federal Government for purposes of immigration detention and other immigration enforcement initiatives. The same is true for agreements between local government entities and the Federal Government to use property and to cooperate with federal immigration enforcement initiatives, as local government entities can form agreements to

47

use property and cooperate with other law enforcement initiatives without violating the Challenged Laws, while forming the same agreements to facilitate federal immigration law enforcement is prohibited. Indeed, nothing about the Challenged Laws would bar New Mexico, Albuquerque, or Doña Ana County law enforcement agencies from contracting with private entities to use a prison for civil detention purposes unrelated to immigration, yet DHS is barred from contracting with New Mexico governmental entities to use detention facilities for civil immigration detention purposes. The intergovernmental immunity doctrine dictates that discriminatory targeting of the Federal Government is unlawful.

129.    HB9 specifically singles out federal civil immigration enforcement officers for treatment worse than state and local law enforcement officers by permitting agreements and the use of property for detention and state law enforcement purposes not involving federal immigration detention, adding that "[n]othing in this section shall be construed to limit the ability of law enforcement personnel to detain individuals or to perform brief investigative stops *as permitted by state law*." HB9 at § 3(E) (emphasis added). By including a carveout that permits detention and investigation for purposes of state law, HB9 embodies New Mexico's intent to limit law enforcement detention authority in a manner that applies solely to federal immigration law enforcement officials, while permitting detention and investigation for comparable state law purposes.

130.    The Federal Government is the sole entity that is tasked with the enforcement of federal immigration law. Among the enforcement mechanisms authorized by Congress are the formation of cooperative agreements between state and local entities and the Federal Government concerning the enforcement of immigration law. By requiring the immediate termination of these agreements and barring all future agreements, and while allowing agreements of other kinds

between governmental entities to achieve other goals, HB9 unlawfully discriminates against the Federal Government.

131.    The ASCPO and BSCPO discriminate against the Federal Government by requiring businesses to notify aliens of federal immigration enforcement operations, while allowing other law enforcement operations to proceed without any notice. *See* ASCPO §§ 13-17-6; BSCPO § 51-5(b). This includes state and local criminal enforcement operations and even civil enforcement, such as regulatory actions. The ASCPO and BSCPO thus single out the Federal Government for significantly worse treatment when conducting federal immigration enforcement activities, as private businesses are not required to tip off employees as to other law enforcement activities.

132.    The Local Laws facially prevent federal immigration agents from entering publicly owned property accessible to state, county, city, and other local law enforcement, and prohibit public employees, contractors, and agents from facilitating such access, and thus discriminate against the Federal Government. The Local Laws discriminate against the Federal Government by treating federal immigration authorities differently than other law enforcement agents through access restrictions to property. ASCPO §§ 5-1-5(A), (B), 13-17-4(A)(1); BSCPO §§ 51-2, 51-3; SCAR §§ 2(D)–(I), 3, 4. The Local Laws single out federal authorities for worse treatment than state authorities by permitting voluntary cooperation with non-immigration-related law enforcement officials through the provision of access to property and certain records while prohibiting the same right to voluntary access of such property and records to immigration law enforcement officials absent a judicial warrant, subpoena, or order. *See* ASCPO § 13-17-4(A)(2); BSCPO §§ 51-2, 51-3; SCAR § 4(A)(2)(a). As a result, the Local Laws unlawfully and intentionally discriminate against the Federal Government by treating federal immigration authorities differently than other law enforcement agents through access restrictions to property

and records, in violation of the principles of intergovernmental immunity. Courts have recognized that ICE may avail itself of publicly owned property. *See King Cnty.*, 122 F.4th at 758 ("Requiring this form of non-discriminatory access to [public] property consistent with the intergovernmental immunity doctrine does not create a back-end anti-commandeering problem."); *see also Washington*, 596 U.S. at 839 ("[S]tate law discriminates against the Federal Government . . . if it 'singles them out' for less favorable 'treatment' or if it regulates them unfavorably on some basis related to their governmental 'status.'").

133.    The SCAR singles out the Federal Government for worse treatment by barring County officials from "[a]ssisting or cooperating . . . with any [ICE] or [CBP] investigation, detention, or arrest procedures, public or clandestine, relating to alleged violations of the civil provisions of the federal immigration law." SCAR § 2(C). No such prohibitions apply to the investigation, detention, or arrest procedures under New Mexico state laws or to other state law enforcement authorities—these prohibitions solely apply to federal immigration enforcement authorities. The SCAR thus singles out federal immigration officials, expressly and implicitly, for unfavorable and uncooperative treatment when no other member of the public or law enforcement is so treated. This is an undue and burdensome regulation specifically aimed at impeding the Federal Government.

