# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

THE UNITED STATES OF AMERICA,

     *Plaintiff*,

     v.

THE STATE OF NEW MEXICO;
MICHELLE LUJAN GRISHAM, in her
Official Capacity as Governor of the State
of New Mexico; RAÚL TORREZ, in his
Official Capacity as Attorney General of
the State of New Mexico; THE CITY OF
ALBUQUERQUE; TIMOTHY KELLER,
in his Official Capacity as Mayor of the
City of Albuquerque, BERNALILLO
COUNTY; CINDY CHAVEZ, in her Official
Capacity as Manager of Bernalillo County;
DONA AÑA COUNTY; SCOTT
ANDREWS, in his Official Capacity as
Manager of Dona Aña County,

     *Defendants*.

Case No.: 1:26-cv-1471-KG-LF
The Honorable Kenneth J. Gonzales

**ORAL ARGUMENT REQUESTED**

## DEFENDANTS THE STATE OF NEW MEXICO'S
## AND ATTORNEY GENERAL RAÚL TORREZ'S MOTION TO DISMISS
## AND MEMORANDUM IN SUPPORT THEREOF

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ..................................................................................................................i

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 2

LEGAL STANDARD .................................................................................................................. 6

ARGUMENT................................................................................................................................ 6

    I.   Federal Law Does Not Preempt HB9 ............................................................................... 6

        A.  The Relevant Federal Laws Do Not Regulate Private Actors ........................................ 7

        B.  HB9 Is Not an Obstacle to the Accomplishment of Federal Law ................................. 9

        C.  If Federal Law Preempted HB9, It Would Violate the Anticommandeering Doctrine ............... 13

    II.  HB9 Does Not Violate Principles of Intergovernmental Immunity ................................... 14

        A.  HB9 Does Not Directly Regulate the Federal Government ......................................... 15

        B.  HB9 Does Not Discriminate Against the Federal Government .................................... 17

    III. HB9 Does Not Violate the Contract Clause ..................................................................... 19

        A.  The Contract Clause Does Not Apply to HB9.......................................................... 19

        B.  The United States Identifies No Enforceable Contract that HB9 Impairs .................................. 22

        C.  HB9 Would Survive Any Review Under the Contract Clause...................................................... 26

        D.  The Contract Clause Provides No Basis for Any Facial Challenge ........................................... 26

CONCLUSION............................................................................................................................ 27

Defendants the State of New Mexico and Raúl Torrez, in his official capacity as Attorney General of New Mexico, respectfully move this Court to dismiss Plaintiff the United States's First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) as set forth below.[1]

## INTRODUCTION

The United States challenges a New Mexico law that bars the State and its political subdivisions from assisting the federal government in enforcing immigration law. The Immigrant Safety Act, or House Bill 9 (HB9), N.M. Stat. §§ 13-9-1 to 13-9-6, provides that "public bodies" may not enter into agreements under which they would detain, investigate, apprehend, or transport persons for violations of civil immigration law. *Id.* §§ 13-9-3, 13-9-4. It further requires termination of any such existing agreements at the "earliest date permissible under the terms of the agreement." *Id.* §§ 13-9-3(B), 13-9-4(C). The United States asserts that HB9 is preempted by federal law and violates principles of intergovernmental immunity and the U.S. Constitution's Contract Clause.

Each claim fails several times over. With respect to preemption, the United States misunderstands how that doctrine operates: A federal law preempts a state law only if the federal law regulates *private* actors. *See Murphy v. NCAA*, 584 U.S. 453, 472 (2018). But each of the federal laws that the United States invokes are grants of authority or instructions to *federal officials*. Regardless, HB9 does not obstruct federal immigration enforcement. Instead, it simply reflects New Mexico's sovereign right not to participate in such enforcement. Indeed, the various provisions of federal law at issue expressly provide for *voluntary* State participation in federal immigration enforcement. And if the laws *mandated* participation, they would run afoul of the anticommandeering doctrine—a "fundamental structural" feature of the Constitution, *id.* at 470, that preserves New Mexico's authority to decide

---

[1] Consistent with Local Rule 7.1(a), counsel for Defendants contacted counsel for Plaintiff United States of America and confirmed that it opposes this motion.

whether to assist with carrying out federal law. The United States's intergovernmental immunity claims reflect similar confusion. HB9 does not regulate the federal government; instead, it proscribes conduct by the State and its political subdivisions. Nor does HB9 discriminate against the federal government, as it does not treat the federal government worse than any similarly situated party. Any other conclusion would mean that the federal government could force New Mexico to participate in federal immigration enforcement—exactly what the anticommandeering doctrine prohibits.

The United States's Contract Clause claim fares even worse. The Contract Clause does not apply to exercises of "governmental authority," *Contributors to Pa. Hosp. v. City of Philadelphia*, 245 U.S. 20, 23 (1917), particularly laws like HB9 that go to the heart of a State's "police power" by setting priorities for State and local law enforcement, *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 24 (1977). Moreover, the United States identifies no enforceable contract that HB9 actually impairs. And even if it had, HB9 would nevertheless survive Contract Clause review because HB9 is a "reasonable and necessary" means of setting law enforcement priorities. *Id.* at 25. Regardless, the Contract Clause protects only contracts that existed at the time of HB9's enactment. Any viable Contract Clause claim (and there is none) would therefore have no effect on HB9's numerous applications to any future contracts that might be contemplated, which are categorically outside the Clause's ambit.

## BACKGROUND

New Mexico is home to more than 200,000 immigrants.[2] This population plays a vital role in the State's economic system: one in eight New Mexico workers is an immigrant.[3] In light of this, New

---

[2] *Immigrants in New Mexico*, Am. Immigr. Council, https://perma.cc/T7LA-CS3A (last visited June 8, 2026). Defendants request the Court take judicial notice of the public records cited in this motion and attached as exhibits. *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

[3] *Overview of the State – New Mexico – 2025*, Health Res. & Servs. Admin., Maternal & Child Health Bureau, https://perma.cc/66ZZ-UGM8 (last visited June 8, 2026).

Mexico's decision to disentangle itself from voluntary efforts to cooperate with federal immigration enforcement through adoption of HB9 should come as no surprise. Section 3 of HB9 prohibits "public bodies" from "enter[ing] into, extend[ing], renew[ing] or otherwise agree[ing] to be a party to an agreement to detain individuals for federal civil immigration violations, including an intergovernmental services agreement to detain individuals for civil immigration violations." N.M. Stat. § 13-9-3(A).[4] Public bodies that are already party to any such agreement must "terminate the agreement upon the earliest date permissible under the terms of the agreement." *Id.* § 13-9-3(B). HB9 also prevents public bodies from disposing of real property to be used for civil immigration detention. *Id.* § 13-9-3(C). Section 4 bars public bodies from entering into, extending, or renewing agreements to deputize personnel to "perform a function of an immigration officer in relation to the investigation, apprehension, detention or transportation of noncitizens in the United States or the removal of noncitizens from the United States," and requires public bodies to terminate existing agreements to engage in those functions at the earliest date allowed by the agreement. *Id.* § 13-9-4. The Attorney General and the State's district attorneys are authorized to enforce HB9. *Id.* § 13-9-5.

