**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

|  |  |  |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:26-cv-01471-KG-LF |
| | ) | |
| v. | ) | **ORAL ARGUMENT** |
| | ) | **REQUESTED** |
| THE STATE OF NEW MEXICO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**CITY OF ALBUQUERQUE AND MAYOR TIMOTHY KELLER'S
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION......................................................................................................................1

BACKGROUND ......................................................................................................................3

    I.      The Safer Community Places Ordinance................................................................3

        A.       Restrictions on the use of City property and resources....................................4

        B.       Designated Safer Community Places and the Ordinance's consent provision ..5

        C.       Worker-notice requirements ............................................................................5

        D.       The United States' challenge ...........................................................................6

LEGAL STANDARD ...............................................................................................................6

ARGUMENT............................................................................................................................8

    I.      Albuquerque's Ordinance is not preempted by federal law.........................................8

        A.       The FAC pleads no conflict with the text of federal law, and the presumption against preemption confirms that failure is real.............................................8

        B.       The Ordinance does not conflict with the INA, because the INA makes local cooperation optional...........................................................................................10

        C.       The Ordinance is no more preempted by 6 U.S.C. § 112(b)(2) than by the INA.    ………………………………………………………………………………..11

        D.       Recasting the Ordinance as an "obstacle" to enforcement does not establish preemption either. ........................................................................................12

        E.       The United States' preemption theories also run headlong into the Tenth Amendment.....................................................................................................14

        F.       The Ordinance's limits on consent to warrantless entries and searches are not an obstacle to immigration enforcement...................................................15

            *1.*    *For non-public spaces, the consent restriction reflects ordinary Fourth Amendment limits on third-party consent.* .................................................15

            *2.*    *For student and patient records, Albuquerque's Ordinance aligns with FERPA, New Mexico law, and HIPAA.* .......................................................17

                a. For student records, the Ordinance's limits align with FERPA's................... 17

                b. For electronic medical records, Albuquerque's Ordinance's limits align with New Mexico law. ....................................................................................... 17

                c. HIPAA permits—and preserves—the Ordinance's protections for health records.............................................................................................. 18

        G.       Albuquerque's Ordinance's employee notice provision is ordinary labor regulation that conflicts with no federal law.................................................18

    II.    The United States' facial challenge fails because the provisions of Albuquerque's Ordinance that it challenges are valid in their core applications. ............................20

    III.    Albuquerque's Ordinance does not violate intergovernmental immunity...................21

i

**A.** Albuquerque's Ordinance does not directly regulate the federal government. ..........................................................................................................21

**B.** Albuquerque's Ordinance does not discriminate against the federal government. ..........................................................................................................22

    *1.* *Albuquerque's Ordinance's consent provision does not discriminate against the federal government.*........................................................................23

    *2.* *The Ordinance's worker-notice provision does not discriminate against the federal government.* ........................................................................25

**C.** That a law addressed to immigration enforcement falls, as a descriptive matter, on federal actors does not make it discriminatory. .................................25

IV. Merits aside, the United States lacks standing to challenge § 13-17-6(C). .................26

V. The official-capacity claims against Mayor Keller are duplicative and should be dismissed..................................................................................................................26

VI. Any relief must respect the Ordinance's severability clause. ......................................27

**CONCLUSION** ....................................................................................................................**27**

Pursuant to Federal Rule of Civil Procedures 12(b)(1) and 12(b)(6), Defendants the City of Albuquerque and Timothy Keller, in his official capacity as Mayor, move to dismiss the United States' First Amended Complaint. Albuquerque and Mayor Keller also respectfully request oral argument. The United States opposes this Motion. *See* D.N.M.LR-Civ. 7.1(a).

## INTRODUCTION

With its First Amended Complaint ("FAC"), the United States seeks to invalidate Albuquerque's Safer Community Places Ordinance as both preempted by federal law and a violation of intergovernmental immunity. But the FAC pleads none of the things those theories require. It identifies no federal law commanding Albuquerque to assist in federal immigration enforcement. It pleads no federal command that Albuquerque's Ordinance contradicts. It identifies no directive to any federal officer and no instance in which Albuquerque's Ordinance treats the United States worse than a similarly situated state or local actor. What it alleges is only that the Ordinance makes federal immigration enforcement in Albuquerque less convenient and perhaps more costly. Even if true, that is not a legal wrong; it is the price of choices Congress made.

Congress invited state and local cooperation with immigration enforcement. It did not command such cooperation. It made cooperation optional. That was no accident: the Tenth Amendment's anticommandeering principle forbids Congress from demanding cooperation. By passing its ordinance, Albuquerque frustrated no federal command or purpose. It exercised the very option Congress left open to it, an option the Tenth Amendment required Congress to preserve. That is why courts across the country have rejected the United States' attempts to recast

1

Congress' choice as preemption or localities' exercise of their Tenth Amendment right as regulating or discriminating against the federal government.[1]

Yet with its FAC, the United States tries again here. And it fails for the same reason it has failed before: the Constitution entrusts the federal government with enforcing federal law; it does not force state and local governments to help. Nothing in the FAC gives this court a reason to break with the courts that have rejected these claims before. *See* note 1.

Count I of the FAC asserts that Albuquerque's Ordinance is preempted by federal law. FAC ¶¶ 164–173. It fails because preemption—in all its forms—requires a conflict between federal and local law, and here there is none. The Ordinance does not stop federal officers from enforcing federal law, executing judicial warrants, obtaining judicial subpoenas, or using federal facilities and contractors. It does only what federal law leaves Albuquerque free to do: decline to volunteer its own resources and direct local institutions to withhold consent the law does not require them to give.

