UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

|  |  |  |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) ) ) | Civil Action No. 1:26-CV-1471-KG-LF |
| Plaintiff, | ) ) | |
| v. | ) ) | CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS STATE OF |
| THE STATE OF NEW MEXICO, et al.; | ) ) | NEW MEXICO, ATTORNEY GENERAL RAÚL TORREZ, AND GOVERNOR |
| Defendants. | ) ) ) | MICHELLE LUJAN GRISHAM'S MOTIONS TO DISMISS |

i

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 1

    I.      Federal Immigration Law ............................................................................ 4

    II.     Otero County Processing Center and Related Agreements.................................... 5

    III.    287(g) Agreements with Torrance and Curry Counties ......................................... 8

    IV.    House Bill 9 ................................................................................................... 9

    V.     Procedural History .......................................................................................11

LEGAL STANDARD .......................................................................................................11

ARGUMENT .................................................................................................................... 12

    I.      HB9 Violates the Contract Clause. .......................................................... 12

        A.     The Contract Clause Applies to the Agreements. .................................. 12

        B.     The Agreements at Issue are Enforceable Contracts................................ 16

        C.     HB9 Will Impair the Agreements at Issue. ............................................ 20

        D.     HB9's Complete Impairment of the Agreements is Not Supported by Any Significant or Legitimate Public Purpose. .............................................. 22

    II.     HB9 Violates Intergovernmental Immunity Principles........................................ 26

        A.     HB9 Unconstitutionally Discriminates Against Core Federal Functions. 27

        B.     HB9 Seeks to Directly Regulate the Federal Government. ...................... 31

    III.    HB9 Is Preempted By Federal Immigration Law. .............................................. 33

    IV.    The Tenth Amendment Is Not Implicated............................................................. 35

    V.     The Governor Is a Proper Defendant. ................................................................... 37

CONCLUSION.................................................................................................................. 38

Plaintiff United States of America hereby responds in opposition to the motions to dismiss filed by the State of New Mexico, Attorney General Raúl Torrez (Dkt. No. 49, "MTD"), and Governor Michelle Lujan Grisham (Dkt. No. 51, "Gov. MTD"). In support, the United States proffers the following:

**<u>INTRODUCTION</u>**

The State of New Mexico is actively trying to impede federal immigration enforcement and disrupt a long-running and mutually beneficial arrangement to enforce federal law. But the Contract Clause and Supremacy Clause forbid attempts by states to impede federal functions. For nearly two decades, since 2008, Otero County, New Mexico, has, without issue, provided vital civil immigration detention services and facilities to the U.S. Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), in exchange for significant monetary compensation pursuant to the terms of successive Intergovernmental Service Agreements, the latest of which became effective on March 16, 2026 ("Otero-ICE Contract") (Dkt. No. 42-8). ICE depends on this agreement and the Otero County Processing Center ("OCPC") to fulfill critical immigration objectives established by Congress in the Immigration and Nationality Act ("INA"). OCPC is a unique detention facility that is indispensable to federal immigration operations; it houses up to 1,096 male and female detainees in a location that is near vital ports of entry and infrastructure. It is consistently a high-quality facility, as it is well staffed and has a track record for safely and humanely handling detainees. Operation of the OCPC also creates jobs and generates significant economic activity for Otero County, and secures the repayment of outstanding revenue bonds that will otherwise be impaired. Curry County and Torrance County have also participated

1

in ICE's INA § 287(g) Program by entering into memoranda of agreement ("287(g) Agreements") to help protect their communities and enforce immigration law. *See* 8 U.S.C. § 1357(g).

Yet, on February 5, 2026, Governor Michelle Lujan Grisham signed House Bill 9 ("HB9") into law, to take effect on May 20, 2026. HB9 seeks to ban the Otero-ICE Contract and prohibit altogether the use of the OCPC for civil immigration detention purposes. It further seeks to eliminate the 287(g) Agreements. Should HB9 be permitted to take effect, federal immigration operations will be significantly burdened both in New Mexico and nationally, and Otero County will be deprived of revenue, jobs, and economic activity. Curry and Torrance Counties will be deprived of their cooperative 287(g) Agreements with DHS. Thankfully, the U.S. Constitution prohibits state laws like HB9 for several reasons.

First, the Contract Clause protects agreements from impairment by fluctuating policies of temporary state legislative majorities like HB9. U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]"). Although the MTD argues that the Contract Clause is inapplicable to HB9, HB9 is the epitome of legislation that this clause was intended to prevent. It makes it impossible for Otero, Curry, and Torrance Counties to satisfy their legitimate contractual obligations for no purpose other than to end "the business of immigration detention" in the State of New Mexico. But preventing the performance of an essential federal function is not a legitimate or significant public purpose. As such, HB9 impairs these contracts in violation of the Contract Clause.

The Constitution further establishes a system of dual sovereignty. Under that system, federal law is "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, states "have no power, by

2

taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819); *see also Mayo v. United States*, 319 U.S. 441, 445 (1943). Under intergovernmental immunity principles, state governments may not regulate or discriminate against the Federal Government. And under preemption principles, state law may not stand as an obstacle to the enforcement of federal law. Yet that is the stated purpose and express function of HB9—to prohibit agreements with the Federal Government concerning the enforcement of federal immigration law. Contrary to the MTD's arguments, HB9 unlawfully discriminates against the Federal Government because it facially singles out the Federal Government for negative treatment by imposing restrictions on its ability to form contracts with local governmental entities for federal immigration enforcement purposes that are specifically authorized by Congress. *See* HB9 § 3(E); *United States v. King Cnty., Wash.*, 122 F.4th 740, 756–57 (9th Cir. 2024). Additionally, HB9's limit on the potential (i) parties with whom the Federal Government may form agreements and (ii) property that may be used for immigration operations also constitutes regulation of the Federal Government. *See CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325–28 (3d Cir. 2025); *Geo Grp. v. Newsom*, 50 F.4th 745, 760–61 (9th Cir. 2022). Finally, HB9's prohibition on contracts for federal immigration detention and enforcement is not merely a refusal to cooperate with federal immigration enforcement, it is a policy that stands as an obstacle to Congress's immigration objectives and is preempted by federal immigration laws that specifically authorize DHS to enter into voluntary agreements with state and local government entities to operate detention facilities and help enforce immigration laws. *See* 8 U.S.C §§ 1103(a)(11)(B), 1231(g), 1357(g); *Geo Grp.*, 50 F.4th at 762.

3

By enacting HB9, the State of New Mexico seeks to flip the Constitution on its head by impeding DHS's ability to perform functions authorized by Congress that are critical to the United States' operation as a sovereign country. The Tenth Amendment does not give New Mexico carte blanche authority to frustrate Congress's cooperative scheme and discriminate against the Federal Government, particularly given that Congress enacted a comprehensive law regulating aliens, not States. HB9 is patently unconstitutional. Its purpose and effect is to impede the enforcement of immigration law. Accordingly, this Court should deny the Motions to Dismiss.

## BACKGROUND

### I.    Federal Immigration Law

As an independent sovereign, "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394–95 (2012). Congress has exercised its broad authority to make laws governing the entry, presence, status, detention, and removal of aliens within the United States by enacting an "extensive and complex" statutory scheme for the "governance of immigration and alien status," as reflected in the INA. *Id.* at 395. Through the INA, Congress established a regulatory scheme granting the Executive the authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1224, 1225, 1226, 1227, 1228, and 1231. The Executive's authority to enforce the nation's immigration laws "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). DHS officers and agents, including ICE, are tasked with enforcing federal immigration law. *See* 8 U.S.C. § 1103(a)(3).

4

Among DHS's responsibilities is the detention of aliens. *See* 8 U.S.C. §§ 1226(a), (c), 1231(a)(2), (g), 1225(b)(1)(B)(ii), (b)(1)(B)(iii)(IV), (b)(2)(A), 1226a(a)(1). To fulfill the mandates of the INA, Congress recognized that cooperation with state and local law enforcement is essential. *See Arizona*, 567 U.S. at 411 ("Consultation between Federal and state officials is an important feature of the immigration system."). Congress thus authorized the Federal Government to enter into agreements with state and local governments for detention purposes. *See* 8 U.S.C. §§ 1103(a)(11)(B) ("in support of persons in administrative *detention in non-Federal institutions*, is authorized . . . *to enter into a cooperative agreement* with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required *to establish acceptable conditions of confinement and detention services* in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service.") (emphasis added); 1231(g)(1) (authorizing the Executive Branch to "arrange for appropriate places of detention for aliens detained," and, when federal facilities are unavailable, to "expend . . . amounts necessary to acquire land and to . . . operate facilities . . . necessary for detention."). The Federal Government is also authorized to enter into cooperative agreements under which local law enforcement are trained and deputized to assist in the investigation, arrest, and detention of aliens. *See* 8 U.S.C. § 1357(g) (INA § 287(g)). Congress thus expressly contemplated and approved the use of voluntary agreements with and property belonging to local law enforcement to implement federal immigration detention operations.

