UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

|                                    |   |                                      |
|------------------------------------|---|--------------------------------------|
|                                    | ) |                                      |
| THE UNITED STATES OF AMERICA,      | ) |                                      |
|                                    | ) | Civil Action No. 1:26-CV-1471-KG-LF  |
| Plaintiff,                         | ) |                                      |
|                                    | ) |                                      |
| v.                                 | ) | RESPONSE IN OPPOSITION TO            |
|                                    | ) | DEFENDANTS CITY OF ALBUQUERQUE       |
| THE STATE OF NEW MEXICO, et al.;   | ) | AND MAYOR TIMOTHY KELLER'S           |
|                                    | ) | MOTION TO DISMISS                    |
| Defendants.                        | ) |                                      |
|                                    | ) |                                      |

i

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ....................................................................................................................... 2

    I.      Federal Supremacy Principles.................................................................................... 2

    II.     Congress's Comprehensive Statutory Immigration Scheme........................................ 3

    III.    The Albuquerque SCPO................................................................................................ 5

    IV.   Procedural History ....................................................................................................... 7

LEGAL STANDARD ............................................................................................................... 7

ARGUMENT ............................................................................................................................ 8

    I.      The ASCPO Is Preempted............................................................................................ 8

         A.    The ASCPO conflicts and stands as an obstacle to federal immigration enforcement by rejecting Congressionally authorized means of enforcement. 8

         B.    The ASCPO stands as an obstacle to federal immigration enforcement by requiring businesses to tip off aliens as to immigration enforcement activities. ........................................................................................................................... 13

         C.    The ASCPO stands as an obstacle to federal immigration enforcement by restricting the Federal Government's access to property. ............................... 14

         D.    The INA does not violate the anti-commandeering doctrine. ......................... 15

    II.     The ASCPO Violates the Doctrine of Intergovernmental Immunity. ........................ 17

         A.    The ASCPO impermissibly discriminates against the Federal Government. . 18

         B.    The ASCPO impermissibly regulates the Federal Government. .................... 20

    III.    The United States' Sovereign Interests Are Harmed By the ASCPO Tip Off Provision. ....................................................................................................................................... 23

    IV.  Mayor Keller Is A Proper Defendant. ............................................................................ 24

CONCLUSION........................................................................................................................... 24

Plaintiff United States of America hereby responds in opposition to the motion to dismiss filed by the City of Albuquerque and Albuquerque Mayor Timothy Keller ("Defendants") (Dkt. No. 50) ("Motion"). In support, the United States proffers the following:

**INTRODUCTION**

Through its so-called Safer Community Places Ordinance ("ASCPO"), the City of Albuquerque is actively trying to impede federal immigration enforcement by making it harder for the Federal Government to investigate, detain, and remove criminal illegal aliens from this country. Congress has established a comprehensive scheme of critical immigration objectives that depends on the Federal Government's ability to operate within the states. Yet, the ASCPO prevents the Federal Government from accessing the property, people, and records necessary to achieve Congress's immigration objectives at the expense of the Nation as a whole. The ASPCO requires the Federal Government to obtain judicial warrants and subpoenas, when Congress authorized the use of administrative warrants, subpoenas, and detainers. The ASCPO does not just apply these restrictions to city-owned property, but to an unbounded list of misnamed "Safer Community Places." Worse, the ASCPO attempts to shield illegal aliens from detection by federal authorities by requiring businesses to notify aliens on ongoing immigration enforcement activities. These requirements run afoul of the Supremacy Clause. Despite Defendants' protestations, the United States does not claim it can commandeer city property and personnel for any purpose. Instead, the United States claims that Defendants cannot obstruct federal law enforcement, ignore Congressionally authorized means of enforcement, or discriminate against or regulate the Federal Government. Because the United States alleges facts supporting viable claims based on federal supremacy principles, the Motion must be denied.

1

**BACKGROUND**

### I. Federal Supremacy Principles

The Supremacy Clause mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under the Supremacy Clause, a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000).

A state law is also invalid "if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990). "[A] state law discriminates against the Federal Government . . . if it singles [it] out for less favorable treatment or if it regulates [it] unfavorably on some basis related to [its] governmental status." *Untied States v. Washington*, 596 U.S. 832, 839 (2022). The Supreme Court has long recognized that "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). States "have no power" to "in any manner control[] the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819). Accordingly, the "United States may perform its functions without conforming to the police regulations of a state." *Arizona v. California*, 283 U.S. 423, 451 (1931); *see also United States v. Town of Windsor*, 765 F.2d 16, 18 (2d Cir. 1985) ("Absent congressional consent, direct state regulation of the activities of the Government is barred by the Supremacy Clause.").

## II.    Congress's Comprehensive Statutory Immigration Scheme

"[O]ver no conceivable subject is the" federal power "more complete," and thus more supreme, "than it is over" immigration. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quotations omitted). "[T]he supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution." *Hines*, 312 U.S. at 62. The regulation of immigration is a "national matter[ ] . . . intrusted to the government of the Union." *Ping v. United States*, 130 U.S. 581, 605–06 (1889). As a result, Congress "has undoubtedly the right . . . to take all proper means to carry out the system which it provides." *Fong Yue Ting v. United States*, 149 U.S. 698, 714 (1893). Based on its enumerated constitutional and sovereign powers to control and conduct relations with foreign nations, the Federal Government has broad authority to establish immigration laws, the execution of which the States cannot obstruct or discriminate against. *See Arizona v. United States*, 567 U.S. 387, 394–95 (2012); *accord North Dakota*, 495 U.S. at 435; *id.* at 444-47 (Scalia, J., concurring).

