# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

THE UNITED STATES OF AMERICA,

        *Plaintiff*,

    v.

THE STATE OF NEW MEXICO;
MICHELLE LUJAN GRISHAM, in her
Official Capacity as Governor of the State
of New Mexico; RAÚL TORREZ, in his
Official Capacity as Attorney General of
the State of New Mexico; THE CITY OF
ALBUQUERQUE; TIMOTHY KELLER,
in his Official Capacity as Mayor of the
City of Albuquerque, BERNALILLO
COUNTY; CINDY CHAVEZ, in her Official
Capacity as Manager of Bernalillo County;
DONA AÑA COUNTY; SCOTT
ANDREWS, in his Official Capacity as
Manager of Dona Aña County,

        *Defendants*.

Case No.: 1:26-cv-1471-KG-LF
The Honorable Kenneth J. Gonzales

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS THE STATE OF NEW MEXICO'S
AND ATTORNEY GENERAL RAÚL TORREZ'S REPLY IN SUPPORT OF THEIR
MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................................... i

I.  HB9 Does Not Violate the Contract Clause ................................................................. 1

    A.  The Contract Clause Does Not Apply to HB9 ....................................................... 1

    B.  The United States Identifies No Enforceable Contract that HB9 Impairs ................... 3

    C.  HB9 Would Survive Any Review Under the Contract Clause ...................................... 8

II.  HB9 Does Not Violate Principles of Intergovernmental Immunity .................................... 10

    A.  HB9 Does Not Discriminate Against the Federal Government .................................... 10

    B.  HB9 Does Not Directly Regulate the Federal Government ......................................... 12

III.  Federal Law Does Not Preempt HB9 ......................................................................... 14

CONCLUSION ................................................................................................................... 18

This case concerns the principles of federalism and dual sovereignty. When the U.S. Constitution displaced the Articles of Confederation, our nascent polity struck a bargain where "the power surrendered by the people is . . . divided between two distinct governments"—state and federal. The Federalist No. 51 (James Madison). Through this "unique contribution . . . to political science and political theory," *United States v. Lopez*, 514 U.S. 549, 575 (1995) (Kennedy, J., concurring), the Framers sought to secure liberty by "reduc[ing] the risk of tyranny and abuse from either" states or the federal government through "a healthy balance of power between" the two, *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). When it comes to immigration enforcement, the United States seeks to upend that bargain by conscripting New Mexico, through its subordinate political subdivisions, into its service and by recasting those "creatures of the State" as mini-sovereigns vested with authority to act "in opposition to the will of their creator." *Coleman v. Miller*, 307 U.S. 433, 441 (1939). Unsurprisingly, bedrock case law forbids this assault at every turn.

## I.    HB9 Does Not Violate the Contract Clause

### A.  The Contract Clause Does Not Apply to HB9

In enacting the Immigrant Safety Act, or House Bill 9 (HB9), N.M. Stat. §§ 13-9-1 to 13-9-6, New Mexico exercised its sovereign authority to extricate itself from participation in federal immigration enforcement to refocus the State's law enforcement on state and local concerns. The United States posits that the Contract Clause transforms the Intergovernmental Services Agreement executed in 2026 between Otero County and the U.S. Immigration and Customs Enforcement (ICE) and 287(g) agreements between Curry and Torrance Counties and ICE into fixed impediments to New Mexico's choice to do so. *See* Am. Compl Ex. H, Dkt. 42-8 (2026 Otero-ICE IGSA); MTD Ex. E, Dkt. 49-5 (Curry Cnty. 287(g)); MTD Ex. F, Dkt. 49-6 (Torrance Cnty. 287(g)). Courts have long rejected the view that state legislatures—let alone subordinate political subdivisions—can

1

"divest[] themselves by contract of the right to exert their governmental authority." *Contributors to Pa. Hosp. v. City of Philadelphia*, 245 U.S. 20, 23 (1917); *see also U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 24 (1977); *Stone v. Mississippi*, 101 U.S. 814, 820 (1879); *Boston Beer Co. v. Massachusetts*, 97 U.S. 25, 31–32 (1877). The United States rejects wholesale the applicability of this line of cases, known as the "reserved-powers doctrine." *U.S. Tr. Co.*, 431 U.S. at 23. In the United States's view, this doctrine is a vestigial attribute of "precursors to the current test" applicable to Contract Clause claims that has been subsumed within the prong of that test that queries whether the challenged law is supported by a "legitimate public interest." Opp'n 12–13, Dkt. 63; *see also Sveen v. Melin*, 584 U.S. 811, 819 (2018) (setting forth the governing law for Contract Clause claims). That is wrong.

