**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:26-cv-01471-KG-LF |
| | ) | |
| v. | ) | **ORAL ARGUMENT** |
| | ) | **REQUESTED** |
| THE STATE OF NEW MEXICO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**CITY OF ALBUQUERQUE AND MAYOR TIMOTHY KELLER'S
REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
THE UNITED STATES' FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................2

    I.   Albuquerque's Ordinance is not preempted by federal law...................................2

        A.    Recasting the Ordinance as an "obstacle" to enforcement does not establish preemption ...................................................................................3

        B.    Statutes authorizing ICE to use administrative warrants do not preempt Albuquerque's regulation of local institutions' and actors' voluntary consent ..........4

            1.  *Congress authorized administrative warrants; it did not require Albuquerque or local institutions to honor them notwithstanding contrary local law*..................................................................................5

            2.  *Administrative arrest warrants do not supplant or excuse compliance with the Fourth Amendment.*................................................................5

            3.  *Administrative subpoenas for records fare no better* ...........................7

            4.  *HIPAA, FERPA, and New Mexico law cut against the United States' position, not for it* ........................................................................8

        C.    Requiring workplace notices is not "harboring"...........................................8

  II.  Albuquerque's Ordinance does not violate intergovernmental immunity...........................9

        A.    The Ordinance does not directly regulate the federal government .............................9

        B.    Albuquerque's Ordinance does not discriminate against the federal government ...10

        C.    The United States' pregnancy-discrimination analogy does not salvage its theory ...........................................................................................11

  III. Mayor Keller not a proper defendant.....................................................................12

  CONCLUSION...................................................................................................................12

**INTRODUCTION**

The United States' Opposition (Opp.) (ECF No. 64) does not cure what the First Amended Complaint (FAC) lacks. It exposes it. *First*, both insist that Albuquerque's Ordinance is preempted, citing an assortment of federal immigration statutes. FAC ¶¶ 164–73; Opp. at 8–17. But every statute the United States invokes merely authorizes federal immigration officers to act; none is displaced, contradicted, or rendered impossible to carry out by the Ordinance. The United States thus never identifies the conflict on which every preemption theory depends: a federal legal rule that local law overrides or a federal command it defies. Instead, the United States falls back on repeated invocations of the supremacy of federal law, as if that supremacy were itself a source of preemption. It is not. The Supremacy Clause tells a court which law wins once a conflict exists; it does not manufacture the conflict. That distinction is dispositive, and it is fatal to the FAC's Count I. In addition, and tellingly, Albuquerque's opening brief identified eight recent decisions rejecting materially similar preemption theories. The United States engages with only one, *McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022), which it attempts to distinguish on factual grounds. Opp. at 22.

*Second,* the United States' claims to intergovernmental immunity fare no better. Albuquerque's Ordinance commands no federal officer. It regulates only City officials, covered institutions, and employers. The United States nevertheless contends that requiring covered institutions to insist on a judicial warrant *functionally* regulates ICE. But that theory confuses regulation of property owners and custodians of information with regulation of the federal government. Albuquerque's Ordinance tells City officials, property owners, and custodians of confidential information how to respond to requests from immigration agents; it does not tell federal officers how to conduct immigration enforcement. That federal agents may not, as a result,

1

need judicial authorization before accessing property or information reflects the Fourth Amendment's default rule—and, for records, the floor HIPAA and FERPA preserves for more protective local law, see *infra* Part I.B.4—not any burden the Ordinance creates. An Ordinance that leaves federal officers exactly as subject to the Constitution as they always were does not regulate them; it simply declines to excuse them from requirements neither Albuquerque nor ICE had power to waive. Intergovernmental immunity asks whether a law regulates the federal government itself, not whether it affects the circumstances under which federal officers carry out their duties. It prohibits state and local laws that disable the federal government from carrying out its functions altogether, not laws, such as Albuquerque's Ordinance, that leave federal officers free to proceed through lawful processes the Constitution or other applicable laws already require. Nor does the United States identify any similarly situated state or local actor the Ordinance treats more favorably. For these reasons, Counts II and III fail at the threshold.

*Third,* once the United States' preemption and immunity theories fall away, this case reduces to two ordinary local regulations. One instructs designated property owners and custodians of information not to voluntarily admit civil immigration agents into nonpublic spaces or provide protected student or health records absent judicial process. The other requires employers to tell their own employees about immigration-enforcement activity in their own workplaces. Federal law forbids neither.

Because Counts I, II, and III—the only counts asserted against Albuquerque and Mayor Keller—fail as a matter of law, the Court should dismiss the FAC against them in its entirety.

