UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | Civil Action No. 1:26-CV-1471-KG-LF |
| Plaintiff, | ) | |
| v. | ) | RESPONSE IN OPPOSITION TO DEFENDANTS BERNALILLO COUNTY AND COUNTY MANAGER CINDY CHAVEZ'S MOTION TO DISMISS |
| THE STATE OF NEW MEXICO, et al.; | ) | |
| Defendants. | ) | |

**TABLE OF CONTENTS**

INTRODUCTION ........ 1
BACKGROUND ........ 1
I. Legal Background ........ 1
II. The Bernalillo County SCPO ........ 4
III. Procedural History ........ 5
LEGAL STANDARD ........ 5
ARGUMENT ........ 6
I. The BSCPO Is Preempted. ........ 6
A. The BSCPO conflicts and stands as an obstacle to federal immigration enforcement by rejecting Congressionally authorized means of enforcement. ........ 6
B. The BSCPO stands as an obstacle to federal immigration enforcement by requiring businesses to tip off aliens as to immigration enforcement activities. ........ 12
C. The BSCPO stands as an obstacle to federal immigration enforcement by restricting the Federal Government's access to property. ........ 14
D. The INA does not violate the anti-commandeering doctrine. ........ 15
II. The BSCPO Violates the Doctrine of Intergovernmental Immunity. ........ 18
A. The BSCPO impermissibly discriminates against the Federal Government. ........ 18
B. The BSCPO impermissibly regulates the Federal Government. ........ 21
III. County Manager Cindy Chavez Keller Is A Proper Defendant. ........ 24
CONCLUSION ........ 24

## INTRODUCTION

Through the so-called Safer Community Places Ordinance ("BSCPO"), Bernalillo County is actively trying to impede federal immigration enforcement by making it harder for the Federal Government to investigate, detain, and remove criminal illegal aliens from this country. Congress has established a comprehensive scheme of critical immigration objectives that depend on the Federal Government's ability to operate within the states. Yet, the BSCPO prevents the Federal Government from accessing the property, people, and records necessary to achieve Congress's immigration objectives at the expense of the Nation as a whole. The BSCPO requires the Federal Government to obtain judicial warrants and subpoenas when Congress authorized the use of administrative warrants, subpoenas, and detainers. The BSCPO does not just apply these restrictions to County-owned property, but to an unbounded list of misnamed "Safer Community Places." Worse, the BSCPO attempts to shield illegal aliens from detection by federal authorities by requiring businesses to notify aliens on ongoing immigration enforcement activities.

These requirements violate the Supremacy Clause. Despite Bernalillo County's arguments, the United States does not claim it can commandeer County property and personnel for any purpose. Instead, the United States claims that Bernalillo County cannot obstruct federal law enforcement, ignore Congressionally authorized means of enforcement, or discriminate against or regulate the Federal Government. Because the United States alleges facts supporting viable claims based on federal supremacy principles, Bernalillo County's Motion to Dismiss must be denied.

## BACKGROUND

### I. Legal Background

The Supremacy Clause mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any

Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under the Supremacy Clause, a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000). A state law is also invalid "if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990). "[A] state law discriminates against the Federal Government . . . if it singles [it] out for less favorable treatment or if it regulates [it] unfavorably on some basis related to [its] governmental status." *Untied States v. Washington*, 596 U.S. 832, 839 (2022). The Supreme Court has long recognized that "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). States "have no power" to "in any manner control[] the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819).

"[O]ver no conceivable subject is the" federal power "more complete," and thus more supreme, "than it is over" immigration. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quotations omitted). "[T]he supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution." *Hines*, 312 U.S. at 62. The Federal Government thus has broad authority to establish immigration laws, the execution of which the States cannot obstruct or discriminate against. *See Arizona v. United States*, 567 U.S. 387, 394–95 (2012); *accord North Dakota*, 495 U.S. at 435; *id.* at 444-47 (Scalia, J., concurring). As reflected in various provisions of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101, *et seq.* ("INA"), Congress has exercised its broad authority by enacting an

"extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395. The INA confers extensive authority on the Executive to inspect, investigate, arrest, detain, and remove aliens. *See* 8 U.S.C. §§ 1182, 1224–1228, 1231. Responsibility for enforcing these laws is vested principally in the U.S. Department of Homeland Security ("DHS") as well as its component agencies, including Immigration and Customs Enforcement ("ICE"). 8 U.S.C. § 1103(a) (general authority to enforce immigration law).

Congress gave DHS several tools to fulfill its mission. The INA expressly authorizes DHS to arrest and detain aliens pursuant to administrative, not judicial, warrants. *See* 8 U.S.C. § 1226(a). DHS is authorized to inspect all applicants for admission and take appropriate action against inadmissible aliens, even ones who are transferred to state or local custody pending prosecution, *see* 8 U.S.C. §§ 1182, 1225; 8 C.F.R. § 235.2, and "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). DHS is further authorized to arrest and search individuals without a warrant. *See id.* § 1357(a)(2), (4), (5), (c). These powers include the ability to get search warrants to locate and inspect aliens, *see Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1219 (D.C. Cir. 1981), and to issue administrative subpoenas for witness testimony and documents. *See* 8 U.S.C. § 1225(d)(4). Courts have recognized that DHS may avail itself of publicly owned property for the purpose of carrying out its mission. *See, e.g.*, *United States v. King Cnty., Wash.*, 122 F.4th 740, 758 (9th Cir. 2024). DHS has "broad discretion" to implement these laws. *Arizona*, 567 U.S. at 396. Congress further sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii).

