UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | Civil Action No. 1:26-CV-1471-KG-LF |
| v. | ) | RESPONSE IN OPPOSITION TO DEFENDANTS' DOÑA ANA COUNTY AND COUNTY MANAGERS' MOTION TO DISMISS FIRST AMENDED COMPLAINT |
| THE STATE OF NEW MEXICO, et al.; | ) | |
| Defendants. | ) | |

## TABLE OF CONTENTS


INTRODUCTION .......... 1
BACKGROUND .......... 2
I. Legal Background .......... 2
II. The Doña Ana County SCAR .......... 4
III. Procedural History .......... 5
LEGAL STANDARD .......... 6
ARGUMENT .......... 6
I. The SCAR Is Preempted. .......... 6
A. The SCAR's information sharing restrictions are expressly preempted. .......... 7
B. The SCAR's information sharing restrictions conflict with and stand as an obstacle to federal immigration enforcement. .......... 9
C. The SCAR stands as an obstacle to federal immigration enforcement by restricting the Federal Government's access to property. .......... 11
D. The INA does not violate the anti-commandeering doctrine. .......... 15
II. The SCAR Violates the Doctrine of Intergovernmental Immunity. .......... 19
A. The SCAR impermissibly discriminates against the Federal Government. .......... 19
B. The SCAR impermissibly regulates the Federal Government. .......... 22
III. The County Managers Are Proper Defendants. .......... 23
IV. The SCAR Severability Clause Does Not Warrant Dismissal of the Facial Challenges. .......... 24
CONCLUSION .......... 24

**INTRODUCTION**

Through its adoption of the so-called Safe Communities for All Residents ("SCAR") resolution, Doña Ana County seeks to undermine the federal immigration law framework by creating obstacles that burden the Federal Government's ability to investigate, detain, and remove criminal illegal aliens from the country. Congress has established a comprehensive scheme of critical immigration objectives that depend on the Federal Government's ability to operate within the states. Yet, the SCAR prevents the Federal Government from accessing the property, people, information, and records necessary to achieve Congress's immigration objectives at the expense of the Nation as a whole. To access certain County records, the SCAR requires the Federal Government to obtain judicial warrants and subpoenas when Congress authorized the use of administrative warrants, subpoenas, and detainers. Worse, the SCAR restricts the "gather[ing], transmi[ssion], or disseminat[ion]" by County officials of "information regarding the immigration status of individuals" in direct contravention of federal law. *See id.* § 2.

These laws violate the Supremacy Clause. While the County characterizes the federal immigration scheme as "voluntary" and justifies its obstruction of federal law as an exercise of its "police powers," compliance with federal immigration law is *mandatory*, and obstruction of federal immigration enforcement is not a legitimate exercise of any state police power. Moreover, the United States does not claim that it can commandeer County property and personnel for any purpose. Instead, the United States claims that the County cannot obstruct federal law enforcement, ignore Congressionally authorized means of enforcement, or discriminate against or regulate the Federal Government. Because the United States alleges facts supporting viable claims based on federal supremacy principles, Doña Ana County 's Motion to Dismiss must be denied.

# BACKGROUND

## I. Legal Background

The Supremacy Clause mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under the Supremacy Clause, a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000). A state law is also invalid "if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990). "[A] state law discriminates against the Federal Government . . . if it singles [it] out for less favorable treatment or if it regulates [it] unfavorably on some basis related to [its] governmental status." *United States v. Washington*, 596 U.S. 832, 839 (2022). The Supreme Court has long recognized that "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). States "have no power" to "in any manner control[] the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819).

"[O]ver no conceivable subject is the" federal power "more complete," and thus more supreme, "than it is over" immigration. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quotations omitted). "[T]he supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution." *Hines*,

312 U.S. at 62. The Federal Government thus has broad authority to establish immigration laws, the execution of which the States cannot obstruct or discriminate against. *See Arizona v. United States*, 567 U.S. 387, 394–95 (2012); *accord North Dakota*, 495 U.S. at 435; *id.* at 444-47 (Scalia, J., concurring). As reflected in various provisions of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101, *et seq.* ("INA"), Congress has exercised its broad authority by enacting an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395. The INA confers extensive authority on the Executive to inspect, investigate, arrest, detain, and remove aliens. *See* 8 U.S.C. §§ 1182, 1224–1229a, 1231, 1357. Responsibility for enforcing these laws is vested principally in the U.S. Department of Homeland Security ("DHS") as well as its component agencies, including U.S. Immigration and Customs Enforcement ("ICE"). 8 U.S.C. § 1103(a) (general authority to enforce immigration law).

Congress gave DHS several tools to fulfill its mission. The INA expressly authorizes DHS to arrest and detain aliens pursuant to administrative, not judicial, warrants. *See* 8 U.S.C. § 1226(a). DHS is authorized to inspect all applicants for admission and take appropriate action against inadmissible aliens, even ones who are transferred to state or local custody pending prosecution, *see* 8 U.S.C. §§ 1182, 1225; 8 C.F.R. § 235.2, and "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). DHS is further authorized to arrest and search individuals without a warrant. *See id.* § 1357(a)(2), (4), (5), (c). These powers include the ability to get search warrants to locate and inspect aliens, *see Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1219 (D.C. Cir. 1981), and to issue administrative subpoenas for witness testimony and documents. *See* 8 U.S.C. § 1225(d)(4). Courts have recognized that DHS may avail itself of publicly owned property for the purpose of carrying

out its mission. *See, e.g.*, *United States v. King Cnty., Wash.*, 122 F.4th 740, 758 (9th Cir. 2024). DHS has "broad discretion" to implement these laws. *Arizona*, 567 U.S. at 396. Congress sought to affirmatively penalize efforts to obstruct immigration enforcement by barring the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii).

