UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | Civil Action No. 1:26-CV-1471-KG-LF |
| Plaintiff, | ) | MOTION TO DISMISS DEFENDANT STATE OF NEW MEXICO'S COUNTERCLAIMS AND MEMORANDUM IN SUPPORT BY PLAINTIFF AND COUNTERCLAIM DEFENDANT THE UNITED STATES OF AMERICA AND COUNTERCLAIM DEFENDANTS DEPARTMENT OF HOMELAND SECURITY AND IMMIGRATION AND CUSTOMS ENFORCEMENT |
| v. | ) | |
| THE STATE OF NEW MEXICO et al., | ) | |
| Defendants. | ) | |

Plaintiff and Counterclaim Defendant United States of America and Counterclaim Defendants Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE") (together, "Counterdefendants") hereby move under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the counterclaims brought against them by Defendant State of New Mexico (the "State") in the State's Answer and Counterclaims, Dkt. No. 79. In support, Counterdefendants proffer the following:

# TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

I. Federal Law ..... 2

II. New Mexico Law ..... 4

III. Procedural History ..... 6

STANDARD OF REVIEW ..... 7

ARGUMENT ..... 8

I. The Court lacks jurisdiction over the State's declaratory-judgment claim, which fails on the merits in any event. ..... 8

A. The State seeks an advisory opinion. ..... 8

B. The Amended Agreement does not violate New Mexico law. ..... 10

II. The State's Tenth Amendment claim fails because the Amended Agreement does not violate the anticommandeering doctrine. ..... 12

III. The State's APA claims fail because the State lacks a cause of action and ICE's execution of the Amended Agreement did not violate the APA. ..... 14

A. ICE had discretion to execute the Amended Agreement. ..... 15

B. The State suffered no legal wrong. ..... 16

C. ICE did not act arbitrarily or capriciously. ..... 17

D. ICE did not act contrary to law. ..... 19

CONCLUSION ..... 19

# INTRODUCTION

Congress has tasked DHS with enforcing civil immigration law and safeguarding the Nation from criminal illegal aliens. To carry out this mission, ICE is authorized to sign agreements with States deputizing their officers to enforce federal immigration law and permitting the detention of aliens on state property. For years, federal immigration detainees have been housed at a facility in Otero County, New Mexico, pursuant to successive agreements with the Otero County Board of Commissioners ("Board"). Such immigration intergovernmental services agreements ("IGSAs") play a crucial role in carrying out Congress' immigration agenda.

In 2026, the New Mexico legislature passed HB 9, a law banning state officials from signing new immigration IGSAs and requiring them to terminate existing immigration IGSAs as soon as possible. After the legislature passed HB 9, but before it became effective, ICE and the Board amended the IGSA concerning the Otero County facility to remove the Board's authority to terminate the agreement. As such, the Amended Agreement is outside HB 9's reach. But HB 9 still violates federal law.

The United States filed this action against the State of New Mexico because HB9 is preempted by federal law and violates the intergovernmental immunity doctrine and the Contracts Clause of the U.S. Constitution. In response, the State asserts counterclaims against the United States, DHS, and ICE, seeking a declaration that the IGSA governing the Otero County facility violates New Mexico law (Count I), claiming that the IGSA violates the Tenth Amendment (Count II), and asserting that ICE's amendment of the IGSA violated the Administrative Procedure Act ("APA") (Counts III and IV). All these claims fail. Count I fails because the State seeks an advisory opinion and the IGSA does not violate New Mexico law. Count II fails because the Amended

Agreement does not violate the anticommandeering doctrine. And Counts III and IV fail because ICE's amendment of the IGSA was committed to agency discretion, the State suffered no legal injury, and ICE did not act arbitrarily, capriciously, or contrary to law.

The Court should dismiss the State's counterclaims.

## **BACKGROUND**

### I. FEDERAL LAW

"[T]he United States Constitution confers on Congress the power to regulate matters relating to immigration." *Lopez v. INS*, 758 F.2d 1390, 1392 (10th Cir. 1985) (citing U.S. Const. art. I, § 9, cl. 1). Indeed, "'[o]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Id.* (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). Like all delegated powers, the Constitution's "broad grant of authority" over immigration "is exclusive to Congress." *Id.* (citing *Galvan v. Press*, 347 U.S. 522, 531–32 (1954)).