### HB9 VIOLATES THE CONTRACT CLAUSE

134.    HB9 requires local government entities to terminate their existing agreements that are intended to facilitate the detention of aliens who violate federal immigration law and to facilitate the enforcement of federal immigration law. *See* HB9 §§ 3(B), 4(C). By doing so, instead of permitting the parties to continue to perform their mutually beneficial bargained-for obligations or entering into modifications, extensions, or renewals of existing agreements, HB9 unequivocally

impairs existing agreements between county governments, the Federal Government, and other entities made to detain aliens and otherwise enforce federal immigration law.

135.    The Federal Government has relied to its detriment in performing and arranging to perform under the mutually beneficial promises made in its agreements to ensure that federal immigration law will be enforced and aliens who violate federal immigration law will be detained in a manner consistent with Congress's statutory scheme and goals. If HB9 is permitted to take effect, the termination of existing agreements intended to further federal immigration enforcement purposes would cause significant financial losses and impose significant operational burdens on the Federal Government.

136.    Moreover, HB9 requires the termination of existing agreements without a legitimate or significant public purpose, let alone a public purpose sufficient to overcome the imposition of the most severe impairment possible on the existing agreements between the Federal Government, county governments, and other entities.

137.    While HB9 does not profess any purported purpose, statements made by New Mexico state legislators make clear that HB9 is intended to eliminate civil immigration detention in New Mexico and to obstruct cooperation between state and federal authorities enforcing federal immigration law. Specifically, New Mexico Representative Eleanor Chavez, a co-sponsor of HB9, expanded on the purpose of HB9, stating that HB9 "is a straightforward bill. It gets New Mexico out of the business of immigration detention."[7] Governor Michelle Lujan Grisham's Director of

---

[7] Pat Davis, *Momentum builds in New Mexico legislature to ban ICE facilities statewide*, New Mexico Political Report (Jan. 28, 2026), https://nmpoliticalreport.com/2026/01/28/momentum-builds-in-new-mexico-legislature-to-ban-ice-facilities-statewide/; *see also* Patrick Lohmann, *NM lawmakers add ban on law enforcement agreements with ICE to Immigrant Safety Act*, Source New Mexico (Jan. 28, 2026, at 5:57 AM), https://sourcenm.com/2026/01/28/nm-lawmakers-add-ban-on-law-enforcement-agreements-with-ice-to-immigrant-safety-act/ ("'We want to create a

Communications also elaborated on the purpose of HB9, stating that "Gov. Lujan Grisham wants to ensure New Mexico will not be complicit in discriminatory mass immigration enforcement . . ."[8]

138.    Preventing public bodies from continuing to perform under decades-old voluntary agreements that are consistent with, and specifically authorized by, federal law does not advance any significant nor legitimate public purpose. *See* 8 U.S.C. §§ 1357(g), 1103(a)(11)(B), 1231(a), (g). And even if HB9 had a significant and legitimate public purpose, that purpose is not a sufficiently significant or legitimate purpose to justify the severe impairment (i.e., forced termination) of existing agreements with the Federal Government that the federal government has long relied on.

139.    Even assuming HB9 had a sufficient public purpose, it is not tailored to address that purpose. HB9 requires the *categorical* termination of existing immigration detention and law enforcement agreements without any conditions, let alone reasonable conditions appropriate to address the ostensible public purpose justifying its enactment. *Cf. U.S. Tr. Co.*, 431 U.S. at 29–30 ("it cannot be said that total repeal . . . was essential; a less drastic modification would have permitted the contemplated plan without entirely removing the . . . limitations . . ."); *id.* at 30 ("the States could have adopted alternative means of achieving their . . . goals"); *id.* at 31 ("a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well.").

---

situation where it's consistent throughout the state, where public entities are not cooperating with ICE enforcement,' [Rep. Chavez] said. 'It's really plain and simple.'").

[8] Alex Ross, *Lujan Grisham to push immigrant detention ban in next legislative session*, New Mexico Political Report (Sept. 8, 2025), https://nmpoliticalreport.com/2025/09/08/lujan-grisham-to-push-immigrant-detention-ban-in-next-legislative-session/.

140.    On a fundamental level, these agreements are completely voluntary for local governmental entities. If localities viewed them as problematic, lacked sufficient resources, or their constituents disapproved of such arrangements, localities could simply exercise their discretion and decline to enter into them or terminate them on their own initiative. Yet, the State of New Mexico seeks to remove that discretion by instituting a blanket policy requiring the immediate termination of existing agreements and banning all future agreements, regardless of the local circumstances.

141.    The sole purpose of HB9 is to express discontent with the federal immigration policies of the current administration. However, immigration is subject to broad federal regulation and is within the ambit of comprehensive federal power and authority. Policy disagreements are not a legitimate or sufficiently significant basis to require termination of all existing agreements and ban all future agreements, much less a basis to frustrate and actively obstruct federal immigration law enforcement.

142.    There is simply no significant or legitimate public purpose in passing a law that bars all existing and future agreements to detain violators of civil immigration law or coordinate local enforcement of federal immigration law.