Governor Michelle Lujan Grisham signed HB9 on February 5, 2026, *see* 2026 N.M. Laws Ch. 5, and it took effect on May 20, 2026, *see* N.M. Const. art. IV, § 23 (laws take effect 90 days after the adjournment of the legislature enacting them). To mitigate potential monetary loss from the closing of detention facilities, the Governor also signed Senate Bill 273. *See* 2026 N.M. Laws Ch. 70. That law provides funding to cover bond payments tied to detention centers should the centers close and as relevant here, allots $5,940,000 to Otero County. *Id.* § 1(A)(3).

---

[4] A "public body" is "a state or local government, a sheriff's department, an advisory board, a commission, an agency or an entity created by the constitution of New Mexico or any branch of government that receives public funding, including political subdivisions, special tax districts, school districts and institutions of higher education." N.M. Stat. § 13-9-2.

The federal government (acting through U.S. Immigration and Customs Enforcement (ICE)) currently has three agreements with New Mexico political subdivisions for detention facilities.[5] The only publicly owned facility with such an agreement—and thus the only detention facility covered by HB9—is the Otero County Processing Center (OCPC).[6] Today, OCPC holds roughly 900 federal civil immigration detainees.[7] OCPC has long been the subject of complaints about abusive treatment of individuals entrusted to its custody, including the death of a 32-year-old man,[8] overcrowding,[9] unsanitary conditions,[10] and allegations of retaliatory use of solitary confinement.[11] New Mexico adopted HB9 in part to put an end to these abuses.[12]

OCPC is governed by an Intergovernmental Services Agreement (IGSA) executed by ICE and the Otero Board of County Commissioners. *See* Am. Compl. Ex. H, Dkt. 42-8 (2026 Otero-ICE IGSA). ICE and the Board have agreed to IGSAs at irregular intervals since the facility opened in 2008. *See* Ex. A, IGSA Between the U.S. DHS ICE & County of Otero, N.M., 2014 (2014 Otero-ICE

---

[5] *See Detention Facilities*, U.S. Immigr. & Customs Enf't, https://www.ice.gov/detention-facilities?state=24&office=&name= (last visited June 8, 2026).

[6] *Id.* OCPC's initial construction was funded by bonds payable from the facility's revenues. *Otero County, New Mexico Jail Project Revenue Bonds, Series 2007 Official Statement*, Electronic Mun. Mkt. Access (May 23, 2007), https://emma.msrb.org/MS259954-MS235262-MD458910.pdf. As a result, the County is not obligated to make payments on the bonds if OCPC revenues are insufficient. *Id.* at 6. In the original bond documents, purchasers were advised that changes in the law could render OCPC defunct. *Id.* at 1–5.

[7] Resp't Resp. to Emergency Verified Pet. for Writ of Mandamus and Opp'n to Req. for Stay at 2, *State ex rel. Torrez v. Bd. of Cnty. Comm'rs for Otero Cnty.*, No. S-1-SC-41362 (N.M. filed Apr. 1, 2026).

[8] Gabrielle Porter, *Death of 32-year-old After Immigration Arrest Prompts Call for Investigation*, Santa Fe New Mexican (Aug. 3, 2025), https://perma.cc/RE4A-2AHU.

[9] *Rep. Vasquez Finds Overcrowded ICE Facility Detaining Mostly Non-Criminal Immigrants*, N.M. Pol. Rep. (Jul. 31, 2025), https://perma.cc/7AVL-GWU4.

[10] U.S. Dep't of Homeland Sec., Off. of the Inspector Gen., *Concerns About ICE Detainee Treatment and Care at Detention Facilities* 7 (2017), https://perma.cc/7H9G-N2GU.

[11] Press Release, ACLU of N.M., Migrants Held in Otero Prison File Complaint for Retaliatory Use of Solitary Confinement (Jun. 17, 2024), https://perma.cc/2FT9-4DX3; U.S. Dep't of Homeland Sec., *supra* note 10, at 6.

[12] *See House – Chamber Meeting*, 2026 Leg., 57th Sess. 2:24:17 PM (N.M. 2026), https://sg001-harmony.sliq.net/00293/Harmony/en/PowerBrowser/PowerBrowserV3/20260604/-1/78279 (statement of Rep. Andrea Romero) (HB9 adopted to prevent "the continued detention of [noncitizens] in our state" because of the "gross violations of human rights" and because the "facilities have not been kept up to standard").

IGSA); Ex. B, IGSA Between the U.S. DHS ICE & County of Otero, N.M., 2008 (2008 Otero-ICE IGSA). The prior IGSAs allowed either party to terminate the agreement upon the provision of written notice. *See* 2014 Otero-ICE IGSA, art. 8; 2008 Otero-ICE IGSA, art. VII. In 2025, the New Mexico House of Representatives adopted a prior version of HB9 that stalled in the Senate. *See* H.B. 9, 57th Leg., Reg. Sess. (N.M. 2025). Shortly thereafter, ICE and Otero County modified their agreement, removing for the first time the Board's right to terminate the agreement. Ex. C, Amendment 46 to the 2014 Otero-ICE IGSA. ICE and Otero County later extended that agreement to run through March 15, 2026. Ex. D, Amendment 47 to the 2014 Otero-ICE IGSA.

After Governor Lujan Grisham signed HB9, but before it took effect, Otero County executed a new IGSA at an improperly noticed board meeting (although it subsequently cured the lack of notice).[13] The 2026 Otero-ICE IGSA has a performance period of 60 months and provides that Otero County "shall not have the right to terminate this agreement"—while allowing ICE to terminate by providing written notice. *See* 2026 Otero-ICE IGSA, art. XIV. Separately, the County contracted with the Management and Training Corporation (MTC), a private company, to handle OCPC's daily operations. *See* Am. Compl. Ex. I, Dkt. 42-9 (Otero-MTC Contract).

Two other counties, Curry and Torrance, have agreements with ICE under which county employees may be deputized to assist in the enforcement of immigration law. *See* Ex. E, Memorandum of Agreement Between ICE & Curry County Sheriff's Office, May 13, 2025 (Curry Cnty. 287(g)); Ex. F, Memorandum of Agreement Between ICE & Torrance County Sheriff's Office, Mar. 28, 2026 (Torrance Cnty. 287(g)). These arrangements, commonly referred to as "287(g) agreements" (which refers to the provision of the Immigration and Nationality Act that allows for them, 8 U.S.C.