Counts II and III invoke intergovernmental immunity. FAC ¶¶ 174–190. They fail because Albuquerque's Ordinance neither regulates nor discriminates against the federal government. It commands no federal officer. And it singles out no one: it limits assistance by the City and specifically enumerated non-City entities from one single activity—civil immigration

---

[1] *See, e.g.*, *McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022); *United States v. California*, 921 F.3d 865 (9th Cir. 2019); *United States v. City of Los Angeles*, No. CV 25-5917 FMO, 2026 WL 1790971 (C.D. Cal. June 20, 2026); *United States v. Colorado*, No. 25-cv-01391-GPG-KAS, 2026 WL 878882 (D. Colo. Mar. 31, 2026); *United States v. New York*, 814 F. Supp. 3d 266 (N.D.N.Y. 2025); *United States v. New York*, 810 F. Supp. 3d 329 (N.D.N.Y. 2025); *United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025); *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355 (D.N.J. 2020), *aff'd sub nom. Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, 8 F.4th 176 (3d Cir. 2021).

enforcement—whoever performs it, while leaving federal agents free to seek City and non-City cooperation for every other federal purpose.

The United States' theory proves too much. Taken to its logical end, it would render any local law preempted, or an affront to intergovernmental immunity, the moment the law makes federal enforcement less convenient or more costly. But neither the Constitution nor the INA requires local governments to maximize federal efficiency. Instead, they both leave States and their subdivisions free to decide how to deploy their property and personnel, how to protect their workers, and how to safeguard access to their communities' hospitals, shelters, and schools. The United States may think Albuquerque chose unwisely. If so, that is an argument for Congress, not a claim for this Court. The FAC comes nowhere near pleading the clear and manifest congressional purpose required to displace Albuquerque's historic police powers.

The FAC's remaining defects are quickly stated. The official-capacity claims against Mayor Keller merely duplicate the claims against the City. And the prayer to invalidate the Ordinance in its entirety founders on the Ordinance's severability clause. Separately, as to the Ordinance's Section 13-17-6(C) specifically, the United States lacks standing to challenge it at all: the FAC identifies no concrete, particularized injury flowing from that provision.

As to Albuquerque and Mayor Keller, Counts I, II, and III—the only counts against them—should be dismissed with prejudice.

## BACKGROUND

### I.    The Safer Community Places Ordinance

Albuquerque's Safer Community Places Ordinance—No. O.2026.009, codified at ROA 1994 §§ 5-1-5 and 13-17-1 *et seq.*—took effect in March 2026. It is an exercise of the City's home-rule authority over its own property, its personnel, and institutions within its borders. *See* N.M.

3

Const. art. X, § 6. The Ordinance also continues Albuquerque's longstanding municipal commitment to its immigrant residents, reflected in an earlier Immigrant Family Resolution, R-18-7.

Albuquerque's Ordinance has three core functions: (1) prohibiting use of City property and resources for immigration enforcement; (2) directing the implementation of policies to prohibit hospitals, schools, libraries, shelters, and other sensitive community spaces from voluntarily consenting to access to their non-public spaces without a judicial warrant or access to patient or student records without a judicial order; and (3) requiring notice to workers of I-9 inspections and immigration-enforcement activity in their workplaces. These provisions are directed to local actors, not federal officers. The full text of Albuquerque's Ordinance is included as Exhibit B to the FAC.

**A.    Restrictions on the use of City property and resources**

Chapter 5, Article I of the Ordinance preserves City property and resources for City use rather than immigration enforcement. First, under that Article, no City-owned or City-operated structure or venue "shall be used for immigration enforcement purposes, including as a staging area, processing location, or operations base." § 5-1-5(A). To implement that prohibition, the Ordinance directs City departments to identify City sites that have been or are likely to be used for those purposes, to post signage stating that they may not be, and to secure them. § 5-1-5(B)(1)–(2). City employees who learn of an attempted or actual prohibited use must report it up the chain to the Mayor and City Attorney. § 5-1-5(B)(3).

Second, the City and its employees, contractors, and agents may not approve a permit, contract, or agreement for the use of City property or resources when they reasonably believe the property will facilitate immigration enforcement. § 5-1-5(B)(4).

4

Third, the Ordinance bars use of City resources—"moneys, equipment, personnel, vehicles, or facilities"—to transport individuals for immigration-enforcement purposes or facilitate custody transfers to federal authorities, absent a valid judicial warrant or court order. § 5-1-5(B)(5)–(6). These provisions govern what Albuquerque will do with its own resources. None regulate what federal agents may do with theirs.

**B.    Designated Safer Community Places and the Ordinance's consent provision**

Chapter 13, Article 17 designates a limited set of locations as "Safer Community Places"— among them hospitals and other healthcare facilities, schools and places where children gather, residential shelters and community resource centers, libraries and cultural centers, courthouses, public-transit facilities, City-owned and operated facilities, and places where City services are delivered. § 13-17-3.

For those locations, the Ordinance directs the City to adopt policies prohibiting their owners and operators from voluntarily consenting to let immigration-enforcement agents enter non-public areas or access, review, or obtain student or patient records. § 13-17-4(A). This provision is narrow. It does not prevent compliance with a valid judicial warrant, subpoena, or court order; and it does not reach public spaces. In addition, it permits entry into non-public areas under exigent circumstances—such as an imminent threat of bodily harm or hot pursuit of a suspect who has fled into a private area. § 13-17-4(A)(a)–(b). This consent provision thus reaches only voluntary access to non-public spaces, and it leaves every avenue of judicial process untouched.

**C.    Worker-notice requirements**

Chapter 13, Article 17-6 also creates worker-notification rights. Employers must notify current employees, within 24 hours, of any inspection by a government agency of I-9 Employment Eligibility Verification forms or other employment records, except as federal law otherwise

requires. § 13-17-6(A). If an inspection produces a finding that an employee's documents do not establish work authorization, the employer must notify that employee of the finding, the time to correct any deficiency, and the right to representation. § 13-17-6(B). And if a law-enforcement agent engaged in or supporting immigration enforcement is present at a workplace other than for an I-9 inspection, the employer must notify workers, within 24 hours, of the agency's name and the date of its presence. § 13-17-6(C).[2] Each notice runs to workers after the event it reports. None imposes any obligation on a federal officer.

### D.    The United States' challenge

The FAC alleges that Albuquerque's Ordinance is preempted (Count I), unlawfully regulates the federal government (Count II), and unlawfully discriminates against the federal government (Count III). The United States brings these claims as a facial challenge; seeking to invalidate the Ordinance in full, including provisions the FAC never mentions, before any of them have been applied. And the FAC also alleges that DHS "will not comply with" Albuquerque's Ordinance. FAC ¶ 154.