## II.    Otero County Processing Center and Related Agreements

For nearly two decades, since 2008, Otero County has housed aliens and provided related civil immigration detention services to ICE through its operation of the OCPC pursuant to the

terms of successive Intergovernmental Services Agreements ("IGSAs") with ICE. *See* Dkt. No. 42 ("FAC") at ¶ 103. In that time, multiple Attorneys General and other officials have blessed the IGSAs, as well as agreements between Otero County and Management & Training Corporation ("MTC"), a private entity that manages and operates the OCPC, with specific oversight from the New Mexico Attorney General, the Department of Finance and Administration, and the Risk Management Division of the General Services Department. NMSA 1978, § 33-3-27 (2015); NMSA 1978, § 33-3-2 (1989). Each has repeatedly ratified these ISGAs without issue, including the current Attorney General, who approved of the Otero-MTC Contract in 2024. *See* FAC at ¶ 103. Under these laws, New Mexico officials can provide oversight of the ISGAs and set requirements. New Mexico inspectors and legislators can and do visit the facility. *Id.* at ¶ 143. The OCPC consistently passes inspections and accreditation. *Id.* at ¶¶ 104, 143.

The Otero-ICE Contract is the latest of the IGSAs whereby Otero County allows ICE to use OCPC in exchange for substantial revenue. *See id.* at ¶¶ 105, 143. The latest agreement effective on March 16, 2026, has a term of 60 months and can be extended if both parties agree. *See id.* at ¶ 105. However, in 2025 the parties modified the existing agreement so only ICE can terminate it; Otero County expressly cannot terminate it. *See id.* at Art. 14(B) ("The service provider shall not have the right to terminate this agreement"). Under the terms of the related Operations, Management, and Maintenance Agreement ("Otero-MTC Contract") between MTC and Otero County, effective February 14, 2024, MTC is to perform necessary operational and management functions for the OCPC for a period of five years by staffing the OCPC, providing food and medical services, and performing maintenance. *See* FAC at ¶ 106. Unlike the Otero-ICE Contract, Otero County may terminate the Otero-MTC Contract, but only for cause. Dkt. No. 42-

9 at Art. IV, § D.1. Otero County does not have the operating capability to honor the Otero-ICE Contract itself; MTC provides all the staff and runs the facility. FAC at ¶¶ 106, 143–144, 150. Without MTC or another private operator the OCPC could not function, and thus termination of the Otero-MTC Contract would result in Otero County's material breach of the Otero-ICE Contract and be tantamount to termination of the Otero-ICE Contract itself. *Id.*

Under the Otero-ICE Contract, ICE has benefited from access to a fully secure 1,096 bed facility that houses male and female detainees. FAC at ¶¶ 104. The OCPC is critical to ICE's civil immigration operations, as it is geographically situated near the El Paso ERO Field Office, multiple Ports of Entry (e.g., OCPC is approximately 21 miles away from Ysleta, 24 miles away from Americas, 42 miles from Tornillo, and 46 miles from Santa Teresa), major highways, and an international airport. *Id.* OCPC is also the only civil immigration detention facility in New Mexico that can accommodate female detainees and higher risk individuals. *Id.* Moreover, it is consistently a high-quality, well-staffed facility with excellent conditions and stellar track records for safely and humanely handling detainees. *Id.* OCPC provides substantial jobs and revenue to the people of Otero County. *Id.* at ¶¶ 143, 151.

The State of New Mexico, through its Attorney General, has tried (and failed) to invalidate the Otero-ICE Contract by suing for a writ of mandamus and stay with the New Mexico Supreme Court. *See New Mexico ex rel. Raul Torrez v. Bd. of Cnty. Comm'rs for Otero Cnty.*, No. S-1-SC-41362. On April 16, 2026, the New Mexico Supreme Court unanimously denied the State's emergency verified petition for writ of mandamus.

### III.   287(g) Agreements with Torrance and Curry Counties

Curry County and Torrance County, New Mexico, have participated in ICE's 287(g) Program. The Curry County Sheriff's Office and Torrance County Sheriff's Office have approved 287(g) Agreements to participate in the 287(g) Warrant Service Officer (WSO) Program. FAC at ¶ 145. These agreements require DHS to train and certify county officers on immigration enforcement. *Id.* As a result, those officers are deputized under the color of federal law to help enforce immigration warrants and receive training, access to databases, and immunity in exchange. *Id.* Having locally accountable law enforcement operating in its own communities has many benefits and can increase trust and effectiveness in enforcing immigration laws. *Id.* For example, local officers often know more about targets and may even detain them. *Id.* at ¶ 152. Local officers can more easily go into the community and locate and detain individuals violating immigration laws. *Id.* DHS can work with local law enforcement to safely detain and transfer individuals. *Id.*

If the 287(g) Agreements with Torrance and Curry Counties are voided, and if future agreements are impossible, DHS will have to expend substantial resources to enforce the law in those areas because aliens will no longer be encountered at a fixed location and time in a relatively safe and secure environment. FAC at ¶¶ 148–49, 154, 161. Additional officers would be necessary to investigate and locate the at-large alien, for surveillance, and to effect an arrest. This process would require significantly more resources. Such public arrests may attract agitators and protestors resulting in increased safety risks for the officers, aliens, and the public. *Id.* at ¶¶ 159–161.

The Attorney General has sued Torrance and Curry Counties in attempts to void their 287(g) Agreements with DHS under HB9. *See New Mexico ex rel. Raul Torrez v. Bd. of Cnty.*

*Comm'rs for Curry Cnty. and Sheriff Michael Brockett*, No. D-909-cv-2026; *New Mexico ex rel. Raul Torrez v. Bd. of Cnty. Comm'rs for Torrance Cnty. and David Frazee*, No. D-707-cv-2026.

## IV.    House Bill 9

Governor Michelle Lujan Grisham signed HB9 into law on February 5, 2026. HB9 went into effect 90 days after the Legislature adjourned on May 20, 2026. *See* N.M. Const. art. IV, § 23. HB9 applies to "public bodies," which is defined expansively to include "a state or local government, a sheriff's department, an advisory board, a commission…" etc., as well as "an entity or individual acting on behalf of or within the scope of the authority of the public body." HB9 § 2.

HB9 affects agreements like the Otero-ICE Contract and Otero-MTC Contract as well as the 287(g) Agreements. It applies to agreements "to detain individuals for federal civil immigration violations, including an intergovernmental services agreement to detain individuals for civil immigration violations." HB9 §§ 3(A), (B). It applies to agreements "to investigate, apprehend, detain or transport individuals pursuant to 8 U.S.C. Section 1357(g) or 8 C.F.R. Section 287.7" HB9 §§ 4(A), (C). And it applies to agreements "that deputize[] officers, employees or agents of the public body to perform a function of an immigration officer in relation to the investigation, apprehension, detention or transportation of noncitizens in the United States or the removal of noncitizens from the United States." *Id.* at § 4(B).

HB9 prevents public bodies from forming new, or extending existing, agreements for any of these federal immigration enforcement purposes, providing that "[a] public body shall not enter into, extend, renew or otherwise agree to be a party" to any type of agreement. HB9 §§ 3(A), 4(A); *see id.* at § 4(B) ("A public body shall not agree to be a party to an agreement . . ."). HB9 also requires the termination of existing agreements, providing that "[a] public body that is a party to

9

an existing agreement . . . shall . . . terminate the agreement upon the earliest date permissible under the terms of the agreement" and requires public bodies to "invoke exigent circumstances" to affect such termination. HB9 § 4(C); *see id.* at §§ 3(A) ("A public body shall not enter into, extend, renew or otherwise agree to a rider, amendment, supplement or other modification to an agreement . . ."), (B) ("A public body that is a party to an existing agreement . . . shall . . . terminate the agreement upon the earliest date permissible under the terms of the agreement, with respect to all provisions that relate to the detention of individuals for federal civil immigration violations."). In addition to the restrictions on a public body's ability to contract for federal immigration enforcement purposes, HB9 imposes restrictions on the property of public bodies by preventing them from allowing their property to be used to detain aliens for civil immigration violations, providing that "[a] public body shall not sell, trade, lease or otherwise dispose of any real property to be used for the detention of individuals for federal civil immigration violations." *Id.* at § 3(C).