As reflected in various provisions of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101, *et seq.* ("INA"), Congress has exercised its broad authority by enacting an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395. The INA confers extensive authority on the Executive to inspect, investigate, arrest, detain, and remove aliens. *See* 8 U.S.C. §§ 1182, 1224–1228, 1231. Responsibility for enforcing these laws is vested principally in the U.S. Department of Homeland Security ("DHS") as well as its component agencies, including Immigration and Customs Enforcement ("ICE").

Congress gave DHS several tools to fulfill its mission. For example, the INA expressly authorizes DHS to arrest and detain aliens pursuant to administrative, not judicial, warrants. *See* 8 U.S.C. § 1226(a). DHS is authorized to inspect all applicants for admission and take appropriate

action against inadmissible aliens, even ones who are transferred to State or local custody pending prosecution, *see* 8 U.S.C. §§ 1182, 1225; 8 C.F.R. § 235.2, and "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). DHS is further authorized to arrest and search individuals without a warrant. *See id.* § 1357(a)(2), (4), (5), (c). DHS is also empowered to issue administrative subpoenas for witness testimony and documents. *See id.* § 1225(d)(4). Courts have recognized that DHS may avail itself of publicly owned property for the purpose of carrying out its mission. *See, e.g.*, *United States v. King Cnty., Wash.*, 122 F.4th 740, 758 (9th Cir. 2024) ("Requiring this form of non-discriminatory access to [public] property consistent with the intergovernmental immunity doctrine does not create a back-end anti-commandeering problem. [The court] would not perceive a threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways."). DHS has "broad discretion" to implement these laws. *Arizona*, 567 U.S. at 396.

Congress further sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii). Federal, state, and local government entities and officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a); *see also id.* §§ 1644; 1357(g)(10)(A) (no formal agreement is required for a state or local official to communicate with immigration officials regarding the immigration status of any individual, including knowledge of unlawful presence). Congress passed § 1373 to fix a specific problem,

4

after it observed "certain states and localities were restricting their officials' cooperation with federal immigration authorities." *New York v. U.S. Dep't of Just.*, 951 F.3d 84, 96 (2d Cir. 2020); *see City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). In enacting Section 1373, "Congress sought to give State and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary." *New York*, 951 F.3d at 97 (citations omitted).

### III.   The Albuquerque SCPO

On March 23, 2026, Albuquerque Mayor Timothy Keller signed the SCPO, O-26-15, into law, becoming effective on March 30, 2026. *See* ASCPO § 13-17-7(5). The ASCPO broadly prohibits the use of Albuquerque property for federal immigration enforcement purposes, singling out "immigration enforcement" numerous times, stating "[n]o City-owned and operated structure or venue . . . shall be used for immigration enforcement purposes, including as a staging area, processing location, or operations base." ASCPO § 1-5-1(A). The term "staging area" is defined as "an area that is used to assemble, mobilize, and deploy vehicles, equipment, or materials, and related personnel, for the purpose of carrying out immigration enforcement." *Id.* § 1-5-1(A); *see also id.* § 1-5-1(B)(6) (restricting use of certain "resources to be used for immigration enforcement" on non-City property). To enforce this prohibition, the ASCPO requires the "identif[ication of] City-owned and controlled structure[s] or venue[s] . . . that either have been used, or are likely to be used in the future, as a staging area, processing location, or operations base for the purpose of immigration enforcement" and demands that such areas have posted signs stating that they "may not be used for immigration enforcement" and that such areas be physically "secured . . . by means including, but not limited to, locked gates or barriers." *Id.* §§ 1-5-1(B)(1)–(2). City employees are required to report "the attempted or actual use" of such properties "to their

supervisor, who will communicate with the Mayor and the City Attorney." *Id.* § 1-5-1(B)(3). The ASCPO additionally bars the approval of "any permit, contract or other agreement for use of City owned or controlled property or resources if . . . the property or resources will be used for the purposes of facilitating immigration enforcement." *Id.* § 5-1-5(B)(4).

The ASCPO further requires more of DHS than Congress considered appropriate in terms of administrative detainers, subpoenas, and warrants and custodial transfers of criminal illegal aliens. It restricts the "use" of "any City resources, including, but not limited to, moneys, equipment, personnel, vehicles, or facilities . . . to be used to transport individuals for immigration enforcement purposes," and prohibits the use of "City property or resources" to "be used to facilitate custody transfer or transport to federal immigration authorities absent a valid judicial warrant or court order." *Id.* § 5-1-5(B)(5); *see id.* § 5-1-5(B)(6). The ASCPO further restricts the sharing of critical information and requires more than what Congress deemed necessary by prohibiting certain public and private entities "from providing voluntary consent to law enforcement agents engaged in or supporting immigration enforcement from: (1) Entering non-public areas; or (2) Accessing, reviewing, or obtaining student or patient records." *Id.* § 13-17-4(A)(1), (2). The ASCPO applies these information sharing and property restrictions not only to its own records and property, but also the records and property of private entities and areas open to the public including, for example, "[c]ourthouses and judicial facilities," "[h]ospitals and other healthcare facilities," "[l]ibraries, community centers, and cultural centers," [p]laces where children routinely gather," "[c]ommunity resource centers and . . . legal service providers, . . . family justice centers," "[w]ork zones and construction sites on City property and within City rights of way," "[p]ublic transportation facilities and transit centers," and "[a]ny location where City services are delivered to the public[.]" *Id.* §§ 13-17-3(1)–(11). The places subject to the City's

6

restrictions are potentially unbounded, as the ASCPO purports to apply to unspecified "[o]ther similar locations, as determined by the City." § 13-17-3(12).