The United States is confused on multiple levels. It characterizes New Mexico as arguing that any "exercise of its otherwise legitimate police power" is insulated from the Contract Clause's protections. Opp'n 14 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978)). Not so. The reserved-powers doctrine applies here not because HB9 is an exercise of legitimate police power (though it is). Instead, the doctrine applies because the United States's claim depends on the premise that the 2026 Otero-ICE IGSA and Torrance and Curry County 287(g) Agreements preclude New Mexico from making the sovereign decision to extricate itself and its subordinate political subdivisions from federal immigration enforcement.[1] The reserved-powers doctrine establishes that "the Contract Clause does not require" New Mexico "to adhere to a contract that surrenders [that] essential attribute of its sovereignty." *U.S. Trust Co.*, 431 U.S. at 23. And contrary to the United States's understanding,

---

[1] The United States also suggests that the New Mexico Constitution's Contract Clause, N.M. Const. art. II, § 19, is somehow controlling. Opp'n 14 n.3. But "federal Contract Clause jurisprudence will, in general, be applicable in determining whether a particular state law violates the Contract Clause of [the New Mexico] Constitution." *Los Quatros, Inc. v. State Farm Life Ins. Co.*, 1990-NMSC-082, ¶ 35, 110 N.M. 750, 760. The United States has not brought a claim under the New Mexico Constitution's Contract Clause. Nor does it identify any aspect of the jurisprudence interpreting that provision that diverges from the federal counterpart.

that doctrine remains a vital part of Contract Clause case law. *See, e.g.*, *Short v. Billings Cnty.*, 138 F.4th 1072, 1078–79 (8th Cir. 2025) (relying on the reserved-powers doctrine to reject a breach-of-contract claim); *Matsuda v. City & Cnty. of Honolulu*, 512 F.3d 1148, 1154 (9th Cir. 2008) (reviewing a contract under the reserved-power doctrine and ultimately concluding that the doctrine did not apply); *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 437 (8th Cir. 2007) (stating that *Stone v. Mississippi* is "certainly good law" in rejecting a Contract Clause claim challenging a law terminating a state lottery); *Kingman Airport Auth. v. City of Kingman*, No. CV-17-8260, 2018 WL 418011, at *3–4 (D. Ariz. Jan. 16, 2018) (dismissing a Contract Clause claim based on the reserved-powers doctrine).

Adherence to the reserved-powers doctrine here will not allow New Mexico or any other state to "legislatively vitiate almost any contract with its subdivisions." Opp'n 14. As the United States stresses, *id.* at 15–16, states and their subordinate political subdivisions can bind themselves to "purely financial" contracts, which "cannot be questioned" on the ground that they implicate a state's taxing or spending powers, *U.S. Trust Co.*, 431 U.S. at 23–25. And courts do not accord "complete deference to a legislative assessment of reasonableness and necessity" when a state impairs a purely financial contract to which it is party. *Id.* at 26. "[M]ost contracts in which a state agrees to limit its power to act in the future" fall into this category and therefore are not subject to the reserved-powers doctrine. *Matsuda*, 512 F.3d at 1153. But as New Mexico has explained, MTD 21–22, Dkt. 49, HB9 can hardly be deemed fiscal regulation. The United States makes no meaningful argument otherwise.

Accordingly, the Contract Clause claim is foreclosed by the reserved-powers doctrine.

### B.  The United States Identifies No Enforceable Contract that HB9 Impairs

Even if the reserved-powers doctrine did not render the Contract Clause wholly inapplicable here, the United States's claim fails at the threshold because the agreements at issue are either: (1) not

3

enforceable contracts; or (2) not impaired by HB9. *See Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983).

### 1.  2026 Otero-ICE IGSA

The 2026 Otero-ICE IGSA is not an enforceable contract because it is void as against public policy—specifically, New Mexico's public policy embodied in HB9 against state and local entities contracting to provide immigration-detention services.[2] According to the United States, Otero County and ICE were free to ignore that declared policy because federal contracts "are governed by federal law, not by state public policy." Opp'n 18 (citing *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504–05 (1988); *Clearfield Tr. Co. v. United States*, 318 U.S. 363, 366 (1943)). That is wrong for multiple reasons. First, the void-as-against-public-policy doctrine is not some foreign concept. On the contrary, it is recognized in federal common law. In *Town of Newton v. Rumery*, 480 U.S. 386 (1987), the Supreme Court applied void-as-against-public-policy doctrine as a matter of "federal law" to determine whether a criminal defendant's waiver of his right to sue under 42 U.S.C. § 1983 was legally enforceable. *Id.* at 392 ("The relevant principle is well established: a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." (citing Restatement (Second) of Contracts § 1781(1) (A.L.I. 1981))); *see also United States ex. rel Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1169 (10th Cir. 2009) (applying *Rumery* to determine the validity of a former employee's settlement agreement with a government contractor releasing a *qui tam* claim).