**ARGUMENT**

I.     **Albuquerque's Ordinance is not preempted by federal law.**

The FAC does not plead express preemption. It also does not plead field preemption—that

2

Congress has occupied every field that Albuquerque's Ordinance touches from municipal property to student and health records. Instead, it rests entirely on obstacle preemption, FAC ¶¶ 164–73; Opp. at 8–17, which requires an actual conflict with federal law, not tension with federal enforcement objectives or preferences. *Chamber of Commerce v. Whiting,* 563 U.S. 582 (2011); *United States v. California*, 921 F.3d 865 (9th Cir. 2019).

Unable to show any such conflict, the United States instead emphasizes federal supremacy and Congress's immigration power. Opp. at 2–5. But the question here is not whether Congress has authorized the Executive to inspect, investigate, arrest, detain, and remove some noncitizens. No one disputes that. The question here is whether Congress required Albuquerque—or the hospitals, schools, shelters, libraries, employers, and other institutions its Ordinance regulates—to assist those efforts. Congress did not. It made local government participation voluntary, as the Tenth Amendment requires, and no statute compels private parties to help. Albuquerque's Ordinance therefore forbids nothing that federal law requires. And that is fatal to the United States' preemption claims—which is why the United States falls back on a "obstruction," Opp. at 1, 3-4, 14-17, and a claim that Albuquerque's Ordinance "requires more than what Congress deemed necessary." Opp. at 6, 11, 17. That does not work either. Neither label substitutes for the conflict preemption theories require.

### A. Recasting the Ordinance as an "obstacle" to enforcement does not establish preemption.

"Obstacle" preemption is a species of conflict preemption which requires a concrete obstruction of a federal objective *rooted in statutory text*—not mere inconvenience to federal officers. *Virginia Uranium*, *Inc. v. Warren*, 587 U.S. 761, 767 (2019); *California*, 921 F.3d 865, 879. Unless Congress has made its intention to preempt state or local law "unmistakably clear in

the language" of a federal statute, pre-emption, an extraordinary power, is not presumed. *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991) (citation omitted). Nothing in the FAC provides evidence of any such congressional intent.

Even putting that defect aside, the FAC's own allegations foreclose any plausible obstacle-preemption theory. The United States alleges that its immigration enforcement objectives remain fully attainable notwithstanding Albuquerque's Ordinance and that DHS will not be deterred and will "keep track[ing] and safely detain[ing] aliens." FAC ¶ 155. An Ordinance that the United States itself says will not stop enforcement is neither a plausible nor a preemption-level obstacle. *California*, 921 F.3d at 890 (9th Cir. 2019); *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).

### B. Statutes authorizing ICE to use administrative warrants do not preempt Albuquerque's regulation of local institutions' and actors' voluntary consent.

Albuquerque's Ordinance directs City officials to adopt policies prohibiting designated institutions from voluntarily consenting to immigration-enforcement agents' entry into nonpublic spaces or access to student or patient records absent a valid judicial process.[1] According to the United States, that alone establishes preemption: by authorizing ICE to use administrative warrants and subpoenas, Congress necessarily stripped Albuquerque of authority to require the residents or

---

[1] The United States' passing description of Safer Community Places as an "unbounded list" is inaccurate. Opp. 1. Section 13-17-3 identifies eleven specific categories of "Safer Community Places," followed by a catchall limited to "other similar locations." Under the canon of *ejusdem generis,* that catchall is bounded by the enumerated categories that precede it, not standardless; it does not authorize the City to designate any location it chooses. In any event, United States' undeveloped assertion that the Ordinance's reach is "unbounded" has no bearing on preemption or intergovernmental immunity.

institutions it regulates to insist on that process before voluntarily opening their doors or records. Opp. at 10. That argument fails at every step.

### 1. *Congress authorized administrative warrants; it did not require Albuquerque or local institutions to honor them notwithstanding contrary local law.*

The federal statutes the United States invokes authorize federal officers to use administrative warrants and subpoenas and, in specified circumstances, to make warrantless arrests. *See* 8 U.S.C. §§ 1225(d)(4), 1226(a), 1357(a). But none requires a hospital, school, shelter, employer or other covered institution to provide access, records, consent, or other assistance in the face of contrary law. That gap is dispositive.

As the Supreme Court explained in *Murphy v. NCAA*, preemption requires a federal statute that creates a federal right to engage in conduct that state or local law restricts. 584 U.S. 453, 478–79 (2018). The United States identifies none. Congress has authorized tools: administrative warrants and warrantless arrests under certain circumstances. It has passed no law, however, requiring either Albuquerque or local institutions and employers to assist in using those tools. That alone defeats the United States' preemption theory. And the Fourth Amendment, federal privacy statutes, and New Mexico law point the same way.