## II. <u>The Bernalillo County SCPO</u>

On November 18, 2025, the Bernalillo County Board of County Commissioners enacted the BSCPO, Bernalillo County Ordinance No. 2025-33. *See* Bernalillo Cnty., N.M., Code of Ordinances §§ 51-1–51-6. The BSCPO restricts the sharing of critical information and access to property by prohibiting certain public and private entities "from providing voluntary consent to law enforcement agents engaged in or supporting immigration enforcement from: (1) Entering non-public areas; or (2) Accessing, reviewing, or obtaining student or patient records." *Id.* §§ 51-3(a)(1)–(2). The BSCPO applies these information sharing and property restrictions not only to "County owned or operated facilities," but also the records and property of private entities and areas open to the public including, for example, "[h]ospitals and other healthcare facilities," "[p]laces where children routinely gather, including schools and daycares," "[w]ork zones and construction sites on county property and within county rights-of-way," and "[c]ommunity resource centers and direct service providers including legal service providers, homeless shelters, sexual and domestic violence providers, family justice centers, and human trafficking service providers[.]" *Id.* § 51-2. The places subject to these restrictions are potentially unbounded, as the BSCPO purports to apply to "at least" the listed areas in addition to unspecified "[o]ther similar locations whose purpose is to promote the health safety and welfare of residents as determined by the county." *Id.* § 51-2(8).[1] Its most blatant attempt to frustrate immigration enforcement objectives is its tip-off requirement, which mandates that "business[es] shall provide notice to all current employees, contractors, and others performing work for the employer for remuneration . . . within

[1] The BSCPO appears to bar access to these properties even with a valid judicial warrant by creating a judicial exception to access records only, making no exception for access to property. *See* BSCPO § 51-3(a)(2)(A) ("This section does not prohibit a safer community place from complying with a valid judicial warrant authorizing a search of such records or a valid judicial subpoena or judicial order compelling production of such records[.]"); *United States v. Johnson*, 529 U.S. 53, 58 (2000) ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference. . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth.").

24 hours of a law enforcement agent engaging in or supporting immigration enforcement being present at a place of work[,]" which notice includes the name of the agency, date the immigration enforcement agent was present, and the nature of the agent's actions. *See id.* § 51-5(b).

**III. <u>Procedural History</u>**

On June 22, 2026, the United States filed its First Amended Complaint (ECF 42) ("FAC") against Bernalillo County and County Manager Cindy Chavez. *See* FAC at ¶¶ 24, 30, 31.[2] The FAC asserts three claims against Defendants arising out of the BSCPO: (1) federal preemption, (2) unlawful regulation, and (3) unlawful discrimination. *See* FAC at ¶¶ 164–190. The United States seeks, *inter alia*, a judgment declaring that the BSCPO is preempted and violates the Supremacy Clause and is therefore unconstitutional, invalid, and unenforceable, and a permanent injunction of its operation and enforcement. *See* FAC at Prayer for Relief ¶¶ A, B, D. On August 10, 2026, Defendants moved to dismiss the FAC. *See generally* ECF 75 ("Motion" or "Mot.").

**<u>LEGAL STANDARD</u>**

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). A claim survives a motion dismiss when it is facially plausible, *i.e.*, where the plaintiff pleads facts sufficient to raise a right to relief beyond mere speculation. *Id.* (internal citations omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Dismissal is a "harsh remedy which must be cautiously studied . . . to protect the interests of justice." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (citation omitted).

[2] The Court substituted the Board of County Commissioners of Bernalillo County for Bernalillo County. ECF 81. "Defendants" refers to the Board of County Commissioners of Bernalillo County and County Manager Cindy Chavez.

# ARGUMENT

## I. The BSCPO Is Preempted.

As alleged in the FAC, the BSCPO flouts federal supremacy principles and the Federal Government's comprehensive immigration authority by undermining how the Executive Branch enforces Congress's immigration scheme. When Congress exercises its enumerated powers to regulate individuals, the states cannot stand in the way. U.S. Const. art. VI, cl. 2. "[T]he very essence of supremacy" empowers the Federal Government to "remove all obstacles to its action within its own sphere." *McCulloch*, 17 U.S. (4 Wheat.) at 427. Under the Supremacy Clause, "when federal and state law conflict, federal law prevails and state law is preempted." *Murphy v. NCAA*, 584 U.S. 453, 471 (2018). A "State may not pursue policies that undermine federal law," *Arizona*, 567 U.S. at 416, and may not take action that "either frustrates the purpose of the national legislation or impairs the efficiency of th[e] agencies of the federal government to discharge the duties for the performance of which they were created." *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896); *see also Crosby*, 530 U.S. at 373. A state rule need not compel action to conflict with federal law; a sufficient conflict exists "if it interferes with the methods by which the federal statute was designed to reach [its] goal." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).

The BSCPO is preempted because it stands as an obstacle to the accomplishment of the full purposes and objectives of Congress under the INA in several respects.

### A. The BSCPO conflicts and stands as an obstacle to federal immigration enforcement by rejecting Congressionally authorized means of enforcement.

The BSCPO is preempted because it requires "a valid judicial warrant . . . or a valid judicial subpoena or judicial order" to permit certain public and private entities to provide "voluntary consent to law enforcement agents engaged in or supporting immigration enforcement" to provide "[a]ccess[], review[], or obtain[] student or patient records." FAC at ¶¶ 95, 115 (quoting BSCPO

§ 51-3(a)). It further prevents the access of immigration enforcement officers, even if armed with a judicial warrant, to Bernalillo County property and a long (and potentially unbounded) list of so-called Safer Community Places ranging from hospitals to community resource centers to County rights-of-way as well as "[o]ther similar locations, as determined by the county." BSCPO § 51-2.