## II. <u>The Doña Ana County SCAR</u>

On May 12, 2026, the Doña Ana County Board of County Commissioners approved and adopted Resolution No. 2026-67, the SCAR. The SCAR restricts the "gather[ing], transmi[ssion], or disseminat[ion]" by County officials of "information regarding the immigration status of individuals," in direct contravention of federal law. *Id.* § 2. To do so, the SCAR contains specific prohibitions, which include, "but is not limited to," (i) "[r]equesting information about, transmitting or disseminating information regarding the immigration status of any individual," *id.* § 2(A); (ii) "[i]ncluding on any application, questionnaire or interview form . . . any question regarding immigration status," *id.* § (2)(B); and (iii) "[a]ssisting or cooperating . . . with any Immigration and Customs Enforcement (ICE) or Customs and Border Protection (CBP) investigation, detention, or arrest procedures, public or clandestine, relating to alleged violations of the civil provisions of the federal immigration law." *Id.* § 2(C). The SCAR bars the use of County property or resources "for the purposes of facilitating immigration enforcement," *id.* §§ 2(D)–(I), including the use of "any County-owned and operated structures or venues, including but not limited to parking lots, vacant lots, garages, parks, or similar structures or venues," *id.* § 2(D). The SCAR requires County officials to identify, post signs, and lock such properties to ensure they are not used for immigration enforcement. *Id.* § 2(E)–(G). It bars the approval of "any permit,

contract, or other agreement for use of County owned or controlled property or resources if . . . the property or resources will be used for the purposes of facilitating immigration enforcement." *Id.* § 2(I). It designates all County property as "Safe Community Places" and "prohibit[s]" County officials "from providing voluntary consent to law enforcement agents engaged in or supporting immigration enforcement from (1) Entering non-public areas," *id.* § 4(A)(1). It bars immigration enforcement officials from "[a]ccessing, reviewing or obtaining student or patient records" except pursuant to a "valid judicial warrant," "judicial subpoenas or judicial order," or certain exigent circumstances. *Id.* § 4(A)(2).[1]

## III. Procedural History

On June 22, 2026, the United States filed its First Amended Complaint ("FAC") against Defendants Doña Ana County and Scott Andrews in his Official Capacity as Manager of Doña Ana County. ECF 42 ("FAC") at ¶¶ 24, 32, 33.[2] The FAC asserts four claims against Defendants arising out of the SCAR: (1) implied federal preemption, (2) express federal preemption, (3) unlawful regulation, and (4) unlawful discrimination. *See id.* at ¶¶ 164–209. The United States seeks, *inter alia*, a judgment declaring that the SCAR is preempted and violates the Supremacy Clause and is therefore unconstitutional, invalid, and unenforceable, and a permanent injunction

---

[1] The SCAR appears to bar access to "non-public" areas even with a valid judicial warrant by creating a judicial exception to access records only, making no exception for access to property. *See* SCAR § 4(A)(2)(a) ("This section does not prohibit a Safer Community Place from complying with a valid judicial warrant authorizing a search of such records or a valid judicial subpoena or judicial order compelling production of such records[.]"); *United States v. Johnson*, 529 U.S. 53, 58 (2000) ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference. . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth.").

[2] Pursuant to Fed. R. Civ. P. 25(d), Stephen Lopez, Deborah Weir, and Lucio Luttrell, in their Official Capacities as Acting Managers of Doña Ana County, and are automatically substituted for their predecessor, Scott Andrews, who has ceased to hold the office of County Manager of Doña Ana County. The Court substituted the Board of County Commissioners of Dona Ana County for Dona Ana County. ECF 81. "Defendants" refers to the Board of County Commissioners of Dona Ana County and Acting County Managers Stephen Lopez, Deborah Weir, and Lucio Luttrell.

of its operation and enforcement. *See id.* at Prayer for Relief ¶¶ A, B, D. On August 4, 2026, Defendants moved to dismiss the FAC. *See* ECF 74 ("Motion" or "Mot.").

## LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). A claim survives a motion dismiss when it is facially plausible, *i.e.*, where the plaintiff pleads facts sufficient to raise a right to relief beyond mere speculation. *Id.* (internal citations omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Dismissal is a "harsh remedy which must be cautiously studied . . . to protect the interests of justice." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (citation omitted).

## ARGUMENT

### I. The SCAR Is Preempted.

As alleged in the FAC, the SCAR flouts federal supremacy principles and the Federal Government's comprehensive immigration authority by undermining how the Executive Branch enforces Congress's immigration scheme. Doña Ana County "may not pursue policies that undermine federal law." *Arizona*, 567 U.S. at 416. When Congress exercises its enumerated powers to regulate individuals, *see* U.S. Const. art. I, § 8, cl. 4, local governments cannot stand in the way, *see* U.S. Const. art. VI, cl. 2. Yet, the SCAR does so by barring the Federal Government from accessing County property and certain records (absent a judicial order) and receiving information regarding immigration status. These obstacles frustrate the accomplishment of the full purposes

and objectives of federal immigration law. Accordingly, the United States asserts both express and conflict preemption claims. FAC at ¶¶ 164–173, 201–209.