Pursuant to its immigration power, Congress enacted the Immigration and Nationality Act ("INA"). INA, ch. 477, 66 Stat. 163 (1952) (codified as amended in scattered sections of 8 U.S.C.). Among other things, the INA "specifie[s] categories of aliens who may not be admitted to the United States"; makes "[u]nlawful entry and unlawful reentry into the country . . . federal offenses"; "require[s]" aliens "to register with the Federal Government and to carry proof of status on their person"; "authorizes States to deny noncitizens a range of public benefits"; and "imposes sanctions on employers who hire unauthorized workers." *Arizona v. United States*, 567 U.S. 387, 395–96 (2012).

To enforce the INA's complex regulatory scheme, the Federal Government relies on "[a]gencies in the Department of Homeland Security" such as ICE. *Id.* at 397. ICE "conducts

criminal investigations involving the enforcement of immigration-related statutes" and is "responsible 'for the identification, apprehension, and removal of illegal aliens from the United States.'" *Id.* Because of ICE, "hundreds of thousands of aliens are removed by the Federal Government every year." *Id.*

The Federal Government also relies on the States. *See id.* at 411 ("Consultation between federal and state officials is an important feature of the immigration system."). Through ICE's Law Enforcement Support Center, the agency's "investigative resources" are available to States "[]on a 24-hour basis." 8 U.S.C. § 1226(d)(1)(A). And state officers may voluntarily "communicate with the [Federal Government] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States.'" *Arizona*, 567 U.S. at 411–12 (alteration in original) (quoting 8 U.S.C. § 1357(g)(10)(A)). Congress's immigration program is no exception to the rule that "[a]bsent any cooperation at all from local officials, some federal programs may fail or fall short of their goals." *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

Two relevant parts of the INA enable federal-state cooperation. First, section 287(g) of the Act, 8 U.S.C. § 1357(g), authorizes agreements with States deputizing state officers to enforce federal immigration law:

> [T]he Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

§ 1357(g)(1). Second, section 103(a)(11), 8 U.S.C. § 1103(a)(11), authorizes agreements with States regarding the operation of facilities to detain individuals for federal immigration violations:

> The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized . . . to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service.

§ 1103(a)(11)(B). Congress has since transferred the Attorney General's statutory authority to DHS, *see* 6 U.S.C. §§ 251, 552(d), which delegated it to ICE. Agreements under sections 287(g) and 103(a)(11) implement Congress's immigration program by allowing a greater number of illegal aliens to be removed from the United States, and a greater number of criminal immigration offenses to be prosecuted, than would otherwise be possible.

## II. NEW MEXICO LAW

At the heart of this case is a contract executed pursuant to sections 287(g) and 103(a)(11) of the INA between the Federal Government and Otero County, New Mexico. Federal civil immigration detainees are housed at a processing center in the County. Answer 34 ¶ 17, Dkt. No. 79. The processing center is owned by the County and managed and operated by a private company. *Id.* at 32, 36 ¶¶ 12, 30. The County is governed by the Board. *Id.* at 30 ¶ 3.

Since at least 2008, federal civil immigration detainees have been housed at the processing center pursuant to successive IGSAs between the Board and ICE. *Id.* at 36 ¶¶ 27–29. An IGSA signed in February 2014 is the operative agreement ("2014 Agreement"). *Id.* ¶¶ 32–33. The 2014 Agreement originally contained a provision allowing either ICE or the Board to terminate the agreement for cause:

> This Agreement becomes effective upon the date of final signature by the ICE Contracting Officer and the authorized signatory of [Otero County] and will remain in effect for a period not to exceed 60 months unless extended by bi-lateral modification or terminated in writing by either party.

Defs. State of N.M.'s & Att'y Gen. Raúl Torrez's Mot. to Dismiss, Ex. A, at 5, Dkt. No. 49-1.[1]

On February 5, 2026, the New Mexico legislature passed HB 9. Answer 35 ¶ 21, Dkt. No. 79. Pursuant to the New Mexico constitution, all laws except appropriations bills passed by a simple majority of the legislature "shall go into effect ninety days after the adjournment of the legislature enacting them." N.M. Const. art. IV, § 23. HB 9 took effect on May 20, 2026, pursuant to this provision. Answer 36 ¶ 25, Dkt. No. 79.