143.    Moreover, if Otero County is forced to terminate the Otero-ICE Contract, or if the purpose of the Otero-ICE Contract is frustrated by the termination of the Otero-MTC Contract, and if future agreements are prohibited, DHS will be forced to transfer potentially hundreds of detainees away from a facility that is consistently one of the best facilities in terms of staff, conditions, and safe and humane handling of detainees. *See* DHS Decl. ¶ 12; MTC Decl. ¶¶ 16–17; Otero Decl. ¶ 16. DHS would be forced to transfer these detainees hundreds of miles away to other states, such as Camp East Montana in Texas, which are less capable of housing detainees

than the OCPC. DHS Decl. ¶¶ 13–26; Otero Decl. ¶ 16. This forced relocation drains Federal Government resources and will result in the placement of detainees further away from relatives making contact more difficult and potentially prolonging detention periods and the removal process. DHS Decl. ¶¶ 23–25; Otero Decl. ¶ 16. Furthermore, New Mexico can conduct oversight and perform health, safety, and political inspections of the OCPC. DHS Decl. ¶ 12; MTC Decl. ¶ 15. New Mexico can also review the agreements and demand various requirements be included and enforced by the County. MTC Decl. ¶ 11. New Mexico would lack such authority and oversight for facilities in other states where many of the detainees would have to be moved. DHS Decl. ¶¶ 20, 25 Otero Decl. ¶ 16. Otero Country, on the other hand, would lose significant revenue and jobs for its people, and the area would suffer significant economic losses. Otero Decl. ¶¶ 11–15, 17. It is thus difficult to imagine the legitimate state interest New Mexico has in forcefully terminating this long-standing agreement other than to actively try and obstruct lawful immigration enforcement in the state. That is anything but legitimate and is completely contrary to the public interest.

144.    If the State of New Mexico caused the termination of the Otero-ICE Contract or the Otero-MTC Contract, ICE would be significantly and irreparably harmed because ICE would no longer be able to utilize the OCPC to detain and remove illegal aliens in accordance with the mandates of federal immigration law. DHS Decl. ¶¶ 13–26. Loss of the OCPC would be devastating to ICE's operations, as no facilities exist to immediately accommodate the alien population currently housed at the OCPC. DHS Decl. ¶¶ 13–18. Enforcement of HB9 would significantly obstruct ICE's achievement of Congress's immigration objectives and goals by hampering ICE's ability to detain and remove aliens. DHS Decl. ¶¶ 24–26. Again, many aliens

would have to be transferred many miles to facilities in other states. DHS Decl. ¶¶ 17, 19; MTC Decl. ¶ 20; Otero Decl. ¶ 16.

145.    Similarly, there are two counties in New Mexico (Curry County and Torrance County) that have engaged with ICE's 287(g) Program with a memorandum of agreement (MOA). The Curry County Sheriff's Office and Torrance County Sheriff's Office have approved MOAs to participate in the 287(g) Warrant Service Officer (WSO) Program. These agreements require DHS to train and certify their officers on immigration enforcement. As a result, their officers are deputized under the color of federal law to help enforce immigration warrants. Having locally accountable law enforcement operating in their own communities has many benefits and can increase trust and effectiveness in enforcing immigration laws. There is no legitimate reason other than obstruction to require the termination of such voluntary agreements and force federal officers into every county.

146.    In effect, HB9 bans all agreements that promote necessary cooperation between state and local governments and federal civil immigration authorities, whether for detention purposes or law enforcement purposes. By requiring the immediate termination of existing immigration detention and cooperation agreements, HB9 interferes with and substantially impairs all civil immigration enforcement and detention agreements between the Federal Government and any local entity in New Mexico. Accordingly, HB9 violates the Contract Clause and is invalid.

### THE IMPACT OF THE ENFORCEMENT OF THE CHALLENGED LAWS

147.    The State of New Mexico will enforce HB9. New Mexico has already manifested animosity to civil immigration detention agreements by attempting to nullify the latest extension of Otero-ICE Contract between ICE and Otero County through its Emergency Petition for Writ of Mandamus. While unsuccessful, the Petition cites HB9 repeatedly and alleges that Otero County

entered into the latest Otero-ICE Contract extension to avoid the applicability of HB9, expressing clear frustration with the Otero-ICE Contract. The Attorney General is empowered to sue Otero County to enforce HB9 and seek an injunction requiring the termination of the Otero-ICE Contract or Otero-MTC Contract. HB9 § 5. And, as noted, the Attorney General has sued Torrance County and Curry County in attempt to void their 287(g) agreements with DHS under HB9.

148. Should HB9 be enforced, it will result in the termination of numerous agreements between ICE, New Mexico local governmental entities, and private entities, depriving these local government entities and private companies of revenue, and depriving the communities that they serve of jobs and economic activity. If local governmental entities refuse to comply with HB9, the New Mexico Attorney General is empowered to seek injunctive relief to force compliance with HB9 as he has already. *See* HB9 § 5.