---

[13] *See* Patrick Lohmann, *Otero County Extends Federal Immigrant Detention Contract Again After First Attempt Deemed Illegal*, Source NM (Mar. 26, 2026), https://tinyurl.com/2h7e778e.

§ 1357(g)), delegate to local law enforcement the authority to serve and execute warrants on and detain individuals for violating federal immigration law. Each 287(g) agreement allows for at-will termination by either party with 90-days' notice. Curry Cnty. 287(g), § VIII; Torrance Cnty. 287(g), § VIII.[14]

## LEGAL STANDARD

In reviewing a motion to dismiss, the Court "assume[s] that all well-pled factual allegations in the complaint are true and draw[s] all reasonable inferences in the plaintiff's favor." *Spinelli v. Coherus Biosciences, Inc.*, 167 F.4th 1274, 1279 (10th Cir. 2026). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 1279–80 (quotation marks omitted). But legal conclusions need not be accepted as true. *Id.* at 1280. "The complaint must show that there is more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quotation marks omitted).

## ARGUMENT

The United States's claims challenging HB9 are all meritless. Federal law does not preempt HB9. Nor does the law violate principles of intergovernmental immunity. And the United States's Contract Clause claim fails for a host of reasons.

### I.   Federal Law Does Not Preempt HB9

In Count I, the United States asserts that HB9 is preempted by four provisions of federal law: 6 U.S.C. § 112(b)(2) and 8 U.S.C. §§ 1357(g), 1103(a)(11)(B), and 1231(g). *See* Am. Compl. ¶ 166. That

---

[14] As the United States notes, Am. Compl. ¶ 23, New Mexico has moved to enforce HB9 against the Torrance and Curry 287(g) agreements in state court..

argument is wrong several times over.

### A.  The Relevant Federal Laws Do Not Regulate Private Actors

As a threshold matter, the United States's theory of preemption reflects a fundamental misunderstanding about how that doctrine operates. As the Supreme Court has explained, "preemption is based on the Supremacy Clause," which is "not an independent grant of legislative power to Congress." *Murphy*, 584 U.S. at 477. Rather, the Clause "simply provides a rule of decision"— it "specifies that federal law is supreme in case of a conflict with state law." *Id.* (quotation marks omitted). As a result, a federal law preempts a state law only if it satisfies two requirements. First, it must be an exercise of a "power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do." *Id.* And second, because the Constitution "confers upon Congress the power to regulate individuals, not States," the federal law must "regulate[] private actors." *Id.* (quotation marks omitted); *see also id.* at 479 ("every form of preemption"—whether conflict, express, or field—"is based on a federal law that regulates the conduct of private actors, not the States"); *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (same).

The Supreme Court explained how these principles operate in *Murphy*. At issue there was a federal law that prohibited States from authorizing sports gambling. *See* 584 U.S. at 461. The Court held that the federal law was not a preemption provision because there was "no way" in which it could be "understood as a regulation of private actors." *Id.* at 479–80. It did not "confer any federal rights on private actors interested in conducting sports gambling operations." *Id.* at 480. Nor did it impose "any federal restrictions on private actors." *Id.* And if a "private citizen or company started a sports gambling operation, either with or without state authorization," the federal law "would not be violated and would not provide any ground for a civil action by the Attorney General or any other party." *Id.*

7

*Murphy*'s logic controls here. Like the law at issue there, none of the federal laws cited by the United States regulate private actors. Three of them authorize the Secretary of Homeland Security to enter into agreements for various purposes. 8 U.S.C. § 1357(g)(1) allows the Secretary to "enter into a written agreement with a State, or any political subdivision of a state" that would authorize state or local officials to "investigat[e], apprehen[d], or det[ain]" noncitizens in the United States. Similarly, 8 U.S.C. § 1103(a)(11)(B) authorizes the Secretary to "enter into a cooperative agreement with any State, territory, or political subdivision thereof" in order to construct, renovate, or acquire necessary supplies to "establish acceptable conditions of confinement and detention services in any State or unit of local government" that agrees to provide bed spaces for persons in administrative detention. And 6 U.S.C. § 112(b)(2) authorizes the Secretary to enter into "contracts, grants, and cooperative agreements . . . as may be necessary and proper to carry out the Secretary's responsibilities." The final provision, 8 U.S.C. § 1231(g), contains instructions to federal officials: It requires the Secretary to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," and provides that before "initiating any project for the construction of any new detention facility" for immigration purposes, federal officials "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use."

The text of these statutes makes clear that they do not apply to private actors. They do not confer any federal rights on private actors or impose any restrictions on them. Indeed, by their plain terms, they do not regulate anyone at all; they convey grants of authority or instructions to federal officials. There is "no way" to understand them as preemption provisions. *Murphy*, 584 U.S. at 479–80; *accord Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, 8 F.4th 176, 181–82 (3d Cir. 2021) (federal laws that provide for sharing of immigration information between state and federal officials are not

8

preemption provisions because they do not "regulate private actors").

### B.  HB9 Is Not an Obstacle to the Accomplishment of Federal Law

Even if the relevant federal laws could be deemed preemption provisions, they do not preempt HB9. The Supreme Court has recognized three types of preemption—express, field, and conflict. *Murphy*, 584 U.S. at 477. The United States alleges only conflict preemption is at issue here. *See* Am. Compl. ¶¶ 107, 165. "[T]wo cornerstones" guide preemption analysis. *In re MDL 2700 Genentech Herceptin (Trastuzumab) Mktg. & Sales Prac. Litig.*, 960 F.3d 1210, 1224 (10th Cir. 2020) (quotation marks omitted). First, Congress's "purpose . . . is the ultimate touchstone in every pre-emption case." *Id.* (quotation marks omitted). Second, "in all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, a court starts with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 1224–25 (citation modified).

A state law is conflict-preempted if it is "impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 1224 (quotation marks omitted). The United States does not argue that compliance with HB9 and the relevant federal laws is impossible, so the only question is whether HB9 is an obstacle to the accomplishment of the federal laws. That inquiry is "a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1232 (10th Cir. 2009) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). The party arguing that a state law is obstacle-preempted "must show that applying the state law would do major damage to clear and substantial federal interests." *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547

(7th Cir. 2020) (quotation marks omitted).

HB9 does no such damage. The Seventh Circuit's recent decision in *McHenry County v. Raoul*, 44 F.4th 581 (7th Cir. 2022), explains why. At issue in that case was an Illinois law that, like Section 3 of HB9, prevented the State and its political subdivisions from "enter[ing] into or renew[ing] any contract to house or detain individuals for federal civil immigration violations." *Id.* at 586 (quoting 5 Ill. Comp. Stat. 805/15(g)(1) (ellipses omitted)). Two counties challenged the law, asserting that it posed an impermissible obstacle to the congressional purposes set forth in 8 U.S.C. §§ 1103(a)(11)(B) and 1231(g). *McHenry County*, 44 F.4th at 591. They argued that these federal statutes demonstrated a "clear preference by Congress to house immigration detainees in existing facilities instead of constructing new ones," and that the Illinois law contravened that purpose by preventing the federal government from using local detention facilities. *Id.* (quotation marks omitted).