### LEGAL STANDARD

Before reaching the merits, the Court must first determine whether the United States has standing to bring each claim. To establish standing, a plaintiff must show an injury in fact that is concrete and particularized, a causal connection between that injury and the challenged conduct, and a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of*

---

[2] Only subsection (C) of § 13-17-6 is challenged in the FAC. FAC ¶¶ 7, 93, 116, 171. While Paragraph 131 of the FAC cites the entire worker notification provision, every other allegation in the FAC targets only the last prong. To the extent the United States intended to challenge the worker notification provision more broadly, such an effort fails for the same reasons as its specific challenge to § 13-17-6(C) but also because the FAC utterly fails to provide notice of a more expansive claim.

6

*Wildlife*, 504 U.S. 555, 560–61 (1992). Motions to dismiss for lack of standing are "properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Hernandez v. Grisham*, 499 F. Supp. 3d 1013, 1047 (D.N.M. 2020) (citing *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007)).

On the merits, a Rule 12(b)(6) motion tests the legal sufficiency of the complaint, accepting well-pleaded facts as true and drawing reasonable inferences in the pleader's favor. *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013). That presumption does not extend to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

A complaint pleading a facial challenge to a law or ordinance is legally sufficient only if it plausibly pleads that the challenged provision is unconstitutional in all—or at a minimum, all its most obvious—applications. *Doe v. Bonta*, 650 F. Supp. 3d 1062, 1069 (S.D. Cal. 2023) ("For a facial challenge to survive a motion to dismiss, the complaint must establish that no set of circumstances exists under which the statute would be valid,' *i.e.*, that the statute is unconstitutional in all of its applications." (citation omitted)), *aff'd*, 101 F.4th 633 (9th Cir. 2024); *Lightfoot v. D.C.*, No. CIV.A.01 1484 CKK, 2007 WL 1087474, at *1 (D.D.C. Apr. 10, 2007) ("Plaintiffs have not met their 'heavy burden' under *United States v. Salerno*, 481 U.S. 739 (1987), of establishing that 'no set of circumstances exists under which the [Act] would be valid.' As such, the Court shall dismiss Claim One of the Third Amended Complaint." (citation modified)); *Diaz v. Pataki,* 368 F. Supp. 2d 265, 274 (S.D.N.Y. 2005) ("To plead adequately a facial challenge to the constitutionality of a statute, the plaintiff must allege facts that, if proven, would establish that no set of circumstances exists under which the challenged Act would be valid." (citation omitted)), *aff'd sub nom. Diaz v. Paterson,* 547 F.3d 88 (2d Cir. 2008).

**ARGUMENT**

**I.     Albuquerque's Ordinance is not preempted by federal law.**

Count I, which alleges that the Ordinance is preempted by federal law, fails at the threshold. Preemption takes three forms: express preemption, where Congress states its preemptive intent in the statute's text; field preemption, where federal regulation is so pervasive that it leaves no room for the States; and conflict preemption, where compliance with both laws is impossible or the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 398–400 (2012); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000). However framed, every theory "work[s] in the same way": each requires a federal law with which the challenged local law actually conflicts. *Murphy v. NCAA*, 584 U.S. 453, 477 (2018).

The FAC pleads only conflict preemption. It identifies no express preemption provision in any statute it invokes, and it does not allege that federal immigration regulation so dominates the field as to displace all state and local law. So this case reduces to a single question: does Albuquerque's Ordinance conflict with federal law? It does not. No federal law commands the cooperation the Ordinance withholds, and declining optional cooperation obstructs nothing. The presumption against preemption only confirms the point: courts must "assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona*, 567 U.S. at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

>        **A.     The FAC pleads no conflict with the text of federal law, and the presumption against preemption confirms that failure is real.**

As a threshold principle, preemption is not an inquiry into whether federal officials would prefer more local cooperation or whether local law makes federal enforcement less convenient. Preemption requires a conflict between federal law and the challenged state or local law. And because "the purpose of Congress is the ultimate touchstone in every pre-emption case," that conflict must be grounded in the words Congress enacted, not in enforcement preferences a later Executive wishes Congress had enacted. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted). The Supreme Court has been clear: to show preemption, "a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality opinion).

Furthermore, Courts presume that Congress does not preempt laws exercising traditional state and local police powers unless Congress makes that purpose "clear and manifest." *Arizona v. United States*, 567 U.S. 387, 400 (2012) (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 605 (1991). That presumption applies here. Albuquerque's Ordinance governs use of Albuquerque's own resources and personnel, regulates workplace notice for local employers and employees, and safeguards health, safety, the protection of residents' privacy, and educational institutions within the City's borders—classic exercises of local police power. *DeCanas v. Bica*, 424 U.S. 351, 356 (1976) (broad authority under police power to regulate the employment relationship); *Gonzales v. Oregon*, 546 U.S. 243, 270 (local latitude under police powers to regulate medical profession); *Milliken v. Bradley*, 418 U.S. 717, 741 (1974) (deeply rooted history of local control over the operation of schools); *Ass'n of Cmty. Orgs. for Reform Now v. Town of East Greenwich,* 453 F. Supp. 2d 394, 402 (D.R.I. 2006) (recognizing the municipal interest in privacy protection and citing cases). These principles defeat Count I. The United States identifies no constitutional text or federal statute that commands

9

Albuquerque to provide the cooperation the Ordinance withholds, much less the clear and manifest congressional purpose required to displace Albuquerque's exercise of local police authority.

### B. The Ordinance does not conflict with the INA, because the INA makes local cooperation optional.

The crux of the United States' preemption theory is that the Immigration and Nationality Act built an enforcement scheme that depends on state and local cooperation, which Congress hoped for or expected. FAC ¶¶ 58–60. And Congress may well have hoped for or expected that cooperation. But states and localities "are not bound by [Congress's] hope or expectation," *McHenry Cnty. v. Raoul,* 44 F.4th 581, 592 (7th Cir. 2022). Rather, preemption must rest on "a constitutional text or a federal statute" expressing a clear and manifest intent to displace local law. *Va. Uranium*, 587 U.S. at 767. The FAC identifies no such text.