While HB9 facially applies to federal immigration enforcement authorities, HB9 does not "limit the ability of law enforcement personnel to detain individuals or to perform brief investigative stops *as permitted by state law*." HB9 § 3(E) (emphasis added). HB9 is enforceable by "[t]he attorney general or a district attorney" who are empowered to "institute a civil action in a district court if" they have "reasonable cause to believe that a violation of [HB9] has occurred or to prevent a violation of [HB9] from occurring." *Id.* at § 5(A). In such case, the district court "may award appropriate relief . . . to include declaratory and temporary, preliminary or permanent injunctive relief." *Id.* at § 5(B).

## V.    Procedural History

On May 8, 2026, the United States filed its Complaint and Motion for Preliminary Injunction. *See* Dkt. Nos. 1, 2. On May 13, 2026, the parties stipulated that the United States would withdraw its Motion for Preliminary Injunction if New Mexico did not enforce HB9 until a judgment on the merits. *See* Dkt. No. 10. On June 22, 2026, the United States filed its First Amended Complaint against the State of New Mexico, New Mexico Governor Michelle Lujan Grisham, and New Mexico Attorney General Raúl Torrez, in their official capacities (collectively, "Defendants"). *See* FAC at ¶¶ 24–27.[1] The FAC asserts four claims for relief against Defendants: (1) federal preemption, (2) unlawful regulation, (3) unlawful discrimination, and (4) violation of the Contract Clause. *See id.* at ¶¶ 164–200.[2] The United States seeks, *inter alia*, a judgment from this Court declaring that the HB9, is preempted, violates the Supremacy Clause, violates the Contract Clause, and is therefore unconstitutional, invalid, and unenforceable, and a permanent injunction of the operation and enforcement of HB9. *See id.* at Prayer for Relief ¶¶ A–D. On July 6, 2026, Defendants separately moved to dismiss the FAC. *See* Dkt. No. 49, 51.

## LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). A claim will survive a motion dismiss if it is facially plausible, in other words, if the plaintiff pleads facts sufficient to raise a right to relief beyond mere speculation.

---

[1] The United States also sued Albuquerque, Doña Ana County, Bernalillo County, Albuquerque Mayor Timothy Keller, Doña Ana County Manager Scott Andrews, and Bernalillo County Manager Cindy Chavez in the FAC.

[2] The United States also asserted an express preemption claim against Doña Ana County and Doña Ana County Manager Scott Andrews in the FAC.

*Id.* (internal citations omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Dismissal is a "harsh remedy which must be cautiously studied … to protect the interests of justice." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (quotation omitted).

## ARGUMENT

### I.     HB9 Violates the Contract Clause.

HB9 impairs the Otero-ICE Contract, the Otero-MTC Contract, and 287(g) Agreements (collectively, the "Agreements") and lacks a significant or legitimate purpose necessary to justify such impairment. The Contract Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]" U.S. Const. Art. I, § 10, cl. 1. State legislation like HB9 violates the Contract Clause if it substantially impairs a contractual relationship and is not an appropriate or reasonable way to advance a significant and legitimate public purpose. *See Sveen v. Melin*, 584 U.S. 811, 819 (2018). "The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983). And "[w]hen a state actor is a party to a contract at issue, typically courts have determined such legislation is subject to 'stricter scrutiny.'" *A.L. v. Martin*, No. 23-CV-127-WJ-SCY, 2023 WL 7279318, at *4 (D.N.M. Nov. 3, 2023) (citation omitted).

### A.     The Contract Clause Applies to the Agreements.

New Mexico claims that the Contract Clause does not apply to the Agreements because they concern a "police power." *See* MTD at 19–20. Not so. *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 22 (1977) ("[P]rivate contracts are not subject to unlimited modification under the police power."). The "police power" exception that purportedly authorizes New Mexico to violate the contracts of its political subdivisions is merely part of the analysis requiring a legitimate public

12

purpose. *See id.* at 22 ("[L]aws intended to regulate existing contractual relationships must serve a legitimate public purpose."). As stated by the Supreme Court more recently, "[t]he requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Rsrvs.*, 459 U.S. at 412.

None of the cases on which New Mexico relies stands for the proposition that a state can freely violate the contracts of its subdivisions. On the contrary, those cases simply reflect precursors to the current test, which requires a sufficiently significant and legitimate public purpose to justify the vitiation of contracts. *Cf. Stone v. Mississippi*, 101 U.S. 814, 820 (1879) (Contract Clause does not protect lottery contracts from statutes enacted "for the preservation of the public health and the public morals, and the protection of public and private rights."); *Boston Beer Co. v. Massachusetts*, 97 U.S. 25, 32 (1877) (Contract Clause does not protect malt liquor contracts from state statutes that are in "the interests of the community" and "public safety or the public morals"). This does not give states the power to vitiate any contract, much less one to which it is a party. More recently, in discussing *Boston Beer*, the Supreme Court articulated its refined test, stating that "if 'a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.'" *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 522 (2019) (quoting *Mugler v. Kansas*, 123 U.S. 623, 661 (1887)). In fact, because the states have a self-interest in using laws to terminate their own contracts, "when a State is a contracting party, its 'legislative judgment is subject to stricter scrutiny than when the legislation affects only private contracts.'" *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv.*

13

*Workers Int'l Union AFL-CIO-CLC v. Gov't of Virgin Islands*, 842 F.3d 201, 212 (3d Cir. 2016). Given New Mexico's broad conception of its police power, its proposed exception would allow it to legislatively vitiate almost any contract with its subdivisions. "If the Contract Clause is to retain any meaning at all, however, it must be understood to impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978). Thus, such contractual terminations are only permissible if the State has a legitimate public purpose.

New Mexico further claims that the Tenth Amendment authorizes revocation of the Agreements. *See* MTD at 20–21. But the Tenth Amendment "reserve[s]" powers to the States that are either (i) "not delegated to the United States by the Constitution" (ii) "*nor prohibited by it* to the States." U.S. Const. amend. X (emphasis added). The Contract Clause is one of those powers prohibited to the States; it prohibits the States from impairing contractual obligations. *See U.S. Tr. Co.*, 431 U.S. at 17 ("It long has been established that *the Contract Clause limits the power of the States* to modify their own contracts as well as to regulate those between private parties.") (emphasis added). Indeed, the Contract Clause was "perhaps the strongest single *constitutional check on state legislation* during our early years as a Nation." *Allied Structural Steel*, 438 U.S. at 241 (emphasis added). Accordingly, the Tenth Amendment is inapplicable to the United States' Contract Clause claim.

New Mexico pivots to its sovereign authority over its political subdivisions to support its argument that counties derive their authority from the State and cannot bind it contractually.[3] MTD

---

[3] In addition to the U.S Constitution, the Constitution of the State of New Mexico also constrains the New Mexico Legislature from enacting measures that impair contracts. N.M. Const. art. II, § 19 ("No . . . law impairing the obligation of contracts shall be enacted by the legislature."). New Mexico's County Revenue Bond Act likewise provides that laws affecting pledged revenues shall not be modified so as to impair outstanding revenue bonds. NMSA

14

at 21. In support, New Mexico cites *City of Trenton v. State of New Jersey*, 262 U.S. 182, 188 (1923). However, *City of Trenton* simply stands for the unremarkable proposition that a state can give and take away certain powers from a city vis-à-vis the state, not that the state can vitiate any contract entered into by a city. *Id.* at 185–86 (city suing state for change in law under contract clause). The case makes clear that the Contract Clause protects the contractual rights of third parties (i.e., a utility company) against the state or if the political subdivision is acting as a proprietor. *Id.* Here, the Federal Government is the relevant third party whose contractual rights are protected by the Contract Clause. Moreover, here, Otero County is acting as the proprietor of the OCPC. The State of New Mexico specifically authorized Otero County to enter into the Agreements and Otero County has the power to hold and manage its property. The State of New Mexico cannot use its political subdivisions to breach contractual obligations at will; otherwise, states would enter into contracts using their political subdivisions, receive the benefit of those contracts, and then terminate them via legislative fiat when no longer beneficial to them.