Perhaps its most blatant attempt to frustrate immigration enforcement objectives is its tip-off requirement, which mandates that "businesses . . . provide notice to all current employees, contractors, and others performing work for the employer for remuneration . . . within 24 hours of a law enforcement agent engaging in or supporting immigration enforcement being present at a place of work[,]" which notice includes the name of the agency, date the immigration enforcement agent was present, and the nature of the agent's actions. *See id.* §§ 13-7-6(C)(1).

These requirements pose obstacles to the Federal Government's ability to enforce the provisions of the INA, impose mandates and prohibitions on the Federal Government beyond those contemplated by Congress, and single out the Federal Government for negative treatment.

## IV.    **Procedural History**

On June 22, 2026, the United States filed its First Amended Complaint ("FAC") against Defendants. *See* FAC at ¶¶ 24, 28, 29. The FAC asserts three claims against Defendants arising out of the ASCPO: (1) federal preemption, (2) unlawful regulation, and (3) unlawful discrimination. *See id.* at ¶¶ 164–190. The United States seeks, *inter alia*, a judgment declaring that the ASCPO is preempted and violates the Supremacy Clause and is therefore unconstitutional, invalid, and unenforceable, and a permanent injunction of its operation and enforcement. *See id.* at Prayer for Relief ¶¶ A, B, D. On July 6, Defendants moved to dismiss the FAC. *See* MTD.

## **LEGAL STANDARD**

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d

1231, 1235 (10th Cir. 2013). A claim will survive a motion dismiss only when it is facially plausible, in other words, where the plaintiff pleads facts sufficient to raise a right to relief beyond mere speculation. *Id.* (internal citations omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Importantly, dismissal is a "harsh remedy which must be cautiously studied … to protect the interests of justice." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (quoting *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009)). A motion to dismiss filed under Rule 12(b)(1) challenges subject matter jurisdiction, which the plaintiff must establish. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

## ARGUMENT

### I.    The ASCPO Is Preempted.

As alleged in the FAC, the ASCPO flouts federal supremacy principles and the Federal Government's comprehensive immigration authority by undermining how the Executive Branch enforces Congress's immigration scheme. When Congress exercises its enumerated powers to regulate individuals, the states cannot stand in the way. U.S. Const. art. VI, cl. 2. "[T]he very essence of supremacy" empowers the Federal Government to "remove all obstacles to its action within its own sphere." *McCulloch*, 17 U.S. (4 Wheat.) at 427. Under the Supremacy Clause, "when federal and state law conflict, federal law prevails and state law is preempted." *Murphy v. NCAA*, 584 U.S. 453, 471 (2018). The ASCPO is preempted because it stands as an obstacle to the accomplishment of the full purposes and objectives of Congress under the INA in several respects.

### A.    The ASCPO conflicts and stands as an obstacle to federal immigration enforcement by rejecting Congressionally authorized means of enforcement.

The ASCPO is preempted because it requires "a valid judicial warrant . . . or a valid judicial subpoena or judicial order" to permit certain public and private entities to provide "voluntary consent to law enforcement agents engaged in or supporting immigration enforcement" to enter

8

non-public areas or "[a]ccess[], review[], or obtain[] student or patient records." FAC at ¶¶ 92, 115 (quoting ASCPO § 5-1-5(A)). These restrictions are not limited to Albuquerque property, but apply to a long (and potentially unbounded) list of so-called Safer Community Places ranging from hospitals to community resource centers, to public transportation centers—indeed, "[a]ny location where City services are delivered to the public; or [o]ther similar locations, as determined by the City." ASCPO § 13-17-3.

Defendants argue that these restrictions "do[] not obstruct federal immigration enforcement" but rather are consistent with requirements contemplated by existing law. MTD at 15–18. However, Congress authorized the Federal Government to use administrative, not judicial, warrants and subpoenas to obtain access to aliens and related information, *see* 8 U.S.C. §§ 1125(d)(4), 1226(a), and authorized warrantless arrests to detain aliens, *id.* § 1357(a). Congress even sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." 8 U.S.C. § 1324(a)(1)(A)(iii). DHS may also inspect all applicants for admission or "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1); *see id.* § 1225(b)(2); 8 C.F.R. § 235.2. Yet, under ASCPO, if an alien is located in a "Safer Community Place," including a courthouse, library, hospital, or any other location designated by the City, that location must refuse access to law enforcement to detain an alien and cannot accept an administrative warrant or subpoena absent judicial approval. These prohibitions facially override Congress's means of enforcing immigration law.