Second, just because federal law "govern[s]" the validity of federal contracts, *Boyle*, 487 U.S.

---

[2] The United States implies that the New Mexico Supreme Court rejected this argument in denying the State's petition for a writ of mandamus in *State ex rel. Torrez v. Board of Commissioners for Otero County*, No. S-1-SC-41362 (N.M. 2026). Opp'n 16. But the State's petition did not challenge the 2026 Otero-ICE IGSA as void against public policy, and the New Mexico Supreme Court did not reach the petition's merits.

at 504, that does not mean that the Otero County and ICE were free to defy the public policy underlying HB9. "Controversies directly affecting the operations of federal programs, although governed by federal law, do not inevitably require resort to uniform federal rules." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727–28 (1979); *accord United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 594 (1973) ("[I]n many situations, and apart from any supposed influence of the *Erie* decision, rights, interests and legal relations of the United States are determined by application of state law, where Congress has not acted specifically." (quoting *United States v. Standard Oil Co.*, 332 U.S. 301, 308 (1947))); *Clearfield Tr.*, 318 U.S. at 367. In the absence of a federal statute resolving a legal question concerning a federal contract, courts must choose "[w]hether to adopt state law or to fashion a nationwide federal rule." *Kimbell Foods*, 440 U.S. at 728. A three-part test governs this choice-of-law analysis. Courts must consider: (1) whether the issue requires "a nationally uniform body of law"; (2) "whether application of state law would frustrate specific objectives of the federal programs" in question; and (3) "the extent to which application of a federal rule would disrupt commercial relationships predicated on state law." *Id.* at 728–29. All three factors counsel in favor of requiring the United States to respect the public policy underlying HB9.

As an initial matter, the federal program in question necessarily contemplates *nonuniformity.* The Immigration and Nationality Act (INA) authorizes "*cooperative* agreement[s]" between the United States and states or their subordinate political subdivisions that "*agree*[]" to provide immigration-detention services. 8 U.S.C. § 1103(a)(11)(B) (emphases added). That some states' public policy will preclude such arrangements is fully consistent with the voluntary nature of this federal program. For the same reason, the INA's *allowance* for cooperative agreements to provide immigration detention services is not "frustrate[d]" by a state's public policy against such contracts. *Kimbell Foods*, 440 U.S.

5

at 728. A federal program premised on states' voluntary "agree[ment]" cannot be frustrated by a state's nonagreement. 8 U.S.C. § 1103(a)(11)(B). Conversely, a federal rule ignoring a state's public policy against such agreements—beyond making a farce of their voluntary nature—clearly would "disrupt" that policy. *Kimbell Foods*, 440 U.S. at 728–29. Accordingly, there is no reason to "override" the public policy underlying HB9. *Id.* at 729.

The only question, then, is whether New Mexico's public policy against state and local entities contracting to provide immigration-detention services was in force at the time that Otero County and ICE executed the 2026 IGSA.[3] Because the parties executed the agreement during the months between HB9's enactment and its effective date, the United States contends that the New Mexico is trying to give the law retroactive effect and evade the State's default statutory grace period. Opp'n 16–18; *see also* N.M. Const. art. IV, § 23 (providing a default rule that laws take effect 90 days after the adjournment of the legislature that enacted them). Not so. The presumption against retroactive laws and the statutory grace period are irrelevant because New Mexico does not contend that HB9's *terms* invalidate the 2026 Otero-ICE IGSA. Instead, the State's position is that the New Mexico Legislature had already "declared" the State's public policy to prohibit public bodies from entering contracts to provide immigration-detention services when it enacted HB9, more than a month before Otero County and ICE executed the 2026 IGSA. *First Baptist Church of Roswell v. Yates Petrol. Corp.*, 2015-NMSC-004, ¶ 12, 345 P.3d 310; *see also* 2026 N.M. Laws Ch. 5; 2026 Otero-ICE IGSA p.3. The United States does not grapple with any of the authority holding that an enacted law establishes a sovereign's public policy even if it is not yet effective. *See* MTD 23. And with regard to the statutory

---

[3] To be clear, New Mexico does not contend that HB9's 2025 predecessor that failed to secure final passage established public policy. *Contra* Opp'n 19. New Mexico mentions that bill only for context and to establish Otero County's and ICE's track record of attempting to circumvent the Legislature's efforts to prohibit public bodies from contracting to provide immigration-detention services.

grace period, the purpose of that rule, as the United States observes, is "to provide the persons affected by a change in the law with an adequate opportunity to become familiar *with their obligations under it*," Opp'n 17 (emphasis added) (quoting *Atkins v. Parker*, 472 U.S. 115, 130 (1985)), not to permit "one last drink" after "[h]aving sworn off the habit," *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001).