### 2. *Administrative arrest warrants do not supplant or excuse compliance with the Fourth Amendment.*

The United States repeatedly treats administrative warrants as automatically authorizing entry into nonpublic areas and administrative subpoenas as compelling immediate access to records ICE.  Opp. at 3, 9, 11. Neither proposition is correct.

First,  for entry, the United States relies on *United States v. Malagerio*, 49 F.4th 911 (5th Cir. 2022), *United States v. Lucas*, 499 F.3d 769 (8th Cir. 2007), and *Abel v. United States*, 362

U.S. 217 (1960). But none holds that an administrative warrant authorizes nonconsensual entry into private spaces—or that any contrary position is "patently false and has been rejected time and again." Opp. at 11.

*Malagerio* found that no entry had occurred—and therefore did not decide whether an administrative warrant would have authorized it. 49 F.4th at 915. *Lucas* split evenly, 5–5, on the validity of an administrative warrant as the basis for a home arrest. No position commanded a majority. And *Abel*'s discussion of administrative warrants was dictum, predating repeated insistence on judicial warrants as a neutral check on the executive. *See e.g., Payton v. New York*, 445 U.S. 573, 586 (1980); *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972); *Coolidge v. New Hampshire*, 403 U.S. 443, 447, 449 (1971).

*Kidd v. Mayorkas*, 734 F. Supp. 3d 967 (C.D. Cal. 2024), states the prevailing rule: absent consent or a judicial warrant, ICE's entry into private spaces is presumptively unreasonable because officers who sign administrative warrants belong to the executive branch, not judicial branch, and cannot be expected to bring a neutral eye to their own agency's investigations. The Fourth Amendment does not let the fox guard the henhouse. It does not let the executive decide when to grant itself a warrant. *Kidd*, 734 F. Supp. 3d at 979–80. And Congress's authorization of administrative warrants can neither dilute nor remove that constitutional constraint. *See Arias v. Noem*, 818 F. Supp. 3d 864, 866 (W.D. Tex. 2026) ("Administrative warrants issued by the executive branch to itself in the immigration context do not pass probable cause muster; the Constitution requires an independent judicial officer."). Indeed, dating back to the Framing era, arrests for purposes of civil removal proceedings have not been left to the unfettered discretion of the officers responsible for enforcement. They have instead required warrants issued by

6

magistrates or other officers exercising judicial power. Lindsay Nash, *Deportation Arrest Warrants*, 73 Stan. L. Rev. 433 (2021).

In a final effort to defend the sufficiency of administrative warrants, the United States cites *In re Sealed Search Warrant Application*, 784 F. Supp. 3d 970 (S.D. Tex. 2025), for the claim that "[i]t is disputed whether DHS *can* obtain judicial warrants for immigration enforcement." Opp. at 10 (emphasis added). That case says the *opposite*: judicial warrants are not just available; they are the *only* proper vehicle for the kind of entry-and-search Albuquerque's Ordinance is said to obstruct. 784 F. Supp. 3d 970 at 971, 976.

### 3. *Administrative subpoenas for records fare no better.*

The United States fares no better regarding student and patient records than it does on entry. Unlike a judicial subpoena, an administrative subpoena issued under 8 U.S.C. § 1225(d)(4) is not self-executing. *See* Opp. at 4, 10, 22.[2] By its terms, § 1225(d)(4) contemplates that a recipient may decline to comply, after which the government must apply to a federal district court for an enforcement order, and only disobedience of *that* order is punishable as contempt. 8 U.S.C. § 1225(d)(4)(B). Congress thus built the same judicial check into ICE's administrative subpoena power that the Fourth Amendment requires for home entry. Albuquerque's Ordinance, directing

---

[2] The FAC does not allege that Albuquerque's Ordinance conflicts with 8 U.S.C. § 1373. Its § 1373 allegations concern only Doña Ana County's SCAR. *See* FAC ¶¶ 117, 203–09. To the extent the Opposition newly argues that Albuquerque's Ordinance violates § 1373 because immigration-status information might appear within a student or patient record (Opp. at 11-12), that argument fails. Section 1373 addresses laws restricting communicating information about citizenship or immigration status. Albuquerque's Ordinance imposes no such restriction. It limits access to student and patient records absent judicial process. Section 1373 does not entitle immigration officers to obtain an entire protected record merely because some portion of it may contain information bearing on immigration status. *See United States v. California*, 921 F.3d 865, 891–92 (9th Cir. 2019); *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 374–76 (D.N.J. 2020), *aff'd sub nom.*, 8 F.4th 176 (3d Cir. 2021).

hospitals and schools to await judicial process before complying, does not obstruct and is not preempted by federal law. It requires only what federal law permits: awaiting judicial process.