Defendants argue that these restrictions "do not obstruct" federal immigration enforcement but rather are consistent with requirements contemplated by existing law. Mot. at 9. However, Congress authorized the Federal Government to use administrative, not judicial, warrants and subpoenas to obtain access to aliens and related information, *see* 8 U.S.C. §§ 1125(d)(4), 1226(a), and authorized warrantless arrests to detain aliens to expedite the detention and removal process, *id.* § 1357(a), (c). Congress even sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." 8 U.S.C. § 1324(a)(1)(A)(iii). DHS is also empowered to inspect all applicants for admission or "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1); *see id.* § 1225(b)(2); 8 C.F.R. § 235.2. Yet, under BSCPO, if an alien is located in a "Safer Community Place," including a hospital, school, community resource center, or any other location designated by the County, that location must refuse access to law enforcement to detain an alien and cannot accept an administrative warrant or subpoena. These prohibitions facially override Congress's means of enforcing immigration law. Administrative warrants are not a procedural workaround; they are the instrument Congress specifically designed for immigration enforcement. Refusal to recognize the administrative tools granted by Congress to access property, people, and records nullifies the enforcement mechanism Congress prescribed. In fact, it is disputed whether DHS can obtain

judicial warrants for immigration enforcement. *See In re Sealed Search Warrant Application*, 784 F. Supp. 3d 970, 972 (S.D. Tex. 2025). While the United States disagrees with that line of cases, that, in combination with laws like BSCPO, would leave DHS incapable of effectively investigating and enforcing federal immigration law.

Defendants say they are merely declining to consent to cooperation and telling certain private organizations they also cannot consent. *See* Mot. at 9–10. But Defendants admit that the BSCPO prohibits compliance with administrative warrants and subpoenas. *See id.* at 11. Those are not voluntary requests for cooperation; they are mandatory congressionally authorized means of investigation and enforcing the law. Defendants also argue they can control access to their own property and those within its jurisdiction. *See id.* at 4. Not so—counties cannot change property rules to thwart federal law. *See Wolford v. Lopez*, 146 S. Ct. 2032, 2047 (2026) (Hawaii could not change property rules to undermine Second Amendment). Even so, Defendants admit they must allow access to records for judicial warrants. *See id.* at 10, 12. The same must be true for administrative warrants, subpoenas, and warrantless arrests.

Without any basis, Defendants misconstrue federal law to claim administrative warrants and subpoenas cannot include confidential information or non-public spaces. The law says no such thing. Congress knew how to geographically and informationally limit the scope of such authorities but chose not to for county owned property. *See* 8 U.S.C. § 1357(a)(2)–(3) (preventing warrantless arrests in "dwellings"); *New York v. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 393 (S.D.N.Y. 2019) (noting Congress presumed there would be courthouse arrests based on 8 U.S.C. § 1229(e)). And those authorities have been construed to allow search warrants for locating, inspecting, and detaining aliens. *See Blackie's*, 659 F.2d at 1219–23 (reading these DHS authorities to permit administrative search warrants without same restrictions as criminal warrants).

Regardless, BSCPO broadly prohibits entry into areas deemed "non-public," which would prevent immigration enforcement agents from making arrests even in those areas. BSCPO § 51-3. Defendants cannot ignore DHS's authority. Barring immigration enforcement officials from property and requiring them to obtain judicial permission to use the tools given to them by Congress conflicts with and imposes an obstacle to the enforcement of federal law.

Defendants argue that requiring judicial process does not impose an obstacle on federal immigration enforcement. Mot. at 12–13. Not so. The Ninth Circuit held that a similar state law requiring a judicial order to produce medical information was preempted because "the Oregon statute stands as an obstacle to the full implementation of the CSA because it 'interferes with the methods by which the federal statute was designed to reach [its] goal,'" namely administrative subpoenas. *Oregon Prescription Drug Monitoring Program v. U.S. Drug Enf't Admin.*, 860 F.3d 1228, 1236 (9th Cir. 2017) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, (1992)). The BSCPO erects even more substantial obstacles.

Defendants' Fourth Amendment defense is baseless. *See* Mot. at 12–13. The BSCPO bars access to certain parts of so-called Safer Community Places irrespective of who controls such place or consents to search. If they consent, there is no Fourth Amendment issue. *Birchfield v. North Dakota*, 579 U.S. 438, 476 (2016) ("It is well established that a search is reasonable when the subject consents[.]"). Yet BSCPO takes away that option. Furthermore, the BSCPO contravenes federal law by disallowing access even based on judicial orders, in addition to forbidding access based on administrative warrants or subpoenas. But DHS does not even need judicial approval or consent to access such spaces because of the Congressionally authorized means. The notion that administrative warrants do not provide access to private areas protected by the Fourth Amendment is patently false and has been rejected. *See United States v. Malagerio*, 49 F.4th 911, 915–16 (5th