Defendants erroneously claim that the FAC does not identify the specific provisions with which the SCAR conflicts. *See, e.g.*, FAC ¶¶ 113–15, 117–18. The FAC identifies that the SCAR's information sharing and property restrictions are preempted, as they conflict with and frustrate the objectives of Congress's scheme by prohibiting access to public property, stymieing information sharing, and requiring a judicial order to compel compliance with administrative detainers, warrants, and subpoenas counter to federal law. *See* 8 U.S.C. §§ 1182, 1225(a), (d), 1226(a), (c), 1231(a), 1357(a), (d), (g), 1373, 1644; 8 C.F.R. § 287.7. The SCAR's restrictions on information sharing also run headlong into 8 U.S.C. §§ 1373 and 1644, which expressly prohibit these information sharing restrictions. Because Congress has spoken, the SCAR must yield under the Supremacy Clause. *See Crosby*, 530 U.S. at 372–73.

**A. The SCAR's information sharing restrictions are expressly preempted.**

Express preemption occurs when Congress, by statute, explicitly supersedes certain state enactments. *Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 203–04 (1983). "Preemption fundamentally is a question of congressional intent and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990) (citations omitted); *see also Arizona*, 567 U.S. at 399. The Court's task here is easy. Under federal law, "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United

States." 8 U.S.C. § 1644; *see id.* § 1373(a). Also, "no person or agency may prohibit, or in any way restrict," local entities from "sending" to, "maintaining," or "[e]xchanging" with the Federal Government any "information regarding the immigration status, lawful or unlawful, of any individual[.]" *Id.* § 1373(b); *see United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning."). "[C]itizenship or immigration status" means a person's legal classification under federal law. 8 U.S.C. § 1373(a); *see also id.* §§ 1373(b); 1644 (similar). "[I]nformation *regarding*" that status covers "matters relating to [that status]." *See Patel v. Garland*, 596 U.S. 328, 338–39 (2022). Congress sought "'to give State and local officials the authority to communicate with [DHS] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary.'" *New York v. Dep't of Just.*, 951 F.3d 84, 97 (2d Cir. 2020) (citations omitted). There is no need to "strain to find ways to reconcile federal law with seemingly conflicting state law." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 622 (2011).

The SCAR is a conflicting law. It dictates that County employees cannot "gather, transmit or disseminate information regarding the immigration status of individuals in Doña Ana County." *Id.* § 2. It restricts the "gather[ing], transmi[ssion], or disseminat[ion]" of "information regarding the immigration status of individuals," in direct contravention of federal law. *Id.* § 2(A). This information may include the release dates of criminal aliens from Doña Ana County Detention Center. These information sharing restrictions are expressly preempted by Sections 1373 and 1644.

Defendants claim the provisions explicitly prohibiting the sharing of immigration status do not run afoul of the Sections 1323 and 1644 because of the SCAR's savings clause. Mot. at 22. But the restrictions directly conflict with Sections 1323 and 1644. Defendants' apparent position is that their law is a nullity. "It is an elementary rule of construction that the act cannot be held to

destroy itself." *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 20 (1995) (internal quotation marks and citation omitted). If Defendants agree that their employees can freely share information regarding immigration status with federal officials, there would be no dispute.

### B. The SCAR's information sharing restrictions conflict with and stand as an obstacle to federal immigration enforcement.

"[T]he very essence of supremacy" empowers the Federal Government to "remove all obstacles to its action within its own sphere." *McCulloch*, 17 U.S. (4 Wheat.) at 427. Under the Supremacy Clause, "when federal and state law conflict, federal law prevails and state law is preempted." *Murphy v. NCAA*, 584 U.S. 453, 471 (2018). State law conflicts with federal law—and is thus "conflict" preempted—where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373; *see, e.g.*, *Hines*, 312 U.S. at 67. A "State may not pursue policies that undermine federal law," *Arizona*, 567 U.S. at 416, and may not "either frustrate[] the purpose of the national legislation or impair[] the efficiency of th[e] agencies of the federal government to discharge the duties for the performance of which they were created." *Davis*, 161 U.S. at 283; *see also Crosby*, 530 U.S. at 373. A state law need not compel action; a conflict exists "if it interferes with the methods by which the federal statute was designed to reach [its] goal." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).

Congress gave DHS "broad discretion" to implement the federal immigration scheme. *Arizona*, 567 U.S. at 396. To that end, Congress outlawed attempts to "in any way restrict" local officials from sending information regarding immigration status to the Federal Government. 8 U.S.C. § 1644; *see also id.* § 1324(a)(1)(A)(iii). DHS also has the "power to require by subpoena the attendance and testimony of witnesses before immigration officers and the production of books, papers, and documents relating to" immigration enforcement. *See* 8 U.S.C. §1225(d)(4).