HB 9 is directed at immigration IGSAs such as the 2014 Agreement. HB 9 states that "[a] public body shall not enter into, extend, renew or otherwise agree to be a party to an agreement": (1) "to investigate, apprehend, detain or transport individuals pursuant to 8 U.S.C. Section 1357(g)"; (2) to "deputize[] officers, employees or agents of the public body to perform a function of an immigration officer in relation to the investigation, apprehension, detention or transportation of noncitizens in the United States or the removal of noncitizens from the United States"; or (3) "to detain individuals for federal civil immigration violations, including an intergovernmental services agreement to detain individuals for civil immigration violations." N.M. Stat. Ann. §§ 13-9-3(A), 13-9-4(A), (B) (West, Westlaw through chs. of the 2026 2d Reg. Sess. of the 57th Leg.). HB 9 also states that "[a] public body that is a party to an existing agreement" covered by the law

[1] The State filed this excerpt of the 2014 Agreement as an exhibit to its motion to dismiss and cited the exhibit in its pleadings. *See* Answer 36 ¶ 29. The exhibit thus forms part of the State's pleadings. *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) ("In addition to the complaint, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.").

"shall, upon the effective date of [HB 9], terminate the agreement upon the earliest date permissible under the terms of the agreement." §§ 13-9-3(B), 13-9-4(C).

On March 12, 2026, after HB 9 was passed but before it took effect, an employee of the company that manages the processing center sent an internal email stating that the 2014 Agreement must be amended. Answer, Ex. A, at 6–7, Dkt. No. 79-1. The employee suggested modifying the bilateral termination provision so that only ICE could terminate the 2014 Agreement. *See id.* Later that day, another company employee forwarded the email to ICE, adding, "The below changes are necessary to insulate the agreement against HB 9, which would require the County to exercise any termination options it has under the contract upon the statutory effective date on May 20." *Id.* at 5–6. On March 13, 2026, an ICE official emailed back, "Please see updated IGSA with updates as requested." *Id.* at 5.

Later that day, ICE and the Board amended the 2014 Agreement (hereinafter "Amended Agreement") to remove the Board's termination authority:

> This Agreement becomes effective upon the date of final signature by the ICE Contracting Officer and the authorized signatory of [the Board] and will remain in effect for a period not to exceed 60 months unless extended by bilateral modification or terminated in writing by ICE. The [Board] shall not have the right of early termination.[2]

Mot. to Dismiss, Ex. C, at 3, Dkt. No. 49-3. This action followed.

## III. PROCEDURAL HISTORY

On May 8, 2026, the United States filed this action against the State of New Mexico because federal law preempts HB 9 and HB 9 violates the intergovernmental immunity doctrine

[2] The State filed this excerpt of the Agreement as an exhibit to its motion to dismiss and cited the exhibit in its pleadings. *See* Answer 37 ¶ 33. The exhibit accordingly forms part of the State's pleadings. *See Jacobsen*, 287 F.3d at 941.

and the Contracts Clause of the U.S. Constitution. Compl., Dkt. No. 1. On May 13, 2026, the State stipulated that it "will not bring any civil action, as authorized by Section 5 of HB9, or take any other action to challenge or seek, demand, or require the termination of the Otero-ICE Agreement or Otero-MTC Agreement until the date on which a final judgment on the merits has been issued as to all claims in this action." Stip. 4, Dkt. No. 10. The United States filed an Amended Complaint on June 6, 2026.[3] First Am. Compl., Dkt. No. 49. The State moved to dismiss on July 6, 2026.[4] Mot. to Dismiss, Dkt. No. 49. That motion remains pending.

Notwithstanding its stipulation, the State on August 19, 2026, filed an answer purporting to plead counterclaims against the United States, DHS, ICE, and the Board.[5] Answer, Dkt. No. 79. Specifically, the State seeks a declaration that the IGSA governing the Otero County facility violates New Mexico law (Count I). The State also claims that the IGSA violates the Tenth Amendment (Count II), and that the Federal Government's amendment of the IGSA violated the Administrative Procedure Act ("APA") (Counts III and IV).