149. The Federal Government depends on these agreements to operate civil immigration detention facilities and to enforce civil immigration law throughout the State of New Mexico. Consequently, HB9 has the purpose and will have the imminent result of impeding federal immigration enforcement in New Mexico.

150. The loss of either the Otero-ICE or Otero-MTC Contracts would mean that DHS would lose the use of the OCPC, which can house over 1,000 detainees and is the only one in the state that can house women and high security detainees. *See* DHS Decl. ¶¶ 8, 10; MTC Decl. ¶ 20. The OCPC is also critical to ICE's national civil immigration operations thanks to its proximity to multiple ports of entry, highways, and an international airport. DHS Decl. ¶¶ 8–12; MTC Decl. ¶ 19. Without the OCPC, the Federal Government would be forced to transfer detainees from a high-quality, well-staffed facility with excellent conditions and track record to facilities that are hundreds of miles away that have less favorable conditions. DHS Decl. ¶¶ 12, 19–26. Not only

would this result in a significant drain on Federal Government resources, it would also harm the detainees and their families by forcing them to travel longer distances to see loved ones, limiting access to counsel and evidence, and slowing removal proceedings significantly. DHS Decl. ¶¶ 23–26; Otero Decl. ¶ 16. And while state and local political representatives have some oversight of the OCPC and related contracts, they have no oversight over facilities located outside of New Mexico. DHS Decl. ¶¶ 20, 25; MTC Decl. ¶¶ 11, 12, 15–17; Otero Decl. ¶ 16.

151.    In addition to the adverse impacts on the Federal Government, national immigration enforcement operations, and detainees and their families, HB9 would result in significant harm to the people of Otero County. Otero County would lose hundreds of jobs and millions of dollars in revenue annually. MTC Decl. ¶¶ 21–25 Otero Decl. ¶¶ 11, 12. Otero County would also suffer from the loss of hundreds of millions of dollars of indirect economic activity generated by the operation of the OCPC. Otero Decl. ¶ 13. Otero County would further be forced to default on municipal bond payments, resulting in the loss of the OCPC itself, as well as diminishment of the County's credit rating and ability to borrow in the future. Otero Decl. ¶¶ 7–9, 14, 15.

152.    287(g) agreements are also important means for ICE to cooperate and coordinate with local law enforcement. Relying on local law enforcement helps DHS more effectively and safely enforce immigration law. For example, local officers often know more about targets and may even have them detained. They can more easily go out into the community and locate and detain individuals violating immigration laws. DHS can then work with local law enforcement to safely detain and transfer individuals. If the agreements with Torrance and Curry County are voided and if future agreements are impossible, DHS will have to expend substantial resources to enforce the law in those areas because aliens will no longer be encountered at a fixed location and time in a relatively safe and secure environment. This would require arrests at large in the public

after significant efforts to locate targets, which can also attract outside agitators and protestors. Such public arrests are less safe for the officers, aliens, and public.

153.    In addition to its overt attempt to nullify a civil immigration detention agreement between ICE and Otero County, New Mexico has never disclaimed its intent to enforce HB9. Nor have the City of Albuquerque, Doña Ana County, or Bernalillo County expressed an intent not to enforce the Local Laws. The United States believes that New Mexico will enforce HB9 and Albuquerque, Doña Ana County, and Bernalillo County will enforce the Challenged Laws. New Mexico, Albuquerque, Doña Ana County, and Bernalillo County have passed a series of sanctuary policies. Presumably, no government would pass such laws if they did not plan on enforcing them.

154.    The Local Laws cause severe and irreparable harms to DHS's ability to enforce federal immigration laws. Take the Albuquerque and Bernalillo County ordinances. Albuquerque is by far the largest city in the state and has an international airport. Thousands of illegal aliens live in the area. These ordinances purposefully make it more difficult for DHS to enforce immigration law in this area. DHS relies on administrative warrants to detain aliens, as Congress intended. And can do so anywhere in the country. Being able to detain aliens at courthouses is especially important because officers know where they are and that they will be in safe and secure locations and be unarmed. By requiring judicial warrants to enforce immigration law on public property, the ordinances make it much more difficult to apprehend aliens on such property. The same is true for designated safe locations. This incentivizes aliens to use those areas and makes it harder for DHS to easily and safely enforce immigration laws. While DHS will not comply with these restrictions, attempting to arrest an alien on property covered by the ordinances can result in dangerous confrontations with employees. Again, all of these restrictions force DHS to locate

aliens in public in less secure and safe situations, putting officers and others at risk and wasting resources.