The Seventh Circuit rejected that argument. It held that §§ 1103(a)(11)(B) and 1231(g) "demonstrate[] at most a general preference to use existing facilities when they are available." *Id.* But "invoking 'some brooding federal interest' is not enough to support a preemption claim." *Id.* (quoting *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (lead opinion of Gorsuch, J.)). Congress's instruction to "'consider' available facilities and agreements [and] to use them before building new ones does not preempt a State (or local) government's choice to make certain facilities unavailable." *Id.* (quoting 8 U.S.C. § 1231(g)). Even assuming that, in drafting §§ 1103(a)(11)(B) and 1231(g), Congress may have "hoped or expected that States would cooperate with any requests from the [Secretary] to house detainees in their facilities," States are not "bound by that hope or expectation." *Id.* at 592. "It would make no sense to hold that a federal statute premised on State cooperation preempts a State law withholding that cooperation." *Id.*

10

This Court should adopt the same conclusion here. *McHenry County* is on all fours with respect to the United States's argument that §§ 1103(a)(11)(B) and 1231(g) preempt Section 3 of HB9. And although that case did not specifically address 6 U.S.C. § 112(b), that statute is even further afield: It generally authorizes the Secretary to make "contracts, grants, and cooperative agreements . . . as may be necessary and proper to carry out the Secretary's responsibilities," but does not specifically reference State and local governments.

*McHenry County*'s reasoning also applies fully to the United States's argument that 8 U.S.C. § 1357(g) preempts Section 4 of HB9. Like §§ 1103(a)(11)(B) and 1231(g), § 1357(g) evinces, at most, a "hope[] or expect[ation]," *McHenry County*, 44 F.4th at 592, that state and local officials will assist in federal immigration enforcement: it authorizes agreements with States or local governments under which state or local officials may "investigat[e], apprehen[d], or det[ain]" noncitizens in the United States. 8 U.S.C. § 1357(g)(1). But § 1357(g) does not require States or local governments to enter into such agreements. On the contrary, § 1357(g)(9) explicitly provides that nothing in its text "shall be construed to require any State or political subdivision of a State to enter into an agreement with the [Secretary] under this subsection." Here too, it would make "no sense" to conclude that a federal statute premised on state cooperation—and one that specifically guarantees States the right to withhold such cooperation—"preempts a State law withholding that cooperation." *McHenry County*, 44 F.4th at 592. That conclusion is all the more obvious in light of the general presumption that Congress does not intend to disrupt the "historic police powers of the States." *In re MDL 2700*, 960 F.3d at 1224–25 (quotation marks omitted); *see also City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) (Section 1357(g) "does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement"); *County*

*of Ocean v. Grewal*, 475 F. Supp. 3d 355, 383 (D.N.J. 2020), *aff'd on other grounds*, 8 F.4th 176 (3d Cir. 2021) (similar).

The United States also suggests that HB9 is preempted by federal law because it impedes "Congress's comprehensive detention goals," Am. Compl. ¶ 108 (citing 8 U.S.C. §§ 1226(a)(1), (b), (c), 1231(a)(2)(A), (g)), and because it "limit[s] the property and resources accessible and available [to] federal immigration authorities to be used to implement federal immigration law," Am. Compl. ¶ 170. But again, some "brooding federal interest" in the detention of noncitizens "should never be enough to win preemption of a state law." *Va. Uranium*, 587 U.S. at 767 (lead opinion of Gorsuch, J.). Rather, the United States must "point specifically to a constitutional text or a federal statute that does the displacing or conflicts with a state law," *id.* (quotation marks omitted)—something it cannot do.

In any event, New Mexico's decision not to assist in the enforcement of federal immigration law does not create any obstacle preemption problem. As the Ninth Circuit has explained, the Supreme Court's obstacle preemption precedents involve state statutes that "affirmatively instituted a regulatory scheme that conflicted with federal law, either by commission (for example, by applying differing standards or mandating affirmative action irreconcilable with federal law) or omission (by demanding inaction that directly conflicted with federal requirements)." *United States v. California*, 921 F.3d 865, 889 (9th Cir. 2019); *see also id.* at 888 n.14 (collecting cases). But where, as here, there is no provision of federal law that requires New Mexico or its political subdivisions to assist in the enforcement of immigration law, there is no preemption problem. Although New Mexico could choose to assist in those activities if it wanted, declining to do so does not conflict with any federal law. *Accord United States v. Illinois*, 796 F. Supp. 3d 494, 527 (N.D. Ill. 2025) (where inaction is "*permitted* by [federal immigration law]," a State's decision not to assist does not pose an obstacle to federal law).

### C. If Federal Law Preempted HB9, It Would Violate the Anticommandeering Doctrine

HB9 is not preempted by the relevant federal laws for the additional reason that such an interpretation of those laws would run afoul of the Tenth Amendment's anticommandeering doctrine. *See generally United States v. Morales-Lopez*, 92 F.4th 936, 945 (10th Cir. 2024) (reiterating the "cardinal principle" that if a statute's constitutionality is called into question, a court should adopt a construction "by which the question may be avoided" (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). Here again, the Supreme Court's decision in *Murphy* tells us why. As the Court explained, the anticommandeering doctrine prohibits Congress from "issu[ing] orders directly to the States." 584 U.S. at 470. This "fundamental structural decision" was "incorporated into the Constitution"; while the Constitution limits state sovereignty in various ways, it "did not abolish the[ir] sovereign powers." *Id.* And although the Constitution granted Congress "sizable" legislative powers, those powers are not "plenary." *Id.* at 471. Rather, Congress may exercise only those powers enumerated in the Constitution. *Id.* "And conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Id.*

In light of these principles, *Murphy* held that the provision of federal law that prohibited States from authorizing sports gambling was unconstitutional. *Id.* at 474. That provision "unequivocally dictate[d] what a state legislature may and may not do." *Id.* By prohibiting States from adopting a law, the federal law would put state legislatures "under the direct control of Congress." *Id.* It would be as if "federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals." *Id.* "A more direct affront to state sovereignty is not easy to imagine." *Id.*

*Murphy's* analysis controls here. If federal law were construed to require New Mexico or its