The FAC invokes three INA provisions—8 U.S.C. §§ 1357(g), 1103(a)(11)(B), and 1231(g)—as support for preemption. *See* FAC ¶¶ 115–16, 125, 166, 170–71. None supports it. Section 1357(g) authorizes so-called 287(g) agreements with local jurisdictions but expressly provides that "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement." 8 U.S.C. § 1357(g)(9). Section 1103(a)(11)(B) authorizes "cooperative agreement[s]" with state and local agencies, but it operates only where a locality agrees to enter one. 8 U.S.C. § 1103(a)(11)(B). Simply put, both provisions invite local participation, but neither commands it. *See McHenry Cnty.*, 44 F.4th at 589 ("Section 1103(a)(11)(B) thus contemplates discretionary and voluntary choices by States or local entities to assist the federal government with immigration detention, or not. It simply does not command that they do so.").

Through its Ordinance, Albuquerque declined the INA's invitations to voluntarily participate in immigration enforcement. That creates no conflict. As other courts have made clear,

10

"[i]t would make no sense to hold that a federal statute premised on State cooperation preempts a State law withholding that cooperation." *McHenry Cnty.*, 44 F.4th at 592. In short, "[d]eclining an option offered by a federal statute cannot create a conflict for preemption purposes." *United States v. Illinois*, 796 F. Supp. 3d 494, 529 (N.D. Ill. 2025); *accord City of El Cenizo v. Texas*, 890 F.3d 164, 177–78 (5th Cir. 2018).

The third INA provision cited by the United States fares no better. Section 1231(g)(1) directs the Attorney General to "arrange for appropriate places of detention"; it commands no locality to provide anything. 8 U.S.C. § 1231(g)(1). Albuquerque's Ordinance does not prevent the federal government from arranging for detention facilities. Instead, it ensures only that City-owned properties are not conscripted for that purpose.[3]

These INA provisions demand nothing of Albuquerque. "Federal law provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities." *United States v. California*, 921 F.3d 865, 889 (9th Cir. 2019). The Ordinance therefore does not—and could not—conflict with them. *See City of El Cenizo*, 890 F.3d at 178 ("Federal law does not suggest the intent—let alone a 'clear and manifest' one—to prevent states [or counties or municipalities] from regulating *whether* … [they] cooperate in immigration enforcement.").

C.    **The Ordinance is no more preempted by 6 U.S.C. § 112(b)(2) than by the INA.**

The FAC also invokes 6 U.S.C. § 112(b)(2) as a source of preemption. FAC ¶ 169. Not so. Section 112(b)(2) is a procurement authorization. It authorizes the DHS Secretary to make the contracts and cooperative agreements needed to carry out the Department's responsibilities. It does

---

[3] Immigration authority formerly exercised by the Attorney General now belongs largely to the Secretary of Homeland Security. *See* 6 U.S.C. § 251; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

11

not require any state or local government to accept a contract, enter an agreement, or make property available for federal use.[4]

Reading § 112(b)(2) otherwise would turn every federal procurement statute into a commandeering mandate. It would strip local governments of their settled power to decline to contract with the federal government. It would convert authorization for federal contracting into a command that local governments supply what federal officials want. The Tenth Amendment forbids that result. *See Printz v. United States*, 521 U.S. 898, 935 (1997).

**D.    Recasting the Ordinance as an "obstacle" to enforcement does not establish preemption either.**

Nor does the United States save Count I by recasting its theory as obstacle preemption. *See, e.g.*, FAC ¶ 12. Obstacle preemption is a species of conflict preemption, and it requires a concrete obstruction of a federal objective grounded in statutory text. *Va. Uranium*, 587 U.S. at 767 . It does not arise merely because local law makes federal enforcement less convenient—least of all where, as here, Congress made local participation optional.

"[A] high threshold [thus] must be met" before a court may infer that local law is preempted as an obstacle to federal purposes. *Chamber of Com. of the U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (citation omitted). That threshold is not met by invoking a "brooding federal interest" in more convenient or efficient enforcement. *Va. Uranium*, 587 U.S. at 767. Obstacle preemption arises only "if the purpose of the [federal] act cannot otherwise be accomplished"—where a state or local law would frustrate the means Congress enacted, not merely the broader objective the Executive now prefers. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quoting

---

[4] *See* 6 U.S.C. § 112(b)(2) (authorizing the Secretary to "make contracts, grants, and cooperative agreements" to carry out the Department's functions).

*Hines v. Davidowitz*, 312 U.S. 52, 67 n.20 (1941)). That is not this case. Albuquerque's Ordinance forecloses no federal purpose; it forecloses only the government's preferred means of pursuing it. Federal officers thus remain free to enforce federal law with federal personnel, to enter non-public spaces and obtain records through judicial warrants and subpoenas, and to use federal facilities and contractors. No allegation in the FAC plausibly claims otherwise. Because every federal objective thus remains fully attainable, Albuquerque's Ordinance is no obstacle. *See California*, 921 F.3d at 890; *Illinois*, 796 F. Supp. 3d at 529–30. The FAC confirms as much, asserting that DHS "will not comply with" Albuquerque's Ordinance's restrictions, FAC ¶ 154, and will continue to "track and safely detain aliens," undercutting its own claim of harm. *Id.* ¶ 155.

At most, the FAC alleges that the United States may find its work more cumbersome or costly when Albuquerque declines to participate. *See, e.g.*, FAC ¶¶ 170, 172. But that is not preemption. It is the ordinary consequence of the optional scheme Congress built. "[T]he possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). It is not the direct, positive conflict obstacle preemption requires. *See Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 381–82 (D.N.J. 2020); *Illinois*, 796 F. Supp. 3d at 529.

Declining an option Congress made voluntary cannot obstruct the purpose Congress enacted for civil immigration enforcement: it carries out that purpose, since Congress's purpose was precisely to make that cooperation optional. If federal officials believe that purpose makes enforcement more difficult, their remedy lies with Congress, not with implied preemption. The implied preemption inquiry cannot be a "freewheeling" one "into whether a state statute is in tension with federal objectives," for that would "undercut the principle that it is Congress rather than the courts that pre-empts state law." *Whiting*, 563 U.S. at 607. Courts "should not assume the

13

role which our system assigns to Congress." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 223 (1983).