The State of New Mexico's theory flouts the entire purpose of the Contract Clause. *See* THE FEDERALIST NO. 44 (James Madison) (The Contract Clause seeks to protect contracts from interference by "the fluctuating policy" enacted by temporary State legislative majorities and to "banish speculations on public measures, inspire a general prudence and industry, and give a regular course to the business of society."). The Supreme Court "has regularly held that the States are bound by their debt contracts" and that States have "the power to enter into effective financial contracts" and may bind themselves to future financial obligations, despite the fact that these

---

1978, § 4-62-6(C). The Series 2007 bonds, secured exclusively by an irrevocable pledge of OCPC net revenues, remain outstanding. Dkt. No. 42-7 at ¶¶ 7–9. This too undermines any legitimate public interest claimed by the State.

obligations could be considered "as a relinquishment of the State's spending power" or taxing power. *U.S. Tr. Co.*, 431 U.S. at 24. This is the entire purpose of the Contract Clause. Indeed, "[i]f a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all." *Id.* at 26. Thus, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *Id.* at 25–26. So contrary to New Mexico's argument, regardless of the type of contract, "[w]hen a state actor is a party to a contract at issue, typically courts have determined such legislation is subject to 'stricter scrutiny.'" *A.L.*, 2023 WL 7279318, at *4. In sum, New Mexico's arguments that the Contract Clause is not applicable to the Agreements is unavailing; in fact, the opposite is true.

## B.    The Agreements at Issue are Enforceable Contracts.

The Otero-ICE Contract is indisputably an agreement where ICE pays for the use of OCPC and is thus a traditional contract protected from impairment by the Contract Clause. *See Sveen*, 584 U.S. at 818 (stating that the Contract Clause "applies to any kind of contract"). The same is true for the Otero-MTC Contract[4] wherein Otero County pays MTC to staff and operate the OCPC.

While New Mexico weakly rehashes its arguments that the Otero-ICE Contract is void as contrary to public policy, the New Mexico Supreme Court unanimously denied the State's emergency petition seeking to void that same agreement. *See State of New Mexico*, S-1-SC-41362. New Mexico admits that the Otero-ICE Contract became effective before HB9. *See* MTD at 24

---

[4] New Mexico admits that "the Otero-MTC Contract is enforceable[.]" MTD at 25. Although terminable for cause, the Otero-MTC Contract is still impaired by the forced termination required by HB9. And forcing the termination of the Otero-MTC Contract would effectively terminate the Otero-ICE Contract. New Mexico's reliance on the contract's termination-for-cause provision, MTD at 25, is misplaced. A contractual right to terminate does not permit the State to compel its exercise, *see United Healthcare*, 602 F.3d at 628; *DoorDash*, 692 F. Supp. 3d at 290, and an unconstitutional statute is not qualifying "legislation" within the meaning of that provision in any event.

16

("the 2026 Otero-ICE IGSA . . . was executed . . . before [HB9] became effective."). The New Mexico legislature could have passed HB9 earlier or accelerated its effectiveness if the political will existed, but it specifically failed to do so. *See* N.M. Const. art. IV, § 23; MTD at 24 ("HB9's predecessor . . . was adopted by the House of Representatives but not the Senate during the 2025 session"); *compare Cibas v. N.M. Energy, Mins. & Nat. Res. Dep't*, 120 N.M. 127, 130 ("we do not believe that the General Appropriation Act . . . can be given sufficiently broad effect to require application of Chapter 234 before the effective date explicitly prescribed by the legislature."), *with Swink v. Fingado*, 115 N.M. 275, 289 ("It is thus clear that the legislature intended that the 1984 amendments would take effect as soon as possible and that their effectiveness would not be delayed until ninety days after adjournment of the legislature.").[5] New Mexico's interpretation of the Otero-ICE Contract would render its effective date a nullity, which was itself a public policy choice. That Otero County and ICE availed themselves of the intervening period to modify the Otero-ICE Contract to better fit the intent of the parties is expected when enactments have delayed effectiveness. *See Atkins v. Parker*, 472 U.S. 115, 130 (1985) (stating that statutory grace period is intended "to provide the persons affected by a change in the law with an adequate opportunity to become familiar with their obligations under it"); *State ex rel. New Mexico State Bank v. Montoya*, 160 P. 359, 361 (the purpose of the 90-day period in New Mexico's Constitution "is to prevent the practice of making laws take effect immediately upon their passage, and before they could become known to the public" and "undoubtedly was to give the people time and opportunity to learn what changes were to be made in the law before those changes should come into operation").

---

[5] When in doubt as to a law's retroactive application, New Mexico courts apply a presumption against retroactive application. *See Gadsden Fed'n of Tchrs. v. Bd. of Educ. of Gadsden Indep. Sch. Dist.*, 122 N.M. 98, 101 ("The effective date by itself would rarely suggest that a statute applies retroactively. The effective date merely sets the temporal dividing line between prospective and retroactive application.").

DHS and ICE's decision to remove Otero County's right to terminate the Otero-ICE Contract pre-dated the passage of HB9 in the legislature, so it is hard to conceive how this term violated any existing public policy. To effectively apply HB9 retroactively is simply contrary to its effective date. *See Sw. Distrib. Co. v. Olympia Brewing Co.*, 90 N.M. 502, 508 (1977) ("If there was a written contract effective before [the effective date of the statute at issue] then the termination provisions in the contract would control, but any subsequent amendment, renewal or new contract would be subject to the [statute at issue].").

Moreover, the Otero-ICE Contract is an expression of public policy. It has existed since 2008 to benefit Otero County and the United States more broadly. Each time this IGSA was renewed, the Attorney General and State of New Mexico sanctioned it. *See* FAC at ¶ 103. The performance of this contract is so valuable to Otero County that the county issued revenue bonds to finance the construction of the OCPC to be repaid by the revenue generated by its operation. *See* Dkt. No. 42-7. The IGSAs have long been consistent with public policy. Congress authorized ICE to enter into agreements to establish detention facilities and services for violators of federal immigration law. *See* 8 U.S.C. §§ 1103(a)(11)(B), 1231(g). Considering the existence of express Congressional authorization, New Mexico cannot argue that the Otero-ICE Contract is contrary to public policy. That federal policy is supreme, whether it is independently preemptive or not.

More fundamentally, the 2026 Otero-ICE IGSA is a federal procurement contract executed under express congressional authorization. *See* 8 U.S.C. §§ 1103(a)(11)(B), 1231(g). The rights and obligations of the United States under its contracts are governed by federal law, not by state public policy. *See Clearfield Trust Co. v. United States*, 318 U.S. 363, 366 (1943); *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-05 (1988) ("obligations to and rights of the United States under

18

its contracts are governed exclusively by federal law"). New Mexico identifies no authority permitting a state to declare void a contract to which the United States is a party on the ground that the contract offends state policy. Nor do New Mexico's authorities supply the required declaration of public policy. *First Baptist* demands a policy that the legislature or judicial decision has clearly declared. 2015-NMSC-004, ¶ 12. A bill that the Senate declined to pass in 2025 declared nothing; if anything, the Legislature's refusal to enact HB9's predecessor confirms that no such policy existed when the parties agreed to the current termination terms. New Mexico's resort to a voidness theory tacitly concedes that HB9's operative text cannot reach the Otero-ICE Contract because Section 13-9-3(B) commands termination only upon "the earliest date permissible under the terms of the agreement," and Article 14 of the Otero-ICE Contract supplies no such date.

Finally, New Mexico claims that the 287(g) Agreements are not enforceable because they "provide no consideration to the counties." MTD at 25. However, the counties clearly receive consideration because their officials are trained to enforce federal immigration law, they "may use Federal property or facilities," have access to databases, and they "shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit" for actions performed in furtherance of their federal functions. *See* 8 U.S.C. § 1357(g)(2), (4), (8); *see generally* Dkt. Nos. 49-5, 49-6 (287(g) Agreements). Moreover, as is true for the Otero-MTC Contract, the fact that the 287(g) Agreements contemplate termination, MTD at 25, does not mean that they cannot be impaired if the parties are forced to do so against their will. *See, e.g.*, *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 628 (5th Cir. 2010) ("We conclude that [the district court's] first reason--that the contracts were terminable at will by OGB--does not prevent a finding of contract impairment."); *DoorDash, Inc. v. City of N.Y.*, 692 F. Supp. 3d 268, 290 (S.D.N.Y.