Defendants say they are merely declining to consent to cooperation and telling certain private organizations they also cannot consent. *See* MTD at 15. But Defendants admit that the

ASCPO prohibits compliance with administrative warrants and subpoenas. *See id.* at 5. Those are not voluntary requests for cooperation; they are mandatory congressionally authorized means of investigation and enforcing the law. Defendants also argue that federal law allows them to control access to their own property. *See id.* at 15. Yet Albuquerque admits it must allow access for judicial warrants. *See id.* at 5. The same must be true for administrative warrants, subpoenas, and warrantless arrests. Congress knew how to geographically limit the scope of such authorities but chose not to for state and city owned property. *See* 8 U.S.C. § 1357(a)(2)–(3) (preventing warrantless arrests in "dwellings"); *New York v. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 393 (S.D.N.Y. 2019) (noting Congress presumed there would be courthouse arrests based on U.S.C. § 1229(e)). Defendants cannot ignore DHS's Congressionally authorized authority. Requiring immigration enforcement officials to obtain judicial permission to use the tools given to them by Congress conflicts with imposes an obstacle to the enforcement of federal law.

Defendants argue that requiring "judicial process" does not impose an obstacle on federal immigration enforcement. MTD at 15. Not so. It is disputed whether DHS can obtain judicial warrants for immigration enforcement. *See In re Sealed Search Warrant Application*, 784 F. Supp. 3d 970, 972 (S.D. Tex. 2025). And Congress has expressly authorized the use of administrative warrants and subpoenas, and warrantless arrests, to expedite the detention and removal process. 8 U.S.C. §§ 1225(d)(4), 1357(a), (c); *see id.* § 1226(a). These warrants are not a procedural workaround; they are the instrument Congress specifically designed for immigration enforcement. Refusal to recognize the administrative tools granted by Congress to access property, people, and records nullifies the enforcement mechanism Congress prescribed. Section 1357 authorizes federal agents to make arrests without any warrant in certain circumstances. *Id.* § 1357(a)(2). While a state cannot displace federal immigration policy with its own immigration policy, it also cannot

10

sabotage the federal scheme. *Arizona*, 567 U.S. at 408–10. If Defendants acknowledge the legal force of a federal judicial warrant, there is no basis to reject administrative warrants authorized by federal law, as both are supreme. By mandating judicial approval, the ASCPO requires more than what Congress deemed necessary to access the locations, people, and information necessary to enforce immigration law. As a result the ASCPO conflicts with and poses an obstacle to the objectives of federal law and is preempted.

Defendants' Fourth Amendment defense, which imagines some hypothetical situation where someone cannot consent to a search of another's property, is baseless. *See* MTD at 15–16. The ASCPO is not so limited. It covers any access to so-called Safer Community Places irrespective of who controls such place or consents to search. Regardless, the issue here is that the ASCPO contravenes federal law by allowing access only based on judicial orders, forbidding access based on administrative warrants or subpoenas. DHS does not need consent to access such spaces because of Congressionally authorized means. The notion that administrative warrants do not provide access to private areas protected by the Fourth Amendment is patently false and has been rejected time and time again. *See United States v. Malagerio*, 49 F.4th 911, 915–16 (5th Cir. 2022) (administrative warrant allowed arrest in curtilage without Fourth Amendment issue); *United States v. Lucas*, 499 F.3d 769, 776 (8th Cir. 2007) (similar for inside houses); *Abel v. United States*, 362 U.S. 217, 234 (1960) (history and constitutionality of administrative warrants). In any event, the solution to a Fourth Amendment violation is federal law, not a local ordinance.

Defendants' reliance on HIPPA, FERPA, and other New Mexico privacy laws is irrelevant. First, as Defendants acknowledge, HIPPA and FERPA allow disclosure of medical records to law enforcement. MTD at 17–18; *see* 45 C.F.R. § 164.512(f); 34 C.F.R. § 99.31(a)(9)(i) (FERPA allows disclosure on "judicial order or lawfully issued subpoena"). Nothing in those authorizations limits

11

disclosures based on the administrative character of a warrant or subpoena. Second, Defendants cannot prohibit compliance with an administrative subpoena to increase the protections of HIPPA or FERPA. The same logic applies to all state privacy laws. While states and localities are free to pass additional protections, they cannot refuse to comply with administrative subpoenas based on state law, much less prohibit private parties from doing so. Congress authorized administrative subpoenas as a way of obtaining testimony, documents, and records, and, as with judicial warrants, that authorization overrides any contrary state or local laws. Third, administrative warrants do not generally seek patient or student records. DHS merely seeks information related to the immigration status of individuals in furtherance of federal law, as authorized many times over by the INA. Federal law provides that a "State[] or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration officials "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see also* 8 U.S.C. § 1644 (similar). The phrase "citizenship or immigration status," as used in Section 1373(a), refers to a person's legal classification under federal law and information bearing on that status. Other provisions in the immigration scheme demonstrate why this information is relevant and necessary to immigration enforcement. *See, e.g.*, *id.* §§ 1255, 1357(10)(A) (providing an alien's "lawful presence" as an example of information "regarding . . . immigration status"). This information does not include an alien's medical history. The ASCPO as written, however, can preclude access to status information if it is connected to covered records. By preventing access to this information absent a judicial warrant or order, the ASCPO flouts the INA. Hiding behind federal laws that protect other information does not shield immigration status information from disclosure to federal authorities.