This Court should not countenance Otero County's and ICE's purposeful defiance of the public policy underlying HB9.

### 2.  The Torrance and Curry County 287(g) Agreements

The United States's characterization of the Torrance and Curry County 287(g) Agreements as anything other than "illusory and unenforceable promises" defies their own plain text. *Salazar v. Citadel Comm'cns Corp.*, 2004-NMSC-013, ¶ 9, 135 N.M. 447; *see also* Opp'n 19–20. Each agreement states point blank that it "does not, is not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal." Curry Cnty. 287(g), art. VIII; Torrance Cnty. 287(g), art. VIII. But that is precisely what the United States claims in this "civil" matter. Its Contract Clause claim "relie[s] upon" the 287(g) agreements to assert a "substantive" right to enforcement of the agreements against New Mexico's will. That the agreements provide no consideration and are subject to "unilateral . . . revocation" only reinforce their self-described illusory nature. *Salazar*, 2004-NMSC-013, ¶ 9; Restatement (Second) Contracts § 77 cmt. A ("Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise."). Each supposed benefit that the United States identifies, Opp'n 19, in the 287(g) agreements—training, use of federal property or facilities, access to databases, and immunity—are not consideration, but merely "condition[s] of a gratuitous promise" that were "not requested as the price of the promise," 3 Williston on Contracts § 7:19 (4th ed. 2026).

7

A promise to dig a hole is not an enforceable contract merely because the promisee supplies a shovel. And the United States ignores that New Mexico law deems agreements that provide for unilateral revocation—not just unilateral modification—to be illusory promises. *Salazar*, 2004-NMSC-013, ¶ 9. For the reasons discussed above, *supra* pp. 5–6, the purely voluntary nature of 287(g) agreements, *see* 8 U.S.C. § 1357(g)(9), means that New Mexico's standard for contract enforceability should govern over any contrary federal rule.

### 3.  Otero-MTC Contract

Finally, the United States relegates to a footnote its argument that HB9 impairs Otero County's contract with Management and Training Corporation (MTC), Am. Compl. Ex. I, Dkt. 42-9 (Otero-MTC Contract). Opp'n 16 n.4. That the Otero-MTC Contract is "terminable for cause" is not in of itself what establishes the absence of impairment. *Id.* Rather HB9 does not impair the Otero-MTC Contract because the contract defines "cause" to include "the passing of any state . . . legislation that prevents the County or any User Agency from continuing to contract." Otero-MTC Contract art. IV.D.1. Given that provision, Otero County and MTC have no "reasonable expectation[]" that their contract would be enforced despite the passage of a law that does precisely that. *Energy Rsrvs. Grp.*, 459 U.S. at 416.

### C.  HB9 Would Survive Any Review Under the Contract Clause

Even if HB9 impaired any enforceable contract, it would not violate the Contract Clause because it is "reasonable and necessary to serve [the] important public purpose" of redirecting law-enforcement priorities to state and local concerns. *U.S. Tr.*, 431 U.S. at 25. As nothing short of a complete ban could accomplish this reprioritization, HB9 is appropriately tailored to that end.[4] The

---

[4] The United States contends that New Mexico could address its concerns about the inhumane conditions at

United States makes three arguments to the contrary, none of which is availing.

First, the United States contends that New Mexico's proffered purpose is a post hoc rationalization for HB9. Opp'n 22–23. But the State's desire to redirect law-enforcement focus from the exclusively federal concern of immigration is evident on the face of HB9, *see* N.M. Stat. §§ 13-9-3, 13-9-4, and from the statements by HB9's lead sponsor and Governor Lujan Grisham's spokesperson that the United States spotlights, *see* Opp'n 23; Am. Compl. ¶ 137, Dkt. 42. Regardless, the United States identifies no authority requiring a law to contain a "statement of purpose" to survive Contract Clause review. Opp'n 22. On the contrary, the United States's primary authority for this line of argument stated that the court would have been "compelled to uphold" the law challenged in that case if the court had "credited" the state's "*post hoc* rationalization." *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 860 (8th Cir. 2002); *see also* Opp'n 22–23. The court ruled against the state only because "the evidence contradicted" the state's justification. *Equip. Mfrs.*, 300 F.3d at 860. In this way, Contract Clause review "bear[s] a resemblance" to ordinary "rational basis review." *Melendez v. City of New York*, 16 F.4th 992, 1052 (2d Cir. 2021) (Carney, J. concurring) (collecting sources). The main difference is that courts "will not impute to the state any motivation [they] can conceive of but will consider only those that [defendants] assert." *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 325 n.12 (6th Cir. 1998). If HB9's text and legislative history leave any doubt as to the statute's purpose, New Mexico has clearly and consistently articulated it throughout this litigation.