#### 4.  *HIPAA, FERPA, and New Mexico law cut against the United States' position, not for it.*

The United States argues that, because HIPAA and FERPA "allow" disclosure of student and patient records to law enforcement, Albuquerque cannot impose greater protection. Opp. at 11-12. But HIPAA expressly preserves "more stringent" state and local rules, including rules restricting disclosures otherwise permitted. 45 C.F.R. §§ 160.202, 160.203(b). FERPA independently conditions law-enforcement access to education records on a judicial order or lawfully issued subpoena—generally only after advance notice to the student or parent—not upon a mere administrative request. 20 U.S.C. § 1232g(b)(1)(J)(ii), (b)(2); 34 C.F.R. § 99.31(a)(9)(i)–(ii). And New Mexico law, which the United States never mentions, separately forbids disclosure of patient records absent a patient's consent or other legal authorization. Mot. to Dismiss at 17, N.M. Stat. Ann. § 24-14B-6 (1978). Each of these three sources points toward judicial process, not away from it.

### C.  Requiring workplace notices is not "harboring."

Calling § 13-17-6(C) a "tip-off" requirement and "mandated harboring and shielding" is rhetoric, not legal analysis. Opp. at 13. "Harboring" requires knowledge of unlawful status and conduct intended to prevent detection. 8 U.S.C. § 1324(a)(1)(A)(iii). The FAC pleads neither. Nor does it allege any instance of notice enabling evasion, or more than speculative injury, and it offers no authority barring employers from telling their own workforce that enforcement occurred.

Unable to rest on the injury theory it actually pled, the United States now offers one new theory of harm and one new reading of the Ordinance. First, it speculates that the required notice

might enable a worker to evade some *later*, *follow-up* enforcement action—a theory even more speculative than the injury alleged in the FAC. Second, it asserts that notice "necessarily can" occur while an enforcement action is still underway. Opp. at 13. The Ordinance's text forecloses that reading: the notice must identify the date agents were present and the nature of the actions they took (§ 13-17-6(C)(1)): information that necessarily describes a completed event. The United States offers no authority suggesting Congress prohibited employers from informing their own workforce, after the fact, that immigration-enforcement activity occurred.

## II.    Albuquerque's Ordinance does not violate intergovernmental immunity.

Intergovernmental immunity condemns laws that "regulates the United States directly" or "discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990); *Washington v. United States*, 596 U.S. 832, 839 (2022). Albuquerque's Ordinance does neither.

### A.  The Ordinance does not directly regulate the federal government.

Albuquerque's Ordinance commands no federal officer to do or refrain from doing anything. It binds only City officials and nonfederal institutions and employers. The United States responds that requiring judicial process *functionally* regulates the federal government, making access more burdensome. Opp. at 20–23. But every local law touching consent, property access, or confidential records affects the circumstances under which federal officers obtain cooperation; if that sufficed, states and localities could rarely legislate in areas where federal officials might someday seek their assistance. Intergovernmental immunity does not sweep that broadly. *See United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993), *aff'd*, 54 F.3d 825 (D.C. Cir. 1995) (noting that the intergovernmental immunities doctrine protects federal officers from state interference with duties, not from ordinary legal process). It bars laws that eliminate the federal

9

government's capacity to perform a function altogether—not laws that leave federal officers free to proceed through lawful process.[3]

The United States' citations to *CoreCivic* and *GEO Group v. Newsom* prove this point rather than undermine it. Both cases struck down laws that eliminated a private immigration detention capacity altogether. *CoreCivic Inc. v. Governor of New Jersey*, 145 F.4th 315, 321, 325–26, 329 (3d Cir. 2025); *GEO Grp. v. Newsom*, 50 F.4th 745, 757-58 (9th Cir. 2022). Albuquerque's Ordinance does not eliminate any federal capacity. It requires only that ICE operate through processes the Fourth Amendment, FERPA, and HIPAA already contemplate. Requiring lawful process is not direct regulation of the federal government.