Cir. 2022) (administrative warrant allowed arrest in curtilage without Fourth Amendment issue); *Abel v. United States*, 362 U.S. 217, 234 (1960) (history and constitutionality of administrative warrants). Defendants' Fourth Amendment argument relies on *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 979–80 (C.D. Cal. 2024), but the *Kidd* court acknowledged that "it is true that 8 U.S.C. §§ 1226(a) and 1231(a)—which authorize the arrest of noncitizens with an administrative warrant and mandate that noncitizens be taken into custody for removal—make no reference of a judicial warrant" and "consistent with the Fourth Amendment, immigration authorities may arrest individuals for civil immigration removal purposes pursuant to an administrative arrest warrant issued by an executive official, rather than by a judge[.]" *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 979 (C.D. Cal. 2024) (quoting *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 825 (9th Cir. 2020)). That case was also only about houses, which have special protections, and is irrelevant here. *Id.* It is also contrary to other appellate decisions. *See United States v. Lucas*, 499 F.3d 769, 776 (8th Cir. 2007). In any event, the solution to a Fourth Amendment violation is federal law, not a local ordinance. And to the extent the New Mexico Constitution establishes greater protections and stands as a barrier to congressionally authorized administrative subpoenas and warrants, it too would be preempted.

Defendants' reliance on HIPPA, FERPA, and other New Mexico privacy laws is irrelevant. First, as Defendants acknowledge, HIPPA and FERPA allow disclosure of medical records to law enforcement. Mot. at 13–14; *see* 45 C.F.R. § 164.512(f); 34 C.F.R. § 99.31(a)(9)(i) (FERPA allows disclosure on "judicial order or lawfully issued subpoena"). Nothing in those authorizations limits disclosures based on the administrative character of a warrant or subpoena. Second, Defendants cannot prohibit compliance with an administrative subpoena to increase the protections of HIPPA or FERPA. The same logic applies to all state privacy laws. Indeed, courts have routinely held that

similar administrative subpoenas and warrants preempted contrary state privacy laws, including New Mexico's laws. *See United States v. Wilson*, 2022 WL 17093457, at *6 (D.N.M. Nov. 21, 2022) (New Mexico Rule 11-504(B) restrictions on sharing patient information preempted by CSA); *United States v. Zadeh*, 820 F.3d 746, 751 (5th Cir. 2016) (similar); *U.S. Dep't of Just. v. Colo. Bd. of Pharmacy*, No. 10-1116, 2010 WL 3547898 (D. Colo. Aug. 13, 2010), at *2 (limits on basis for complying with subpoenas preempted). Congress authorized administrative subpoenas as a way of obtaining testimony, documents, and records, and, as with judicial warrants, that authorization overrides any contrary county laws.

Third, administrative warrants do not generally seek patient or student records. DHS merely seeks information related to the immigration status of individuals in furtherance of federal law, as authorized many times over by the INA. Federal law provides that a "State[] or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration officials "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see also* 8 U.S.C. § 1644 (similar). The phrase "citizenship or immigration status," as used in Section 1373(a), refers to a person's legal classification under federal law and information bearing on that status. Other provisions in the immigration scheme demonstrate why this information is relevant and necessary to immigration enforcement. *See, e.g.*, *id.* §§ 1255, 1357(10)(A) (providing an alien's "lawful presence" as an example of information "regarding . . . immigration status"). This information rarely includes an alien's medical history. The BSCPO as written, however, precludes access to status information if it is within a covered record. By preventing access to this information absent a judicial warrant or order, the BSCPO flouts the INA. Hiding behind laws that protect other information does not shield immigration status information from disclosure to federal authorities.

While a state cannot displace federal immigration policy with its own immigration policy, it also cannot sabotage the federal scheme. *Arizona*, 567 U.S. at 408–10. If Defendants acknowledge the legal force of a federal judicial warrant, there is no basis to reject administrative warrants authorized by federal law, as both are supreme. By mandating judicial approval, the BSCPO requires more than what Congress deemed necessary to access the locations, people, and information necessary to enforce immigration law. It thus alters the means Congress authorized to help DHS safely locate and detain aliens, including dangerous criminals. That is doubly so because the BSCPO extends to numerous private locations, substantially constraining the locations DHS can enforce federal law within New Mexico's largest county. *See* FAC ¶¶ 154, 155–163. If that is not an obstacle, it is difficult to imagine what is. As a result, the BSCPO conflicts with and poses an obstacle to the objectives of federal law and is preempted.

### B. The BSCPO stands as an obstacle to federal immigration enforcement by requiring businesses to tip off aliens as to immigration enforcement activities.

The BSCPO is also preempted because it compels private businesses to notify aliens "[i]f a law enforcement agent engaging in or supporting immigration enforcement is present at a place of work" by providing, within 24 hours, the name of the immigration enforcement agency, date of the immigration enforcement activities, and nature of the immigration enforcement activities. FAC at ¶¶ 116, 131, 171 (quoting BSCPO § 51-5(b)). By requiring businesses to tip off aliens as to immigration enforcement activities, the BSCPO requires businesses to warn aliens to avoid coming into work so that they may evade detection by immigration enforcement authorities. FAC at ¶ 116. Requiring businesses to help aliens evade detection by immigration enforcement authorities constitutes mandated harboring and shielding of aliens from federal immigration authorities and poses an obstacle to the enforcement of federal law. *See* 8 U.S.C. § 1324(a)(1)(A). Indeed,

"[e]xamples [of harboring] also include attempts to alert undocumented immigrants to the physical approach of immigration authorities." *Kearns v. Cuomo*, 981 F.3d 200, 208 (2d Cir. 2020).