The SCAR imposes obstacles on the authority of the Federal Government under the INA and frustrates the objectives of Congress. Defendants inaccurately claim the SCAR only prevents its employees from gathering information regarding immigration status. Mot. at 10. But the SCAR restricts the "transmi[ssion] or disseminati[on]" of "information regarding the immigration status" regardless of whether employees already possess that information. *Id.* § 2(A). The SCAR further requires DHS to obtain court orders to access certain records that Congress made available through administrative subpoenas, *id.* § 4(A)(2), and while Defendants claim that is acceptable because Congress permitted DHS to go to court to enforce subpoenas, Mot. at 10, "resort to legal processes in every routine or trivial matter" renders immigration enforcement a "practical impossibility," *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). Defendants say they can categorically refuse compliance until a court orders otherwise. Mot. at 10. But the Ninth Circuit held that a similar state law requiring a judicial order to produce medical information was preempted as "the Oregon statute stands as an obstacle to the full implementation of the CSA because it 'interferes with the methods by which the federal statute was designed to reach [its] goal,'" namely administrative subpoenas. *Or. Prescription Drug Monitoring Program v. U.S. Drug Enf't Admin.*, 860 F.3d 1228, 1236 (9th Cir. 2017) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)). The SCAR's prohibitions facially override Congress's means of enforcing immigration law and "frustrate[] the purpose of the national legislation [and] impair[] the efficiency of [] the federal government to discharge [its] duties." *Davis*, 161 U.S. at 283. In doing so, the SCAR's prohibitions make it much more difficult for federal officers to obtain vital information about the location and status of aliens in County custody, including the location and status of dangerous criminals. FAC at ¶¶ 156–159.

Defendants pepper sparks at a strawman, claiming they are merely declining to participate in a voluntary scheme such as 287(g) agreements or detainers. Mot. at 9–10. But the United States neither asserts claims against Defendants based on Section 287(g) nor detainers. *See* FAC at ¶ 117 (emphasizing that communications are required even in the absence of an agreement with DHS). Instead, the INA prohibits policies restricting the sharing of immigration status information, and Congress has authorized the use of administrative subpoenas. 8 U.S.C. § 1225(d)(4). Those are not voluntary requests for cooperation; they are congressionally authorized means of investigation and enforcing the law, just like judicial warrants. Refusal to recognize the tools granted by Congress to access property and records nullifies the enforcement mechanism Congress prescribed and imposes an obstacle to the enforcement of federal law. In fact, it is disputed whether DHS can obtain judicial warrants for immigration enforcement. *See In re Sealed Search Warrant Application*, 784 F. Supp. 3d 970, 972 (S.D. Tex. 2025). While the United States disagrees with that line of cases, that, in combination with laws like the SCAR, would leave DHS incapable of effectively investigating and enforcing federal immigration law. Thus, the SCAR is preempted.

### C. The SCAR stands as an obstacle to federal immigration enforcement by restricting the Federal Government's access to property.

Other SCAR provisions are preempted because they ban federal immigration authorities from entering, accessing, or using County property for immigration enforcement. *See id.* §§ 2(D)–(I). The SCAR bans such access to County property, including public parks and parking lots. *Id.* §§ 2(D)–(I), 4. The "Safer Community Places" section "prohibit[s]" County officials "from providing voluntary consent to law enforcement agents engaged in or supporting immigration enforcement from (1) Entering non-public areas" as designated by the County. *Id.* § 4(A)(1).

But federal law authorizes such access, particularly when federal agents are authorized to do so by an administrative warrant. *See United States v. Malagerio*, 49 F.4th 911, 915–16 (5th Cir. 2022) (administrative warrant allowed arrest in curtilage without Fourth Amendment issue); *Abel v. United States*, 362 U.S. 217, 234 (1960) (history and constitutionality of administrative warrants). Congress knew how to geographically limit the scope of the administrative authorities conferred upon immigration authorities but chose not to for county property. *See* 8 U.S.C. § 1357(a)(2)–(3) (preventing warrantless arrests in "dwellings"); *New York v. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 393 (S.D.N.Y. 2019) (noting Congress presumed there would be courthouse arrests based on U.S.C. § 1229(e)). And those authorities have been construed to allow search warrants for locating, inspecting, and detaining aliens. *See Blackie's*, 659 F.2d at 1219–23 (reading these DHS authorities to permit administrative search warrants without same restrictions as criminal warrants). Moreover, in *King County*, the Ninth Circuit required non-discriminatory access to public property. 122 F.4th at 758 ("[The court] would not perceive a threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways."). Access to public property is often necessary for DHS to perform its immigration enforcement duties. 8 U.S.C. § 1103. If a locality cannot prevent DHS from using otherwise public spaces for enforcement such as roads, airports, and sidewalks, it is not apparent why parks and parking lots would be different.