## <u>**STANDARD OF REVIEW**</u>

To survive a 12(b)(6) or (1) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010) (stating

---

[3] The First Amended Complaint also challenges other laws and names other defendants. *See* First Am. Compl., Dkt. No. 49.

[4] The other defendants have also moved to dismiss, and their motions are also pending. Dkt. Nos. 50, 51, 74, 75.

[5] The United States maintains the State's attempt to plead counterclaims contravenes its stipulation.

that the Rule 12(b)(6) standard of review applies to facial challenges to a pleading's jurisdictional allegations under Rule 12(b)(1)). And "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "On review of a Rule 12(b)(6) motion, [courts] consider the complaint 'as well as documents . . . incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Warnick v. Cooley*, 895 F.3d 746, 754 n.6 (10th Cir. 2018) (alteration in original) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). Courts also apply this standard of review to motions to dismiss counterclaims. *See, e.g.*, *Royal Pac. Ltd. v. Faith Elec. Mfg. Co.*, 322 F. Supp. 3d 1178, 1182 (D.N.M. 2018).

## ARGUMENT

### I. THE COURT LACKS JURISDICTION OVER THE STATE'S DECLARATORY-JUDGMENT CLAIM, WHICH FAILS ON THE MERITS IN ANY EVENT.

In Count I, the State "seeks a declaration from this Court that the [Amended Agreement] is void and unenforceable under New Mexico law" because it "intentionally contravenes New Mexico's declared public policy against state and local involvement in federal civil immigration detention." Answer 43 ¶¶ 65, 66, Dkt. No. 79. This claim fails. The State seeks an advisory opinion for which the Court lacks jurisdiction. That is true because federal common law, and not state law, governs the Amended Agreement. And the Amended Agreement does not violate New Mexico law in any event.

#### A. The State seeks an advisory opinion.

The Court lacks jurisdiction over Count I under Article III of the U.S. Constitution because the State seeks an advisory opinion. An advisory opinion is "an opinion advising what the law

would be upon a hypothetical state of facts." *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1243 (10th Cir. 2008). The State seeks such an opinion here.

The declaration the State seeks would advise what the law would be upon a hypothetical state of facts, namely, the application of New Mexico law to the Amended Agreement. But "[f]ederal law controls the interpretation of a contract entered pursuant to federal law when the United States is a party." *Rio Grande Silvery Minnow v. Keys*, 333 F.3d 1109, 1129 (10th Cir. 2003), *vacated on other grounds*, 355 F.3d 1215 (10th Cir. 2004); *see also United States v. Seckinger*, 397 U.S. 203, 209–10 (1970) (holding that "federal law controls the interpretation of the contract" because it "was entered into pursuant to authority conferred by federal statute"); *United States v. Allegheny County*, 322 U.S. 174, 183 (1944) ("The validity and construction of contracts through which the United States is exercising its constitutional functions . . . present questions of federal law not controlled by the law of any state."). Here, the Amended Agreement was executed pursuant to sections 287(g) and 103(a)(11) of the INA, 8 U.S.C. §§ 1357(g), 1103(a)(11), and the United States is a party. *See Warnick*, 895 F.3d at 755 n.6 (explaining that judicially noticeable facts are properly considered on a Rule 12(b)(6) motion); *see also In re United States v. Bagby*, 696 F.3d 1074, 1083 n.7 (10th Cir. 2012) ("This Court may take judicial notice of public records."). Federal common law accordingly controls the Amended Agreement.

The State may respond that federal common law incorporates its public policy concerns.[6] But federal common law does not permit parties the incorporation of state-law principles. If, as here, "a case 'should be resolved by reference to federal common law[,] . . . state common law [is]

[6] The State asserts a cause of action under the APA based on a violation of federal common law predicated on a violation of New Mexico law. *See* Answer 46 ¶ 88.

pre-empted.'" *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 429 (2011) (alterations in original) (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 488 (1987)); *see, e.g.*, *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 30–35 (2004) (looking to federal law for a rule of decision to apply the federal common law). The State's public policy concerns therefore do not control the Amended Agreement's validity or enforceability under federal common law.