155. This is doubly true for the business notifications requirements. Many aliens can be located at work sites. The ordinances, however, coerce local businesses to warn aliens about enforcement operations. This can allow aliens to evade enforcement or resist. As a result, law enforcement must expend additional resources to track and safely detain aliens. They also may have to enforce harboring laws against the businesses.

156. The same is true for the SCAR in Doña Ana County. Doña Ana County is the second largest population center in New Mexico and has an international airport that supports regional travel and commerce, which increases the volume and variety of individuals transiting the area. Doña Ana County is a border county situated to the immediate northwest of El Paso, which is one of the most important ports of entry. Traffic moves through and around El Paso in Doña Ana County, including northbound traffic moving along Interstate 10. Its proximity to El Paso and multiple ports of entry makes it a transit and residence area for noncitizens of enforcement interest, including individuals with prior removal orders and criminal histories. It is thus an important area for immigration enforcement. Yet the ordinance purposefully makes enforcing federal law harder. Like the other Local Laws, it restricts DHS to judicial warrants in certain locations such as courts where enforcement is important and safe. It prevents ICE from making immigration arrests at courthouses where aliens with significant criminal and immigration histories are present. It also prevents officers from sharing vital information that makes identifying, locating, and detaining illegal aliens, especially criminal ones, easier and safer. There is no justification for the Local Laws other than to impede immigration enforcement and waste federal resources.

157.    The Local Laws prevent immigration enforcement officials from entering parts of county courthouses and other facilities to conduct administrative arrests without judicial approval, even if the targets of such arrests pose public safety threats. The delays and denials that immigration officials will encounter in accessing such properties pose significant operational burdens.

158.    The Local Laws further burden immigration enforcement officials by obstructing voluntary information sharing, which will force immigration officials to rely on slower formal legal processes to obtain information that traditionally was provided through federal-local coordination.

159.    If immigration enforcement officials are unable to access or make arrests in controlled environments, like courthouses and other county facilities, as a result of the Local Laws, they will be forced to conduct more at-large operations in residential and public settings, requiring additional resources and increasing the operational and safety risks to officers, the public, and the targets of such operations.

160.    The United States is irreparably harmed by the Challenged Laws because they seek to (i) obstruct and conflict with federal immigration law; (ii) control and regulate federal functions and operations carried out through the Executive agencies of the United States, in violation of the Supremacy Clause; and (iii) void contracts with federal agencies in violation of the Contract Clause.

161.    All of these measures make enforcing federal law more difficult and dangerous in the State of New Mexico and divert important law enforcement resources. These laws disrupt important coordination between state and local officials and purposefully make the enforcement of federal law more difficult.

162.   States may not adopt laws that violate the Constitution, including laws that upset the federal system and the existing agreements and ongoing cooperation between state and local entities and the Federal Government, nor dictate the parties with whom the Federal Government may contract, particularly in the context of sovereign functions such as immigration enforcement.

163.   The United States is further irreparably harmed absent an injunction because a failure to enjoin this law will encourage other states to enact similar unconstitutional laws. There is no adequate remedy at law for such violations of the Constitution.

## CLAIMS FOR RELIEF

### COUNT I – FEDERAL PREEMPTION OF THE CHALLENGED LAWS
### (AGAINST ALL DEFENDANTS)

164.   Plaintiff hereby incorporates foregoing paragraphs of the Complaint as if fully stated herein.

165.   By virtue of the Supremacy Clause of the United States Constitution, the Challenged Laws are impliedly preempted, unconstitutional, invalid, and unenforceable because they conflict with federal law by obstructing the accomplishment and execution of Congress's full immigration purposes and objectives.

166.   Through the INA, Congress codified its federal immigration purposes and objectives. To fulfill those purposes and objectives, Congress permitted state and local officials to voluntarily agree with the Federal Government to implement federal immigration law by performing federal immigration functions under the color of federal law as well providing detention facilities and services. *See* 8 U.S.C. §§ 1357(g), 1103(a)(11)(B), 1231(g); *see also* 6 U.S.C. § 112(b)(2).

167.   HB9 obstructs the accomplishment and execution of the full purposes and objectives of Congress as codified in the INA by dramatically curtailing the Federal Government's

congressionally delegated discretion to select, locate, and contract with local governments to provide facilities and services for immigration detention. *See* HB9 §§ 3(A)–(C), 4(A)–(C). By prohibiting or severely restricting the ability of the Federal Government to contract for and to use government property to detain aliens the Challenged Laws stand as an obstacle to the enforcement of federal immigration law. *See* 8 U.S.C. §§ 1231(g), 1103(a)(11)(B).

168.    Further, HB9 directly frustrates Congress's delegation of authority to ICE to determine what facilities are appropriate for immigration detention and to secure such facilities through purchase, lease, or contract. *See* HB9 §§ 3(A)–(C). HB9 substitutes New Mexico's policy judgment in place of the Federal Government's determination of how best to house individuals subject to federal immigration proceedings and with whom the Federal Government can contract to achieve those ends. *See* 8 U.S.C. §§ 1231(g), 1103(a)(11)(B).