13

political subdivisions to help in the enforcement of federal immigration law, it would be a "direct command to the States"—which is "exactly what the anticommandeering rule does not allow." *Id.* at 480. Prohibiting New Mexico from deciding its own law enforcement priorities would eliminate a fundamental aspect of its sovereignty, placing it "under the direct control of Congress." *Id.* at 474. The Constitution does not allow that. *See Printz v. United States*, 521 U.S. 898, 935 (1997) (the federal government may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program"); *New York v. United States*, 505 U.S. 144, 176–77 (1992) (anticommandeering doctrine guarantees States the right to "decline to administer [a] federal program"). Indeed, courts across the country have held that if federal law were understood to require States or local governments to participate in immigration enforcement, it would violate the anticommandeering doctrine. *See, e.g.*, *California*, 921 F.3d at 888–91; *Illinois*, 796 F. Supp. 3d at 519–25; *Grewal*, 475 F. Supp. 3d at 376–79; *United States v. New York*, 810 F. Supp. 3d 329, 354–56 (N.D.N.Y. 2025), *appeal filed*, No. 26-104 (2d Cir.); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 866–73 (N.D. Ill. 2018), *aff'd on other grounds*, 961 F.3d 882 (7th Cir. 2020).[15]

## II.    HB9 Does Not Violate Principles of Intergovernmental Immunity

In Counts II and III, the United States argues that HB9 violates the intergovernmental immunity doctrine. Am. Compl. ¶¶ 174–90. This doctrine dates to the Supreme Court's canonical decision in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), in which the Court held

---

[15] In *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), the Second Circuit rejected the argument that information-sharing provisions of 8 U.S.C. §§ 1373 and 1644—neither of which is at issue in this case—violated the anticommandeering doctrine. *See id.* at 33–37. At least one district court has held that "[i]t is clear that *City of New York* cannot survive" *Murphy*, *New York v. Dep't of Justice*, 343 F. Supp. 3d 213, 234 (S.D.N.Y. 2018), although on appeal the Second Circuit "cast[] doubt" on the district court's conclusion that § 1373 was facially unconstitutional, *see* 951 F.3d 84, 114 (2d Cir. 2020). In the latter decision, the Second Circuit held that it did not need to address the question of § 1373's facial validity because the statute did not violate the Tenth Amendment as applied in that case to a "federal funding requirement." *Id.*

14

unconstitutional Maryland's attempt to tax the Bank of the United States without imposing a comparable tax on any other bank in the State. *Id.* at 320, 425–37. Today, it is understood to prohibit "state laws that *either* 'regulate the United States directly *or* discriminate against the Federal Government or those with whom it deals' (*e.g.*, contractors)." *United States v. Washington*, 596 U.S. 832, 838 (2022) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion) (brackets omitted)). The United States argues that HB9 both directly regulates the federal government (in Count II) and that it discriminates against the federal government (in Count III). Each argument fails.

### A.  HB9 Does Not Directly Regulate the Federal Government

A state law directly regulates the federal government when it places a prohibition or mandate "on the federal government," *Hancock v. Train*, 426 U.S. 167, 180 (1976), or when it imposes a tax "directly upon the United States," *United States v. New Mexico*, 455 U.S. 720, 733 (1982) (quoting *Mayo v. United States*, 319 U.S. 441, 447 (1943)). HB9 does neither. The Seventh Circuit's decision in *McHenry County* once again explains why. As noted, *see supra* p. 10, the law at issue there, like Section 3 of HB9, prevented the State and its local governments from entering into or renewing contracts to provide immigration-detention services. *McHenry County*, 44 F.4th at 586. The Seventh Circuit rejected the argument that the law directly regulated the federal government, reasoning that the law restricted only State and local governments from entering into "cooperative agreement[s] for immigration detention." *Id.* at 593. While "*the* intended consequence of the Act" was to prevent the federal government from entering into such agreements, that did not mean that the law regulated the federal government. *Id.*

HB9 operates in the same way. It too prohibits only New Mexico and its political subdivisions from participating in the enforcement of federal immigration law. It does not impose any obligations on the federal government, which remains free to contract with private entities for immigration

15

detention or purchase or build its own facilities in New Mexico. *See* N.M. Stat. §§ 13-9-3, 13-9-4. As a result, it does not regulate the federal government. *See McHenry County*, 44 F.4th at 593.

The United States argues that HB9 directly regulates the federal government by "controlling the potential entities with whom the Federal Government may form voluntary agreements to perform the core government function" of civil immigration enforcement. Am. Compl. ¶ 121. To support that argument, it cites two cases holding that state laws prohibiting *private* parties from operating detention facilities within the State directly regulated the federal government, *Geo Group, Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (en banc), and *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315 (3d Cir. 2025).

Even assuming those decisions are correct,[16] they have no application here. The concern in *Geo Group* and *CoreCivic* was that state regulation of a federal supplier or contractor might, in certain circumstances, allow the State to "control federal operations," and thus have the "same effect as direct enforcement against the [federal] [g]overnment." *Geo Group*, 50 F.4th at 760; *see also CoreCivic*, 145 F.4th at 322–28 (similar). But such concerns do not apply when the State adopts a law prohibiting itself, or its political subdivisions, from entering into agreements with the federal government. New Mexico's decision not to detain people for immigration violations or assist in the investigation of such violations in no way "control[s] federal operations." *Geo Group*, 50 F.4th at 760. Instead, HB9 merely exercises New Mexico's sovereign authority to not participate in the execution of federal immigration law—a right reserved to New Mexico under the anticommandeering doctrine. *See supra* pp. 13–14. To the extent the United States objects to HB9 because it regulates both New Mexico and its political subdivisions, that is a distinction without a difference: It is black-letter law that a State's political

---

[16] *But see CoreCivic*, 145 F.4th at 332–41 (Ambro, J., dissenting) (concluding that "neutral state laws that apply only to private parties are not direct regulations on the federal government"); *Geo Group*, 50 F.4th at 763–66 (Murguia, C.J., dissenting) (same).

16

subdivisions are merely "department[s] of the state, and [that] the state may withhold, grant, or withdraw powers and privileges as it sees fit." *City of Trenton v. New Jersey*, 262 U.S. 182, 187 (1923).

## B.  HB9 Does Not Discriminate Against the Federal Government

Nor does HB9 impermissibly discriminate against the federal government. This branch of the intergovernmental immunity doctrine prohibits States from singling out the federal government or its contractors "for less favorable treatment" or from regulating them "unfavorably on some basis related to their governmental status." *Washington*, 596 U.S. at 839 (quotation marks omitted).