E.    **The United States' preemption theories also run headlong into the Tenth Amendment.**

Congress' decision to make local cooperation with federal immigration enforcement optional was no accident. Under the Tenth Amendment's anticommandeering principle, Congress may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Murphy*, 584 U.S. at 473 (quoting *Printz*, 521 U.S. at 935).

Treating Albuquerque's refusal to provide optional assistance as an unconstitutional "obstacle," as the FAC does, would convert the option Congress gave local governments into the mandate the Constitution forbids. Courts have therefore rejected that move. *See California*, 921 F.3d at 888 ("Even if SB 54 obstructs federal immigration enforcement, the United States' position that such obstruction is unlawful runs directly afoul of the Tenth Amendment and the anticommandeering rule."); *McHenry Cnty.*, 44 F.4th at 590–92; *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1059–60 (D. Colo. 2020).

The FAC complains that federal officers would need to enforce federal law with federal resources, federal facilities, federal contractors, and judicial process. That may be less convenient than Albuquerque's voluntary help. But inconvenience is not conflict, and the loss of optional cooperation is not preemption.[5]

---

[5] Finally, the statutes the United States invokes cannot preempt the Ordinance to the extent they regulate government conduct, not private actors. Preemption "is based on a federal law that regulates the conduct of private actors, not the States." *Murphy*, 584 U.S. at 479. Because the Constitution "confers upon Congress the power to regulate individuals, not States," only a federal law that "regulate[s] . . . private actors" can displace state or local law. *Id.* at 472, 477 (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)).

14

**F.    The Ordinance's limits on consent to warrantless entries and searches are not an obstacle to immigration enforcement.**

Albuquerque's Ordinance's consent provision does not obstruct federal immigration enforcement; it requires only that the City develop policies requiring judicial process that federal, state, and constitutional law already contemplate. Specifically, Section 13-17-4 directs the City to develop policies providing that covered institutions—"City owned or operated facilities" and certain non-City sensitive locations—require a judicial warrant, subpoena, or order before voluntarily allowing immigration agents to (1) enter non-public areas or (2) access student or patient records. That requirement creates no conflict with federal law.

As to the City's own spaces, the City has no obligation to cooperate with immigration enforcement, *see supra* Parts I.B, I.E, and federal law leaves it free to set the terms of access to its own spaces and to the third-party records in its possession. As to the non-public areas of any covered institutions, whether City-owned or privately-owned, the Ordinance instructs only that those institutions withhold consent they lack authority to give. And as to records, it instructs them to withhold what existing law does not require them to disclose, and in most instances forbids them to disclose, absent judicial process. In none of these cases does Albuquerque's Ordinance demand anything federal law does not already permit covered institutions to do.

**1.    For non-public spaces, the consent restriction reflects ordinary Fourth Amendment limits on third-party consent.**

The United States' challenge to Albuquerque's limits on consent to warrantless entry rests on a mistaken premise about third-party consent: that a building owner or operator may consent to a warrantless search of every space within it. Not so. The Supreme Court rejected that idea in *Chapman v. United States*, 365 U.S. 610 (1961), holding that a landlord could not consent to the warrantless entry of a tenant's home because allowing it would "reduce the [Fourth] Amendment

15

to a nullity." *Id.* at 615. Consent authority turns on "mutual use" and "joint access or control for most purposes," not bare title. *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974).

That principle matters here. For example, just as a landlord generally cannot consent to a search of a tenant's private space, *Chapman*, 365 U.S. 610, shelter staff generally cannot consent to a search of a resident's sleeping space, *see Prophete v. Acevedo-Smith*, 743 F. Supp. 3d 440 (E.D.N.Y. 2024); *Cmty. for Creative Non-Violence v. Unknown Agents of U.S. Marshals Serv.*, 791 F. Supp. 1 (D.D.C. 1992), and a hospital generally cannot consent to a warrantless search of a patient's room or effects, *see Jones v. State*, 648 So. 2d 669 (Fla. 1994). Hospitals and shelters are paradigmatic Safer Community Places, and their owners and operators routinely lack the consent authority the United States assumes they hold.

The administrative warrant ICE agents typically carry does not change the analysis. No cited INA provision requires a private facility to admit immigration agents to non-public space without a judicial warrant. And an immigration administrative warrant—Form I-200 or I-205—is not a judicial warrant: it is signed by an immigration officer, not a neutral magistrate, and does not authorize entry into constitutionally protected space over the objection of a person with authority to exclude. *See Kidd v. Mayorkas,* 734 F. Supp. 3d 967, 980 (C.D. Cal. 2024) ("[a]n administrative warrant is insufficient to enter the constitutionally protected areas of a home"); *Valencia-Cardenas v. Chestnut*, No. 26-cv-02073-DAD-SCR(HC), 2026 WL 785871, at *1 n.1 (E.D. Cal. Mar. 20, 2026) (citing *Kidd*). Albuquerque's Ordinance asks covered institutions to adhere to these Fourth Amendment principles and to insist on the judicial process. Far from directing defiance of federal authority, Albuquerque's Ordinance limits only the voluntary cooperation that no person or institution was ever obligated to give.

16

### 2. For student and patient records, Albuquerque's Ordinance aligns with FERPA, New Mexico law, and HIPAA.

Where Albuquerque's Ordinance limits non-City entities from disclosing third-party medical or student records, those limits are consistent with both federal and state privacy laws that already independently limit disclosure of those records.

### a. For student records, the Ordinance's limits align with FERPA's.

Under FERPA, institutions receiving federal funds may not disclose education records without consent, except under enumerated exceptions, and disclosure to law enforcement generally requires a judicial order or lawfully issued subpoena, with advance notice to the parent or student. *See* Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g(b)(1–2); 34 C.F.R. § 99.31(a)(9)(i). The Albuquerque Ordinance's designated Safer Community Places includes schools, which would have student records subject to FERPA. Section 13-17-4 directs schools to insist on judicial process before turning over student records. Thus, as to student records, the Ordinance tracks the principles behind FERPA, which are that student records are highly sensitive and third-parties in possession of such records cannot voluntarily turn those records over without some process. Even in the face of a lawful subpoena, the target of those records must receive notice and an opportunity to object.