19

2023) ("Defendant's argument that as a matter of law 'there can be no substantial impairment where contracts are terminable at-will' has no merit."); Dkt. Nos. 49-5, 49-6. Unlike the employee handbook at issue in *Salazar v. Citadel Comm'cns Corp.*, 135 N.M. 447, the 287(g) Agreements are not subject to unilateral modification or revocation, even if terminable. Dkt. Nos. 49-5 at VI, 49-6 at VI (modifications must be "approved and signed by both parties"). Indeed, ICE must give 90 days' notice before any termination and officers who violate the agreements can be subject to remediation training. Dkt. Nos. 49-5 at VIII, 49-6 at VIII. Further, it is not apparent that state law determines whether something is a contract for purposes of the Constitution. *Cf. Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149–50 (2021) (looking to general law, not state law, to determine property right for Takings Clause); *see supra* at 18. Regardless of what law applies, the Agreements are clearly agreements under the common law. *See generally* Dkt. Nos. 49-5, 49-6.

### C.     HB9 Will Impair the Agreements at Issue.

As New Mexico appears to concede, HB9 will impair the Agreements by categorically requiring their immediate termination. First, HB9 will impair the Otero-ICE Contract by requiring its termination. HB9 will also prevent Otero County from performing its obligations under the Otero-ICE Contract because HB9 likely requires Otero County to terminate existing contracts or forgo renewing contracts that serve the OCPC because they will facilitate the detention of aliens who violate federal immigration law. *See* HB9 §§ 3(A), (B). So, if HB9 is permitted to take effect, the Otero-ICE Contract will be impaired in the most severe manner possible because HB9 prevents its performance and impairs the parties' reasonable expectations, notwithstanding that it remains operative through March 15, 2031. *See, e.g.*, *Allied Structural Steel*, 438 U.S. at 247 (finding impairment where "the statute in question here nullifies express terms of the company's contractual

20

obligations"); *United Healthcare*, 602 F.3d at 630 ("These impairments are substantial and disrupt the purpose of the contracts at issue here; that is, to allow the parties to rely on their contractual expectations of approximate numbers of enrollees and the approximate expense of administering the plans."). New Mexico's contemporaneous legislation, which appropriated $5,940,000 to Otero County to cover bond payments "should the centers close," concedes this impairment. MTD at 3 (citing 2026 N.M. Laws ch. 70, § 1(A)(3)). But a one-time appropriation covering only a fraction of the outstanding debt service is no remedy for this Constitutional harm.

The Federal Government has also relied to its detriment in performing and arranging to perform under the Otero-ICE Contract to ensure that federal immigration law will be enforced and aliens who violate federal immigration law will be detained in the OCPC in a manner consistent with Congress's statutory scheme and goals. FAC at ¶ 135. The inability to use the OCPC would cause significant financial losses to and impose significant operational burdens on the Federal Government. *Id.* ¶¶ 135, 157. DHS relies on OCPC to house up to 1,096 detainees. *Id.* at ¶¶ 104–05. It is the only facility in New Mexico that can detain females and high-risk individuals. *Id.* at ¶ 104. OCPC is in an important area near several ports of entry, an international airport, and major highways. *Id.* Without it, DHS will have to transfer potentially hundreds of detainees many miles away to other States, such as Camp East Montana in Texas. *Id.* This drain on resources and reduced detention capacity will hamper immigration enforcement in New Mexico and require DHS to scramble to find solutions. *Id.* at ¶¶ 143, 150.

Second, HB9 will require the termination of the 287(g) Agreements. Indeed, New Mexico has already tried to force the termination of the 287(g) Agreements. *See State of New Mexico*, No. D-909-cv-2026; *State of New Mexico*, No. D-707-cv-2026. And the parties to the 287(g)

Agreements rely upon them for information sharing, as well as locating and detaining illegal aliens in Curry and Torrance Counties. These counties benefit from increased federal cooperation, especially in connection with the apprehension and removal of criminal illegal aliens. Absent these 287(g) Agreements, cooperation between ICE and the counties will break down and DHS will have to expend additional resources locating and arresting illegal aliens, and will have to do so in public areas, which is far more dangerous to ICE, the public, and the aliens. Accordingly, the Agreements will be impaired in the most extreme way possible by HB9.

**D.      HB9's Complete Impairment of the Agreements is Not Supported by Any Significant or Legitimate Public Purpose.**

HB9's severe impairment of the Otero-ICE Contract is also unsupported by any significant or legitimate public purpose. "Once it is determined that the state regulation is a substantial impairment . . . the burden shifts to the state . . . [to proffer] such a significant and legitimate public purpose for the regulation." *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 323 (6th Cir. 1998); *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 438 (8th Cir. 2007). HB9 itself contains no statement of purpose, and the MTD points only to generalized complaints about conditions at OCPC and a single floor statement. MTD at 4.[6] Those references undercut New Mexico's position as HB9 does not regulate detention conditions; it categorically bans the contracts under which detention occurs, strips New Mexico of its existing inspection and oversight authority, and sends detainees to out-of-state facilities beyond the State's reach. Dkt. No. 42-6 at ¶¶ 11-12, 15-19; Dkt. No. 42-5 at ¶¶ 20, 25. Any post-hoc rationalizations should be rejected. *See Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 859–60 (8th Cir. 2002) (refusing to credit post-hoc articulation

---

[6] At this stage, the United States' allegations that OCPC is a well-run facility that consistently passes inspections and accreditation must be accepted as true. Dkt. No. 42-6 at ¶¶ 15–19. New Mexico's "evidence" is irrelevant.

of legitimate public purpose that conflicted with the evidence). In fact, New Mexico barely offers any defense at all, largely referring back to its police power arguments.

While HB9 does not profess any purported purpose, statements made by New Mexico state legislators make clear that HB9 is intended solely to eliminate civil immigration detention (i.e., the implementation of federal law) in New Mexico. Specifically, New Mexico Representative Eleanor Chavez, the lead sponsor of HB9, explained that HB9 "gets New Mexico out of the business of immigration detention." FAC at ¶ 137. Governor Lujan Grisham's Director of Communications likewise explained that the Governor "wants to ensure New Mexico will not be complicit in discriminatory mass immigration enforcement . . ." *Id.* The sole purpose (and effect) of HB9 is to impede immigration enforcement, which is neither a legitimate nor significant state interest sufficient to satisfy the Contract Clause test.

New Mexico's sole post-hoc public purpose justifying the enactment of HB9 is the prioritization of "local concerns" over "the "federal immigration agenda." MTD at 26. Impeding federal immigration enforcement is not a legitimate public purpose. Moreover, prioritization of alleged local concerns would justify the termination of almost any contract with a state entity, which, as discussed *supra* Argument § I.A, is inconsistent with the Contract Clause, and is nonsensical from a practical standpoint as the counties voluntarily chose to enter the Agreements and remain free to decline to enter or extend them. Counter to New Mexico's assertion, it is clearly in Otero County's interest to provide revenue and jobs to its people and to protect its credit and bond repayment obligations. New Mexico fails to articulate a legitimate, let alone significant, public purpose sufficient to justify the forced termination of contracts that it has long approved and that further the objectives of Congress.

23

If anything, prohibiting public bodies from continuing to perform under decades-old voluntary agreements specifically authorized by federal law harms the public interest and people of New Mexico. *See* 8 U.S.C. §§ 1103(a)(11)(B), 1231(g); *U.S. Tr. Co.*, 431 U.S. at 29–32. For example, Otero County will suffer the loss of significant capital inflows, jobs, productive use of its property, and economic activity. FAC at ¶¶ 143, 151. The mere threat of enforcement has undermined the county's bonds. *Id.* at ¶ 151. If these agreements drained local resources or were contrary to the interests of the communities, the local entities could choose not to enter or extend such agreements. There is no basis for New Mexico to decide all such agreements are contrary to the public interest. If anything, the opposite is true: the Otero-ICE Contract greatly benefits the community. *See generally* Dkt. No. 42-7. The same is true for the 287(g) Agreements. Torrance and Curry Counties entered these agreements to assist law enforcement. Like the Otero-ICE Contract, there is no conceivable legitimate public purpose in hindering federal immigration enforcement. And if the constituents in Torrance or Curry Counties do not want the 287(g) Agreements, they can vote accordingly and elect representatives who will terminate them.