**B.    The ASCPO stands as an obstacle to federal immigration enforcement by requiring businesses to tip off aliens as to immigration enforcement activities.**

The ASCPO is also preempted because it compels private businesses to notify aliens "[i]f a law enforcement agent engaging in or supporting immigration enforcement is present at a place of work" by providing, within 24 hours, the name of the immigration enforcement agency, date of the immigration enforcement activities, and nature of the immigration enforcement activities. FAC at ¶¶ 116, 131, 171 (quoting ASCPO § 13-17-6(C)). By requiring businesses to tip off aliens as to immigration enforcement activities, the ASCPO requires businesses to warn aliens to avoid coming into work so that they may evade detection by immigration enforcement authorities. FAC at ¶ 116. Requiring businesses to help aliens evade detection by immigration enforcement authorities constitutes mandated harboring and shielding of aliens from federal immigration authorities and poses an obstacle to the enforcement of federal law. *See* 8 U.S.C. § 1324(a)(1)(A); *Kearns v. Cuomo*, 981 F.3d 200, 208 (2d Cir. 2020) ("Examples [of harboring] also include attempts to alert undocumented immigrants to the physical approach of immigration authorities.").

Defendants argue that this cannot be harboring because it occurs after enforcement has occurred and the mandated notice goes to all employees. MTD at 19. But the notice requirement is triggered the moment the employer becomes aware of an enforcement action, not after any action has ceased, which necessarily can result in notifying aliens during an operation. ASCPO § 13-17-6(C). Further, aliens will be able to evade detection during any follow up enforcement actions. Either way, this law amounts to harboring by knowingly assisting aliens in evading law enforcement. Defendants further argue that this tip off provision merely reflects "ordinary labor protection" statutes that require "neutral notice." MTD at 19. But the ASCPO's tip off provision is anything but neutral. It facially applies to "immigration enforcement" and has no purpose other than to provide notice to aliens of enforcement actions, facilitating aliens' evasion of immigration

13

enforcement authorities. This provision is much broader and more destructive than the I-9 notice procedures Defendants mention. And there can be no Tenth Amendment concerns where the ASCPO is regulating private employers and forcing them to harbor aliens. Defendants have no police power to obstruct federal immigration enforcement. The challenged provision is preempted because it mandates harboring and shielding of aliens from federal immigration authorities and poses an obstacle to the enforcement of federal immigration law. *See* 8 U.S.C. § 1324(a)(1)(A); *Kearns*, 981 F.3d at 208.

> **C.    The ASCPO stands as an obstacle to federal immigration enforcement by restricting the Federal Government's access to property.**

The ASCPO is preempted because it prevents federal immigration authorities from entering, accessing, or using certain public and private properties for purposes of immigration enforcement, including public spaces and courthouses. FAC at ¶¶ 107, 113. To be clear, the United States is not claiming it can occupy City property for any reason nor that a locality must enter into agreements or cooperate with federal enforcement (though New Mexico cannot ban cooperation outright). The United States' position is that cities cannot (i) refuse to comply with administrative devices, (ii) prohibit immigration enforcement in spaces that are publicly accessible like parks and parking lots, or (iii) prevent access to facilities to inspect or interrogate aliens in local detention. Yet the ASCPO does all of these, in patent conflict with the federal immigration scheme.

Not permitting the Federal Government to access property to perform immigration enforcement operations is not a neutral act—it is tantamount to rejecting the federal scheme itself, and conflicts with existing law. In *King County*, the Ninth Circuit required non-discriminatory access to public property consistent with the intergovernmental immunity doctrine. 122 F.4th at 758 ("[The court] would not perceive a threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the

14

county owns its highways."). Defendants should not be permitted to ban federal immigration law enforcement on generally accessible public property like parking lots and parks.

By prohibiting federal immigration enforcement officers from accessing certain public and private properties, which are used to enforce federal immigration law, the ASCPO "substantially interfere[s]" with and stands as an obstacle to civil immigration enforcement operations. *See CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 327 (3d Cir. 2025); *id.* at 321 ("'the very essence of supremacy' empowers the federal government to 'remove all obstacles to its action within its own sphere ... [and] exempt its own operations from [state] influence'") (quoting *McCulloch*, 17 U.S. at 427); *see Arizona*, 567 U.S. at 406. Specifically, by barring access to property, the ASCPO frustrates DHS's authority to inspect all applicants for admission and take appropriate action against inadmissible aliens. *See* 8 U.S.C. §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. It further presents obstacles to ICE's mandate "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" by barring ICE's access to property. 8 U.S.C. § 1357(a)(1). The ASCPO's property prohibitions are in patent conflict with the INA. Defendants cannot prohibit DHS from accessing property when carrying out powers expressly authorized by Congress.

### D.    The INA does not violate the anti-commandeering doctrine.

Defendants erroneously characterize their obstruction of federal immigration enforcement as their prerogative under the Tenth Amendment. MTD at 14. The anticommandeering doctrine prevents Congress from "compel[ling] the States to enact or enforce a federal regulatory program," or "circumvent[ing] that prohibition by conscripting the State's officers directly." *Printz v. United States*, 521 U.S. 898, 935 (1997); *Murphy*, 584 U.S. at 473. It does not allow obstruction.