Second, the United States recasts HB9's legislative history as evincing a purpose to "eliminate civil immigration detention . . . in New Mexico" and to "[i]mped[e] federal immigration enforcement."

---

the Otero County Processing Center (OCPC) with "reasonable, limited conditions" and other "oversight." Opp'n 25–26. Although responding to OCPC's conditions is a salutary benefit of HB9, the statute's purpose is broader and cannot be accomplished by the means proposed by the United States.

Opp'n 23. But "get[ting] New Mexico out of the business of immigration detention," Am. Compl. ¶ 137 (quoting New Mexico Representative Eleanor Chavez), and "ensur[ing] New Mexico will not be complicit in discriminatory mass immigration enforcement," *id.* (quoting spokesperson for Governor Lujan Grisham), is not remotely the same as eliminating or impeding that federal function. The United States remains free to conduct as much lawful immigration enforcement in New Mexico as it desires using its own personnel and resources or by contracting with private companies.

Finally, the United States argues that HB9 is not reasonable because, in its view, the law imposes economic harms on New Mexico's subordinate political subdivisions and will require noncitizens to be detained in facilities that the United States considers less favorable than OCPC for noncitizens. Opp'n 24–25. But balancing New Mexico's purpose in enacting HB9 against these hypothesized countervailing interests clearly does not accord the "defer[ence] to legislative judgment" that Contract Clause review requires. *U.S. Tr.*, 431 U.S. at 22–23.[5]

## II.     HB9 Does Not Violate Principles of Intergovernmental Immunity

The United States does not establish that HB9 either discriminates against or directly regulates the federal government. *See United States v. Washington*, 596 U.S. 832, 838 (2022). Its intergovernmental immunity claims therefore fail.

### A.  HB9 Does Not Discriminate Against the Federal Government

Because immigration enforcement is "an exclusively federal domain," there is no comparator on which a claim that HB9 discriminates against the federal government can be based. *McHenry County v. Raoul*, 44 F.4th 581, 594 (7th Cir. 2022). In arguing otherwise, the United States points out that the

---

[5] The United States contends that customary deference is not owed here because "the State's self-interest is at stake." Opp'n 25 (quoting *U.S. Tr.*, 431 U.S. at 26). But that more demanding form of review governs only when a state impairs a "purely financial" contract to which it is party. *U.S. Tr.*, 431 U.S. at 25. As discussed above, *supra* p. 3, HB9 is not that kind of law. Regardless, HB9 survives any level of review.

Pregnancy Discrimination Act (PDA), 42 U.S.C. § 2000e(k), defines pregnancy discrimination as sex discrimination, even though "*only* women can get pregnant." Opp'n 29. This argument unintentionally underscores New Mexico's point. Congress enacted the PDA precisely because the Supreme Court held, as matter of constitutional law, that pregnancy discrimination does *not* constitute sex discrimination. *Geduldig v. Aiello*, 417 U.S. 484, 496–97 (1974). The Court later extended *Geduldig*'s reasoning to Title VII of the Civil Rights Act of 1964 in *General Electric Co. v. Gilbert*, 429 U.S. 125, 136 (1976), which the PDA overturned, *see* H.R. Rep. No. 95-948, at 2 (1978); S. Rep. No. 95-331, at 2–3 (1977). But the Court recently reaffirmed that *Geduldig*'s conception of discrimination still governs as a matter of constitutional law in holding that gender-affirming-care bans do not violate the Equal Protection Clause. *United States v. Skrmetti*, 605 U.S. 495, 518 (2025). A law does not discriminate on the basis of sex, the Court said, by "regulating a medical procedure that only one sex can undergo." *Id.* That logic applies with equal force to the United States's intergovernmental immunity claim here. Only the federal government or its agents can enforce immigration law. HB9 does not discriminate against the federal government by extricating New Mexico and its subordinate political subdivisions from a governmental function that only the federal government can undertake.

The absence of a comparator also distinguishes HB9 from the law at issue in *United States v. King County*, 122 F.4th 740 (9th Cir. 2024), on which the United States heavily relies, Opp'n 29–30. That case concerned an executive order that regulated "the way in which the federal government transports noncitizen detainees by preventing ICE from using *private . . .* contractors at Boeing Field." *Id.* at 756 (emphasis added)). The same is true of the Government's hypothetical concerning a prohibition on "*private companies . . .* contracting with the military." Opp'n 29 (emphasis added). That distinction makes all the difference. Private companies do not perform legally specified functions.