### B. Albuquerque's Ordinance does not discriminate against the federal government.

Discrimination requires a comparator—a similarly situated nonfederal actor the Ordinance treats better. *North Dakota v. United States*, 495 U.S. 423, 438 (1990). The United States claims Albuquerque "do[es] not contend otherwise, they simply ignore these comparators." Opp. at 19. Not so. Albuquerque explained, on the very pages the United States cites, that civil immigration enforcement and general criminal enforcement are not similarly situated and that distinguishing between them describes a function, not a federal-versus-local classification. MTD 21–23. *McHenry Cnty.* confirms the point: "The mere fact that the [law] touches on an exclusively federal

---

[3] The United States' citations to *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956); *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819); *Arizona v. California*, 283 U.S. 423, 451 (1931); and *United States v. Town of Windsor*, 765 F.2d 16, 18 (2d Cir. 1985), do not change the analysis. Opp. at 2, 22. Those cases involved a state's attempt to subject the federal government, or those acting on its behalf, to state-imposed legal requirements—whether taxation, licensing, permitting, or local regulatory approval. Albuquerque's Ordinance does none of those things. It imposes no legal obligation on any federal officer. It regulates only City officials, property owners, employers, and custodians of confidential information.

sphere is not enough to establish discrimination," and a state's decision not to cooperate, "a possibility contemplated by the relevant federal statutes," is not discrimination. 44 F.4th at 594 & n.7.

*United States v. King County*, 122 F.4th 740 (9th Cir. 2024), does not change the analysis. There, the Ninth Circuit found discrimination because the challenged county executive order burdened *only* federal operations. *Id.* at 757. Albuquerque's Ordinance does not. Congress permits state and local officers to perform civil immigration-enforcement functions under 8 U.S.C. § 1357(g), and the FAC alleges that Curry and Torrance Counties do so. FAC ¶¶ 69–71, 92, 111–12, 117, 145. And under Albuquerque's Ordinance those deputized officers are subject to the same consent and notice requirements as ICE. The Ordinance thus treats  federal, state, and local officers identically.

## C.  The United States' pregnancy-discrimination analogy does not salvage its theory.

The United States also analogizes the Ordinance to pregnancy discrimination and to laws singling out uniquely federal functions such as minting coin or military operations. Opp. at 19. Neither analogy works.

Pregnancy discrimination became sex discrimination only because Congress enacted a statute making  it so, after the Supreme Court held otherwise. *General Electric Co. v. Gilbert*, 429 U.S. 125, 136 (1976); (superseded by statute); *Shaw v. Delta Airlines*, 463 U.S. 85, 89 (1983). The Pregnancy Discrimination Act provides that discrimination "because of or on the basis of pregnancy" is discrimination because of sex, 42 U.S.C. § 2000e(k). The Act created a statutory rule, not a constitutional principle, and Congress has enacted no comparable rule for functions performed primarily by the federal government.

11

Immigration enforcement also differs from minting coin or commanding the Armed Forces—functions Congress has never authorized state or local governments to perform. Opp. at 19. But Congress has expressly authorized state and local officers to carry out civil immigration enforcement under 8 U.S.C. § 1357(g). Those deputized officers are the relevant comparators, and Albuquerque's Ordinance treats them no differently than federal agents.

## III.    Mayor Keller is not a proper defendant.

The United States argues that municipal officials may, in appropriate circumstances, be sued in their official capacities. Opp. at 24. The question here is different: whether an official-capacity claim against Mayor Keller adds anything when the City is already a defendant and a declaration and injunction against it would fully bind its officers, Mayor Keller included. It does not. Because the official capacity claims against Mayor Keller are entirely duplicative, they should be dismissed.

## CONCLUSION

Counts I, II, and III should be dismissed with prejudice as to the City of Albuquerque and Mayor Keller.

Dated: August 3, 2026

Respectfully Submitted,

/s/ Joshua Karsh                                           /s/ Devon P. King

Toby Merrill*† (MA Bar # 601071)              Devon P. King
Litigation Director                                      Deputy City Attorney
Public Rights Project                               One Civil Plaza NW
Sai Mohan* (CA Bar # 350675)                 P.O. Box 2248
Josh Karsh*†† (Il. Bar # 6203096)           Albuquerque, New Mexico 87103
Kayla Svihovec*‡ (DC Bar # 1735588)      (505) 768-4628
Patrick Archer*‡‡ (NY Bar # 6194757)     dking@cabq.gov
490 43rd Street, Unit #115
Oakland, CA 94609

12

(510) 738-6788
Toby.Merrill@publicrightsproject.org
Sai.Mohan@publicrightsproject.org
Joshua.Karsh@publicrightsproject.org
Kayla.Svihovec@publicrightsproject.org
Patrick.Archer@publicrightsproject.org

\* Admitted *Pro Hac Vice.*
† Admitted in Massachusetts. Not
 admitted in California.
†† Admitted in Illinois. Not admitted in
California.
‡ Admitted in D.C. Not admitted in
California.
‡‡ Admitted in New York. Not admitted
in California.

*Counsel for the City of Albuquerque and Mayor Timothy Keller*

13