Defendants argue that somehow the BSCPO's tip off provision cannot constitute harboring because any employer who knowingly tips off an employee "subject to immigration enforcement already has violated federal law." Mot. at 14–15. It is difficult to follow this argument. Defendants' position appears to be because it is unlawful for businesses to hire illegals, businesses are unlikely to ever harbor aliens by notifying their employees of immigration enforcement. That is odd because the law also requires notifications for any I-9 investigations. *See* BSCPO § 51-5(a). The only plausible purpose of such a law is to help employees who are not here legally to evade enforcement. After all, employers often do violate the law by hiring illegals[3] and the BSCPO's notification requirement requires them to violate another. And aliens who are legal at the time of hiring can later become unlawfully present, as happens as in the case of visa overstays. Indeed, it is difficult to imagine the purpose of this law otherwise, which only applies to immigration enforcement actions and which Bernalillo itself trumpets as a response to increased enforcement. *See* Mot. at 2–4 (citing increased immigration enforcement as rationale for passing BSCPO); BSCPO § 51-1 (explaining purpose of BSCPO is to reaffirm that "immigration enforcement" must have a "valid judicial warrant" "to search or enter" certain designated public and private places).

Further, under the BSCPO, aliens will be able to evade detection during any follow-up enforcement actions. FAC at ¶¶ 116, 155. Either way, this law amounts to harboring by knowingly assisting aliens in evading law enforcement. Defendants further argue that this tip off provision

[3] In 2022, Pew Research estimated that at least 45,000 illegal aliens were employed in New Mexico. *See* Jeffrey S. Passel and Jens Manuel Krogstad, *What we know about unauthorized immigrants living in the U.S.*, Pew Research Center (July 22, 2024), https://www.pewresearch.org/short-reads/2024/07/22/what-we-know-about-unauthorized-immigrants-living-in-the-us/ [https://perma.cc/E8M7-BRVU]; *see also* Carl Davis, *et al.*, *Tax Payments by Undocumented Immigrants*, Institute on Taxation and Economic Policy at 22 (July 30, 2024) (estimating that 61,000 illegal aliens earned approximately $1,661,000,000 in New Mexico), https://sfo2.digitaloceanspaces.com/itep/ITEP-Tax-Payments-by-Undocumented-Immigrants-2024.pdf [https://perma.cc/86R5-A726].

merely reflects "a law of general applicability." Mot. at 15. That is irrelevant and false. The BSCPO's tip off provision facially applies only to "immigration enforcement" and has no purpose other than to provide notice to aliens of immigration enforcement actions and facilitating aliens' evasion of immigration enforcement authorities. Even if this is not always harboring, it is still preempted because it creates an obstacle to immigration enforcement.

And there can be no Tenth Amendment concerns where the BSCPO is regulating private employers and forcing them to harbor aliens. Defendants have no police power to obstruct federal immigration enforcement. The challenged provision is preempted because it mandates harboring and shielding of aliens from federal immigration authorities and poses an obstacle to the enforcement of federal immigration law. *See* 8 U.S.C. § 1324(a)(1)(A); *Kearns*, 981 F.3d at 208.

### C. The BSCPO stands as an obstacle to federal immigration enforcement by restricting the Federal Government's access to property.

The BSCPO is preempted because it prevents federal immigration authorities from entering, accessing, or using certain public and private properties for purposes of immigration enforcement. FAC at ¶¶ 107, 113. While the United States is not claiming it can occupy County property for any reason nor that a locality must enter into agreements or cooperate with federal enforcement, counties cannot (i) refuse to comply with administrative devices, (ii) prohibit immigration enforcement in spaces that are publicly accessible,[4] or (iii) prevent access to facilities to inspect or interrogate aliens in local detention. Yet the BSCPO does all of these, in patent conflict with the federal immigration scheme.

Not permitting the Federal Government to access property to perform immigration enforcement operations is not a neutral act—it is tantamount to rejecting the federal scheme itself,

[4] The BSCPO does not define what constitutes a "non-public area[]" from which immigration enforcement officials are excluded. BSCPO § 51-3(a)(1). Instead, it confers discretion on county officials, including the County Manager, to decide what areas are not accessible to immigration enforcement officials. *See id.* §§ 51-3(a), (b), 51-4.

and conflicts with existing law. In *King County*, the Ninth Circuit required non-discriminatory access to public property consistent with the intergovernmental immunity doctrine. 122 F.4th at 758 ("[The court] would not perceive a threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways."). Defendants should not be permitted to ban federal immigration law enforcement on generally accessible public property or private property.

By prohibiting federal immigration enforcement officers from accessing certain public and private properties, which are used to enforce federal immigration law, the BSCPO "substantially interfere[s]" with and stands as an obstacle to civil immigration enforcement operations. *See CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 327 (3d Cir. 2025); *id.* at 321 ("'the very essence of supremacy' empowers the federal government to 'remove all obstacles to its action within its own sphere . . . [and] exempt its own operations from [state] influence'") (quoting *McCulloch*, 17 U.S. at 427); *see Arizona*, 567 U.S. at 406. Specifically, by barring access to property, the BSCPO frustrates DHS's authority to inspect all applicants for admission and take appropriate action against inadmissible aliens. *See* 8 U.S.C. §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. It further presents obstacles to ICE's mandate "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" by barring ICE's access to property. 8 U.S.C. § 1357(a)(1). The BSCPO's property prohibitions are in patent conflict with the INA. Defendants cannot prohibit DHS from accessing property when carrying out powers expressly authorized by Congress.

**D. The INA does not violate the anti-commandeering doctrine.**

Defendants erroneously characterize their obstruction of federal immigration enforcement as their prerogative under the Tenth Amendment. Mot. at 9–10. The anticommandeering doctrine prevents Congress from "compel[ling] the States to enact or enforce a federal regulatory program,"

or "circumvent[ing] that prohibition by conscripting the State's officers directly." *Printz v. United States*, 521 U.S. 898, 935 (1997); *Murphy*, 584 U.S. at 473. The doctrine does not allow obstruction.