Defendants argue that, like a judicial warrant, an administrative warrant does not authorize entry into a third party's premises to search for a subject. *See* Mot. at 10 (citing *Steagald v. United States*, 451 U.S. 204, 213–16 (1981)). But "*Steagald* 'addressed only the right of a third party not named in the arrest warrant to the privacy of his or her home'; it did not decide that officers may

not enter a third party's property to arrest the subject of a warrant they reasonably believe is present." *United States v. Butler*, 168 F.4th 1107, 1110 (8th Cir. 2026) (quoting *United States v. Kaylor*, 877 F.2d 658, 663 n.5 (8th Cir. 1989)). *Steagald* thus does not apply beyond circumstances involving an individual's home. Even for a home, "if, at the time of entry, law enforcement officers possessed a valid warrant for the subject's arrest and reason to believe that he was then in the premises entered, the subject of the arrest warrant will not be heard to complain that entry was not authorized by a search warrant." *United States v. Bohannon*, 824 F.3d 242, 251 (2d Cir. 2016) (citing *Payton v. New York*, 445 U.S. 573, 602–03 (1980)); *see United States v. Thompson*, 402 F. App'x 378, 382 (10th Cir. 2010). The SCAR facially restricts all such entries.

By prohibiting federal immigration enforcement officers from accessing all County property to enforce federal immigration law, the SCAR "substantially interfere[s]" with and stands as an obstacle to civil immigration enforcement operations. *See CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 327 (3d Cir. 2025); *id.* at 321; *see Arizona*, 567 U.S. at 406. By barring access to County property, the SCAR frustrates DHS's authority to inspect all applicants for admission and take appropriate action against inadmissible and removable aliens. *See, e.g.*, 8 U.S.C. §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. The SCAR presents obstacles to ICE's mandate "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" by barring ICE's access to property. 8 U.S.C. § 1357(a)(1). Defendants cannot prohibit DHS from accessing property when carrying out powers expressly authorized by Congress. Further, the "Safer Community Place" section appears to prohibit providing access to "non-public areas" for immigration officers even if they have administrative warrants. *See* SCAR § 4(A)(1). Unlike the records section, there is no exception for judicial warrants. *Compare id.* § 4(A)(2)(a). Thus, the

County is obstructing federal immigration enforcement by denying DHS access to property to carry out its duties even with congressionally authorized tools like administrative warrants.

Defendants argue any such access is a "physical taking" of County property. Mot. at 13. This argument fails. First, the United States is not trying to conscript County facilities or resources, and is not claiming it can occupy County property for any reason; rather, the United States claims that Defendants cannot prohibit immigration enforcement in spaces that are publicly accessible, or prevent access to non-public facilities to inspect, interrogate, or arrest aliens, as the SCAR does.

Second, "[w]hen the state acts pursuant to its police power, rather than the power of eminent domain, its actions do not constitute a taking for purposes of the Takings Clause." *Lech v. Jackson*, 791 F. App'x 711, 717 (10th Cir. 2019). Because DHS is temporarily entering the County's property to enforce federal immigration laws, it is acting for the "public good" as part of its police powers and is not taking the property as part of its eminent domain power. *Id.* at 718 (significant danger to home was not taking); *see also Johnson v. Manitowoc Cnty.*, 635 F.3d 331, 336 (7th Cir. 2011); *Zitter v. Petruccelli*, 744 F. App'x 90, 96 (3d Cir. 2018) (no taking where law enforcement officers acquired plaintiff's property pursuant to a lawful warrant).

Third, DHS is merely temporarily entering property for specific purposes. When DHS uses public property, DHS does so in a manner similar to the general public. That is not a taking. Indeed, "[t]he permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude. Not every physical *invasion* is a taking." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 436 n.12, (1982); *see PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83 (1980) (temporary activity on private property that "is open to the public at large" did not constitute taking); *City of St. Louis v. W. Union Tel. Co.*, 148 U.S. 92, 98 (1893) (reasoning

that use of property that is "temporary, shifting and in common with the general public" is not a taking). Finally, even if the United States lawfully took County property, the County is not permitted to prohibit access to that property through an ordinance. The proper response to a taking would be to request just compensation, not prevent a taking *ex ante*.

Defendants argue that challenges to Section 4 are premature because Defendants have not issued policies implementing this section. Mot. at 23. But SCAR facially requires the issuance of policies "to prohibit" immigration enforcement in County "non-public areas" with no exceptions, and bars access to certain records absent a court order or exigency. SCAR § 4(A). The County has not indicated any intent not to issue or implement policies consistent with this directive. Thus, the existence of this provision is sufficient to show that a challenge is appropriate at this juncture. *See* FAC at ¶ 22 (citing *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 110 (10th Cir. 2024)).

At bottom, using publicly accessible property and accessing non-public property pursuant to congressionally authorized administrative tools is not a voluntary scheme from which localities can opt out. On the other hand, prohibiting the Federal Government from accessing property to perform immigration enforcement operations is not a neutral act—it impedes enforcement and conflicts with existing law. *See King County*, 122 F.4th at 758. Defendants should not be permitted to ban federal immigration law enforcement on generally accessible public property like parking lots and parks or bar access to non-public property based on administrative warrants.

**D. The INA does not violate the anti-commandeering doctrine.**

Defendants argue their obstruction of federal immigration enforcement is a lawful exercise of "police powers" and that invalidation of the SCAR would commandeer of local officials. Mot. at 8–9, 11–13. The anticommandeering doctrine prevents Congress from "compel[ling] the States

to enact or enforce a federal regulatory program," or "circumvent[ing] that prohibition by conscripting the State's officers directly." *Printz v. United States*, 521 U.S. 898, 935 (1997); *Murphy v. NCAA*, 584 U.S. 453, 473 (2018). The doctrine does not allow obstruction.