The State asks the Court to assume for the sake of argument that New Mexico law governs the Amended Agreement. But a declaration based on this counterfactual scenario would merely advise what the law would be upon a hypothetical state of facts—an advisory opinion insufficient to confer Article III jurisdiction. The Court should dismiss Count I.

**B. The Amended Agreement does not violate New Mexico law.**

In any event, under New Mexico law, the State's claim still fails because the Amended Agreement does not violate state law. In New Mexico, "contracts are 'void as being contrary to public policy, [when] they are *clearly contrary* to what the legislature or judicial decision has declared to be the public policy, or they manifestly tend to injure the public in some way.'" *First Baptist Church of Roswell v. Yates Petroleum Corp.*, 345 P.3d 310, 313–14 (N.M. 2015) (alteration in original) (quoting *First Baptist Church of Roswell v. Yates Petroleum Corp.*, 281 P.3d 1235, 1240 (N.M. Ct. App. 2012)); *see also United Wholesale Liquor Co. v. Brown-Forman Distillers Corp.*, 775 P.2d 233, 237 (N.M. 1989) ("New Mexico also has a strong public policy of freedom to contract that requires enforcement of contracts unless they *clearly contravene* some law or rule of public morals." (emphasis added)). Notwithstanding that strong public policy, the State invokes HB 9, but, as evident from its text, the Amended Agreement does not clearly contravene HB 9.

As an initial matter, HB 9 is not retroactive. New Mexico courts do not presume laws affecting contract rights apply retroactively. *See, e.g.*, *Sw. Distrib. Co. v. Olympia Brewing Co.*, 565 P.2d 1019, 1025 (N.M. 1977) ("Since the statute makes a substantive change in the rights and obligations of the parties and is remedial in nature, the general rule is that it is presumed to operate prospectively only."). Because the State points to nothing showing HB 9 is retroactive, the Court must presume HB 9 is prospective only.

Moreover, HB 9 does not void immigration IGSAs that were active when HB 9 became effective such as the 2014 Agreement or the Amended Agreement. HB 9 states that "[a] public body shall not enter into, extend, renew or otherwise agree to be a party to" an immigration IGSA. N.M. Stat. Ann. §§ 13-9-3(A), 13-9-4(A), (B). HB 9 also states, however, that "[a] public body that is a party to an *existing agreement*" covered by the law "shall, upon the effective date of [HB 9], terminate the agreement upon the earliest date permissible under the terms of the agreement." §§ 13-9-3(B), 13-9-4(C) (emphasis added). In other words, HB 9 merely requires state officials to exercise any termination rights they have under existing immigration IGSAs and bars them from signing new agreements. In this way, HB 9 contemplates that state officials without authority to terminate existing immigration IGSAs will continue to perform them. HB 9's plain text alone shows that the Amended Agreement does not *clearly* contravene the statute.

Accordingly, even if the Court concludes that the State has a cause of action and assumes arguendo that New Mexico law somehow governs the Amended Agreement, the Court should dismiss the State's declaratory-judgment claim.

## II. THE STATE'S TENTH AMENDMENT CLAIM FAILS BECAUSE THE AMENDED AGREEMENT DOES NOT VIOLATE THE ANTICOMMANDEERING DOCTRINE.

In Count II, the State invokes the anticommandeering doctrine, contending that the Amended Agreement is unconstitutional because it "requires the Board to aid in the enforcement of federal civil immigration law." Answer 44 ¶ 72, Dkt. No. 79. ; *see also id.* at 43 ¶ 71 ("requir[ing] the Board to detain individuals for civil immigration purposes, regardless of whether the Board seeks to cease doing so for any reason"). But voluntarily agreeing to assist the Federal Government is not commandeering.[7]

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The anticommandeering doctrine recognizes that although Congress's enumerated powers are plenary, "the power to issue direct orders to the governments of the States" is "conspicuously absent from the list of powers given to Congress." *Murphy v. NCAA*, 584 U.S. 453, 471 (2018). Accordingly, Congress may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Id.* at 473 (quoting *Printz v. United States*, 521 U.S. 898, 935 (1997)).