169.    The Challenged Laws likewise conflict with 6 U.S.C. § 112(b)(2) by impermissibly regulating and restricting the Federal Government's ability to carry out its functions through contracts with non-federal parties, including Otero County.

170.    The Challenged Laws also obstruct the achievement of Congress's federal immigration purposes and objectives by limiting the property and resources accessible and available federal immigration authorities to be used to implement federal immigration law, as well as ordering defiance of administrative warrants and detainers and instead requiring judicial warrants. *See* HB9 §§ 3(A)–(C); ASCPO §§ 5-1-5(A), (B), 13-17-4(A)(1); BSCPO §§ 51-2, 51-3; SCAR § 4(2)(a). The denial of access to public property, including courthouses, severely restricts the locations in which federal immigration officers can perform their duties and thereby impedes and creates an obstacle to the enforcement of federal immigration law in accordance with the

mandates of Congress. *See, e.g.*, 8 U.S.C. §§ 1226a, 1226(c), 1231(a), 1357; *see also* 18 U.S.C. §§ 372, 1071.

171.    The ASCPO and BSCPO further obstruct the achievement of Congress's federal immigration purposes and objectives by requiring businesses to notify aliens of ongoing federal immigration enforcement operations, thereby giving aliens the ability to avoid detection by federal immigration authorities. The Local Laws obstruct the achievement of Congress's federal immigration purposes and objectives by denying certain entities the right to voluntarily cooperate with federal immigration enforcement officials by providing access to property and certain records. These requirements are designed to facilitate the evasion of law enforcement. ASCPO §§ 13-17-4(A), 13-17-6(C); BSCPO §§ 51-2, 51-3; SCAR § 4; *see* 8 U.S.C. § 1324(a)(1)(A)(iii) (prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation."); *Kearns v. Cuomo*, 981 F.3d 200, 208 (2d Cir. 2020) ("Examples [of harboring] also include attempts to alert undocumented immigrants to the physical approach of immigration authorities.").

172.    The Challenged Laws harm the United States' sovereign interest in the supremacy and enforcement of federal law, particularly the INA, undermine and conflict with federal immigration enforcement policy, and impose financial harm on the United States and taxpayers by increasing the costs of immigration enforcement. A favorable ruling would redress the United States' harms.

173.    Because the Challenged Laws stand as obstacles to the full accomplishment and execution of Congress's objectives in administering a nationwide immigration system, they are impliedly preempted by federal law and are unconstitutional and invalid.

**COUNT II – VIOLATION OF THE SUPREMACY CLAUSE**
**(UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT**
**AGAINST ALL DEFENDANTS)**

174. Plaintiff hereby incorporates foregoing paragraphs of the Complaint as if fully stated herein.

175. The Challenged Laws violate basic principles of intergovernmental immunity by unlawfully regulating the Federal Government. Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445.

176. HB9 regulates the Federal Government by imposing restrictions on the parties with whom the Federal Government can contract to detain aliens for civil immigration violations and to implement federal immigration law, including by deputizing state officials.

177. The Challenged Laws regulate the Federal Government by imposing burdensome restrictions on the property and resources available to be used for federal civil immigration enforcement and detention purposes.

178. The Local Laws regulate the Federal Government by imposing restrictions on federal immigration authorities' access to property and records beyond those required by Congress by requiring judicial warrants and orders instead of administrative warrants.

179. The purpose and design of the Challenged Laws are to prevent federal immigration detention by removing local entities and property available to be used for federal immigration detention purposes.

180. The Challenged Laws therefore purport to directly regulate the Federal Government in violation of the intergovernmental immunity doctrine and are invalid under the Supremacy Clause.

**COUNT III – VIOLATION OF THE SUPREMACY CLAUSE**
**(UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT**
**AGAINST ALL DEFENDANTS)**

181.    Plaintiff hereby incorporates foregoing paragraphs of the Complaint as if fully stated herein.

182.    The Challenged Laws "single out" federal immigration authorities for disfavored treatment, expressly and impliedly, which is exactly what intergovernmental-immunity principles bar. *Dawson v. Steager*, 586 U.S. 171, 178 (2019).

183.    The Federal Government is tasked by Congress with implementing and enforcing federal immigration law.

184.    HB9 restricts public bodies from continuing to perform under and from entering into Section 287(g) agreements and agreements to detain aliens for civil immigration enforcement purposes while allowing public bodies to form agreements for other functions unrelated to federal immigration law. This includes detention and cooperation between state and local law enforcement, including for civil purposes.

185.    HB9 makes clear that it is meant to solely apply to federal immigration enforcement functions by limiting its application to other law enforcement personnel. *See* HB9 § 3(E) ("Nothing in this section shall be construed to limit the ability of law enforcement personnel to detain individuals or to perform brief investigative stops as permitted by state law.").