Once again, the Seventh Circuit's decision in *McHenry County* explains why HB9 does not impermissibly discriminate against the federal government. As the court there pointed out, the Supreme Court's decision in *United States v. Washington* "provides a helpful illustration of impermissible discrimination." *McHenry County*, 44 F.4th at 593. At issue in that case was a Washington State workers' compensation law that applied only to federal contract workers, which made it easier for such workers to establish workers' compensation claims, "thereby increasing costs for the federal government." *Id.* That law impermissibly "'singl[ed] out the Federal Government for unfavorable treatment'"; "[o]n its face, the law treated federal workers 'differently than state or private workers.'" *Id.* (quoting *Washington*, 596 U.S. at 839). By contrast, the Illinois law in *McHenry County*—which, like HB9, prohibited Illinois and its political subdivisions from entering into or renewing agreements to detain persons who violate immigration law, *see supra* p. 10—did not "discriminate against the federal government." *Id.* The Illinois law allowed the federal government to "house immigration detainees in its own facilities or those of private entities." *Id.* And nothing in it "suggest[ed] that the federal government or its contractors have been singled out for less favorable treatment." *Id.* at 594 (quotation marks omitted). Indeed, the Illinois law did not regulate the federal government or its contractors at all. *Id.* at 593.

To be sure, the Illinois law did not prohibit the State and its local governments from "participat[ing] in intergovernmental cooperation for *other* detention services not related to immigration." *Id.* at 594 n.7 (quotation mark omitted). But that did not mean that the law discriminated against the federal government. Rather, "[d]ifferential treatment is critical to a discrimination-based intergovernmental immunity claim." *Id.* at 594. A comparator is necessary: a state law discriminates against the federal government only if it imposes a greater burden on federal actors than "on other *similarly situated* constituents." *Id.* (emphasis added) (quoting *North Dakota*, 495 U.S. at 438). In *McHenry County*, no such comparator existed, because the federal government is the only sovereign that enforces immigration law. As the Seventh Circuit explained, a state law does not discriminate against the federal government simply because it "affects an exclusively federal domain." *Id.*

HB9 does not discriminate against the federal government for the same reasons. Like the Illinois law at issue in *McHenry County*, HB9 merely provides that New Mexico and its political subdivisions may not enter into agreements with the federal government to detain individuals for federal civil immigration violations or assist in the investigation of such violations. N.M. Stat. §§ 13-9-3, 13-9-4. It matters not that HB9 "appl[ies] solely to the area of civil immigration enforcement . . . while simultaneously permitting the same law enforcement activities for other purposes." Am. Compl. ¶ 127. As in *McHenry County*, the United States has not identified a proper comparator: The relevant question is whether HB9 treats federal actors who engage in civil immigration detention *worse* than state actors who engage in the same activities. HB9 does not; there are no state actors who engage in civil immigration detention, as the United States admits. *See* Am. Compl. ¶ 130 ("The Federal Government is the sole entity that is tasked with the enforcement of federal immigration law."); *see also Arizona v. United States*, 567 U.S. 387, 408 (2012) ("Federal law specifies limited circumstances in

18

which state officers may perform the functions of an immigration officer.").

Finally, any other conclusion would violate the anticommandeering doctrine, which prevents the federal government from "issu[ing] orders directly to the States," *Murphy*, 584 U.S. at 470, and from "command[ing] the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program," *Printz*, 521 U.S. at 935. Yet that is exactly what the United States's position here would do: it would *require* New Mexico (or its political subdivisions) to participate in the detention or investigation of noncitizens accused of violating federal immigration law. The Constitution does not allow that result. *See California*, 921 F.3d at 891 (it "would be inconsistent with the Tenth Amendment and the anticommandeering rule" to conclude that state laws restricting state cooperation in federal immigration enforcement violate principles of intergovernmental immunity).

## III.    HB9 Does Not Violate the Contract Clause

In Count IV, the United States alleges that HB9 violates the Contract Clause by "impair[ing] existing contracts between local governmental entities in New Mexico and the Federal Government concerning the detention of aliens and enforcement of federal immigration laws." Am. Compl. ¶¶ 195, 200. This claim fails for several reasons.

### A.  The Contract Clause Does Not Apply to HB9

The Contract Clause provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Despite its "facially absolute" language, the Supreme Court has long held that the Clause's "prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934)). Based on that principle, "the contracts which the Constitution protects are those that relate to property rights, not governmental." *Stone v. Mississippi*, 101 U.S. 814, 820 (1879). The "police power" is "among

19

those" that cannot be "contracted away." *U.S. Tr.*, 431 U.S. at 24. Put simply, "states cannot by virtue of the contract clause be held to have divested themselves by contract of the right to exert their governmental authority." *Contributors*, 245 U.S. at 23; *see also U.S. Tr.*, 431 U.S. at 22 ("One whose rights . . . are subject to state restriction, cannot remove them from the power of the State by making a contract about them." (quoting *Hudson Cnty. Water Co. v. McCarter*, 209 U.S. 349, 357 (1908))).

In *Stone*, for example, the Supreme Court held that Mississippi did not violate the Contract Clause by adopting a constitutional provision prohibiting state lotteries, even though the provision had the effect of invalidating a charter that the legislature had previously granted to a private company to operate a lottery for 25 years. 101 U.S. at 817–19. Because "the right to suppress" or permit a lottery is "governmental" in nature, the Court held that "[a]ny one . . . who accepts a lottery charter does so with the implied understanding that the people, in their sovereign capacity, and through their properly constituted agencies, may [withdraw] it any time when the public good shall require." *Stone*, 101 U.S. at 821. Similarly, in *Boston Beer Co. v. Massachusetts*, 97 U.S. 25 (1877), the Court held that Massachusetts did not violate the Contract Clause by banning the sale of malt liquor after the legislature had previously granted a charter to a company to produce the same. *Id.* at 29, 32.

The same principle governs here. Through HB9, New Mexico exercised its sovereign "governmental authority" to withhold the assistance of the State and its political subdivisions for federal immigration enforcement. *Contributors*, 245 U.S. at 23. Indeed, the anticommandeering doctrine guarantees New Mexico the right to refuse to "administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935; *see also supra* pp. 13–14. And setting State and local law enforcement priorities is at the very heart of New Mexico's exercise of its "police power." *U.S. Tr.*, 431 U.S. at 24; *see also California ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1029 (N.D. Cal. 2018) ("The State has broad

police powers reserved to it under the Constitution to determine its local policies and enforcement priorities pursuant to the Tenth Amendment."); *Romero v. United States*, 883 F. Supp. 1076, 1087 (W.D. La. 1994) ("[T]he ability to control its law enforcement officers, methods of law enforcement and law enforcement funding priorities are necessary elements of any sovereign's ability to maintain public order."). Prior to HB9, New Mexico did not expressly prohibit public bodies from entering into contracts to engage in such conduct. But any that did so had an "implied understanding that the people, in their sovereign capacity," could later choose to prohibit such contracts. *Stone*, 101 U.S. at 821. If a contract was no obstacle to Mississippi banning lotteries or Massachusetts banning malt liquor, then a contract is no obstacle to HB9. Any contract invalidated by HB9 was "good as against existing laws, but subject to future legislative . . . control and withdrawal." *Id.*

That HB9 regulates local governments does not alter the analysis. On the contrary, that only weakens the United States's claim. "The power of the state, unrestrained by the contract clause . . . , over the rights and property of [political subdivisions] held and used for 'governmental purposes' cannot be questioned." *City of Trenton*, 262 U.S. at 188. That is because a political subdivision is but a "creature of the state" whose "local powers of government" the state may "withdraw . . . at pleasure." *City of Worcester v. Worcester Consol. St. Ry. Co.*, 196 U.S. 539, 549 (1905) (citation omitted). If the New Mexico Legislature cannot "divest[]" itself by contract of its "right to exert [its] governmental authority" over public bodies' participation in federal immigration enforcement, then surely local governments cannot tie the Legislature's hands. *Contributors*, 245 U.S. at 23.