### b. For electronic medical records, Albuquerque's Ordinance's limits align with New Mexico law.

New Mexico law independently forbids hospitals (which are designated Safer Community Places) and other health-care providers from disclosing patients' electronic medical records without patient consent, except as allowed by state or federal law. N.M. Stat. Ann. § 24-14B-6 (1978). The FAC identifies no state or federal law allowing release of those records to immigration officers on demand and without this consent required by New Mexico state law. *See id.*

17

### c. HIPAA permits—and preserves—the Ordinance's protections for health records.

The Health Insurance Portability and Accountability Act ("HIPAA") operates differently than FERPA and New Mexico law, but points in the same direction. HIPAA's Privacy Rule permits certain disclosures by covered health care providers to law enforcement, 45 C.F.R. § 164.512(f), but does not require them. A provider that declines to disclose violates nothing in HIPAA. But HIPAA sets a floor, not a ceiling: its preemption provision explicitly preserves state-law protections "more stringent" than the Rule, including rules that "prohibit[] or restrict[] a use or disclosure in circumstances under which such use or disclosure otherwise would be permitted." 45 C.F.R. §§ 160.202 (flush language), 160.203(b). Section 13-17-4 is such a rule: it restricts voluntary disclosures HIPAA might otherwise permit absent judicial process. HIPAA saves that rule; it does not preempt it.

Together, FERPA, New Mexico law, and HIPAA defeat the United States' implicit premise that an administrative subpoena or administrative warrant entitles its agents to student or patient records on demand. FERPA generally requires judicial process or a lawfully issued subpoena and notice for law-enforcement access to student records; New Mexico law bars disclosure of medical records absent patient authorization; and HIPAA permits but never compels disclosure, while preserving a locality's power to require more. An institution that insists on a judicial warrant or order is not obstructing federal enforcement. It is obeying federal and state law that governs these records.  Albuquerque's Ordinance directs Safer Community Places to do exactly that and conflicts with nothing.

### G. Albuquerque's Ordinance's employee notice provision is ordinary labor regulation that conflicts with no federal law.

Section 13-17-6(C) requires an employer to notify its workers, within 24 hours, that an immigration-enforcement agent was present at the workplace. The United States asserts that this

18

provision conflicts with federal law and is therefore preempted. FAC ¶ 116. Specifically, it claims the provision "mandate[s] harboring and shielding of aliens" in violation of 8 U.S.C. § 1324. FAC ¶¶ 14, 116. But the United States offers no theory of how an after-the-fact report of a visit that has already ended could conceal anyone from anything. That is dispositive here. Preemption "is ordinarily not to be implied absent an actual conflict," *English v. Gen. Elec. Co.*, 496 U.S. 72, 90 (1990), and "[a] hypothetical or potential conflict is insufficient," *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).

Invoking "harboring" gets the United States nowhere. Statutory harboring requires "conduct which is intended to facilitate an alien's remaining in the United States illegally and to prevent detection"—an affirmative act undertaken with knowledge of unlawful status. *Kearns v. Cuomo*, 981 F.3d 200, 208 (2d Cir. 2020). A neutral notice issued after agents have left is, by contrast, neither concealment nor advance warning, and it requires no knowledge of any worker's status. It satisfies no element of the offense. Instead, employee-notice serves the ordinary labor-protection interest of informing workers that an enforcement event affecting them occurred—a step squarely within local authorities' "broad authority under their police powers to regulate the employment relationship to protect workers." *DeCanas v. Bica*, 424 U.S. 351, 356 (1976); *accord Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985). If anything, the case for the notice provision here is even stronger than for other measures courts have already upheld: other courts sustained have even *advance* notice of I-9 inspections against the United States' materially similar obstruction theories. *See California*, 921 F.3d at 881; *United States v. Illinois*, 795 F. Supp. 3d 1057, 1072 (N.D. Ill. 2025). Section 13-17-6(C) requires only after-the-fact notice of non-I-9 visits. And the Immigration Reform and Control Act's narrow preemption clause reaches only

19

laws imposing "civil or criminal sanctions . . . upon those who employ" unauthorized workers, 8 U.S.C. § 1324a(h)(2)—not worker-notice rules. The United States does not contend otherwise.

**II.      The United States' facial challenge fails because the provisions of Albuquerque's Ordinance that it challenges are valid in their core applications.**

The United States chose to bring a facial rather than an as-applied challenge here, and that choice is decisive. A facial challenge is "the most difficult challenge to mount successfully," because the challenger must establish that "no set of circumstances exists under which the [provision] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *accord United States v. Rahimi*, 602 U.S. 680, 693 (2024); *United States v. Harrison*, 153 F.4th 998, 1007 (10th Cir. 2025). The United States cannot meet that standard as to any provision it challenges here, including the two challenged provisions that impose limits, or direct the City to impose limits, on non-City entities.[6]

First, the consent provision, § 13-17-4(A), is valid in its most obvious applications for the reasons given above. *See supra* Section I.F. The owners and operators of Safer Community Places generally lack authority to consent to searches of patients' rooms and residents' sleeping quarters, *see Chapman*, 365 U.S. 610; a school may not disclose a student's records without the process and notice FERPA requires; and a provider may be directed by more-protective law to withhold health records absent a warrant or judicial order. Because § 13-17-4(A) is thus consistent with the principles underlying federal and state law protecting the privacy of these highly sensitive records in those core applications, any facial challenge to it fails. Even if some marginal applications might

---

[6] In *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122–28 (10th Cir. 2012), the Tenth Circuit questioned Salerno's "no set of circumstances" formulation, but the Supreme Court has since reaffirmed it, see *Rahimi*, 602 U.S. at 693; *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024), and so has the Tenth Circuit, see *Harrison*, 153 F.4th at 1007; *United States v. Ogilvie*, 153 F.4th 1098, 1103 (10th Cir. 2025).

press beyond existing consent limits, that would not matter on a facial challenge; for a facial challenge the United States must show the provision is invalid in all its applications. It has not tried, and it could not, given that the provision directs the promulgation of a policy that would define its applications, and the FAC makes no allegations about any such policy.