Moreover, HB9 does not even help the aliens it is ostensibly trying to assist. While the intended effect is to impede federal law enforcement (which is never in the public interest), the law will also cause detainees to be transferred to far-flung facilities that may be further from relatives making contact more difficult. FAC at ¶ 143. Furthermore, New Mexico can conduct health and safety inspections, engage in political oversight and visitations, review agreements, and ensure Otero County is complying with state law. *Id.* If the Contract is terminated, those 1,096 detainees will likely end up in other states where New Mexico has no oversight authority. *Id.* It is thus difficult to imagine the legitimate state interest New Mexico has in forcefully terminating the

24

long-standing Otero-ICE and Otero-MTC Contracts approved by multiple New Mexico Attorneys General. FAC at ¶ 103. And HB9's purpose of obstructing lawful immigration enforcement is neither legitimate nor in the public interest. *See United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest.").

Further, the public purpose here must be extremely significant to pass constitutional muster. *See Energy Rsrvs.*, 459 U.S. at 411 ("The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected."). And because Otero, Torrance, and Curry Counties (state entities) are parties to the Agreements, the Court may not simply defer to the legislature's purported public purpose. *See A.L.*, 2023 WL 7279318, at *4; *U.S. Tr. Co.*, 431 U.S. at 26 ("complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake."). Because HB9 lacks a valid public purpose, it certainly lacks a sufficient legitimate or significant public purpose to justify wholesale termination of the decades-old Otero-ICE Contract (or the related Otero-MTC Contract) or the 287(g) Agreements—there is no valid public purpose in frustrating the enforcement measures specifically authorized by Congress. *See* 8 U.S.C. § 1357(g).

Finally, even assuming that HB9 had a legitimate and significant purpose, HB9 must be tailored to meet that purpose based on reasonable, limited conditions. *See Energy Rsrvs.*, 459 U.S. at 412. Yet, HB9 requires the *categorical* termination of existing immigration detention and law enforcement agreements *without any conditions*, let alone reasonable conditions appropriate to address the supposed public purpose justifying its enactment. *Cf. U.S. Tr. Co.*, 431 U.S. at 29–30 ("it cannot be said that total repeal . . . was essential; a less drastic modification would have permitted the contemplated plan without entirely removing the . . . limitations . . ."). A wholesale

25

ban requiring the unconditional termination of an agreement cannot be deemed a reasonable condition "of a character appropriate to the public purpose justifying [the legislation's] adoption." *Energy Rsrvs.*, 459 U.S. at 412 (quoting *U.S. Tr. Co.*, 431 U.S. at 22). Again, New Mexico can and does have reasonable oversight and requirements placed on OCPC, which are much more effective and tailored means of ensuring the health and safety of aliens in the state. FAC at ¶¶ 143, 150. Yet, New Mexico seeks to remove all discretion for localities by instituting a blanket policy requiring the immediate termination of all existing agreements, regardless of the specific circumstances applicable to each. In HB9, New Mexico thus takes the most extreme and broad action possible to address its purported purpose of banning civil immigration detention and cooperation with federal law enforcement. HB9 thus violates the Contract Clause and is invalid.[7]

## II.      HB9 Violates Intergovernmental Immunity Principles.

The Constitution's Supremacy Clause embodies the doctrine of intergovernmental immunity, which "generally immunizes the Federal Government from state laws that directly regulate or discriminate against it." *United States v. Washington*, 596 U.S. 832, 835 (citing *South Carolina v. Baker*, 485 U.S. 505, 523 (1988)). As the Supreme Court put it nearly a century ago: "The United States may perform its functions without conforming to the police regulations of a state." *Arizona v. California*, 283 U.S. 423, 451 (1931). "[I]f a state law directly regulates the conduct of the United States, it is void irrespective of whether the regulated activities are essential to federal functions or operations, and irrespective of the degree to which the state law interferes

---

[7] New Mexico's contention that the Contract Clause cannot support facial relief, MTD at 26–27, does not support dismissal because the United States pleads its Contract Clause claim as to the existing Agreements. *See* FAC ¶ 200.

26

with federal functions or operations." *United States v. California*, 2026 WL 1088674, at \*5 (9th Cir. Apr. 22, 2026). HB9 is both discriminatory and a regulation of the federal government.

### A.     HB9 Unconstitutionally Discriminates Against Core Federal Functions.

Discrimination occurs when a state "treats someone else better than" the Federal Government or "singl[es] out the Federal Government for unfavorable treatment," *Washington*, 596 U.S. at 839, or imposes a discriminatory burden on the Federal Government, *see Dawson v. Steager*, 586 U.S. 171, 175 (2019). HB9 specifically prohibits agreements for detention and cooperation with federal immigration enforcement officers while permitting agreements and the use of property for detention and state and local law enforcement purposes, adding that "[n]othing in this section shall be construed to limit the ability of law enforcement personnel to detain individuals or to perform brief investigative stops *as permitted by state law*." HB9 at § 3(E) (emphasis added). Civil immigration detention is a regulatory area governed exclusively by federal law and enforced by the Federal Government. By including a carveout that permits detention and investigation agreements for state law purposes, HB9 embodies New Mexico's intent to limit law enforcement detention authority in a manner that applies solely to federal immigration law. *See Washington*, 596 U.S. at 839 (deeming law discriminatory because "[o]n its face" it "explicitly treats federal workers differently than state or private workers"); *King Cnty.*, 122 F.4th at 757 (ban on servicing ICE charter flights was unlawful because it "burden[ed] federal operation, and *only* federal operation").

This discrimination is apparent in practice. For example, New Mexico law allows state and local entities to enter into intergovernmental agreements and memoranda of understanding for all sorts of purposes. *See* NMSA 1978, §§ 11-1-1 to 11-1-7. So, while contracts may not be formed

between the Federal Government and localities for the purpose of civil immigration detention, no such prohibition exists for intergovernmental contracts for any other type of detention or cooperation. Indeed, Otero County operates another detention facility with MTC next door (the Otero County Prison Facility). Dkt. No. 42-6 at ¶ 13. That facility accommodates detainees for other state and local entities. *Id.* Similarly localities have non-binding MOUs between various local law enforcement entities.[8] That too does not violate HB9, but inexplicably the 287(g) Agreements do. The Joint Powers Agreements Act expressly authorizes precisely these intergovernmental law enforcement and detention arrangements, but HB9 implicates only those serving federal immigration enforcement. In treating its own state law enforcement purposes and entities better than the Federal Government, New Mexico unlawfully discriminates.

New Mexico does not contest that state and local law enforcement can enter detention and cooperation agreements with each other. Instead, relying on non-binding out of circuit precedent, it claims there is no comparator because only the Federal Government does immigration enforcement. *Cf. McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022). Troublingly, this principle suggests that states have *more* leeway to discriminate against certain federal functions *because* they are inherently federal. This turns the intergovernmental immunity doctrine, which is meant to protect the Federal Government, on its head. Indeed, in any other context this idea is not

---

[8] *See, e.g.*, Albuquerque Police Department Procedural Orders, *Law Enforcement Assisted Diversion (LEAD) Program* (Sept. 7, 2023) https://documents.cabq.gov/police/standard-operating-procedures/2-79-law-enforcement-assisted-diversion-lead-program.pdf [https://perma.cc/HC9U-R8TH]; Office of the Second Judicial District Attorney State of New Mexico, *Diversion*, https://da2nd.nm.gov/office-divisions/diversion/ [https://perma.cc/WDE9-6W3F] (New Mexico Law Enforcement Assisted Diversion "is a collaborative partnership between Bernalillo County, Albuquerque Police Department (APD), Bernalillo County Sheriff, the District Attorney's Office, and the Law Office of the Public Defender."); *Memorandum of Understanding Between Santa Fe County and the Pueblo of Tesuque*, https://cops.usdoj.gov/pdf/tribal_training/MOU_MOA/Funding/MOU_Santa_Fe_County_Pueblo_of_Tesuque.pdf [https://perma.cc/H6W3-5MVP]; N.M. Stat. Ann. § 29-1-11(B); *Memorandum of Understanding Between the Espanola Police Department and the Espanola Public Schools for a School Resource Officer Program for the 2019-2020 School Year*, https://www.espanolanmusa.org/DocumentCenter/View/3609/Draft-SRO-MOU-2020-2?bidId=.