Defendants fundamentally mischaracterize the relief that the United States seeks. The United States does not ask this Court to compel city officials to affirmatively implement federal

15

immigration law or even cooperate in detention. Rather, the United States wants Defendants to stop obstructing federal immigration enforcement. FAC at ¶ 19. First, compliance with administrative warrants, subpoenas, inspections, and warrantless arrests are not "voluntary" requests that localities can reject. Nor are they commandeering localities any more than normal judicial warrants or subpoenas requiring the transfer of a detainee and sharing of information. If compliance with a judicial warrant is not commandeering, then neither is compliance with an administrative warrant. Moreover, ASCPO broadly requires various employees to affirmatively deny access to non-public spaces. Preventing active obstruction is not commandeering. And non-governmental entities have no Tenth Amendment rights. Second, the notification requirement placed on businesses does not raise Tenth Amendment concerns, as businesses have no Tenth Amendment rights. In any event, it is not a regulation of states or commandeering to prevent active obstruction and harboring of aliens. Third, access to public spaces and some facilities for limited immigration purposes is not commandeering. Using spaces that are otherwise open to the public like parking lots and parks does not commandeer local personnel or resources; it amounts to use of public spaces like streets open to everyone. *King Cnty.*, 122 F.4th at 758. Merely accessing certain facilities for investigations and interrogations of aliens does not commandeer local officials or resources. City officials do not have to assist, they merely cannot obstruct access for limited purposes. The Supreme Court has rejected the argument that the Tenth Amendment is violated whenever a federal law "will consume [state or local] employees' time and thus the State's resources." *Reno v. Condon*, 528 U.S. 141, 150 (2000); *see also King Cnty.*, 122 F.4th at 758 ("To the extent King County argues that it has expended resources ensuring the safety of [a local airport] in response to ICE charter flights, it identifies no case treating this degree of background support as rising to the level of unconstitutional commandeering.").

16

At bottom, the United States is *not* arguing that state or local law enforcement must actively enforce immigration law. It is asking Defendants not to impose obstacles to the implementation of the INA by banning access to property, requiring judicial warrants where Congress deemed administrative warrants sufficient, and requiring businesses to notify aliens of ongoing immigration enforcement activities. The ACSPO simply "is not the system Congress created." *Arizona*, 567 U.S. at 408. Thus the Federal Government's requests are not commandeering but rather reasonable requests to permit immigration enforcement officials to serve the national interest. And while Defendants argue in a footnote that the INA does not regulate individuals under *Murphy,* MTD at 15 n.5, the INA is a comprehensive scheme for regulating *aliens*. *See Arizona*, 567 U.S. at 395. To that end, the INA includes the authority to issue administrative warrants, subpoenas, conduct warrantless arrests, and interrogations. Their aims are regulating *aliens*, even if they might require a city to provide access to information or aliens. *See* 8 U.S.C. § 1357(a), (c), 1225(d)(4). That is obviously true for the harboring provision, which prevents individuals from helping aliens evade law enforcement, including city officials. None of these laws, all of which the ASCPO obstructs, regulates local governments rather than aliens.

The INA cannot function if immigration enforcement officials cannot access property, are required to use the judicial process to obtain warrants, and have their investigations stymied because local businesses are required to alert illegal aliens of immigration enforcement activities. Thus, the ASCPO is far more than passive resistance—it is affirmative obstruction.

II.    **The ASCPO Violates the Doctrine of Intergovernmental Immunity.**

The ASCPO singles out "immigration enforcement" activities that only the Federal Government performs for disfavored treatment. It also imposes prohibitions on the Federal

17

Government (i.e., from accessing property, from obtaining information absent court order, etc.). In so doing, the ASCPO discriminates against and regulates the Federal Government.

> **A.      The ASCPO impermissibly discriminates against the Federal Government.**

A state law is invalid "if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota*, 495 U.S. at 435; *Washington*, 596 U.S. at 838. "[A] state law discriminates against the Federal Government . . . if it singles [it] out for less favorable treatment or if it regulates [it] unfavorably on some basis related to [its] governmental status." *Washington*, 596 U.S. at 839. The ASCPO illegally discriminates against the Federal Government, FAC at ¶¶ 127–133, because it singles out federal officials for less favorable treatment by applying only to "a law enforcement agent engaging in or supporting *immigration* enforcement." ASCPO §§ 13-17-6(C)(1) (emphasis added).

First, the ASCPO restricts the use of parking lots and parks solely for "the purpose of carrying out immigration enforcement." *Id.* § 5-1-5(A). Use of such properties and facilities by state or local law-enforcement officials is not restricted by the ASCPO. Second, private businesses are required to tip off employees to "immigration enforcement" activities, while other law enforcement activities by state or local officers are not reached by the tip off provision. *Id.* § 13-17-6(C)(1). While Defendants argue that this restriction is facially neutral, MTD at 19, it is anything but, as it expressly applies only to "immigration enforcement" activities, which are performed by the Federal Government. *Id.* Third, ASCPO's entry and access restrictions to "Safer Community Places" apply only to "law enforcement agents engaged in or supporting immigration enforcement[.]" *Id.* § 13-17-4(A). The ASCPO thereby singles out federal authorities for worse treatment than state and local authorities by permitting non-immigration-related law enforcement officials to access property and records while denying the same right of access to immigration law

18

enforcement officials. *See King Cnty.*, 122 F.4th at 758 ("Requiring this form of non-discriminatory access to [public] property consistent with the intergovernmental immunity doctrine does not create a back-end anti-commandeering problem."); *see also Washington*, 596 U.S. at 839 ("[S]tate law discriminates against the Federal Government . . . if it 'singles them out' for less favorable 'treatment' or if it regulates them unfavorably on some basis related to their governmental 'status.'").