Instead, they hold themselves out to the public to provide certain goods or services in exchange for compensation. When they provide those goods or services to certain individuals or entities, but not others, they engage in differential treatment. Not so when a state or its subordinate political subdivisions decline an invitation to take on an exclusively federal function.

The United States's capacious understanding of discrimination under the intergovernmental immunity doctrine would violate the Tenth Amendment's anticommandeering doctrine. *See Murphy v. NCAA*, 584 U.S. 453, 470 (2018) ("The anticommandeering doctrine . . . withhold[s] . . . the power to issue orders directly to the States."). Indeed, *King County* itself expressly distinguished the regulation of private contractors at issue in that case with the Illinois law at issue in *McHenry County* that, like HB9, "prohibited state or local governments from housing or detaining individuals for federal immigration violations." *King County*, 122 F.4th at 758. Whereas the King County executive order required private contractors to "single[] out the federal government . . . for unfavorable treatment," the Illinois law merely ensured that the state would not "be[] conscripted into carrying out federal immigration laws on the federal government's behalf." *Id.* at 757–58 (internal quotation marks omitted). If, as the United States argues, intergovernmental immunity principles required a state on its own or through its subordinate political subdivisions to perform federal functions against its will, that would create "an anti-commandeering question." *Id.* at 758. But that is not the law.

### B.  HB9 Does Not Directly Regulate the Federal Government

Far from directly regulating the federal government, HB9 prohibits only New Mexico and its subordinate political subdivisions from participating in federal immigration enforcement, without imposing any obligations on the federal government. *See* N.M. Stat. §§ 13-9-3, 13-9-4.

Still, the United States argues that HB9 regulates the federal government by "eliminat[ing] . . .

12

potential counterparties to agreements that Congress specifically authorized as part of the cooperative civil immigration enforcement scheme." Opp'n 31–32. But that is an *indirect* effect of HB9. Regardless, that argument runs into the same anticommandeering issues that the United States's discrimination argument raises. The federal statutes in question *themselves* permit states and their subordinate political subdivisions to remove themselves as potential counterparties. 8 U.S.C. § 1103(a)(11)(B) (authorizing the federal government to enter "cooperative agreements" with states or their subordinate political subdivisions that "agree[]" to provide immigration-detention services); *id.* § 1357(g)(9) (providing that "[n]othing in this subsection shall be construed to require any State or political subdivisions of a State to enter into" a 287(g) agreement). That is a feature, not a bug of those statutes.

The anticommandeering doctrine forbids federal laws that "issue orders directly to the States." *Murphy*, 584 U.S. at 470. *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315 (3d Cir. 2025), and *Geo Group, Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (en banc), are not to the contrary. *Contra* Opp'n 31–32. Like *King County*, those cases concern regulation of private contractors. Intergovernmental immunity principles simply do not apply to such regulation. *See CoreCivic*, 145 F.4th at 332 (Ambro, J., dissenting) ("State laws that apply only to private contractors but still affect the Federal Government, even substantially, are indirect regulations."); *Geo Group*, 50 F.4th at 766 (Murguia, C.J., dissenting) (stating that "[t]o the extent that we are concerned with state laws that burden the federal government by regulating private parties, those concerns are more appropriately addressed by preemption," rather than the "intergovernmental immunity doctrine"). Regardless, any interpretation of the intergovernmental immunity doctrine cannot be used to "conscript[]" states and their subordinate political subdivisions into "carrying out federal immigration laws on the federal government's behalf." *King County*, 122 F.4th at 758. That is just what the United States's argument here seeks to accomplish.

13

## III.    Federal Law Does Not Preempt HB9

The United States's invocation of preemption is similarly flawed. It anchors its argument to a misstatement of obstacle-preemption principles, a derogation of New Mexico's sovereign power to regulate its instrumentalities, and a case that does not support its position.

First, the United States ignores a fundamental precondition to preemption—that the federal law regulates private actors. The Supreme Court was clear in *Murphy*. "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy*, 584 U.S. at 477. Consequently, the provisions that the United States identifies as preemptive must cover private actors. *See* Am. Compl. ¶ 166 (citing 6 U.S.C. § 112(b)(2) and 8 U.S.C. §§ 1357(g), 1103(a)(11)(B), and 1231(g)). Only then can this Court reach whether HB9 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *In re MDL 2700 Genentech Herceptin (Trastuzumab) Mktg. & Sales Prac. Litig.*, 960 F.3d 1210, 1230 (10th Cir. 2020) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)).