As the Second Circuit has explained, "[a] commandeering challenge" necessarily "depends on there being pertinent authority 'reserved to the States.'" *New York v. Dep't of Just.*, 951 F.3d 84, 113 (2d Cir. 2020) (quoting U.S. Const. amend. X). In *Murphy*, it was undisputed that regulating sports gambling fell within the state's police powers. But here the Federal Government has the "preeminent" power over immigration law, *id.* (citation omitted), and states "may not pursue policies that undermine federal law," *Arizona*, 567 U.S. at 416. Because the Congress acted pursuant to an enumerated Constitutional power in enacting the INA to *regulate aliens*, *id.* at 395, *Murphy* is inapposite, as there is no authority reserved to the states nor does the INA regulate them. *See New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States[.]").

Defendants' invocation of their purported "police powers" changes nothing, as such powers must yield in the face of an enumerated Constitutional power under the Supremacy Clause. *See id.* The Supreme Court has also rejected the notion that a local government's characterization of its "purpose" can act as a shield in the preemption analysis because "such a doctrine would enable state legislatures to nullify nearly all unwanted federal legislation by simply . . . articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law." *Perez v. Campbell*, 402 U.S. 637, 652 (1971). Defendants do not have a lawful "police power" to frustrate the enforcement of federal law, no matter how they frame the purpose.

Defendants further fundamentally mischaracterize the relief that the United States seeks. The United States does not ask this Court to compel County officials to affirmatively implement federal immigration law or even cooperate in detention. Rather, the United States wants Defendants to stop obstructing federal immigration enforcement. FAC at ¶ 19. Compliance with administrative warrants, subpoenas, inspections, and warrantless arrests are not "voluntary" requests that localities can reject. Nor are they commandeering localities any more than normal judicial warrants or subpoenas requiring the transfer of a detainee and sharing of information. If compliance with a judicial warrant is not commandeering, then neither is compliance with an administrative warrant. Moreover, BSCPO broadly requires various entities to affirmatively deny access to non-public spaces. *See* BSCPO §§ 51-2, 51-3(a)(1). Preventing active obstruction is not commandeering. And these non-governmental entities have no Tenth Amendment rights.

The same is true concerning the notification requirement placed on businesses, as businesses have no Tenth Amendment rights. In any event, it is not a regulation of states or commandeering to prevent active obstruction and harboring of aliens. Moreover, access to public spaces and some facilities for limited immigration purposes is not commandeering. Using spaces that are otherwise open to the public does not commandeer local personnel or resources; it amounts to use of public spaces like highways open to everyone. *King Cnty.*, 122 F.4th at 758. Merely accessing certain facilities for investigations and interrogations of aliens does not commandeer local officials or resources. County officials do not have to assist, they merely cannot obstruct access for limited purposes. The Supreme Court has rejected the argument that the Tenth Amendment is violated whenever a federal law "will consume [state or local] employees' time and thus the State's resources." *Reno v. Condon*, 528 U.S. 141, 150 (2000); *see also King Cnty.*, 122 F.4th at 758 ("To the extent King County argues that it has expended resources ensuring the safety

of [a local airport] in response to ICE charter flights, it identifies no case treating this degree of background support as rising to the level of unconstitutional commandeering.").

At bottom, the United States is *not* arguing that County law enforcement must actively enforce immigration law. It is asking Defendants not to impose obstacles to the implementation of the INA by banning access to property, requiring judicial warrants where Congress deemed administrative warrants sufficient, and requiring businesses to notify aliens of ongoing immigration enforcement activities. The INA cannot function as Congress intended if immigration enforcement officials cannot access property, are required to use the judicial process to obtain warrants, and have their investigations stymied because local businesses are required to alert illegal aliens of immigration enforcement activities. The United States does not seek to commandeer local officials.

## II. <u>The BSCPO Violates the Doctrine of Intergovernmental Immunity.</u>

The BSCPO singles out for disfavored treatment "immigration enforcement" activities that only the Federal Government performs. It also imposes prohibitions on the Federal Government (i.e., from accessing property, from obtaining information absent court order, etc.). In so doing, the BSCPO discriminates against and regulates the Federal Government.

### A. The BSCPO impermissibly discriminates against the Federal Government.

A state law is invalid "if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota*, 495 U.S. at 435; *Washington*, 596 U.S. at 838. "[A] state law discriminates against the Federal Government . . . if it singles [it] out for less favorable 'treatment' or if it regulates [it] unfavorably on some basis related to [its] governmental 'status.'" *Washington*, 596 U.S. at 839. The BSCPO illegally discriminates against the Federal Government, FAC at ¶¶ 127, 131, 132, because it singles out federal officials for less

favorable treatment by applying only to "a law enforcement agent engaging in or supporting *immigration* enforcement." BSCPO §§ 51-3(a) (emphasis added).