**1.** Defendants claim Sections 1373 and 1644 are unconstitutional under *Murphy*. Mot. at 17–21. *Murphy* invalidated a law that required states to prohibit sports gambling as it commandeered the state legislature by regulating states rather than private parties. *Id.* at 477. Defendants overread *Murphy.* The point of preemption is to invalidate contrary local laws. The Supreme Court recently upheld a valid preemption clause dictating that a "State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." *Monsanto Co. v. Durnell*, 146 S. Ct. 2001, 2009–10 (2026) (quoting 7 U.S.C. § 136v(b)). That is like the texts of Sections 1373 and 1644. And *Printz* carved out information sharing provisions like these. 521 U.S. at 918 (Statutes "which require only the provision of information to the Federal Government, do not involve the precise issue before us here, which is the forced participation of the States' executive in the actual administration of a federal program.").

Moreover, "[a] commandeering challenge" necessarily "depends on there being pertinent authority 'reserved to the States.'" *Dep't of Just.*, 951 F.3d at 113 (quoting U.S. Const. amend. X). In *Murphy*, it was undisputed that regulating sports gambling was a state's police power. By contrast, here, the Federal Government has the "preeminent" power over immigration law, *Dep't of Just.*, 951 F.3d at 90, and states "may not pursue policies that undermine federal law," *Arizona*, 567 U.S. at 416. For this reason, the Second Circuit rejected the argument that *Murphy* overturned previous precedent holding that Sections 1373 and 1644 did not violate the Tenth Amendment. *See Dep't of Just.*, 951 F.3d at 113. The law simply prohibits local governments "only from directly

restricting the voluntary exchange of immigration information" with federal immigration authorities, it does not commandeer them to effectuate federal law. *City of New York*, 179 F.3d at 35. Because Congress acted pursuant to an enumerated Constitutional power in enacting the INA, *Murphy* is inapposite, as there is no authority reserved to the states. *See New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States[.]").

Additionally, Sections 1373 and 1644 regulate aliens, and only incidentally affect states. The INA reflects a comprehensive scheme for regulating *aliens*, and its provisions cannot be viewed in isolation. *See Arizona*, 567 U.S. at 395. The INA grants DHS the power to issue administrative detainers, warrants, and subpoenas concerning *aliens* and conduct warrantless arrests and interrogations of *aliens*. 8 U.S.C. §§ 1182, 1225, 1226(a), 1225(d)(4), 1357(a). Congress tasked DHS with the duty to enforce immigration law and remove illegal aliens—a task requiring information regarding immigration status from states. *See* 8 U.S.C. §§ 1373, 1644.

That Sections 1373 and 1644 do not regulate states directly is confirmed by the fact that Section 1373(b) applies equally broad information sharing requirements to "person[s]" generally. The same is true of Section 1644, which is facially applicable to both private and state actors. *See* 8 U.S.C. § 1644 ("no State or local government entity may be prohibited, or in any way restricted"); *Bartenwerfer v. Buckley*, 598 U.S. 69, 75 (2023) ("Passive voice pulls the actor off the stage" and shows Congress is "agnostic[]" as to the actor). Facially, this statute applies evenhandedly to anyone who may prohibit or in any way restrict the sharing of immigration status information, whether a public official or private party. *Haaland v. Brackeen*, 599 U.S. 255, 283 (2023) ("Legislation that applies 'evenhandedly' to state and private actors does not typically

implicate the Tenth Amendment.") (quoting *Murphy*, 584 U.S., at 476)). Accordingly, the Tenth Amendment does not shield the SCAR from a generally applicable federal law. "When a federal statute applies on its face to both private and state actors, a commandeering argument is a heavy lift" and, in this case, Defendants "ha[ve] not pulled it off." *Haaland*, 599 U.S. at 284–85.

**2.** More broadly, in characterizing the United States' FAC as seeking to commandeer County officials, Defendants fundamentally mischaracterize the relief that the United States seeks. The United States does not ask this Court to compel County officials to implement federal immigration law. Rather, the United States seeks an order preventing the County from obstructing federal immigration enforcement. FAC at ¶¶ 18–19. Compliance with administrative warrants, subpoenas, inspections, and warrantless arrests are not "voluntary" requests that localities can reject. Nor are they commandeering localities any more than judicial warrants or subpoenas requiring the transfer of a detainee and sharing of information. If compliance with a judicial warrant is not commandeering, neither is compliance with an administrative warrant.

Moreover, access to public spaces for limited immigration purposes is not commandeering. Using spaces that are otherwise open to the public like parking lots and parks does not commandeer local personnel or resources; it amounts to use of public spaces open to everyone. *King Cnty.*, 122 F.4th at 758. Accessing certain facilities for investigations and interrogations of aliens does not commandeer local officials or resources. County officials do not have to assist; they merely cannot obstruct. The Supreme Court has rejected the argument that the Tenth Amendment is violated whenever a federal law "will consume [state or local] employees' time and thus the State's resources." *Reno v. Condon*, 528 U.S. 141, 150 (2000); *see also King Cnty.*, 122 F.4th at 758 ("To the extent King County argues that it has expended resources ensuring the safety of [a local airport]

in response to ICE charter flights, it identifies no case treating this degree of background support as rising to the level of unconstitutional commandeering."); *South Carolina v. Baker*, 485 U.S. 505, 514–15 (1988). At bottom, the United States is asking Defendants not to impose obstacles to the implementation of the INA by banning access to property and records and requiring judicial approval where Congress deemed administrative approval sufficient.