The Amended Agreement does not implicate *Murphy*. Under New Mexico law, Otero County is a corporate body with authority to enter contracts. *See* N.M. Stat. Ann. §§ 3-18-1, 4-37-

[7] To the extent the State argues it has a Tenth Amendment right to prohibit its officers from voluntarily enforcing federal law, the State is mistaken. *See, e.g.*, *City of New York*, 179 F.3d at 31 (recognizing that "[S]tates do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs"); *see also New York v. DOJ*, 951 F.3d 84, 90-91 (2d Cir. 2020) (reaffirming *City of New York* after *Murphy*).

1, 4-38-1 (West, Westlaw through chs. of the 2026 Second Reg. Sess. of the 57th Legis.). The Board voluntarily chose to enter the Amended Agreement. The State has no Tenth Amendment right to prohibit that voluntary cooperation. State officials who voluntarily agree to assist in enforcing federal law are not being commandeered; this is not a situation where a federal statute compels States to enact, administer, or enforce federal policies. *E.g.*, *Kansas v. United States*, 214 F.3d 1196 (10th Cir. 2000) (federal law requiring States to enact legislation and perform administrative tasks to receive childcare funding); *Oklahoma ex rel. Okla. Dep't of Pub. Safety v. United States*, 161 F.3d 1266 (10th Cir. 1998) (federal law prohibiting States from disclosing drivers' information); *Kelley v. United States*, 69 F.3d 1503 (10th Cir. 1995) (federal law prohibiting States from regulating motor carriers).

The Ninth Circuit recognized this distinction in *United States v. King County*, 122 F.4th 740 (9th Cir. 2024). There, the Federal Government had previously conveyed an airport to King County pursuant to a deed reserving federal rights to continue using the airport. *Id.* at 747. After federal authorities began using the airport to transport immigration detainees, King County enacted an ordinance prohibiting the use of county facilities for federal civil immigration enforcement. *Id.* at 748. The United States sued to invalidate the ordinance, and King County argued that enforcing the deed would violate the anticommandeering doctrine because the Federal Government could not require the County to participate in immigration enforcement. *Id.* at 758–59. The Ninth Circuit rejected that argument, explaining that "[r]equiring a municipality to uphold its end of a contractual bargain is not commandeering." *Id.* at 758.

Accordingly, the State's reliance on *United States v. California*, 921 F.3d 865 (9th Cir. 2019), is misplaced. There, the Ninth Circuit held that the INA did not conflict-preempt a

California law restricting state officers from transferring individuals to federal immigration authorities absent specified conditions. *Id.* at 886–90. The court reasoned that because California could "decline to administer the federal program," its decision not to participate could not constitute obstacle preemption where the INA merely permitted, rather than required, participation. *See id.* at 889–90. That holding addressed a State's ability to withhold cooperation in the absence of any voluntary commitment to the contrary. It did not address whether a State may invoke the Tenth Amendment to avoid obligations voluntarily undertaken by one of its political subdivisions. Thus, *California* reaffirmed that the Tenth Amendment serves as a shield against federal compulsion, not as the State urges here, a sword to prohibit voluntary cooperation with the Federal Government. *Accord City of New York*, 179 F.3d at 31 (recognizing that "[S]tates do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs").

The same principle applies here. The Board voluntarily contracted to have federal civil immigration detainees housed at the processing center in Otero County. Answer 36 ¶¶ 27–29. As in *King County*, this case involves a voluntary contractual undertaking rather than compliance with a federal command. Count II accordingly fails as a matter of law and should be dismissed.

## III. THE STATE'S APA CLAIMS FAIL BECAUSE THE STATE LACKS A CAUSE OF ACTION AND ICE'S EXECUTION OF THE AMENDED AGREEMENT DID NOT VIOLATE THE APA.

Counts III and IV are unavailing because they are unreviewable claims under the Administrative Procedure Act ("APA"). Section 706 of the APA provides that courts may "hold unlawful and set aside agency action[s] . . . found to be . . . arbitrary, capricious, . . . or otherwise not in accordance with law." § 706. But § 706 only applies "except to the extent that . . . agency

action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). And judicial review under § 706 is limited to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. The State claims that "ICE's execution of the" Amended Agreement was arbitrary and capricious (Count III) and contrary to law (Count IV) in violation of the Act. Answer 44 ¶ 76, 46 ¶ 86, Dkt. No. 79. The State purportedly brings both claims under § 706, but ICE's execution of the Amended Agreement was committed to the agency's discretion, and the State suffered no legal injury. And in any event ICE's action was neither arbitrary nor capricious, and was not contrary to law.