186.    The ASCPO and SCAR restrict the use of government resources and access to property to assist in federal immigration law enforcement activities while permitting such resources and property to be used for other law enforcement purposes.

187.    The ASCPO and BSCPO require that private businesses provide notice to aliens of active federal immigration enforcement activities, while permitting other law enforcement

activities to proceed without requiring any notification. This includes state and local criminal and civil enforcement actions.

188. The Local Laws prohibit certain public and private entities from voluntarily cooperating with immigration law enforcement officials through the provision of access to certain property and records, while permitting the same public and private entities to voluntarily cooperate with other law enforcement officials for other law enforcement purposes.

189. The Challenged Laws do not require the termination of existing agreements, bar entry into future agreements, restrict the use of property, restrict voluntary cooperation, or require notice to subjects of investigation for other law enforcement functions civil or otherwise. Instead, the Challenged Laws single out the Federal Government, responsible for the implementation and enforcement of federal immigration law, for worse treatment.

190. Accordingly, the Challenged Laws are invalid because they violate the Supremacy Clause and principles of intergovernmental immunity.

### COUNT IV – VIOLATION OF THE CONTRACT CLAUSE
### (AGAINST DEFENDANTS STATE OF NEW MEXICO, GOVERNOR MICHELLE LUJAN GRISHAM, AND ATTORNEY GENERAL RAÚL TORREZ)

191. Plaintiff hereby incorporates foregoing paragraphs of the Complaint as if fully stated herein.

192. The Contract Clause of the United States Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts . . ." U.S. Const. art. I, § 10, cl. 1. "The Contracts Clause restricts the power of States to disrupt contractual arrangements." *Sveen*, 584 U.S. at 818.

193.    Federal law authorizes agreements between the Federal Government and state and local governments to facilitate the detention of aliens and the enforcement of federal immigration laws. *See* 8 U.S.C. §§ 1357(g), 1231(g), 1103(a)(11)(B); 6 U.S.C. § 112(b)(2).

194.    Congress thus expressly contemplated and approved the use of agreements, such as the Otero-ICE Contract, to implement federal immigration detention operations and enforce federal immigration law.

195.    HB9 substantially impairs existing contracts between local governmental entities in New Mexico and the Federal Government concerning the detention of aliens and enforcement of federal immigration laws by requiring the immediate termination of such agreements, by prohibiting the use of county property and facilities to house civil immigration detainees, and by prohibiting intergovernmental services agreements to detain individuals for civil immigration violations and requiring termination of such agreements. HB9 thus nullifies key aspects of agreements to implement federal immigration detention operations and enforce federal immigration law, including the Otero-ICE Contract and Otero-MTC Contract. The same is true for the existing 287(g) agreements with Curry and Torrance Counties.

196.    HB9 also impairs and disrupts the Federal Government's ability to freely contract with local government entities in New Mexico to implement federal immigration law, including, for example, to contract with Otero County to use OCPC as a detention facility, thereby violating the Contract Clause.

197.    HB9 lacks any sufficiently significant or legitimate public purpose to justify terminating voluntary agreements between local New Mexico entities and the Federal Government made pursuant to federal law.

198.    HB9 impairs agreements between local governmental entities in New Mexico and the Federal Government concerning the detention of aliens and enforcement of federal immigration laws in a manner that is neither reasonable nor necessary.

199.    HB9 is not a legitimate exercise of State power.

200.    HB9 is therefore unconstitutional and invalid under the Contract Clause, particularly as applied to the Otero-ICE Contract, the Otero-MTC Contract, and the 287(g) agreements with Torrance and Curry counties.

### COUNT V – EXPRESS FEDERAL PREEMPTION OF THE SCAR
### (AGAINST DOÑA ANA COUNTY AND SCOTT ANDREWS)

201.    Plaintiff hereby incorporates foregoing paragraphs of the Complaint as if fully stated herein.

202.    Express preemption occurs when Congress explicitly precludes local regulation in a particular area. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992).

203.    The SCAR is expressly preempted by the 8 U.S.C. §§ 1373 and 1644's requirement that "a local government entity or official may not prohibit, or in any way restrict, any governmental entity official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* § 1644 (same).

204.    The SCAR is also expressly preempted by 8 U.S.C. §§ 1373 and 1644's requirement that "no person or agency may prohibit, or in any way restrict, a . . . local government entity from . . . (1) Sending [information regarding the immigration status, lawful or unlawful, of any individual] to . . . [federal immigration officials;] (2) Maintaining [information regarding the immigration status, lawful or unlawful, of any individual; or] (3) Exchanging [information

regarding the immigration status, lawful or unlawful, of any individual] with any other Federal, State, or local government entity." 8 U.S.C. § 1373(b).

205.    The prohibitions in 8 U.S.C. § 1373 exist "[n]otwithstanding any other provision of Federal, State, or local law," evincing Congress's intent to expressly preempt contrary laws.