To be sure, not all legislative acts are immune from the Contract Clause's protections. Although a State cannot contract away its "police power," it can "bind itself in the future exercise of the taxing and spending powers." *U.S. Tr.*, 431 U.S. at 24. The Contract Clause thus does apply to a

State's "financial contracts"—but only those that are "purely financial." *Id.* at 25. The mere presence of financial terms does not render a legislative act subject to the Contract Clause. As the Supreme Court has stressed, "a revenue bond might be secured by the State's promise to continue operating" a facility; "yet such a promise surely could not validly be construed to bind the State never to close the facility for health or safety reasons." *Id.* HB9 cannot be characterized as regulating in a "purely financial" manner. *Id.* Its unmistakable focus is not fiscal; it is to withhold State and local assistance to federal immigration enforcement. The Contract Clause has nothing to say about that.

## B. The United States Identifies No Enforceable Contract that HB9 Impairs

Even if the Contract Clause applies to HB9, the United States identifies no enforceable contract that the statute impairs. The "threshold inquiry" under the Contract Clause, *Energy Rsrvs.*, 459 U.S. at 411, has three components: "[1] whether there is a contractual relationship, [2] whether a change in law impairs that contractual relationship, and [3] whether the impairment is substantial," *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992). The agreements referenced in the Amended Complaint are either not enforceable contracts or are not impaired by HB9.

### 1. The 2026 Otero-ICE IGSA Is Void as Contrary to Public Policy

The primary focus of the United States's Contract Clause claim is the 2026 Otero-ICE IGSA. That agreement provides no basis for a Contract Clause claim because it is void as contrary to public policy. *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1149 (9th Cir. 2004) (rejecting a Contract Clause claim to the extent that it relied on an implied term that "would be void as against public policy"). Under New Mexico law, "contracts are void as being contrary to public policy, when they are clearly contrary to what the legislature or judicial decision has declared to be the public policy." *First Baptist Church of Roswell v. Yates Petrol. Corp.*, 2015-NMSC-004, ¶ 12, 345 P.3d 310, 313 (internal quotation

22

marks, citation, and brackets omitted). The 2026 Otero-ICE IGSA fits that standard to a tee.

Governor Lujan Grisham signed HB9 into law on February 5, 2026, to take effect on May 20, 2026. HB9 explicitly establishes a public policy against public bodies "enter[ing] into, extend[ing], renew[ing] or otherwise agree[ing] to be a party to an agreement to detain individuals for federal civil immigration violations." N.M. Stat. 13-9-3(A). The 2026 IGSA does precisely what HB9 prohibits. *See* 2026 Otero-ICE IGSA, p.1 (stating that IGSA is "for the detention and care of detained noncitizens").

That HB9 had not taken effect when the 2026 Otero-ICE IGSA was executed is of no moment. *See* 2026 ICE-Otero IGSA, p.3. By adopting HB9 more than a month earlier, the Legislature had already "declared" New Mexico's "public policy" to prohibit public bodies from entering into contracts to provide immigration detention. *First Baptist*, 2015-NMSC-004, ¶ 12. An enacted statute can establish a sovereign's public policy even if it is not yet effective. *Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th 124, 157–58 (2d Cir. 2025) (waiver provision in a loan-modification agreement held unenforceable as contrary to public policy because even if the law prohibiting such provisions was enacted but not yet effective at the time of the loan modification, the law was still "persuasive authority" establishing a "clear expression of a policy against waiving" racial discrimination claims in housing and lending transactions); *Ruiz v. ConAgra Foods Packaged Foods LLC*, 606 F. Supp. 3d 881, 889 (E.D. Wis. 2022) (in conducting a public policy analysis, the court was required to "take heed of the fact" that the Wisconsin legislature had enacted a statute shielding businesses from liability for coronavirus exposure even though the law took effect one day after the plaintiff initiated the lawsuit); *cf. Davis v. Savage*, 1946-NMSC-011, ¶ 42, 50 N.M. 30, 43 (power of sale in a mortgage held unenforceable as contrary to public policy because it was "within the spirit" of a subsequent intervening statute prohibiting such provisions).

23

Moreover, in determining whether a contract is void as against public policy, courts take into account "the seriousness of any misconduct involved and the extent to which it was deliberate." Restatement (Second) of Contracts § 178(3)(c). Otero County and ICE committed misconduct by drafting the 2026 IGSA in a transparent attempt to circumvent HB9. As detailed above, *see supra* p. 5, before HB9's predecessor was introduced in the 2025 legislative session, each of the agreements between ICE and Otero County allowed either party to unilaterally terminate the agreement. *See* 2014 Otero-ICE IGSA, art. 8; 2008 Otero-ICE IGSA, art. VII. After HB9's predecessor gained significant support—it was adopted by the House of Representatives but not the Senate during the 2025 session—Otero County and ICE changed the terms of their existing agreement, removing the County's authority to terminate the contract while preserving ICE's ability to do so. *See* Amendment 46 to the 2014 Otero-ICE IGSA. The parties incorporated the same term into the 2026 Otero-ICE IGSA—which was executed after HB9 was signed, but before it became effective. *See* 2026 Otero-ICE IGSA, art. 14(B). Had the 2026 Otero-ICE IGSA provided the same or similar termination provisions that were in the 2014 or 2008 IGSAs, HB9 would have required the agreement's termination. *See* N.M. Stat. § 13-9-3(B) (existing detention contracts inconsistent with HB9 must be terminated "upon the earliest date permissible under the terms of the agreement"). This Court should not sanction this brazen effort to thwart New Mexico's sovereign authority.[17]

### 2. Other Agreements

In addition to the 2026 Otero-ICE IGSA, the Amended Complaint also references other agreements in passing—specifically, the Otero-MTC Contract and 287(g) agreements between the

---

[17] Indeed, of the over 600 detention facility contracts or modifications in ICE's FOIA library spanning 8 years, Defendants could not identify *any* besides the Otero-ICE IGSA that grants ICE exclusive, unilateral termination authority. *See* ICE, FOIA ICE Library, https://perma.cc/6FVC-EEYY (last visited June 8, 2026).