Furthermore, the worker-notification requirements in § 13-17-6, and specifically the provision that the United States challenges, § 13-17-6(C), are valid in every application, because they are ordinary labor regulations that conflict with nothing in federal law. *See supra* Part I.G. A provision valid in all its applications is, *a fortiori*, valid in the only ones a facial challenge may consider.

### III.    Albuquerque's Ordinance does not violate intergovernmental immunity.

Counts II and III invoke intergovernmental immunity, which is violated only by a law that "regulate[s] the United States directly" or "discriminate[s]" against the federal government or those with whom it deals. *United States v. Washington*, 596 U.S. 832, 838 (2022). The Ordinance does neither.

#### A.    Albuquerque's Ordinance does not directly regulate the federal government.

A direct regulation "places a prohibition on the Federal Government." *McHenry Cnty,* 44 F.4th at 592. The Ordinance places none. It governs only City actors and local entities: it directs City departments to secure City-owned property, bars City employees from approving permits for immigration-enforcement use of City resources, directs designated locations to withhold voluntary consent, and requires employers to notify their workers of enforcement activity. §§ 5-1-5(B), 13-17-4(A), 13-17-6. No provision tells a federal officer what to do.

Courts have repeatedly rejected the attempt to recast such internal resource decisions as regulation of the United States. *See McHenry Cnty.*, 44 F.4th at 593 (no direct regulation where

the law "regulate[d] only State and local entities . . . not the federal government"); *United States v. New York,* 810 F. Supp. 3d 329, 352 (N.D.N.Y. 2025) ("New York is not attempting to regulate federal agents."); *Illinois*, 796 F. Supp. 3d at 535; *Cnty. of Ocean*, 475 F. Supp. 3d at 385.

That federal agents can no longer draw on City property and personnel is a consequence of the City's choice to withhold them, not a regulation of the federal government. A jurisdiction's decision to stop volunteering its own resources is not a rule directed at federal officers — it is simply non-participation. The same is true of the Ordinance's insistence on a judicial warrant before the City or a covered location surrenders custody or records: this requirement does not regulate federal agents; it limits only what local actors may volunteer. And the worker-notification provision regulates no federal officer either: it directs employers to inform their own workers when an enforcement agent has been present. It imposes no obligation on any federal officer and dictates nothing about how immigration enforcement is conducted. A rule that tells an employer what to tell its employees is not a regulation of the United States.

### B. Albuquerque's Ordinance does not discriminate against the federal government.

Intergovernmental immunity also bars a law that "single[s] out" the federal government— or those with whom it deals—for treatment worse than that given to similarly situated state or local actors. *Dawson v. Steager*, 586 U.S. 171, 178 (2019); *see Washington*, 596 U.S. at 838. The Ordinance does not do that. It draws no line between the federal government and anyone else. It withholds City resources from a single activity—civil immigration enforcement—and withholds them from everyone who performs that activity. That is a distinction among functions, not among sovereigns, and intergovernmental immunity does not forbid it. *See McHenry Cnty.*, 44 F.4th at 594 n.7; *California*, 921 F.3d at 880–81.

The FAC's own theory confirms this point, alleging that the Ordinance restricts City resources for immigration enforcement "while permitting such resources and property to be used for other law enforcement purposes." FAC ¶¶ 186, 188. The distinction between those functions is important. Civil immigration enforcement and ordinary criminal law enforcement are not similarly situated functions, and "the mere fact that the [law] touches on an exclusively federal sphere is not enough to establish discrimination." *McHenry Cnty.*, 44 F.4th at 594. A locality that lends its property to one function while declining another has chosen among activities; it has not treated the federal government worse than a comparable actor performing a comparable task. *See Illinois*, 796 F. Supp. 3d at 534 (distinction based "on the enforcement context (civil immigration versus criminal law), not government status," is not discrimination).

### 1. Albuquerque's Ordinance's consent provision does not discriminate against the federal government.

Nor does it matter that the Ordinance's consent provision reaches sensitive private locations like hospitals and shelters as well as City actors. Although intergovernmental immunity extends to "those with whom" the federal government deals, it only reaches laws that "substantially interfere with" or "control" the government's relationship with contractors – in other words, laws that target them *because of* their federal dealings. *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 327 (3d Cir. 2025); *accord GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 757 (9th Cir. 2022). That is not what this case is about. *CoreCivic* and *GEO Group* prove the City's point rather than the United States'. Both cases struck down state laws that forbade the federal government's *contractors* from performing a federal function: New Jersey barred private companies from entering or maintaining immigration-detention agreements with ICE, and California's AB 32 would have eliminated federal detention capacity in the State altogether. Because the regulated parties detained noncitizens *for* the United States under federal contract, controlling them

23

effectively controlled the federal detention operation itself—which is why each law "'substantially interfere[d] with' or control[led]" the federal government's contractors. *CoreCivic*, 145 F.4th at 327 (quoting *United States v. New Mexico*, 455 U.S. 720, 735 & n.11 (1982)); *accord GEO Grp.*, 50 F.4th at 757.

Albuquerque's Ordinance bears none of those features. The covered Safer Place institutions are not federal contractors and perform no federal function; a hospital treating its patients and a shelter housing its residents act for themselves, not as the government's agents. The Ordinance's consent provision is not triggered by any federal dealing—it directs an institution to withhold consent to a warrantless search of its own non-public space by whoever seeks entry, regardless of whether the institution has ever transacted with the United States. And it neither interferes with nor controls any federal operation. ICE retains every facility, contractor, and federal resource, and may enter any covered institution with a judicial warrant. Declining to *add* voluntary, warrantless cooperation the government was never owed is the opposite of "effectively controlling" a federal function. *CoreCivic* and *GEO Group* thus mark the line between regulating the government's contractors and regulating a private party's control of its own property; a hospital that declines to admit immigration agents is exercising its own authority over its own building, not performing or refusing a federal contract—and Albuquerque's Ordinance stays well on the permissible side of that line.