28

conceivable. For example, can a state bar private companies (e.g., Northrop Corporation) from contracting with the military (e.g., the U.S. Air Force) on the basis that the military performs a uniquely federal function without an exact comparator (e.g., flying B-2 Spirit bombers)? Surely not. The requirement that the Federal Government identify a civil immigration comparator is overly specific. Why couldn't a state also pass a law stating that no one can assist with the enforcement of federal law? They are defining the comparator as the very thing they are discriminating against. The more logical level of specificity would require a comparator that performs detention services and law enforcement more generally. To analogize to other discrimination contexts, discrimination against pregnancy is discrimination "on the basis of sex" *because only* women can get pregnant, even though not all women are pregnant. 42 U.S.C. § 2000e(k) ("because of or on the basis of pregnancy"); *California Fed. Sav. & Loan Assn. v. Guerra*, 479 U.S. 272, 277 (1987). A rule that allows States to discriminate against the Federal Government merely because it is performing a uniquely federal function is contrary to the intergovernmental immunity doctrine.

The Ninth Circuit rejected this principle in a similar case where King County, Washington, promulgated an order that modified agreements with ICE. *See King Cnty.*, 122 F.4th at 757. In deeming the order to be unlawfully discriminatory against the Federal Government, the Ninth Circuit did not require a comparator because "the only entity in the business, so to speak, of deporting immigration detainees, is the federal government." *Id.* The order explicitly restricted the use of county property from flight servicers for "any purpose other than servicing flights 'engaged in the business of deporting immigration detainees.'" *Id.* at 757. Because the order facially singled out the Federal Government, the Ninth Circuit concluded that it was discriminatory. *See id.* at 757–

29

58 ("King County's Executive Order on its face discriminates against the United States 'by singling out' the federal government and its contractors 'for unfavorable treatment' or 'regulat[ing] them unfavorably on some basis related to their governmental status.'") (quoting *Washington*, 596 U.S. at 839). Here, because state and local law enforcement entities can enter into similar agreements for law enforcement purposes but are barred from doing so solely for federal immigration law enforcement purposes, HB9 is facially discriminatory.

New Mexico attempts to invoke anticommandeering principles to save HB9. Yet, HB9 facially prohibits state and local entities from contracting with the Federal Government. The anticommandeering doctrine does not apply to laws that violate intergovernmental immunity principles, which are designed to protect the Federal Government from unlawful actions by states. More fundamentally, the Federal Government is not requiring localities to enter into any particular contract. The Federal Government is merely seeking to prevent New Mexico from categorically banning federal immigration enforcement activities within the state. *See King Cnty.*, 122 F.4th at 758 ("Here, the United States does not seek to compel King County to implement a federal immigration program."). The localities that choose to enter into these agreements voluntarily are clearly not being commandeered. *See id.* ("Requiring a municipality to uphold its end of a contractual bargain is not commandeering."); *id.* ("Requiring this form of non-discriminatory access to county property consistent with the intergovernmental immunity doctrine does not create a back-end anti-commandeering problem."). To analogize to classic discrimination contexts, businesses are not forced to open or operate, but once they do, they cannot discriminate on certain protected bases. Here, the State of New Mexico engages in law enforcement cooperation and

detention initiatives, while attempting to prohibit those in the immigration context. Accordingly, the United States easily states a plausible claim of discrimination that withstands dismissal.

### B.    HB9 Seeks to Directly Regulate the Federal Government.

A state law unlawfully regulates the United States when it "'places [either] a prohibition' or mandate on the federal government." *CoreCivic*, 145 F.4th at 321 (quoting *Hancock v. Train*, 426 U.S. 167, 180 (1976)). Here, HB9 regulates the Federal Government by placing a prohibition on the parties and property available to it. The purpose and effect of HB9 is to control the parties with whom the Federal Government may form voluntary agreements to perform the core government function of enforcing immigration law. *See* HB9 §§ 3(A)–(C); *CoreCivic*, 145 F.4th at 327 (finding that a state law "directly regulates the federal government by substantially interfering with a core federal function" by banning immigration detention facilities). The law removes Otero County as a potential counterparty an agreement like the Otero-ICE Contract even though it is a willing participant. HB9 also removes all other counties and localities as contracting parties to similar agreements and 287(g) agreements, such as Curry and Torrance Counties.

HB9 also regulates the Federal Government by controlling the property that the Federal Government may use to perform its immigration enforcement operations, including the detention of aliens. *See* HB9 § 3(C). While Congress authorized the Federal Government to cooperate with state and local governmental entities to use real property to detain aliens, New Mexico seeks to limit and control the real property available to the Federal Government for that purpose. *Compare* 8 U.S.C. §§ 1231(g), 1103(a)(11)(B), *with* HB9 § 3(C). The elimination of potential counterparties to agreements that Congress specifically authorized as part of the cooperative civil immigration

31

enforcement scheme constitutes regulation of the Federal Government by imposing conditions on the Federal Government that are inconsistent with federal immigration law or Congressional intent.

New Mexico tries to argue that it is only regulating its own subdivisions, not the Federal Government. But "'what cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows[.]'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1867)). By comparison, in *Geo Grp., Inc. v. Newsom*, the en banc Ninth Circuit invalidated a California statute that phased out all private detention facilities in the State. 50 F.4th at 751. Because the statute would have prevented ICE's contractors from continuing to run detention facilities for federal purposes, requiring ICE either to transform its approach to detention, the statute regulated the Federal Government and was therefore unconstitutional. *Id.* Further, in *CoreCivic*, the Third Circuit invalidated a state law that banned state and local governments and private parties from making, renewing, or extending contracts to detain people for civil immigration violations. 145 F.4th 315, 319 (2025). Although the law's text did not name the Federal Government, the Third Circuit probed the purpose and self-evident operation of the statute, "easily see[ing] the law for what it really [was]: a regulation" of the Federal Government. *Id.* at 325; *see also Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189 (1956) (holding that a state law requiring building contractors to obtain a state license could not be enforced against a contractor hired on a federal construction project). While New Mexico points out that these cases involved private parties, the principles remain the same: a state cannot purposefully limit the parties with whom the government can contract on a blanket basis for the purpose of stymieing immigration enforcement. Here, state legislators have championed HB9's purpose of imposing a regulation on

32

the Federal Government by ending civil immigration detention in New Mexico. FAC at ¶ 137.

Accordingly, HB9 unlawfully regulates the Federal Government and the MTD should be denied.

## III.  HB9 Is Preempted By Federal Immigration Law.

HB9 is preempted because it stands as an obstacle to Congress's immigration purposes and objectives as set forth in the INA. The preemption doctrine provides that federal interests overcome state interests when federal and state law "clash." *North Dakota v. United States*, 495 U.S. 423, 426 (1990) (plurality). When a state law conflicts with a federal statute, the state law is impliedly preempted. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). A state law conflicts with a federal statute where the law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *Crosby*, 530 U.S. at 372–73; *Cerveny v. Aventis, Inc.*, 855 F.3d 1091, 1098 (10th Cir. 2017) (describing "obstacle" preemption as when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

To achieve Congress's immigration objectives, the INA requires that aliens be detained in various circumstances. *See* 8 U.S.C. §§ 1226(a), (c), 1231(a)(2), (g), 1225(b)(1)(B)(ii), (b)(1)(B)(iii)(IV), (b)(2)(A), 1226a(a)(1). Thus, the INA gives broad discretion to the Executive to "arrange for appropriate places of detention for aliens detained," and, when federal facilities are unavailable, to "expend . . . amounts necessary to acquire land and to . . . operate facilities . . . necessary for detention." 8 U.S.C. § 1231(g). That includes the ability "to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local

33

government which agrees to provide guaranteed bed space for persons detained by the Service." 8 U.S.C. § 1103(a)(11)(B). That also includes 287(g) agreements to help investigate and enforce immigration laws. *See* 8 U.S.C. § 1357(g). Thus, to fulfill those purposes and objectives, Congress permitted state and local officials to voluntary contract to provide the Federal Government detention facilities and services. *See* 8 U.S.C. §§ 1231(g); 1103(a)(11)(B); *see also* 6 U.S.C. § 112(b)(2) (granting the DHS Secretary "the authority to make contracts, grants, and cooperative agreements . . . as may be necessary and proper to carry out the Secretary's responsibilities . . .").