Defendants argue that this does not discriminate against the Federal Government, just the function of immigration enforcement. *See* MTD at 25. But, as Defendants admit, only federal officers conduct immigration enforcement. *See id.* at 24. So, by definition, the ASCPO singles out federal officers for worse treatment. Troublingly, this principle suggests that states have *more* leeway to discriminate against certain federal functions *because* they are inherently federal. Nor can the Tenth Amendment allow states to discriminate against the federal government in violation of the Supremacy Clause. This turns the intergovernmental immunity doctrine, which is meant to protect the Federal Government, on its head. Imagine if the law singled out other functions that are unique to the Federal Government like military functions or the minting of coins. Discriminating against pregnancy, for example, is discrimination on the basis of sex because only women get pregnant. 42 U.S.C. § 2000e(k) ("because of or on the basis of pregnancy").

Defendants further argue that the lack of a comparator means that the ASCPO is not discriminatory. MTD at 22–23. But the FAC does allege that comparators exist, as state and local law enforcement officials have access to City facilities, use parks and lots for enforcement operations, receive information and access to property without a judicial warrant, and do not face a tip-off requirement. *See* FAC at ¶¶ 128, 131, 132. Defendants do not contend otherwise, they simply ignore these comparators. Even if specific comparators were not alleged, intergovernmental

19

immunity "is not a formalist doctrine[;]" courts must "look through form and behind labels to substance" and probe the "purpose or self-evident operation" of a state law to see whether it achieves indirectly what it could not do directly. *CoreCivic*, 145 F.4th at 322 (cleaned up); *see id.* at 325 (State law carried "the same sting as a law whose text applies expressly to the federal government" because it functionally eliminated the United States's chosen method of detaining immigration detainees in New Jersey.). There is, therefore, no need to look for precise comparators; by its terms, the ASCPO imposes a burden unique to the United States based on the "status" of federal immigration officials as federal immigration officials but no one else. *North Dakota*, 495 U.S. at 438. By applying solely to "immigration enforcement," the ASCPO facially treats the Federal Government differently from any potential comparator. The Ninth Circuit held as much, explaining that "[b]y 'burden[ing] federal operations, and only federal operations,' the Executive Order violates the anti-discrimination principle of the intergovernmental immunity doctrine." *King Cnty.*, 122 F.4th at 757 (quoting *California*, 921 F.3d at 883). By applying solely to immigration enforcement, ASCPO treats federal immigration authorities worse than any other law enforcement entity, and is therefore facially discriminatory.

**B.      The ASCPO impermissibly regulates the Federal Government.**

The Supreme Court has long recognized that "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445. States "have no power" to "in any manner control[] the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch*, 17 U.S. (4 Wheat.) at 436. Accordingly, unless Congress expressly authorizes otherwise, the "United States may perform its functions without conforming to the police regulations of a state." *Arizona v. California*, 283 U.S. at 451. While Defendants claim that the United States fails to identify a specifically conflicting

provision in the INA—a claim belied by the numerous provisions cited herein—this doctrine applies "in the absence of a specific [conflicting] federal law, [ensuring that] federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993), *aff'd*, 54 F.3d 825 (D.C. Cir. 1995) (citing *In re Neagle*, 135 U.S. 1, 10 (1890)).

Contrary to Defendants' assertions that the ASCPO cannot constitute regulation because it merely reflects their decision "to stop volunteering [their] resources" and to not participate in immigration enforcement, these principles apply with full force to the Federal Government's immigration-enforcement functions. MTD at 22. Several courts of appeals have held that state bans on private detention facilities unlawfully regulated the Federal Government because such laws "prevent[] the federal government from choosing how . . . it will carry out a core federal function." *CoreCivic*, 145 F.4th at 325; *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 757 (9th Cir. 2022) (en banc) (explaining that a state law would impermissibly "give California the power to control ICE's immigration detention operations in the state"). While Defendants point out that these cases involved regulation of federal contractors, this fact only helps the United States' case, as the Federal Government itself has "substantially" greater protection from "state law under the Supremacy Clause." *GEO Grp.*, 50 F.4th at 755; *see also North Dakota*, 495 U.S. at 436–37. States have no authority to determine the circumstances in which federal officers can carry out their functions; that is for the Federal Government to decide. It is abundantly clear that the purpose and effect of the property ban, judicial warrant requirement, and tip off requirement, is to engage in that form of impermissible regulation, as these requirements "place[] a prohibition on the Federal Government," *Hancock*, 426 U.S. at 180, and improperly seek to regulate its immigration enforcement functions. *See Town of Windsor*, 765 F.2d at 18. The property ban unequivocally

21

prohibits the Federal Government from utilizing property for the enforcement of immigration law.

Most obviously, the judicial warrant requirement imposes a mandate on the Federal Government that obligates the Federal Government to do more than Congress required. Congress expressly authorized administrative warrants and subpoenas, as well as warrantless arrests. 8 U.S.C. §§ 1225(d)(4), 1226(a), 1357(a), (c); 8 C.F.R. § 287.7. By requiring a judicial warrant to access property and records, the ASCPO forecloses federal immigration officials' use of Congressionally authorized tools and imposes a different method, with a different standard, on the United States for effectuating immigration law. Albuquerque is not merely declining to consent or cooperate, it is requiring city employees and private parties to disobey the Congressional mandate by refusing to honor administrative warrants absent judicial approval. States have no power to prevent federal agents from carrying out their duties "until they satisfy a state officer." *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956). The judicial warrant requirement is just that— a state's condition that federal officers must satisfy before they may execute their federal duties. That is a regulation of the United States's "core power to enforce immigration laws[,]" regardless of whether the ASCPO's text is addressed to state officials or federal ones. *CoreCivic*, 145 F.4th at 319; *see also GEO Grp.*, 50 F.4th at 757 (state law would impermissibly "give California the power to control ICE's immigration detention operations in the state").