The United States's attempt to clear this threshold falls flat. It notes only that "the INA is a comprehensive scheme" regulating "aliens," *i.e.*, private actors. Opp'n 36. While that point is true, it is also irrelevant. *Murphy*'s analysis did not focus on whether the law at issue regulated private actors as a global matter. *See* 584 U.S. at 479–80. Instead, the Supreme Court analyzed whom the purportedly preemptive provision regulated in isolation. The provision, 28 U.S.C. § 3702(1), forbids states and their political subdivisions from legalizing sports gambling. *Murphy*, 584 U.S. at 461 & n.22. The Supreme Court concluded that it was "not a preemption provision because there is no way in which this provision can be understood as a regulation of private actors": it neither conferred a federal right

14

nor imposed a federal restriction on private actors. *Id.* at 479–80. That the neighboring and "closely related provision," 28 U.S.C. § 3702(2), "*does* restrict private conduct" had no bearing on the preemptive effect of § 3702(1), *see Murphy*, 584 U.S. at 479–80.

Accordingly, what matters for HB9 is whether the four provisions the United States identifies regulate private actors. None do. As the United States's brief betrays, each statute is exclusively about what public actors can do. *See* Opp'n 33–35 (mentioning only government officials when discussing the four provisions' purpose and effect). 6 U.S.C. § 112(b)(2) authorizes the Secretary of Homeland Security to enter cooperative agreements. 8 U.S.C. § 1357(g) permits states to voluntarily agree to enforce federal immigration law. Section 1103(a)(11)(B) authorizes the Secretary to enter detention agreements. And § 1231(g) requires the Secretary to consider available detention facilities before constructing new ones. These provisions do not confer a right or impose a restriction on private actors, so they cannot have a preemptive effect. That other provisions of the INA may regulate private actors is irrelevant.

Second, the United States's reference to local cooperation flouts the principles of federalism and dual sovereignty principle at the heart of preemption doctrine. New Mexico's political subdivisions are not sovereign unto themselves; they are instrumentalities of the State, and the State has the sovereign authority to regulate them. *See, e.g.*, *City of Trenton v. New Jersey*, 262 U.S. 182, 187 (1923) (explaining that a state can "withhold, grant, or withdraw powers and privileges [from its political subdivisions] as it sees fit"). So, the United States's argument that HB9 impermissibly obstructs local cooperation relies on treating political subdivisions as distinct mini-sovereigns. Preemption, however, requires the exercise of a legitimate federal power. *See Murphy*, 584 U.S. at 477. And the United States cannot abolish a fundamental component of New Mexico's sovereignty—its

15

exercise of control over its instrumentalities—no matter how badly it wants to circumvent the State.

Third, the United States underplays that the four provisions in question presume voluntary cooperation, meaning New Mexico's decision not to participate in cooperative enforcement is consistent with Congress's scheme. The United States acknowledges that the laws at issue provide for only voluntary immigration enforcement and do not mandate cooperation. It does not, though, proffer any principle to explain why New Mexico and its subdivisions can decline every federal request for cooperation but the State cannot pass a law with the exact same effect. Instead, the United States claims that because the INA works best with local help, HB9 "would eviscerate Congress's scheme." Opp'n 35. Yet New Mexico is not bound by a "hope or expectation" of cooperation. *McHenry County*, 44 F.4th at 592. "It would make no sense to hold that [federal statutes] premised on State cooperation preempt[] a State law withholding that cooperation." *Id.*; *accord United States v. California*, 921 F.3d 865, 888 (9th Cir. 2019) ("[R]efusing to help [enforce immigration law] is not the same as impeding. If such were the rule, obstacle preemption could be used to commandeer state resources and subvert Tenth Amendment principles." (internal quotation marks omitted)).

After all, far from "refus[ing]" federal law its "natural effect," *Crosby*, 530 U.S. at 373 (internal quotation marks omitted), New Mexico is doing precisely what Congress permitted: electing not to participate in voluntary immigration enforcement as part of its sovereign prerogative. If these four statutes functioned otherwise and stopped New Mexico from choosing not to enforce federal immigration law, the United States would be telling New Mexico what it "may not do." *Murphy*, 584 U.S. at 474–75. That is paradigmatic—and constitutionally impermissible—commandeering.