BSCPO's entry and access restrictions to "Safer Community Places" apply only to "law enforcement agents engaged in or supporting immigration enforcement[.]" *Id.* § 51-3(a). Access to such properties by state or local law-enforcement officials is not restricted by the BSCPO. *See* FAC ¶ 132. Safer Community Places, for example, can consent to give access and records to local officers. The BSCPO thereby singles out federal authorities for worse treatment than state and local authorities by permitting non-immigration-related law enforcement officials to access property and records while denying the same right of access to immigration law enforcement officials. *See King Cnty.*, 122 F.4th at 758 ("Requiring this form of non-discriminatory access to [public] property consistent with the intergovernmental immunity doctrine does not create a back-end anti-commandeering problem."); *see also Washington*, 596 U.S. at 839 ("[S]tate law discriminates against the Federal Government . . . if it 'singles them out' for less favorable 'treatment' or if it regulates them unfavorably on some basis related to their governmental 'status.'"). Similarly, the tip off requirement applies only to "immigration enforcement" activities, while other law enforcement activities by state or local officers are not affected. FAC ¶ 131.

Defendants agree that the BSCPO discriminates against the core federal function of immigration enforcement. *See* Mot. at 17. So, by definition, the BSCPO singles out federal officers for worse treatment. However, Defendants argue that because the BSCPO discriminates against a core federal function, there is no comparator, and thus the BSCPO is not discriminatory. Mot. at 17. As a preliminary matter, the FAC alleges that comparators exist, as state and local law enforcement officials have access to information and property without a judicial warrant and do not face a tip-off requirement. *See* FAC at ¶¶ 131, 132. Oddly, Bernalillo even admits they are

treating state law enforcement differently even for civil purposes because they "have not created the same problems the Ordinance seeks to mitigate," meaning enforcing federal law in ways the County disapproves. Mot. at 17. That rationale, however, does not defeat the comparators. *See King Cnty.*, 122 F.4th at 757–58 (claim that ICE flights caused worse harms did not save policy from being unconstitutionally discriminatory).

Defendants' concerns, in any event, are not part of the FAC and thus not a basis for dismissal. Otherwise, Defendants do not contest the comparators, they simply ignore them. Even worse, Defendants' theory suggests that counties have *more* leeway to discriminate against certain federal functions *because* they are inherently federal. Several courts have recently found that discrimination against immigration enforcement does indeed constitute unconstitutional discrimination despite its unique federal nature. *See Genesis GSA Strategic One, LLC v. Howard County*, No. 1:26-cv-915-ABA, --- F. Supp. 3d ---, 2026 WL 2294479, at *20 (D. Md. Aug. 10, 2026) (discriminatory immigration law preliminarily enjoined because it "explicitly singles out the federal government by applying only to . . . a function exclusively of the federal government"); *GEO Group, Inc. v. Ryan*, No. 1:26-cv-2533, ECF 34 at 7 (D. Colo. Aug. 20, 2026) (discriminatory immigration law preliminarily enjoined because it "focus[ed] on immigration-related facilities" and thus "is limited to facilities that by their nature are carrying out federal policies").

Nor does the Tenth Amendment allow discrimination against the Federal Government. That would turn the intergovernmental immunity doctrine, which is meant to protect the Federal Government, on its head. Imagine if the law singled out other functions that are unique to the Federal Government like military functions or the minting of coins. Finding such a policy illegal and thus requiring some cooperation or at least adherence to lawful orders would not constitute commandeering. At bottom, the Tenth Amendment does not permit discrimination.

Even if specific comparators were not alleged in the FAC, intergovernmental immunity "is not a formalist doctrine[;]" courts must "look through form and behind labels to substance" and probe the "purpose or self-evident operation" of a state law to see whether it achieves indirectly what it could not do directly. *CoreCivic*, 145 F.4th at 322 (cleaned up); *see id.* (State law carried "the same sting as a law whose text applies expressly to the federal government" because it functionally eliminated the United States's chosen method of detaining immigration detainees in New Jersey.). There is, therefore, no need to look for precise comparators; by its terms, the BSCPO imposes a burden unique to the United States based on the "status" of federal immigration officials as federal immigration officials but no one else. *North Dakota*, 495 U.S. at 438. By applying solely to "immigration enforcement," the BSCPO facially treats the Federal Government differently from any potential comparator. The Ninth Circuit held as much, explaining that "[b]y 'burden[ing] federal operations, and only federal operations,' the Executive Order violates the anti-discrimination principle of the intergovernmental immunity doctrine." *King Cnty.*, 122 F.4th at 757 (quoting *California*, 921 F.3d at 883). By applying solely to immigration enforcement, the BSCPO treats federal immigration authorities worse than any other law enforcement entity, and is therefore facially discriminatory. *See, e.g.*, *Genesis GSA Strategic One*, No. 1:26-cv-915-ABA, 2026 WL 2294479, at *14–15, 18–22; *GEO Group*, No. 1:26-cv-02533, ECF 34 at 6–9.

**B. The BSCPO impermissibly regulates the Federal Government.**

The Supreme Court has long recognized that "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445. States "have no power" to "in any manner control[] the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch*, 17 U.S. (4 Wheat.) at 436. Accordingly, unless Congress expressly authorizes otherwise, the "United States may perform its

functions without conforming to the police regulations of a state." *Arizona v. California*, 283 U.S. 423, 451 (1931). This doctrine applies "in the absence of a specific [conflicting] federal law, [ensuring that] federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993), *aff'd*, 54 F.3d 825 (D.C. Cir. 1995) (citing *In re Neagle*, 135 U.S. 1, 10 (1890)).