## II. The SCAR Violates the Doctrine of Intergovernmental Immunity.

A local law is invalid "if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota*, 495 U.S. at 435; *Washington*, 596 U.S. at 838. This is true even without preemptive legislation because the Supremacy Clause itself invalidates such local regulations: "intergovernmental immunity has independent bite, and courts must apply it to referee 'clashing sovereignty.'" *CoreCivic*, 145 F.4th at 328 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 430). The SCAR singles out "immigration enforcement" activities that only the Federal Government performs for disfavored treatment. It also imposes prohibitions on the Federal Government (i.e., from accessing property and obtaining information). In so doing, the SCAR discriminates against and regulates the Federal Government.

### A. The SCAR impermissibly discriminates against the Federal Government.

"[A] state law discriminates against the Federal Government . . . if it singles [it] out for less favorable treatment or if it regulates [it] unfavorably on some basis related to [its] governmental status." *Washington*, 596 U.S. at 839. The SCAR illegally discriminates against the Federal Government, FAC at ¶¶ 127, 128, 132, 133, because it singles out federal officials for less favorable treatment by applying its property and information sharing restrictions only to those engaging "in the enforcement of federal immigration law." SCAR § 2; *see also id.* §§ 2(D) (restricting use of

property used "for the purpose of carrying out immigration enforcement"), 2(I) (barring approval of "any permit, contract or other agreement for use of County owned or controlled property or resources if . . . the property or resources will be used for the purpose of facilitating immigration enforcement"), 4(A) (prohibiting access of "law enforcement agents engaged in or supporting immigration enforcement" to certain areas and records). The SCAR is facially discriminatory as it specifically limits cooperation "with any Immigration and Customs Enforcement (ICE) or Customs and Border Protection (CBP) investigation, detention or arrest procedures . . . relating to alleged violations of the civil provisions of the federal immigration law." SCAR § 2(C). These provisions single out the Federal Government for disfavored treatment and do not apply to any law enforcement function other than enforcement of federal immigration law.

Defendants argue that the SCAR's provisions are neutral because they apply "regardless of who is involved in the enforcement" of federal immigration law. Mot. at 16–17. But the FAC alleges comparators, as local law enforcement may access County facilities, use property, and receive information without a judicial warrant. *See* FAC at ¶¶ 128, 132, 133. Defendants do not contend otherwise, they simply argue that these comparators are not sufficiently specific.

Even worse, Defendants' theory suggests that counties have *more* leeway to discriminate against immigration enforcement *because* it is inherently federal and thus there cannot be a comparator. Indeed, several courts have recently found that discrimination against immigration enforcement does indeed constitute unconstitutional discrimination despite its unique federal nature. *See Genesis GSA Strategic One, LLC v. Howard County*, No. 1:26-cv-915-ABA, --- F. Supp. 3d ---, 2026 WL 2294479, at *20 (D. Md. Aug. 10, 2026) (discriminatory immigration law preliminarily enjoined because it "explicitly singles out the federal government by applying only

to . . . a function exclusively of the federal government"); *GEO Group, Inc. v. Ryan*, No. 1:26-cv-2533-DDD-SBP, ECF No. 34 at 7 (D. Colo. Aug. 20, 2026) (discriminatory immigration law preliminarily enjoined because it "focus[ed] on immigration-related facilities" and thus "is limited to facilities that by their nature are carrying out federal policies"). The contrary cases are wrong.

Moreover, even if specific comparators were not alleged, intergovernmental immunity "is not a formalist doctrine[;]" courts must "look through form and behind labels to substance" and probe the "purpose or self-evident operation" of a law to see if it achieves indirectly what it could not do directly. *CoreCivic*, 145 F.4th at 322 (cleaned up); *see id.* at 325 (State law carried "the same sting as a law whose text applies expressly to the federal government" because it eliminated the United States's chosen method of detaining immigration detainees in New Jersey.). There is, therefore, no need to look for precise comparators; by its terms, the SCAR imposes a burden unique to the United States based on the "status" of federal immigration officials as federal immigration officials. *North Dakota*, 495 U.S. at 438. By applying solely to "immigration enforcement," the SCAR facially treats the Federal Government differently from any comparator. By singling out federal authorities for worse treatment than County authorities (i.e., permitting non-immigration-related law enforcement officials to access property and records while denying the same to immigration law enforcement officials), SCAR is discriminatory. *See King Cnty.*, 122 F.4th at 757.

The Tenth Amendment does not allow counties to discriminate against the Federal Government. This distorts the intergovernmental immunity doctrine, which protects the Federal Government. If a law singled out other uniquely federal functions like military functions or the minting of coins, invalidating it and requiring some cooperation would not be commandeering. As the Ninth Circuit said striking down a similar law, "[r]equiring this form of non-discriminatory

access to county property consistent with the intergovernmental immunity doctrine does not create a back-end anti-commandeering problem. We would not perceive a threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways." *King Cnty.,* 122 F.4th at 758.