### A. ICE had discretion to execute the Amended Agreement.

Counts III and IV fail because the decision whether to execute the Amended Agreement was committed to ICE's discretion by law. To resolve whether an agency action is unreviewable under § 706 for this reason, courts ask whether "the statute [enabling the action] is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Am. Bank, N.A. v. Clarke*, 933 F.2d 899, 902 (10th Cir. 1991) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). This inquiry turns on the statute's "express language, . . . the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.* (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984)). That standard forecloses APA review of ICE's execution of the Amended Agreement. The provisions of the INA upon which the Amended Agreement is based conclusively show that the decision to enter or amend an immigration IGSA is a discretionary—and thus unreviewable—agency action.

Two parts of the INA authorized ICE's action and complete discretion in this context. The first, section 287(g), is framed broadly: "[T]he Attorney General *may* enter into a written agreement with a State . . . ." 8 U.S.C. § 1357(g)(1) (emphasis added). The second provision, section 103(a)(11), is similar: "The Attorney General, in support of persons in administrative detention in non-Federal institutions, *is authorized* . . . to enter into a cooperative agreement with any State . . . ." *Id.* § 1103(a)(11)(B) (emphasis added). Congress has since transferred the Attorney General's statutory authority to DHS, *see* 6 U.S.C. §§ 251, 552(d), which delegated it to ICE.

ICE *may* make agreements with States under section 287(g) and *is authorized* to make detention agreements with States under section 103(a)(11). Both provisions use "highly discretionary" language that "exudes strong deference to the [agency]'s decision." *Clarke*, 933 F.2d at 903. The APA accordingly does not permit judicial review. *See, e.g.*, *Merida Delgado v. Gonzales*, 428 F.3d 916, 920 (10th Cir. 2005) ("[T]he statute gives no basis on which to assess the agency's decision, short of permitting cross-examination of the Attorney General concerning his views of the Nation's security and whether the plaintiff was inimical to those interests, an inquiry the court will not undertake." (citation modified)).

ICE's decision to execute the Amended Agreement is not reviewable under § 706. The Court should dismiss Counts III and IV.

**B. The State suffered no legal wrong.**

Counts III and IV independently fail because the State suffered no legal wrong. "[A] 'legal wrong'" under § 706 "is an invasion of a 'legal right,' that is 'one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a

privilege.'" *NCAA v. Califano*, 622 F.2d 1382, 1386 (10th Cir. 1980) (quoting *Tennessee Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 137–38 (1939)). The State identifies two alleged legal wrongs: (1) the Amended Agreement "prevents [it] from exercising its constitutional authority to regulate its political subdivisions and set law enforcement priorities"; and (2) the Amended Agreement "is contrary to federal common law because it is void for public policy." Answer 45 ¶ 83, 46 ¶ 88, Dkt. No. 79. Neither of these wrongs suffices.

The first injury the State invokes—interference with its police powers—is not cognizable for the same reasons the Amended Agreement does not violate the anticommandeering doctrine. The State argues the Tenth Amendment confers a legal right to prohibit its political subdivisions from voluntarily enforcing federal law. That is incorrect. As discussed above, the Tenth Amendment is a shield, not a sword. *See supra* Part II. The Tenth Amendment does not reserve to the States the power to prohibit its officials from honoring their contractual obligations. *See id.*

The second injury the State identifies is likewise illusory. The State claims that ICE violated federal common law when it signed the Amended Agreement, because ICE's execution of the agreement violated New Mexico's public policy. *See* Answer 46 ¶ 88. But as discussed above, federal common law displaces state law where federal common law applies. *See* Section I.A, *supra*. The State cannot bootstrap its state-law claim into federal common law.

Because the State suffered no legal wrong, ICE's action is unreviewable under § 706 on this alternative ground, and the Court should dismiss Counts III and IV.