206.    The SCAR expressly forbids Doña Ana County officials from using resources to (i) "gather, transmit or disseminate information regarding the immigration status of individuals in Doña Ana County[,]" SCAR § 2; and (ii) "[r]equest[] information about, transmit[] or disseminat[e] information regarding the immigration status of any individual[,]" *id.* § 2(A). The SCAR further prohibits Doña Ana County officials from "[i]ncluding on any application, questionnaire or interview form . . . any question regarding immigration status" and requires that [a]ny such questions existing or being used by the county at the time this Resolution is adopted" to "be deleted within sixty days . . ." *Id.* § 2(B).

207.    These provisions of the SCAR are expressly preempted by 8 U.S.C. §§ 1373, 1644 because they restrict local government entities and officials from maintaining, sending, receiving, and exchanging information regarding the immigration status of individuals with the Federal Government and restrict the maintenance of such information.

208.    By instructing county employees and officials not to inquire about an individual's immigration status, and by instructing county employees not to share information about an individual's immigration status with the Federal Government, the SCAR runs afoul of the prohibitions codified at 8 U.S.C. §§ 1373 and 1644 and are expressly preempted.

209.    Because these provisions of the SCAR are expressly preempted, they are unconstitutional and invalid.

69

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that this Court enter a judgment:

A.      Declaring that the Challenged Laws are preempted by federal law and are therefore unconstitutional, invalid, and unenforceable;

B.      Declaring that the Challenged Laws violate the Supremacy Clause and principles of intergovernmental immunity by unlawfully regulating and discriminating against and the Federal Government and are therefore unconstitutional, invalid, and unenforceable;

C.      Declaring that HB9 violates the Contract Clause and is therefore unconstitutional, invalid, and unenforceable, and enjoining its application to the Otero-ICE Contract, the Otero-MTC Contract, and the 287(g) agreements with Torrance County and Curry County;

D.      Preliminarily and permanently enjoining the operation and enforcement of the Challenged Laws, including by prohibiting lawsuits, enforcement, actions, investigations, or any other actions by Defendants or their agents or successors to enforce or achieve the goals of the Challenged Laws;

E.      Awarding the United States its costs and fees in this action; and

F.      Awarding any other relief it deems just and proper.

DATED: June 22, 2026                          Respectfully Submitted,

TODD BLANCHE                                  /s/ Jackson M. Story
Acting Attorney General                       Trial Attorney
                                              U.S. Department of Justice, Civil Division
BRETT A. SHUMATE                              Enforcement & Affirmative Litigation Branch
Assistant Attorney General                    P.O. Box 386
Civil Division                                Washington, DC 20044-0386
                                              Telephone: (202) 451-7304
TIBERIUS DAVIS                                Email: jackson.m.story@usdoj.gov
Counsel to the Assistant Attorney General

RYAN ELLISON                                  EMIL J. KIEHNE
First Assistant United States Attorney        Assistant U.S. Attorney
District of New Mexico                        U.S. Attorney's Office,
                                              District of New Mexico
ROBERT O. LINDEFJELD                          201 3rd Street NW, Suite 900
Assistant Director                            Albuquerque, New Mexico 87102
U.S. Department of Justice, Civil Division    Telephone: (505) 346-6855
Enforcement & Affirmative Litigation Branch   Email: emil.kiehne@usdoj.gov


                                              *Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2026, I filed the foregoing document using CM/ECF which caused all parties and counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing. I further certify that on such date I caused the foregoing to be served on the following parties via electronic mail and certified mail, return receipt requested:

Doña Ana County and Scott Andrews, in his Official Capacity as Manager of Doña Ana County
c/o Amanda Lopez Askin
Doña Ana County Clerk
845 N Motel Blvd
Las Cruces, NM 88007
dacclerk@donaana.gov

Doña Ana County and Scott Andrews, in his Official Capacity as Manager of Doña Ana County
c/o Cari Neill
Doña Ana County Attorney
845 N Motel Blvd
Las Cruces, NM 88007
carin@donaana.gov

Bernalillo County and Bernalillo County Manager Cindy Chavez, in her Official Capacity as Manager of Bernalillo County
c/o Michelle S. Kavanaugh
Bernalillo County Clerk
415 Silver Ave SW, 2nd Floor
Albuquerque, NM 87102
clerk@bernco.gov

Bernalillo County and Bernalillo County Manager Cindy Chavez, in her Official Capacity as Manager of Bernalillo County
c/o W. Ken Martinez
Bernalillo County Attorney
415 Silver SW
Albuquerque, NM 87102
info@bernco.gov

*/s/ Jackson M. Story*
JACKSON M. STORY
Trial Attorney
United States Department of Justice
Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044-0386
Phone: (202) 451-7304
Email: jackson.m.story@usdoj.gov