Torrance and Curry County Sheriff's Offices and ICE. *See, e.g.*, Am. Compl. ¶¶ 195, 200. The United States's Contract Clause claim is no stronger with regard to any of those agreements. The Torrance and Curry County 287(g) agreements are not contracts at all. "For a contract to be legally valid and enforceable, it 'must be factually supported by an offer, an acceptance, consideration, and mutual assent.'" *Flemma v. Halliburton Energy Servs., Inc.*, 2013-NMSC-022, ¶ 28, 303 P.3d 814, 822 (quoting *Garcia v. Middle Rio Grande Conservancy Dist.*, 1996-NMSC-029, ¶ 9, 121 N.M. 728, 731). "Under general New Mexico contract law, an agreement that is subject to unilateral modification *or revocation* is illusory and unenforceable." *Salazar v. Citadel Comm'cns Corp.*, 2004-NMSC-013, ¶ 9, 135 N.M. 447, 450 (emphasis added). The 287(g) agreements provide no consideration to the counties. The sheriff's offices that assist with federal immigration enforcement pursuant to such agreements do so on their own dime and get nothing of value in return. *See generally* Torrance Cnty. 287(g); Curry Cnty. 287(g). And either side can unilaterally terminate the 287(g) agreements for any reason or no reason at all. Torrance Cnty. 287(g), § VIII; Curry Cnty. 287(g), § VIII. What's more, each agreement expressly provides that it "is not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any person." Torrance Cnty. 287(g), § VIII; Curry Cnty. 287(g), § VIII. Thus, by their own terms, the 287(g) agreements are nothing more than "illusory and unenforceable" promises. *Salazar*, 2004-NMSC-013, ¶ 9, 135 N.M. at 450.

In contrast, the Otero-MTC Contract is enforceable, but its terms allow either party to "terminate . . . for Cause," which it expressly defines to include "the passing of any state or federal legislation that prevents the County or any User Agency from continuing to contract the operation of . . . OCPC to MTC as a private contractor." Otero-MTC Contract, § IV.D.1. The contract thus fully anticipates and allows for termination to the extent that HB9 requires it.

25

### C. HB9 Would Survive Any Review Under the Contract Clause

Even if a statute substantially impairs a contract—which HB9 does not—there is no Contract Clause violation if the law is "reasonable and necessary to serve an important public purpose." *U.S. Tr.*, 431 U.S. at 25. HB9 ensures that State and local concerns—rather than the federal immigration agenda—are the law enforcement priority in New Mexico, which assuredly is an "important public purpose." *Id.* And requiring public bodies to terminate existing contracts that are inconsistent with that prioritization is a "reasonable and necessary measure" to effectuate that policy, *id.*, especially when it comes to political subdivisions that are "creature[s] of the state," *City of Worcester*, 196 U.S. at 549.

### D. The Contract Clause Provides No Basis for Any Facial Challenge

In all events, a facial challenge to HB9 cannot be premised on the Contract Clause. The United States's Contract Clause claim is at least in part an as-applied challenge to HB9. Am. Coml. ¶ 200 (alleging that HB9 "is unconstitutional and invalid under the Contract Clause, *particularly* as applied to" the Otero-ICE IGSA, Otero-MTC Contract, and the Torrance and Curry County 287(g) agreements (emphasis added)). But to the extent that the claim also facially challenges HB9, it fails.

Facial challenges are "disfavored," *Moody v. NetChoice, LLC*, 603 U.S. 707, 717, 743–44 (2024), and are "the most difficult challenge to mount successfully," *United States v. Salerno*, 481 U.S. 739, 745 (1987). Because there is no "'overbreadth' doctrine outside the limited context of the First Amendment," a facial challenge "must establish that no set of circumstances exists under which the [law] would be valid." *Id.* The United States does not come close to satisfying that standard.

The United States's baseless objections to HB9's effect on *existing* contractual relationships do not call into question the law's validity *going forward*. Attempting to justify its facial challenge, the United States alleges that "HB9 . . . impairs and disrupts the Federal Government's ability to freely contract with local government entities in New Mexico" in the future. Am. Compl. ¶ 196. But that is not how

26

the Contract Clause works. As the Supreme Court long ago recognized in ending the maligned *Lochner* era, "[t]he Constitution does not speak of freedom of contract." *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391 (1937). The Supreme Court's Contract Clause cases have thus long recognized that a "statute cannot be said to impair a contract that did not exist at the time of its enactment." *Texaco, Inc. v. Short*, 454 U.S. 516, 531 (1982); *see also Edwards v. Kearzey*, 96 U.S. 595, 603 (1877) ("It is only those [contracts] in existence when the hostile law is passed that are protected from its effect."). Accordingly, even if the United States is correct about HB9's impairment of any existing contracts, it has failed to establish any basis for invalidating the statute as a whole; there are a plethora of circumstances—*i.e.*, any future contract that might be contemplated—where the statute would not, and could not, violate the Contract Clause. *See Salerno*, 481 U.S. at 745–46.

Whatever this Court's view of HB9's validity as applied to any contract currently in force, any facial Contract Clause claim must be dismissed.

## CONCLUSION

This Court should grant the State's motion to dismiss.

July 6, 2026                                          Respectfully submitted,


*/s/ Bailey Colfax*


Raúl Torrez                                          Jonathan L. Backer*
Attorney General                                    Mary B. McCord*
Anjana Samant                                       Rupa Bhattacharyya
Deputy Counsel                                      INSTITUTE FOR CONSTITUTIONAL ADVOCACY
Amy Senier                                          AND PROTECTION
Senior Counsel                                      GEORGETOWN LAW
Bailey Colfax                                       600 New Jersey Ave. NW
Assistant Attorney General                          Washington, DC 20001
NEW MEXICO DEPARTMENT OF JUSTICE                     (202) 661-6671
408 Galisteo Street                                 (202) 661-6730 (fax)
Santa Fe, NM 87501                                  jb2845@georgetown.edu
(505) 490-4060                                       mbm7@georgetown.edu
asamant@nmdoj.gov                                   rupa.bhattacharyya@georgetown.edu
asenier@nmdoj.gov
bcolfax@nmdoj.gov

*Counsel for Defendants State of New Mexico and Attorney General Raúl Torrez*


*Admitted pro hac vice*

28

## CERTIFICATE OF SERVICE

I hereby certify that, on July 6, 2026, I electronically filed the foregoing with the Clerk of the Court and served a copy upon all counsel of record registered to receive notice via the Court's CM/ECF system.

/s/ Bailey Colfax
Bailey Colfax