The district court decision in *United States v. California* is illustrative. In that case, the district court enjoined a provision of California's AB 450 that restricted employers' consent to immigration agents' access. 314 F. Supp. 3d 1077, 1096 (E.D. Cal. 2018), *aff'd in part, rev'd in part*, 921 F.3d 865 (9th Cir. 2019). But that statute failed for a feature Albuquerque's Ordinance does not share: it *penalized* them for granting it, imposing "significant and escalating fines" of up

24

to $10,000 on any employer who voluntarily cooperated with federal agents. *Id.* at 1096. That penalty, the court held, impermissibly burdened those who chose to deal with the United States. Albuquerque's Ordinance imposes no such penalty.

### 2. The Ordinance's worker-notice provision does not discriminate against the federal government.

Albuquerque's Ordinance's worker-notice applies to every employer in the City, whatever its dealings with the federal government, and the I-9-inspection notice it requires is triggered by an inspection "by a government agency," not by any federal actor in particular. § 13-17-6(A). To the extent the provision singles out immigration-enforcement activity at all, it singles out an activity, not the United States—and a locality may require employers to notify workers of that activity for the same reason it may decline to assist it. *See California*, 921 F.3d at 881; *North Dakota v. United States*, 495 U.S. 423, 438 (1990) (plurality).

### C. That a law addressed to immigration enforcement falls, as a descriptive matter, on federal actors does not make it discriminatory.

Civil immigration enforcement is committed to the federal government. FAC ¶ 183; *see Arizona v. United States*, 567 U.S. 387, 394 (2012). As a result, a rule directed at that function necessarily affects those who perform it—but the rule describes who does the work, not whom the law disfavors. Reading intergovernmental immunity to forbid any rule that burdens an exclusively federal function would convert the doctrine from a shield against unequal treatment into a guarantee of local assistance for every federal program. In that case, whenever Congress created an enforcement program, the Supremacy Clause would override a locality's control of its own property and personnel. But that is the very commandeering the Tenth Amendment forbids, and courts have therefore refused to let "the guise of intergovernmental immunity" become an "end-

run around the Tenth Amendment." *New York*, 810 F. Supp. 3d at 355; *accord Illinois*, 796 F. Supp. 3d at 535; *California*, 921 F.3d at 891.

**IV.     Merits aside, the United States lacks standing to challenge § 13-17-6(C).**

The United States has not pleaded a non-speculative injury from the worker-notice provision. The FAC alleges only that employer notice "*can* allow aliens to evade enforcement or resist," and that DHS "*may* have to enforce harboring laws against the businesses." FAC ¶ 155 (emphasis added). And that claimed injury is speculative, depending on whether a covered worker is present, receives the employer's after-the-fact notice, and then acts to evade. It is precisely the "highly speculative," "attenuated" injury that *Clapper v. Amnesty International USA* holds insufficient. 568 U.S. 398, 409, 410–14 (2013). All claims directed at § 13-17-6(C) should be dismissed on that independent ground as well.

**V.     The official-capacity claims against Mayor Keller are duplicative and should be dismissed.**

The official-capacity claims against Mayor Keller add nothing to the claims against the City. An official-capacity suit "generally represent[s] only another way of pleading an action against an entity" and is "treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); *accord Johnson v. Bd. of Cnty. Comm'rs*, 85 F.3d 489, 493 (10th Cir. 1996). Where a plaintiff sues both a municipality and an official in an official capacity, courts routinely dismiss the official-capacity claim as duplicative. *See, e.g.*, *N.F. ex rel. M.F. v. Albuquerque Pub. Schs.*, No. 14-cv-699 SCY/SMV, 2015 WL 13662805, at *2 (D.N.M. May 4, 2015).

The FAC alleges nothing about Mayor Keller beyond his signing the Ordinance into law. *See* FAC ¶¶ 6, 87. It identifies no injury traceable to the Mayor apart from the City and no relief that could run against him independently. The official-capacity claims are redundant and should be dismissed. *See Illinois*, 796 F. Supp. 3d at 511–12.

26

**VI.    Any relief must respect the Ordinance's severability clause.**

The United States seeks to invalidate the Ordinance in full. But it has not challenged every provision, and it has not stated a claim as to the provisions it does challenge. Even if some applications were invalid, the remedy would not be wholesale invalidation. The Ordinance contains an express severability clause establishing the Council's intent that each provision stands independently. § 3. Any relief must be limited accordingly. The Court need not reach severability, however, because the United States has stated no claim at all.

### CONCLUSION

The United States asks this Court to strike Albuquerque's Ordinance because Albuquerque declines to place local resources at the service of federal immigration enforcement. But no federal law requires that assistance, which is no accident. Congress invited local cooperation because the Tenth Amendment forbade it to command more. Albuquerque's decision to decline that invitation is none of the things the FAC calls it—not a conflict, not an obstacle, not regulation of the federal government, not discrimination. It is the voluntary scheme working as Congress designed it. The one provision the FAC suggests sets this case apart asks hospitals, shelters, schools, and other community institutions to withhold voluntary consent absent judicial process, which is consistent with the constitution, federal law, and state law. What remains is the United States' preference for fuller cooperation—an argument for Congress, not for this Court. Counts I, II, and III should be dismissed with prejudice as to the City of Albuquerque and Mayor Keller.

Dated: July 6, 2026

Respectfully Submitted,

*/s/Devon P. King*
Devon P. King
Deputy City Attorney
One Civil Plaza NW
P.O. Box 2248
Albuquerque, New Mexico 87103
(505) 768-4628
dking@cabq.gov

*/s/ Joshua Karsh*
Toby Merrill* (MA Bar # 601071)
Litigation Director
Public Rights Project
Sai Mohan*** (CA Bar # 350675)
Joshua Karsh** (Il. Bar # 6203096)
Kayla Svihovec* (DC Bar # 1735588)
Patrick Archer* (NY Bar # 6194757)
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
Toby.Merrill@publicrightsproject.org
Sai.Mohan@publicrightsproject.org
Joshua.S.Karsh@publicrightsproject.org
Kayla.Svihovec@publicrightsproject.org
Patrick.Archer@publicrightsproject.org

*Counsel for the City of Albuquerque and
Timothy Keller*

\* Admitted *Pro Hac Vice*. Not licensed to practice law in California.
\*\* Application for Admission *Pro Hac Vice* Forthcoming. Not licensed to practice law in
California.
\*\*\* Admitted *Pro Hac Vice.*

28