HB9 stands as an obstacle to the accomplishment and execution of those congressional objectives by dramatically curtailing the Federal Government's congressionally delegated discretion to select, locate, and contract with local governments to provide facilities and services for immigration detention. *See* HB9 §§ 3(A)–(C). HB9 directly frustrates Congress's delegation of authority to ICE to determine what facilities are appropriate for immigration detention and to secure such facilities through purchase, lease, or contract. *See* HB9 §§ 3(A)–(C). HB9 substitutes New Mexico's policy judgment for the Federal Government's determination of how best to house individuals subject to federal immigration proceedings and with whom to contract to achieve those ends. HB9 likewise conflicts with 6 U.S.C. § 112(b)(2) by impermissibly regulating and restricting the Federal Government's ability to carry out its functions through contracts with non-federal parties, including Otero County. This is unconstitutional, as "the Supremacy Clause . . . bars states from taking actions that frustrate federal laws and regulatory schemes." *City of N.Y. v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). And it eviscerates the cooperative scheme for 287(g) agreements. As explained, impairing the Agreements would frustrate DHS's ability to enforce immigration laws within New Mexico and nationally. *Supra* Background § II, Argument § I.C. The

same is true for the 287(g) Agreements. *Id*. Put simply, banning all agreements for immigration detention and enforcement with public bodies creates a significant impediment to the enforcement of immigration laws and defeats the flexibility of Congress's cooperative detention scheme.

New Mexico, relying on *McHenry* once again, erroneously argues that its decision to force its political subdivisions to withhold cooperation with the Federal Government, as envisioned by the INA, is not an obstacle because the scheme is voluntary. The Second Circuit has made clear that "[i]f Congress may not forbid states from outlawing even voluntary cooperation with federal programs by state and local officials, states will at times have the power to frustrate effectuation of some programs. Absent any cooperation at all from local officials, some federal programs may fail or fall short of their goals unless federal officials resort to legal processes in every routine or trivial matter, often a practical impossibility." *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). States thus cannot outright ban cooperation as that would eviscerate Congress's scheme, which is exactly what New Mexico did through the enactment of HB9. *Id.*

As the Supreme Court made clear in *Arizona*, the INA depends on local cooperation. *See* 567 U.S. at 411 ("Consultation between Federal and state officials is an important feature of the immigration system."); *see also, e.g.*, 8 U.S.C. §§ 1226(d), 1231(a), 1357(g); *see also United States v. Alas*, 63 F.4th 269, 274 (4th Cir. 2023). While localities, in their discretion, can decline to enter these agreements, a State cannot ban Congress's scheme and thus frustrate it. *See City of New York*, 179 F.3d at 35. That is exactly what obstacle preemption principles are intended to prevent.

IV.    <u>**The Tenth Amendment Is Not Implicated.**</u>

The Supremacy Clause makes clear that when state and federal laws clash, federal law is supreme. The Tenth Amendment merely reserves powers not granted to the Federal Government

or prohibited to the States, to the States. The "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens," *Arizona*, 567 U.S. at 394, and an inherent obligation and broad authority to establish immigration laws, *see Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). To that end, Congress enacted an "extensive and complex" statutory scheme for the "governance of immigration and alien status," as reflected in the various provisions of the INA. *See Arizona*, 567 U.S. at 395. As part of that scheme, while States can prosecute and detain aliens, the Federal Government is obligated to then detain them following their incarceration. *See* 8 U.S.C. §§ 1225(b)(2)(A), 1226(c), 1231. Congress thus created a cooperative federalism system to ensure effective immigration enforcement, which requires particular forms of state participation as a condition of the state's voluntary choice to participate in a federal program. *See Murphy v. NCAA*, 584 U.S. 453, 476 (2018) (describing precedents upholding such "cooperative federalism" programs) (citation omitted). "Consultation between Federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. Absent any cooperation at all from "local officials," the immigration system—like other federal programs—"may fail or fall short of [its] goals[.]" *City of New York*, 179 F.3d at 35.

New Mexico claims that the INA's cooperative scheme cannot be preemptive because it does not regulate private parties. But the INA is a comprehensive scheme to regulate *aliens*. *See Arizona*, 567 U.S. at 395. The INA allows states to first detain aliens, but it also requires DHS to then detain many of those same aliens. To effectuate this regulation of aliens, state cooperation is vital. *See, e.g.*, 8 U.S.C. § 1357(g). While New Mexico claims the INA would commandeer its legislative functions, the INA does not require state officials to pass or repeal a law. The Federal Government merely seeks to enforce immigration law as part of its broad scheme to regulate aliens.

For similar reasons, the INA is not commandeering New Mexico. The United States is not insisting that local officials enforce federal law but seeks to preclude the state from banning its voluntary cooperation in a way that frustrates Congress's scheme. The Second Circuit supported this view in *City of New York*, 179 F.3d at 33–35, explaining that "the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal programs" cannot be converted "into a sword allowing states and localities to . . . frustrate[] federal programs." *Id.* at 35. The Second Circuit has since reaffirmed that holding *after Murphy*. *See State v. Dep't of Just.*, 951 F.3d 84, 114 n.27 (2d Cir. 2020). Disallowing a state from banning all voluntary cooperation is not the same as commandeering or regulating the state.

## V.      <u>**The Governor Is a Proper Defendant.**</u>

The Governor admits she "has the authority to direct the Attorney General[.]" Gov. MTD at 6. Indeed, as alleged, she "'has control over' Attorney General Torrez 'and, therefore, may direct whether and to what extent' [the Act] is enforced." FAC at ¶ 26 (quotation omitted). She admits that she has the authority to direct the Attorney General to "prosecute and defend in any other court or tribunal all actions and proceedings, civil or criminal, in which the state may be a party or interested." N.M. Stat. Ann. 8-5-2(B) (1975)." *Id.* These concessions alone warrant denial of her motion and demonstrate that the United States has standing to seek injunctive relief against the Governor, which she does not contest. *See Hernandez v. Lujan Grisham*, 499 F. Supp. 3d 1013, 1049 (D.N.M. 2020); *Petrella v. Brownback*, 697 F.3d 1285, 1293–94 (10th Cir. 2012).

Instead, the Governor makes two frivolous immunity arguments. First, the United States is not suing the Governor because she signed HB9. Instead, the United States is seeking prospective relief against the *enforcement* of HB9. FAC at ¶ 26. Accordingly, legislative immunity does not

warrant her dismissal. Second, the Governor's argument that the Eleventh Amendment provides herself and New Mexico immunity overlooks who the Plaintiff is: the United States of America. There is a reason New Mexico does not make this argument: the Eleventh Amendment "forbids suits against States *only* when 'commenced or prosecuted by Citizens of another State, or by Citizens or Subjects of any Foreign State.'" *United States v. Mississippi*, 380 U.S. 128, 140 (1965) (internal citation omitted) (emphasis added). "While this has been read to bar a suit by a State's own citizen as well, . . . nothing in this or any other provision of the Constitution prevents or has ever been seriously supposed to prevent a State's being sued by the United States. The United States in the past has in many cases been allowed to file suits in this and other courts against States" *Id.* (collecting cases). Indeed, the Tenth Circuit rejected an identical argument raised by the University of New Mexico because the Eleventh Amendment "does not bar suits against a state by the United States." *U.S. for & on Behalf of Santa Ana Indian Pueblo v. Univ. of New Mexico*, 731 F.2d 703, 705 (10th Cir. 1984). So, the Eleventh Amendment does not apply, and the United States does not need to satisfy *Ex Parte Young* to secure injunctive relief against the Governor.

## <u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully requests that this Court deny the Motions to Dismiss filed by the State of New Mexico, Attorney General Raúl Torrez, and Governor Michelle Lujan Grisham (Dkt. Nos. 49, 51).

DATED: July 20, 2026

TODD BLANCHE
Acting Attorney General

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TIBERIUS DAVIS
Counsel to the Assistant Attorney General

RYAN ELLISON
First Assistant United States Attorney
District of New Mexico

ROBERT O. LINDEFJELD
Assistant Director
U.S. Department of Justice, Civil Division
Enforcement & Affirmative Litigation Branch

Respectfully Submitted,

*/s/ Jackson M. Story*
Trial Attorney
U.S. Department of Justice, Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044-0386
Telephone: (202) 451-7304
Email: jackson.m.story@usdoj.gov

EMIL J. KIEHNE
Assistant U.S. Attorney
U.S. Attorney's Office,
District of New Mexico
201 3rd Street NW, Suite 900
Albuquerque, New Mexico 87102
Telephone: (505) 346-6855
Email: emil.kiehne@usdoj.gov

*Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2026, I filed the foregoing with the Clerk of Court using

the CM/ECF system, which will send notice of such filing to all counsel of record.

*/s/ Jackson M. Story*
Trial Attorney
U.S. Department of Justice

39