Defendants rely on *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581 (7th Cir. 2022), but that case involved a lease of property to the Federal Government; here, the United States does not compel Albuquerque to lease property to anyone, but seeks temporary access to effectuate immigration law as contemplated in the INA. And insofar as the court in *McHenry County* did not apply "the functional approach that intergovernmental immunity demands," *CoreCivic*'s use of that approach makes it the more compelling case. *CoreCivic*, 145F.4th at 325. Further, the anti-

commandeering doctrine is inapplicable here as it protects states from being conscripted to administer federal programs. *Printz*, 521 U.S. at 933. Here, the United States is not seeking to force Albuquerque to implement a federal scheme. The United States is simply enforcing federal law through Congressionally authorized means, including with private parties.

**III.     The United States' Sovereign Interests Are Harmed By the ASCPO Tip Off Provision.**

Defendants argue that the United States' injury in connection with the tip off requirement is too speculative to constitute an injury sufficient to confer standing, MTD at 26. At the dismissal stage, general factual allegations of injury resulting from the defendant's conduct suffice because the Court should "presume[] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990).

The United States suffers a sovereign injury when a state legislates in violation of federal law and the Supremacy Clause. *See Vt. Ag'y of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). It is obvious that "[t]he United States has a legally protected interest in enforcing federal law." *United States v. Missouri*, 114 F.4th 980, 984–85 (8th Cir. 2024), *cert. denied*, 146 S. Ct. 90 (2025) (citing *United States v. Colo. Sup. Ct.*, 87 F.3d 1161, 1165 (10th Cir. 1996). The Federal Government has cognizable "sovereign interests" not only in its "power to create and enforce a legal code, both civil and criminal[,]" but also in "recognition [of that code] from other sovereigns[.]" *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). That suffices here. Further, as alleged by the United States, the tip off requirement requires businesses to warn aliens to avoid coming into work so that they may evade detection by immigration enforcement authorities, FAC at ¶¶ 11, 14, 16, 93, 116, 131, which constitutes mandated harboring and shielding of aliens from federal immigration authorities and poses an obstacle to the enforcement of federal immigration law, *see id.* at ¶¶ 40–41 (citing 8 U.S.C. §

23

1324(a)(1)(A); *Kearns*, 981 F.3d at 208. It obviously is an injury to the United States if aliens are warned about immigration enforcement and can thus more easily evade enforcement. Expending resources and time to relocate such aliens is a substantial injury. Defendant's assertion that these allegations are too speculative is baseless. Finally, the United States alleged that the tip off requirement discriminated against the Federal Government by requiring businesses to notify aliens of federal immigration enforcement operations, thus singling out the Federal Government. FAC at ¶¶ 131. Accordingly, the United States has alleged an injury sufficient to establish standing.

### IV.      Mayor Keller Is A Proper Defendant.

Defendants argue that the Mayor should be dismissed because the FAC alleges only that he signed the ASCPO and that the official capacity claims are redundant. MTD at 26. "[A]n official who is charged with enforcing a state statute on behalf of the entire state is a proper defendant, so long as the plaintiff shows an appreciable threat of injury flowing directly from the statute." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005) (citing *Wilson v. Stocker*, 819 F.2d 943, 947 (10th Cir. 1987)). The FAC identifies that the Mayor has specific enforcement obligations under the ASCPO and City law, and has communicated with constituents directly concerning the ASCPO. *See* FAC at ¶¶ 29, 89. His enforcement obligations, actions, and control of city property and those who enforce of the ASCPO, establish that he is a proper defendant. There is no basis that the United States lacks standing against the Mayor just because the city is also a proper defendant.[1]

### CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court deny the Motion to Dismiss filed by the City of Albuquerque and Mayor Timothy Keller (Dkt. No. 50).

---

[1] Defendants briefly say the entire ASCPO should not be invalidated due to its severability clause and that this is not a truly facial challenge. It is a facial challenge to certain provisions rather than as-applied because the challenge does not turn on specific facts. *See United States v. Sup. Ct. of New Mexico*, 839 F.3d 888, 913 (10th Cir. 2016) (allowing similar theory as facial challenge as to federal prosecutors). Instead, the challenged provisions are facially invalid. The United States has no objection to the non-challenged provisions remaining in effect given the severability clause.

24

DATED: July 20, 2026

Respectfully Submitted,

TODD BLANCHE
Acting Attorney General

/s/ Jackson M. Story
Trial Attorney
U.S. Department of Justice, Civil Division

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044-0386
Telephone: (202) 451-7304

TIBERIUS DAVIS
Counsel to the Assistant Attorney General

Email: jackson.m.story@usdoj.gov

RYAN ELLISON
First Assistant United States Attorney
District of New Mexico

EMIL J. KIEHNE
Assistant U.S. Attorney
U.S. Attorney's Office,
District of New Mexico

ROBERT O. LINDEFJELD
Assistant Director
U.S. Department of Justice, Civil Division
Enforcement & Affirmative Litigation Branch

201 3rd Street NW, Suite 900
Albuquerque, New Mexico 87102
Telephone: (505) 346-6855
Email: emil.kiehne@usdoj.gov

*Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2026, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Jackson M. Story
Trial Attorney
U.S. Department of Justice

25