Finally, the United States relies heavily on *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999); *see also* Opp'n 35–37. In that case, the Second Circuit upheld as constitutional two express

16

preemption provisions, which barred states from prohibiting their employees from voluntarily sharing people's immigration statuses with the Immigration and Naturalization Service, the precursor to ICE. *Id.* at 31. The United States's reliance on *City of New York* is misplaced because *Murphy* removed the core of its rationale. *City of New York* acknowledged that the federal government cannot "affirmatively conscript[] states, localities, or their employees into the federal government's service." *Id.* at 35. But the Second Circuit distinguished the two provisions at issue because they imposed no affirmative obligations. "Rather, they prohibit[ed] state and local governmental entities or officials only from directly restricting" voluntary information sharing. *Id.* In *Murphy*, the Supreme Court dubbed this distinction "empty." 584 U.S. at 475. If a federal law "command[s] 'affirmative' action" or "impos[es] a prohibition," the "basic principle—that Congress cannot issue direct orders to state legislatures— applies in either event." *Id.*; *see also City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 872–73 (N.D. Ill. 2018), *aff'd on other grounds*, 961 F.3d 882 (7th Cir. 2020) (outlining multiple other fatal flaws in *City of New York*'s reasoning).[6]

Regardless, even taking as valid *City of New York*'s faulty analysis, the case helps the United States far less than it lets on. The case addressed 8 U.S.C. § 1373, added to the INA in 1996. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 642, 110 Stat. 3009, 3009-707 (1996). That provision expressly preempts states from restricting voluntary information sharing. 8 U.S.C. § 1373(a). None of the provisions the United States relies upon here contains a similar express preemption clause. And *City of New York*'s conclusion that Congress can

---

[6] The United States claims that the Second Circuit reaffirmed *City of New York* after *Murphy*. Opp'n 37 (citing *New York v. Dep't of Just.*, 951 F.3d 84, 114 n.27 (2d Cir. 2020)). But the Second Circuit did not go that far. In dicta, the court cast doubt on whether *Murphy* required reversing *City of New York*, but it did not reach the issue and addressed only an as-applied Tenth Amendment challenge to a federal funding requirement. *New York*, 951 F.3d at 112–14.

17

expressly preempt certain state laws does nothing to suggest that Congress impliedly did so here.

Indeed, Congress's statutory design choices when enacting § 1373 confirm that the opposite is true. Congress also enacted 8 U.S.C. §§ 1357(g), 1103(a)(11)(B), and 1231(g), three of the provisions the United States invokes here, as part of the same 1996 amendment to the INA. *See* § 133, 110 Stat. at 3009-563 to -564; *id.* § 373, 110 Stat. at 3009-647; *id.* § 241, 110 Stat. at 3009-606. Yet, unlike § 1373, as noted above, none contains an express preemption clause. The real takeaway from *City of New York*, then, is that Congress did not want the provisions at issue in this case to preempt state laws barring local cooperation. If that were Congress's intent, then it would have included an express preemption clause as it did in § 1373. *See Mullin v. Al Otro Lado*, 146 S. Ct. 2079, 2091 (2026) (declining to impute a concept of "attempted entry" into one INA provision where "[o]ther provisions of the INA refer to both *actual* entrance into the United States and *attempted* entrance"). Given this deliberate textual variation, holding HB9 preempted by these provisions would be an outright substitution of "judicial policy preference" for Congress's design. *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (lead opinion of Gorsuch, J.); *see also In re MDL 2700*, 960 F.3d at 1224 ("[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." (internal quotation marks omitted)).

In short, the United States's arguments that HB9 is preempted lack all merit. HB9 reflects exactly the sort of voluntary choice to withhold cooperation that Congress allowed when enacting and amending the INA. As such, New Mexico's exercise of its sovereign authority poses no obstacle to the enforcement of federal law.

## CONCLUSION

This Court should grant the State's motion to dismiss.

August 3, 2026                                   Respectfully submitted,


/s/ Bailey Colfax

Raúl Torrez                                      Jonathan L. Backer*
Attorney General                                 Mary B. McCord*
Anjana Samant                                    Rupa Bhattacharyya
Deputy Counsel                                   INSTITUTE FOR CONSTITUTIONAL ADVOCACY
Amy Senier                                       AND PROTECTION
Senior Counsel                                   GEORGETOWN LAW
Bailey Colfax                                    600 New Jersey Ave. NW
Assistant Attorney General                       Washington, DC 20001
NEW MEXICO DEPARTMENT OF JUSTICE                 (202) 661-6671
408 Galisteo Street                              (202) 661-6730 (fax)
Santa Fe, NM 87501                               jb2845@georgetown.edu
(505) 490-4060                                   mbm7@georgetown.edu
asamant@nmdoj.gov                                rupa.bhattacharyya@georgetown.edu
asenier@nmdoj.gov
bcolfax@nmdoj.gov

*Counsel for Defendants State of New Mexico and Attorney General Raúl Torrez*


*\*Admitted pro hac vice*

19

## CERTIFICATE OF SERVICE

I hereby certify that, on August 3, 2026, I electronically filed the foregoing with the Clerk of the Court and served a copy upon all counsel of record registered to receive notice via the Court's CM/ECF system.

*/s/ Bailey Colfax*
Bailey Colfax