Contrary to Defendants' assertions that the BSCPO cannot constitute regulation because it "imposes no obligation on the federal government," these principles apply with full force to the BSCPO because it imposes several obligations on the Federal Government's immigration-enforcement functions. Mot. at 18. For example, several courts of appeals have held that state bans on private detention facilities unlawfully regulated the Federal Government because such laws "prevent[] the federal government from choosing how . . . it will carry out a core federal function." *CoreCivic*, 145 F.4th at 325; *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 757 (9th Cir. 2022) (en banc) (explaining that a state law would impermissibly "give California the power to control ICE's immigration detention operations in the state"). While these cases involved regulation of federal contractors, the Federal Government itself has "substantially" greater protection from "state law under the Supremacy Clause." *GEO Grp.*, 50 F.4th at 755; *see also North Dakota*, 495 U.S. at 436–37. States have no authority to determine the circumstances in which federal officers can carry out their functions; that is for the Federal Government to decide. It is abundantly clear that the purpose and effect of the property and record restrictions are to engage in impermissible regulation, as these requirements "place[] a prohibition on the Federal Government," *Hancock*, 426 U.S. at 180, and improperly seek to regulate its immigration enforcement functions. *United States v. Town of Windsor*, 765 F.2d 16, 18 (2d Cir. 1985).

Most obviously, the judicial warrant requirement imposes a mandate on the Federal Government that obligates the Federal Government to do more than Congress required. As Defendants appear to acknowledge, Motion at 11–12, Congress expressly authorized administrative warrants and subpoenas, as well as warrantless arrests. 8 U.S.C. §§ 1225(d)(4), 1226(a), 1357(a), (c); 8 C.F.R. § 287.7. But by requiring a judicial warrant to access records, the BSCPO forecloses federal immigration officials' use of Congressionally authorized tools and imposes a different method, with a different standard, on the United States for effectuating immigration law. Defendants are not merely declining to consent or cooperate, they are requiring County employees and private parties to disobey the Congressional mandate by refusing to honor administrative warrants absent judicial approval. Counties have no power to prevent federal agents from carrying out their duties "until they satisfy a state officer." *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956). The judicial warrant requirement is just that—a locality's condition that federal officers must satisfy before they may execute their federal duties. That is a regulation of the United States's "core power to enforce immigration laws[,]" regardless of whether the law's text is addressed to local officials. *CoreCivic*, 145 F.4th at 319; *see GEO Grp.*, 50 F.4th at 757.

Defendants rely on *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581 (7th Cir. 2022), but that case involved property leased by the Federal Government; here, the United States does not compel Defendants to lease property to anyone but seeks temporary access to effectuate immigration law. And insofar as the court in *McHenry County* did not apply "the functional approach that intergovernmental immunity demands," *CoreCivic*'s use of that approach makes it the more compelling case. *CoreCivic*, 145F.4th at 325. Further, the anticommandeering doctrine is inapplicable here as it protects states from being conscripted to administer federal programs. *Printz*, 521 U.S. at 933. Here, the United States is not seeking to force Defendants to implement a

federal scheme. The United States is simply enforcing federal law through Congressionally authorized means, including with private parties. And the Tenth Amendment cannot be weaponized to regulate federal officers as that would turn the Constitution on its head.

## III. County Manager Cindy Chavez Keller Is A Proper Defendant.

Defendants argue that the County Manager should be dismissed because the official capacity claims against the County Manager are redundant of those against Bernalillo County. Mot. at 19. "[A]n official who is charged with enforcing a state statute on behalf of the entire state is a proper defendant, so long as the plaintiff shows an appreciable threat of injury flowing directly from the statute." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005) (citing *Wilson v. Stocker*, 819 F.2d 943, 947 (10th Cir. 1987)). The Motion itself, as well as the FAC, identifies that the County Manager has specific enforcement obligations under the BSCPO and Bernalillo County law, and has implemented and enforced the BSCPO consistently with those obligations. *See* Mot. at 6–7, FAC at ¶ 31 (citing Bernalillo County Charter Art. IV § A, Bernalillo County Code of Ordinances At. III, Div. 2, § 2-63); BSCPO §§ 51-4, 51-3(b). Her enforcement obligations, actions, and control of County property and those who enforce the BSCPO establish that she is a proper defendant. There is no basis for the claim that the United States lacks standing against the County Manager just because the County is also a proper defendant. Defendants cite no law for that conclusion.[5]

## CONCLUSION

For the foregoing reasons, the United States requests that this Court deny Defendants' Motion and allow its claims to proceed.

[5] Defendants briefly say the entire BSCPO should not be invalidated due to its severability clause and that this is not a truly facial challenge. It is a facial challenge to certain provisions rather than as-applied because the challenge does not turn on specific facts. *See United States v. Sup. Ct. of New Mexico*, 839 F.3d 888, 913 (10th Cir. 2016) (allowing similar theory as facial challenge). Instead, the challenged provisions are facially invalid. The United States has no objection to the non-challenged provisions remaining in effect given the severability clause.

DATED: August 24, 2026

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TIBERIUS DAVIS
Counsel to the Assistant Attorney General

RYAN ELLISON
First Assistant United States Attorney
District of New Mexico

ROBERT O. LINDEFJELD
Assistant Director
U.S. Department of Justice, Civil Division
Enforcement & Affirmative Litigation Branch

*<u>/s/ Jackson M. Story</u>*
Trial Attorney
U.S. Department of Justice, Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044-0386
Telephone: (202) 451-7304
Email: jackson.m.story@usdoj.gov

EMIL J. KIEHNE
Assistant U.S. Attorney
U.S. Attorney's Office,
District of New Mexico
201 3rd Street NW, Suite 900
Albuquerque, New Mexico 87102
Telephone: (505) 346-6855
Email: emil.kiehne@usdoj.gov

*Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2026, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Jackson M. Story*
Trial Attorney
U.S. Department of Justice