**B. The SCAR impermissibly regulates the Federal Government.**

The Supreme Court has long recognized that "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445. States "have no power" to "in any manner control[] the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch*, 17 U.S. (4 Wheat.) at 436. Unless Congress authorizes otherwise, the "United States may perform its functions without conforming to the police regulations of a state." *Arizona v. California*, 283 U.S. 423, 451 (1931). This doctrine applies "in the absence of a specific [conflicting] federal law, [ensuring that] federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993), *aff'd*, 54 F.3d 825 (D.C. Cir. 1995) (citing *In re Neagle*, 135 U.S. 1, 10 (1890)).

Contrary to Defendants' assertions that the SCAR cannot constitute regulation because it "manage[s] the allocation and use of the County's own resources and the conduct of its own employees" to not participate in immigration enforcement, these principles apply to the Federal Government's immigration-enforcement functions. Mot. at 14. Courts of appeals have held that bans on private detention facilities regulated the Federal Government because such laws "prevent[] the federal government from choosing how . . . it will carry out a core federal function." *CoreCivic*, 145 F.4th at 325; *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 757 (9th Cir. 2022) (en banc)

(explaining that a state law would impermissibly "give California the power to control ICE's immigration detention operations in the state"). While Defendants point out that these cases involved regulation of federal contractors, this helps the United States, as the Federal Government itself has "substantially" greater protection from "state law under the Supremacy Clause." *GEO Grp.*, 50 F.4th at 755; *see also North Dakota*, 495 U.S. at 436–37. Laws that facially regulate third parties can have the purpose and effect of regulating the Federal Government, *CoreCivic*, 145 F.4th at 325, and thus "place[] a prohibition on the Federal Government," *Hancock*, 426 U.S. at 180.

That is the case here. The SCAR dictates that federal officers cannot access non-public property even with a warrant, use public property, or get certain records absent a judicial order even though Congress provided alternative tools. 8 U.S.C. §§ 1225(d)(4), 1226(a), 1357(a), (c); 8 C.F.R. § 287.7. SCAR forecloses those tools and regulates how federal officers carry out their functions vis-à-vis the County. States have no power to prevent federal agents from carrying out their duties "until they satisfy a state officer." *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956). By requiring a judicial warrant to access records and forbidding access to property, the SCAR imposes a different method, with a different standard, on the United States for effectuating immigration law. That is a regulation of the United States's "core power to enforce immigration laws[,]" regardless of whether the SCAR's text is addressed to state officials or federal ones. *CoreCivic*, 145 F.4th at 319; *see also GEO Grp.*, 50 F.4th at 757.

## III. <u>The County Managers Are Proper Defendants.</u>

Defendants argue that the County Managers should be dismissed because the claims against the County are redundant of those against the County Managers. Mot. at 24. "[A]n official who is charged with enforcing a state statute on behalf of the entire state is a proper defendant, so long as

the plaintiff shows an appreciable threat of injury flowing directly from the statute." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005) (citing *Wilson v. Stocker*, 819 F.2d 943, 947 (10th Cir. 1987)). The SCAR "direct[s] the County Manager to implement" its provisions. SCAR at 2. The FAC identifies that the County Manager has enforcement obligations under the SCAR and the County's Human Resources Policies. *See* FAC at ¶¶ 29, 89; SCAR §§ 1, 2(E)–(H), 4(B)–(C), 5. The County Managers' enforcement obligations and control of County property, departments, and those who enforce the SCAR show that they are proper defendants. There is no basis to dismiss the County Managers just because the County is also a proper defendant.

## IV. **The SCAR Severability Clause Does Not Warrant Dismissal of the Facial Challenges.**

Defendants inaccurately claim that because the SCAR has a severability clause and not every provision is illegal, the United States' facial claim must fail. Mot. at 22–23. The United States seeks relief only as to the SCAR provisions challenged in the FAC that unlawfully harm the United States. In the Tenth Circuit, such challenges are "facial" because they seek to invalidate the entirety of the provision as to an entity and do not turn on the particular facts of an individual case. In *United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 913–16 (10th Cir. 2016), the Tenth Circuit evaluated a challenge to part of a New Mexico ethics rule as to federal prosecutors as a facial challenge even though it did not challenge the entirety of the rule or its application to non-federal prosecutors because the lawsuit was a categorial legal challenge to those provisions applying to the Federal Government rather than a fact-specific application. *Id.* The same is true here; the provisions not challenged can be severed. This is not a basis for dismissal.

## **CONCLUSION**

For these reasons, the United States requests that the Court deny Defendants' Motion.

DATED: August 25, 2026

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TIBERIUS DAVIS
Counsel to the Assistant Attorney General

RYAN ELLISON
First Assistant United States Attorney
District of New Mexico

ROBERT O. LINDEFJELD
Assistant Director
U.S. Department of Justice, Civil Division
Enforcement & Affirmative Litigation Branch

*/s/ Jackson M. Story*
Trial Attorney
U.S. Department of Justice, Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044-0386
Telephone: (202) 451-7304
Email: jackson.m.story@usdoj.gov

EMIL J. KIEHNE
Assistant U.S. Attorney
U.S. Attorney's Office,
District of New Mexico
201 3rd Street NW, Suite 900
Albuquerque, New Mexico 87102
Telephone: (505) 346-6855
Email: emil.kiehne@usdoj.gov

*Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 25, 2026, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Jackson M. Story*
Trial Attorney
U.S. Department of Justice