**C. ICE did not act arbitrarily or capriciously.**

Even if ICE's execution of the Amended Agreement is reviewable, it was not arbitrary or capricious. An agency's decision is arbitrary and capricious in four situations:

> An agency's decision is arbitrary and capricious if the agency (1) "entirely failed to consider an important aspect of the problem," (2) "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," (3) "failed to base its decision on consideration of the relevant factors," or (4) made "a clear error of judgment."

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222 (10th Cir. 2017) (quoting *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009)). The State focuses on the first factor, arguing that ICE "failed to consider . . . New Mexico's declared public policy prohibiting its political subdivisions from providing immigration-detention services." Answer 45 ¶¶ 81. Here, however, ICE considered—and rejected—that factor.

An earlier draft of the Amended Agreement did not include unilateral termination authority. *See* Mot. to Dismiss, Ex. A, at 5, Dkt. No. 49-1.[8] In response, an employee of the company that manages the Otero County processing center sent a revised IGSA to ICE officials and explained that the Board must not have termination authority "to insulate the agreement against HB 9." Answer, Ex. A, at 5–6, Dkt. No. 79-1. The next day an ICE official emailed back, "Please see updated IGSA with updates as requested." *Id.* at 5. Thereafter, ICE and the Board executed the Amended Agreement, removing the Board's termination authority. Mot. to Dismiss, Ex. C, at 3, Dkt. No. 49-3.[9] Even if *WildEarth* correctly states the law and the public policy the State identifies is "important," *WildEarth*, 870 F.3d at 1233, the materials cited above show that ICE officials considered that policy and concluded that enforcing federal immigration law was more important.

---

[8] Exhibit A to the State's Motion to Dismiss forms part of the pleadings and is properly considered here. *See supra* note 1.

[9] Exhibit C to the State's Motion to Dismiss forms part of the pleadings and is properly considered here. *See supra* note 2.

The State's disagreement with that decision does not mean that ICE failed to consider "New Mexico's declared public policy prohibiting its political subdivisions from providing immigration detention-services." Answer 45 ¶ 81. The materials cited above, which are incorporated into the State's pleadings, defeat this claim. Accordingly, even if ICE's action is reviewable under § 706, the Court should dismiss Count III.

**D. ICE did not act contrary to law.**

Count IV likewise fails because the Amended Agreement was not contrary to law. The State pleads no facts showing otherwise but rather contends that the Amended Agreement is contrary to federal common law by reference to New Mexico public policy. *See* Answer 46 ¶¶ 85–90. But "if a case 'should be resolved by reference to federal common law[,] . . . state common law [is] pre-empted.'" *Am. Elec. Power Co.*, 564 U.S. at 429 (alterations in original) (quoting *Ouellette*, 479 U.S. at 488); *see, e.g.*, *Kirby*, 543 U.S. at 30–35 (looking to federal law for a rule of decision to apply the federal common law). The State accordingly has not sufficiently pled that ICE acted contrary to law. Therefore, if ICE's action is reviewable under § 706, the Court should still dismiss Count IV.

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' motion to dismiss.

DATED: November 23, 2026

Respectfully Submitted,

RYAN ELLISON
First Assistant United States Attorney
District of New Mexico

EMIL J. KIEHNE
Assistant U.S. Attorney
U.S. Attorney's Office
District of New Mexico

JONATHAN D. GUYNN
Acting Assistant Attorney General
Civil Division

CODY M. POPLIN
Deputy Assistant Attorney General

HILARY K. PERKINS

201 3rd Street NW, Suite 900
Albuquerque, New Mexico 87102
Telephone: (505) 346-6855
Email: emil.kiehne@usdoj.gov

Director

JACQUELINE COLEMAN SNEAD
Deputy Director
ROBERT O. LINDEFJELD
Assistant Director

*/s/ Alexander William Furtaw*
Alexander William Furtaw (D.C. Bar No. 90036368)
Trial Attorney
Enforcement & Affirmative Litigation Branch
U.S. Department of Justice
450 Fifth Street, NW
Washington, D.C. 20001
Tel.: (202) 598-5667

*Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 23, 2026, I electronically filed the foregoing with the Clerk of Court and served a copy upon all counsel of record registered to receive notice via the Court's CM/ECF system.

*/s/ Alexander William Furtaw*
Alexander William Furtaw