# **EXHIBIT A**

Case 1:26-cv-01471-KG-LF Document 109-1 Filed 11/24/26 Page 2 of 49

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 26-1874**

---

THE UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

THE COMMONWEALTH OF VIRGINIA; JAY JONES, in his official capacity as Attorney General of Virginia,

Defendants – Appellants,

and

STEVE DESCANO, in his official capacity as Commonwealth Attorney for Fairfax, Virginia,

Defendant.

------------------------------

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON; FEDERALISM PROFESSORS; THE RODERICK & SOLANGE MACARTHUR JUSTICE CENTER; LEGAL AID JUSTICE CENTER,

Amici Supporting Appellants.

HON. KENNETH T. CUCCINELLI II,

Amicus Supporting Appellee.

---

**No. 26-2258**

---

THE UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

THE COMMONWEALTH OF VIRGINIA; JAY JONES, in his official capacity as Attorney General of Virginia,

Defendants – Appellants,

and

STEVE DESCANO, in his official capacity as Commonwealth Attorney for Fairfax, Virginia,

Defendant.

------------------------------

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON; FEDERALISM PROFESSORS; THE RODERICK & SOLANGE MACARTHUR JUSTICE CENTER; LEGAL AID JUSTICE CENTER,

Amici Supporting Appellants.

HON. KENNETH T. CUCCINELLI II,

Amicus Supporting Appellee.

---

Appeals from the United States District Court for the Eastern District of Virginia, at Richmond. Robert E. Payne, Senior District Judge. (3:26-cv-00545-REP)

---

Argued: October 27, 2026 Decided: November 23, 2026

---

Before KING, HEYTENS, and BENJAMIN, Circuit Judges.

---

Preliminary injunctions affirmed in No. 26-1874 and vacated in No. 26-2258 by published opinion. Judge Heytens wrote the opinion, which Judge Benjamin joined. Judge King wrote

an opinion concurring in part and dissenting in part.

---

**ARGUED:** Tillman J. Breckenridge, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Megan Lacy Owen, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Jay Jones, Attorney General, Travis G. Hill, Chief Deputy Attorney General, Gretchen Ellen Nygaard, Deputy Attorney General, Ethan P. Fallon, Deputy Solicitor General, R. Trent Taylor, Deputy Solicitor General, Triston C. O'Savio, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Brett A. Shumate, Assistant Attorney General, Mark R. Freeman, Daniel Tenny, Andrew M. Bernie, Randall C. Smith, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. Nikhel S. Sus, Lauren C. Bingham, CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, Washington, D.C.; Burt M. Rublin, BALLARD SPAHR LLP, Philadelphia, Pennsylvania, for Amicus Citizens for Responsibility and Ethics in Washington. Zachary Ezor, TIN FULTON WALKER & OWEN, Durham, North Carolina, for Amici Federalism Professors. Ellen Noble, Layla Kousari, THE RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Washington, D.C., for Amicus The Roderick & Solange MacArthur Justice Center. Alex Kornya, Angela Ciolfi, THE LEGAL AID JUSTICE CENTER, Charlottesville, Virginia, Caroline McCance, Emily Lopynski, Rohmah Javed, Abigail Marshak, THE LEGAL AID JUSTICE CENTER, Falls Church, Virginia, for Amicus Legal Aid Justice Center. Mateo Forero-Norena, FEDERATION FOR AMERICAN IMMIGRATION REFORM, Washington D.C., for Amicus Honorable Kenneth T. Cuccinelli II.

---

TOBY HEYTENS, Circuit Judge:

The United States Constitution "split the atom of sovereignty." *United States Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring). Under its framework, "both the Federal Government and the States wield sovereign powers." *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018). And because the Federal Government "must act within the States," *Tennessee v. Davis*, 100 U.S. 257, 263 (1879), "[t]here are within the territorial limits of each State two governments, restricted in their spheres of action, but independent of each other, and supreme within their respective spheres," *Tarble's Case*, 80 U.S. 397, 406 (1871). This "system of dual sovereignty" was deliberate. *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). "[A] healthy balance of power between the States and the Federal Government," the Framers believed, would "reduce the risk of tyranny and abuse from either front." *Id.* at 458.

Those principles resolve these two appeals. In No. 26-2258, we vacate a preliminary injunction preventing the Commonwealth of Virginia from rendering unenforceable existing agreements between the Federal Government and the Commonwealth's state or local agencies "to perform [the] function[s] of a federal immigration officer" unless certain conditions are met. Va. Code § 15.2-1726.1(A). The Federal Government may not "command" the Commonwealth's "officers, or those of [its] political subdivisions" (*Printz v. United States*, 521 U.S. 898, 935 (1997)) to assist with federal immigration enforcement efforts, and the Commonwealth's supreme lawmaking body has imposed new limits on when its agents may agree to do so. That choice does not violate the intergovernmental immunity doctrine because it neither requires the Federal Government to do anything nor

limits any private party's ability to contract with the Federal Government. It also does not violate the Federal Constitution's Contracts Clause for two separate reasons: (1) because the existing agreements all expressly permit the non-federal party to unilaterally terminate without cause; and (2) even if they did not, the Commonwealth would have constitutionally valid justifications for imposing new terms for future cooperation in any event.

The same principles generate a different result in No. 26-1874. There, we affirm a preliminary injunction forbidding enforcement of a new state law that regulates when federal employees may wear facial coverings and must display visible identification while performing their federal duties. See Va. Code § 19.2-83.6:2. We question neither the sincerity nor the reasonableness of the Commonwealth's objections to masked and otherwise-unidentified law enforcement activities, and we emphasize that States may limit or forbid such conduct by their own state and local officers. But just as Congress may not "issue orders directly to the States," *Murphy*, 584 U.S. at 470, States may not issue orders directly to the Federal Government. We thus conclude the law at issue violates the intergovernmental immunity doctrine.

## I.

It is an understatement to say there has been a great deal of public attention paid to immigration enforcement in recent years. During its most recent session, Virginia's General Assembly enacted several laws involving that topic. Two such laws gave rise to a single underlying lawsuit and two separate interlocutory appeals.

The first law—which the parties and the district court call the 287(g) Law—was signed by the governor on April 22, 2026. Explaining that label requires a brief detour.

Section 287(g) of the federal Immigration and Nationality Act—also known as 8 U.S.C. § 1357(g)—is captioned, "Performance of immigration officer functions by State officers and employees." It authorizes the federal Attorney General to "enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision . . . may carry out" various "function[s] of an immigration officer." § 1357(g)(1). Any such cooperation must be "at the expense of the State or political subdivision," *id.*, and, when so acting, the state or local employees "shall be subject to the discretion and supervision of the Attorney General," § 1357(g)(3). Another provision states: "Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection." § 1357(g)(9).

In 2025 and 2026, some of the Commonwealth's agencies and those of its political subdivisions entered into Section 287(g) agreements with the Federal Government. The Commonwealth's 287(g) Law addresses that development. It creates new rules governing when state or local "law-enforcement agenc[ies]" may "enter into" such agreements and forbids "maintain[ing]" or "renew[ing]" existing agreements that lack specific terms. Va. Code § 15.2-1726.1(A), (C). The 287(g) Law further declares that any existing agreements "shall be deemed void and unenforceable" if they are not modified to comply with the law by September 1, 2026. § 15.2-1726.1(D).

The second law—the Mask/Identity Law—was signed by the governor on May 20, 2026. The Commonwealth has long had a general law that restricts the wearing of "any mask, hood, or other device" "with the intent to conceal" the wearer's identity. Va. Code

Case 1:26-cv-01471-KG-LF Document 109-1 Filed 11/24/26 Page 8 of 49

§ 18.2-422. In contrast, the Mask/Identity Law is a new provision that applies solely to "law-enforcement officer[s]," § 19.2-83.6:2(B)–(E), including "any full-time or part-time employee of a federal law-enforcement agency," § 19.2-83.6:2(A).

The Mask/Identity Law does two things that are relevant here. *First*, it states that—unless one of eight exceptions applies—"no law-enforcement officer shall wear a facial covering that conceals, obscures, or otherwise covers his face while such law-enforcement officer is engaged in the performance of his official duties." Va. Code § 19.2-83.6:2(B); see § 19.2-83.6:2(C) (listing exceptions). *Second*, it declares that—"[e]xcept as otherwise provided by this section"—a law enforcement officer "engaged in the performance of his official duties" must "visibly display" "a badge or insignia bearing such law-enforcement officer's name or other individual identifier" and "the name of the law-enforcement agency that employs such law-enforcement officer." § 19.2-83.6:2(D).

On June 11, 2026, the Federal Government filed a six-count complaint against the Commonwealth and its Attorney General (collectively, the Commonwealth).[1] The first two counts contend the Mask/Identity Law cannot be enforced against federal law enforcement officers because it violates the intergovernmental immunity doctrine by directly regulating the Federal Government (Count I) and discriminating against it (Count II). The remaining counts challenge the 287(g) Law. Count III asserts that the law violates the Contracts Clause by "substantially impair[ing] existing § 287(g) contracts between entities in

---

[1] The Federal Government also sued a local Commonwealth Attorney, who was later dismissed as a defendant with the agreement of all parties.

Virginia and the Federal Government." JA 99. Count IV asserts the 287(g) Law is preempted. And Counts V and VI assert that the 287(g) Law violates the intergovernmental immunity doctrine because it directly regulates the Federal Government and discriminates against it, respectively. The Federal Government sought a preliminary injunction barring enforcement of both laws.

The district court bifurcated the preliminary injunction proceedings, conducting separate hearings and issuing separate opinions and orders about the two laws. In its first order, the court preliminarily enjoined the Commonwealth from enforcing the Mask/Identity Law "against any federal officer, employee, or agency involved in enforcing federal immigration laws and regulations." JA 16.[2] The Commonwealth appealed that injunction, which was docketed as No. 26-1874. See 28 U.S.C. § 1292(a)(1) (authorizing appeals from "[i]nterlocutory orders . . . granting . . . injunctions"). In its second order, the district court preliminarily enjoined the Commonwealth "from, in any way, interfering with the performance of existing § 287(g) agreements by any party to such existing agreements." SA 18. The Commonwealth appealed that injunction as well, which was docketed as No. 26-2258. We granted the Commonwealth's motion to consolidate its two appeals.

## II.

"A preliminary injunction is an extraordinary remedy never awarded as of right."

---

[2] With the consent of the parties and the permission of this Court, the district court later issued corrected versions of its first order and opinion to reflect an updated statutory citation.

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Like any other plaintiff, the Federal Government "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. Although we review a district court's decision to grant a preliminary injunction "under the deferential abuse of discretion standard," *PSEG Renewable Transmission LLC v. Arentz Fam., LP*, 185 F.4th 497, 507 (4th Cir. 2026), "[a] ruling that rests on an error of law is necessarily an abuse of discretion," *Pendleton v. Jividen*, 96 F.4th 652, 656 (4th Cir. 2024). As always, "[w]e review questions of law de novo." *McAdams v. Robinson*, 26 F.4th 149, 155 (4th Cir. 2022).[3]

III.

We vacate the preliminary injunction that bars enforcing the 287(g) Law with respect to existing agreements. The district court concluded the Federal Government was likely to succeed on the merits because rendering such agreements unenforceable violates both the intergovernmental immunity doctrine and the Contracts Clause. We disagree. The intergovernmental immunity doctrine does not apply because the 287(g) Law neither directly regulates the Federal Government nor prevents private parties from contracting

[3] The Commonwealth does not challenge the Federal Government's standing to seek each form of relief presently before us or assert any of its current claims are not ripe. Having satisfied our independent duty to confirm those points, see, *e.g.*, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230–31 (1990), we conclude the Federal Government has standing to challenge the 287(g) Law as applied to pre-existing agreements and to bring a pre-enforcement challenge to the Mask/Identity Law. We also conclude its current claims are ripe.

with it. See Part III(A). The 287(g) Law also does not violate the Contracts Clause for two separate reasons: (1) because the existing agreements expressly permit unilateral termination by the non-federal party; and (2) even if they did not, the Commonwealth would have constitutionally valid justifications for requiring state and local officials to terminate or renegotiate any such agreements. See Part III(B). And because the Federal Government cannot obtain a preliminary injunction without showing it is likely to succeed on the merits, see, *e.g.*, *Northern Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 497 (4th Cir. 2025), we vacate the August 18, 2026, preliminary injunction without reaching the remaining *Winter* factors.

A.

The Federal Government is not likely to succeed in showing the 287(g) Law violates the intergovernmental immunity doctrine. Quite the contrary: its arguments get basic federalism principles backwards.

Principle #1: The Federal Government cannot issue orders directly to States. See, *e.g.*, *New York v. United States*, 505 U.S. 144, 175–76 (1992).

Principle #2: The Federal Government cannot end-run a State's own authority by instructing state or local officials to enforce federal law. See, *e.g.*, *Printz v. United States*, 521 U.S. 898, 935 (1997).

Principle #3: States always remain free to change their minds about how to exercise their "sovereign power[s]" going forward. *Stone v. Mississippi*, 101 U.S. 814, 821 (1879); see *id.* at 819–20 (rejecting claim that a State could not outlaw lotteries after granting a private party a license to operate one).

Principle #4: As a matter of both federal and Virginia law, state and local agencies have only those powers the Commonwealth gives them, and any powers that are granted can later be taken away. See, *e.g.*, *Ysura v. Pocatello Educ. Ass'n*, 555 U.S. 353, 362 (2009); *Sinclair v. New Cingular Wireless PCS, LLC*, 727 S.E.2d 40, 44 (Va. 2012).

Those principles defeat any intergovernmental immunity challenge to the 287(g) Law. The Federal Government could not order the Commonwealth's own agents—be they state or local officials—to enforce federal law, much less do so at their own expense, see 8 U.S.C. § 1357(g)(1), while under "the direction and supervision of the" Federal Government's own Attorney General, § 1357(g)(3). The Commonwealth may choose to participate in such efforts or permit its own subordinate political actors to do so. But the inverse is also true. Just as the Commonwealth was allowed to make one choice in the past, it is allowed to make a different choice going forward. Indeed, that is the essence of democratic self-government.

The fact that the 287(g) Law says the Commonwealth is willing to permit continued assistance so long as certain new terms are met changes nothing about the intergovernmental immunity analysis. True, the Commonwealth's list of conditions contains many terms it could not simply impose on the Federal Government or federal contractors. See Va. Code § 15.2-1726.1(C)(1)–(12). But just as the Federal Government may place conditions on receiving federal funds that it could not mandate directly, see, *e.g.*, *South Dakota v. Dole*, 483 U.S. 203, 206 (1987), States may do the same when deciding whether to participate (or continue to participate) in federal law enforcement efforts. Such conditions do not regulate the Federal Government—much less

impermissibly—because the Federal Government can always say no and thus decline a State's assistance. And, unlike with the Spending Clause, we know of no doctrinal basis for saying that a State's conditions for providing cooperation can ever be improperly coercive. Cf. *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 575–85 (2012).

Far from improving its position, the decisions on which the Federal Government relies only confirm why its intergovernmental immunity arguments against the 287(g) Law are wrong.

The Federal Government places greatest emphasis on *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315 (3d Cir. 2025). In that case, the Third Circuit held that New Jersey could not prevent otherwise-willing "private parties"—a term the majority opinion used *seven times*—from contracting with the Federal Government "to detain people for civil immigration violations." *Id.* at 320. The court relied on a line of Supreme Court authority holding that States "cannot regulate private parties in a way that severely undercuts a federal function." *Id.* at 322. The court concluded that the challenged law would "functionally bar" the Federal Government from detaining people in New Jersey by "destroy[ing] the federal government's marketplace" for something that only the Federal Government could purchase—"private immigration[ ] detention." *Id.* at 319, 324, 326.

None of that has anything to do with this case. The 287(g) Law does not bar any "private part[y]"—let alone "all contractors" in a relevant market—from contracting with the Federal Government to provide immigration-related services, nor does it dictate or forbid any contractual terms. *CoreCivic*, 145 F.4th at 325, 327. And even though the New Jersey law in *CoreCivic* also barred "the state" and "its local governments" from providing

such services (*id.* at 320), the Third Circuit never suggested those parts of the law violated the intergovernmental immunity doctrine, see *id.* at 329 (holding the law was "unconstitutional as applied to CoreCivic").

The Federal Government nonetheless insists that *CoreCivic* supports it because the Third Circuit emphasized that "[i]ntergovernmental immunity is not a formalist doctrine," deals with "substance" rather than "form," and prevents States from doing "indirectly" what they cannot do directly. *CoreCivic*, 145 F.4th at 322. Those statements do not help the Federal Government here. In *CoreCivic*, the underlying substantive rules were that the Federal Government was entitled to house immigration detainees in New Jersey and enlist help in doing so. See *id.* at 325–28. As a result, the Third Circuit concluded it did not matter that "the [challenged] law's text" did not mention the Federal Government because it "ha[d] the exact same effect as a state law that bars the federal government from contracting *for private immigration services*." *Id.* at 321–22 (emphasis added). The Commonwealth's 287(g) Law does nothing of the sort.[4]

The Federal Government also cites *United States v. King County*, 122 F.4th 740 (9th Cir. 2024). In that case, the Ninth Circuit held a county could not forbid private contractors from providing "essential services, such as fueling and landing stairs" to "ICE charter flights" at a county-owned airfield. *Id.* at 747. The court began its analysis by holding the county's restriction violated a 1948 deed (executed under a federal statute)

---

[4] *CoreCivic*, of course, is not binding on us, and we need not decide whether we would have agreed with the majority or dissent in that case. We simply point out that this situation is far afield from *CoreCivic*'s self-described "narrow" holding. 145 F.4th at 329.

giving the Federal Government, as well as "its employees or agents," the right to use the airport. *Id.* at 753–55. Having so concluded, the Ninth Circuit also determined the county's action "violate[d] the intergovernmental immunity doctrine," both "by preventing ICE from using private [] contractors" at the airfield and "by singling out" "contractors who serve ICE charter flights" for special disfavored treatment. *Id.* at 756–57. Finally, the Ninth Circuit concluded that enforcing the terms of the 1948 deed did not violate the anti-commandeering doctrine because no county "officials [were] being conscripted into carrying out federal immigration laws." *Id.* at 758.

This case is worlds away from *King County*. Here, there is no federal statute or deed giving the Federal Government a right to use the Commonwealth's property or that of its localities. To the contrary, the relevant federal statute emphasizes that "[n]othing in" it "shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General." 8 U.S.C. § 1357(g)(9). The 287(g) Law does not forbid the Federal Government from using private contractors to do anything, nor does it impose any restrictions (much less discriminatory ones) on private contractors doing business with the Federal Government. And here the Federal Government *is* asking a federal court to commandeer state resources by requiring the Commonwealth's own agents to perform certain "function[s] of an immigration officer" (§ 1357(g)(1)) on terms to which the Commonwealth now objects.

For our purposes, the most relevant decision is *McHenry County v. Raoul*, 44 F.4th 581 (7th Cir. 2022), which rejected a series of arguments nearly identical to those the Federal Government presses here. In *McHenry*, two localities challenged an Illinois law

"prohibiting State agencies and political subdivisions from contracting with the federal government to house immigration detainees" and requiring "any entity with an existing contract" to terminate it by a specified date. *Id.* at 585–86. The Seventh Circuit rejected the municipalities' claims, including an intergovernmental immunity argument. As the court emphasized, the challenged law "impose[d] no direct regulation on any federal official or agency" and did not prevent the Federal Government from "hous[ing] immigration detainees in its own facilities in Illinois or [ ] contract[ing] with private parties." *Id.* at 593. The court also concluded that a State's decision to withhold cooperation "in the immigration context—a possibility contemplated by the relevant federal statutes—does not constitute discrimination against the federal government." *Id.* at 594 n.7; accord *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) (stating it "would be inconsistent with" the anti-commandeering principle if "California *cannot* choose to discriminate against federal immigration authorities by refusing to assist their enforcement efforts" (emphasis in original)). So too here.

One final point. Parts of the district court's opinion can be read as suggesting the 287(g) Law violates the intergovernmental immunity doctrine not because of what it does but because of the motives that may have given rise to it. See, *e.g.*, SA 59 (suggesting the 287(g) Law is invalid because its conditions on further cooperation "are designed to change the way that federal immigration law is enforced," something the Commonwealth "well knows that it could not directly impose" on the Federal Government). That was error. Just as most preemption questions turn "on *what* the State did, not *why* it did it," *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 774 (2019) (opinion of Gorsuch, J.) (emphasis in

original), the same is true of the intergovernmental immunity doctrine, see *Dawson v. Steager*, 586 U.S. 171, 177 (2019) ("treatment rather than intent is what matters"). And what the Commonwealth has done here—setting new terms on which federal actors can leverage state resources to help enforce federal law—does not violate that doctrine.

B.

The Federal Government is also unlikely to succeed in showing that applying the 287(g) Law to existing agreements violates the Contracts Clause, which declares that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Without question, the 287(g) Law is a "Law," and we assume without deciding that Section 287(g) agreements are "Contracts." See *Sveen v. Melin*, 584 U.S. 811, 818–19 (2018) (emphasizing the Contracts Clause "applies to any kind of contract"). But we conclude that applying the 287(g) Law to the then-existing agreements does not "impair[ ]" any "Obligations" under such agreements and thus cannot support the preliminary injunction the district court granted.

"[N]ot all laws affecting pre-existing contracts violate the [Contracts] Clause." *Sveen*, 584 U.S. at 819. "To determine when such a law crosses the constitutional line," the Supreme Court "has long applied a two-step test." *Id.* "The threshold issue is whether the [challenged] state law has operated as a substantial impairment of a contractual relationship." *Id.* (quotation marks removed). Only if the answer is yes do we turn to the second question: "whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Id.* (quotation marks removed).

We conclude the Federal Government cannot satisfy that test for two different, yet

Case 1:26-cv-01471-KG-LF Document 109-1 Filed 11/24/26 Page 18 of 49

complementary, reasons. *First*, all the agreements covered by the district court's injunction expressly permit the Commonwealth's agents to unilaterally terminate without cause, which means the 287(g) Law does not "substantially impair" (*Sveen*, 584 U.S. at 819) a contractual relationship at Step 1. *Second*, even if the agreements did not so provide, neither the Commonwealth's agencies nor those of its localities may contract away "an essential attribute of [the Commonwealth's] sovereignty." *United States Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23 (1977). Here, that attribute is the Commonwealth's power to decide whether and on what terms to assist with the ongoing enforcement of federal law. Cf. *Printz*, 521 U.S. at 928 ("dragoon[ing]" state and local officers "into administering federal law" violates "an essential attribute of the States' [ ] sovereignty"). For that reason too, the 287(g) Law does not substantially impair any contractual rights the Federal Government would otherwise enjoy. And even if we were to get to Step 2, the 287(g) Law has the "significant and legitimate public purpose" (*Sveen*, 584 U.S. at 819) of ensuring that the Commonwealth will decide for itself when its agents and those of its political subdivisions may devote their own resources to helping enforce federal law.

1.

It seems hard to argue that the 287(g) Law "operate[s] as a substantial impairment of a contractual relationship" (*Sveen*, 584 U.S. at 819) when each of the relevant agreements expressly permits the non-federal party to end its cooperation on a going-forward basis without any justification or excuse. That is particularly so given the agreements all contemplate an indefinite relationship with no fixed termination date. The Federal Government could not "reasonabl[y] expect[ ]" (*id.*) the existing agreements would

remain in force forever, nor would it "undermine[] the contractual bargain" (*id.*) to permit the Commonwealth to achieve a result those same agreements expressly permit—terminating the existing arrangements.

The Federal Government's contrary arguments are unpersuasive.

To begin, we agree that "the power to terminate [] contracts at will" does not *necessarily* "prevent a finding of contract impairment" under the Contracts Clause. *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 628 (5th Cir. 2010). We also agree that just because a contract gives one party a unilateral right to terminate the contractual relationship does not mean that same party can choose to maintain the relationship *while also* unilaterally altering its terms. See *id.*

But that is not what the 287(g) Law does. Rather, the law is functionally a notice of termination accompanied by a new offer: It declares the Commonwealth is unwilling to maintain the current arrangements going forward while offering new terms the Federal Government remains free to reject. Cf. Restatement (Second) of Contracts § 39(1) (1981) ("A counter-offer is an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer."). Nor does it matter the Commonwealth has made clear it is willing to make a new agreement only on its preferred terms. Many if not most "offer[s] to make a contract" entail "an implied threat by one party . . . not to make the contract unless his terms are accepted by the other party." § 176 cmt. a.

Nor can the district court's likelihood-of-success holding be salvaged by the fact that a few of the Section 287(g) agreements covered by its injunction include provisions

requiring the parties to provide 90 days' notice before any termination. For one thing, 25 of the 30 relevant agreements do not require advance notice by the non-federal party, so, even on its own terms, this rationale provides no justification for enjoining the 287(g) Law with respect to those agreements. What is more, even if the 90-day notice provisions constituted "Obligation[s]" that were "impair[ed]" by the 287(g) Law (U.S. Const. art. I, § 10, cl. 1), the proper remedy would be an injunction requiring the counterparties to provide the required notice—not one prohibiting their exit. Cf. *Gill v. Whitford*, 585 U.S. 48, 73 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). And worse still for the Federal Government's position, it appears it got a formal termination notice for at least one of the agreements with a 90-day notice provision, see SA 405, meaning any proper injunction would need to be limited to—at most—4 of the 30 agreements the current preliminary injunction covers.[5]

In any event, we conclude none of this ultimately matters because the Federal Government does not (and could not plausibly) claim it had less than 90 days' notice that its existing Section 287(g) arrangements would become unenforceable unless it reached new deals with the relevant counterparties. The governor signed the 287(g) Law on April 22, 2026—132 days before the provisions the Federal Government claims impaired its contractual rights took effect. The Federal Government never claims to have been unaware

---

[5] Indeed, any injunction may need to be even further limited. Another local agency with an agreement containing a 90-day notice provision told the Commonwealth that "it had proposed changes" to that agreement "consistent with the 287(g) Law, had not received a response from ICE, and planned to terminate its 287(g) Agreement prior to September 1, 2026, if it did not receive a response from ICE." SA 404.

Case 1:26-cv-01471-KG-LF Document 109-1 Filed 11/24/26 Page 21 of 49

of this development, and it filed this lawsuit when there were still 82 days left on the clock. Under those circumstances, we conclude that any failure to comply with the 90-day notice-of-termination procedure contained in a (literal) handful of the relevant agreements neither "undermine[d] the contractual bargain" nor "interfere[d] with" any "reasonable expectations" arising from such agreements. *Sveen*, 584 U.S. at 819.

2.

Even if the relevant agreements did not expressly permit termination by the non-federal parties, we still would conclude that the 287(g) Law does not violate the Contracts Clause. Although the Supreme Court has long held a State's own agreements are not immune from Contracts Clause scrutiny, see, *e.g.*, *Fletcher v. Peck*, 10 U.S. 87, 135–39 (1810), it has been equally clear that "the Contract[s] Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty," *United States Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23 (1977).

Yet that is what the Federal Government seeks to do here. The Federal Government claims the Commonwealth has, through various agreements by its agencies and political subdivisions, forfeited (perhaps forever?) the power to decide that neither it nor its localities will devote further personnel and resources to assisting with federal immigration enforcement efforts unless the Federal Government agrees to certain terms. But for reasons that we have explained, making decisions about whether and on what terms to assist with enforcing another sovereign's laws is a core attribute of the Commonwealth's sovereign authority that no agent has the power to surrender. See Part III(A).

No question, the United States Constitution permits States to make certain

Case 1:26-cv-01471-KG-LF Document 109-1 Filed 11/24/26 Page 22 of 49

irrevocable promises, including when taking on debt or disposing of government-owned property. See, *e.g.*, *United States Tr. Co.*, 431 U.S. at 23–25; *Fletcher*, 10 U.S. at 134–35. But we need not determine where precisely the line between permissible and impermissible promises lies because this situation comes nowhere close to it. The Commonwealth is not seeking to "annihilat[e]" any title that has already "vested," *Fletcher*, 10 U.S. at 135, or to repudiate "financial obligation[s]" that it or one of its localities voluntarily assumed, *United States Tr. Co.*, 431 U.S. at 24; accord *Baltimore Tchrs. Union v. Mayor & City Council of Baltimore*, 6 F.3d 1012, 1018 (4th Cir. 1993). Instead, the Commonwealth is exercising its core sovereign powers to decide how its own property and personnel may and may not be used going forward.

For the reasons just described, we conclude the 287(g) Law satisfies neither part of the Supreme Court's two-part test. At Step 1, the 287(g) Law does not "substantially impair" any "contractual relationship" (*Sveen*, 584 U.S. at 819) because any guarantee of perpetual participation would have been unenforceable—that is, "invalid *ab initio*" (*United States Tr. Co.*, 431 U.S. at 23)—in the first place. And even if we somehow got to Step 2, we would conclude the 287(g) Law is "drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose" (*Sveen*, 584 U.S. at 819 (quotation marks removed))—that is, reclaiming the Commonwealth's authority to make decisions for itself and its subordinate political actors about how state and local law enforcement resources will be used.

The Federal Government protests that the 287(g) Law's purpose is "clearly illegitimate" because it "seeks to alter policies and practices for the enforcement of federal

immigration law." U.S. Suppl. Resp. Br. 28–29. But *Printz v. United States*, 521 U.S. 898 (1997), never says *why* the plaintiff officials in that case "object[ed] to being pressed into federal service," *id.* at 905, nor does it suggest their aims in withholding consent would have made any difference. And in *New York v. United States*, 505 U.S. 144 (1992), the Supreme Court emphasized that States "may elect to decline a federal grant" *because* they "view federal policy as sufficiently contrary to local interests." *Id.* at 168. The same is true here. Just as the Commonwealth's former leaders could empower its agencies and political subdivisions to assist with federal immigration enforcement efforts in the past, its current leaders may alter the conditions of that authorization going forward.

IV.

In contrast, we affirm the preliminary injunction against enforcing the Mask/Identity Law against federal officers acting in their official capacities. To be sure, there are many hard and unresolved questions about when federal officers are bound by "general rules that might affect incidentally the mode of carrying out the[ir] employment." *Johnson v. Maryland*, 254 U.S. 51, 56 (1920). We need not attempt to resolve all such questions here. Instead, we conclude the specific legal issues before us are not close and that the district court thus did not exceed its discretion in entering a preliminary injunction.

A.

The district court correctly held the Federal Government is likely to succeed in showing that applying the Mask/Identity Law to federal officers engaged in their official duties violates the intergovernmental immunity doctrine.

Our analysis starts (and largely ends) with a three-page, century-old Supreme Court

opinion—*Johnson v. Maryland*, 254 U.S. 51 (1920). In that case, Maryland sought to prosecute "an employee of the Post Office Department of the United States" for "driving a government motor truck in the transportation of mail" without possessing a state-issued driver's license. *Id.* at 55. As here, there does not appear to have been any federal statute, regulation, or official directive forbidding the postal worker from obtaining such a license. Yet the Supreme Court held the Maryland statute could not be applied to a federal officer performing federal duties. See *id.* at 57.

The Court relied on two lines of authority in reaching that decision. The first was the rule that States may not tax federal instrumentalities. See *Johnson*, 254 U.S. at 55–56 (discussing, among other decisions, *McCulloch v. Maryland*, 17 U.S. 316 (1819)). The second was a unanimous decision holding that Ohio could not prosecute a federal official for serving margarine in a home for disabled soldiers without following a state law requiring that margarine use be disclosed. See *Johnson*, 254 U.S. at 56 (citing *Ohio v. Thomas*, 173 U.S. 276, 283 (1899)).

We need only apply *Johnson* and *Thomas* to resolve the issues before us. Just as Maryland could not impose additional state-law licensing requirements for federal employees to deliver the mail, the Commonwealth may not impose additional state-law requirements about how and when federal law enforcement officers must identify themselves. Just as Ohio could not prosecute a federal official for serving margarine without complying with state-law requirements about how that could be done, the Commonwealth may not prosecute federal law enforcement officials for not complying with state-law requirements about when such officials may (and may not) wear facial

coverings when performing federal duties. And just as in those cases, it does not matter that there is no federal statute mandating what the Mask/Identity Law forbids. Accord *Hancock v. Train*, 426 U.S. 167, 179 (1976). Indeed, the Commonwealth acknowledged at oral argument that it could not identify any decision from any court holding that States may regulate federal officers this way. See Oral Arg. 12:11–:31.

The Commonwealth offers two responses. *First*, it claims some language in *Johnson* supports its position. *Second*, it argues that post-*Johnson* developments defeat any intergovernmental immunity claim here. We are unpersuaded by both arguments.

The Commonwealth relies on two sentences in *Johnson*. The first reads: "Of course an employee of the United States does not secure a general immunity from state law while acting in the course of his employment." *Johnson*, 254 U.S. at 56. The second states: "It very well may be that, when the United States has not spoken, the subjection to local law would extend to general rules that might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets." *Id.*

Even if we read both of those statements for all they are worth, we conclude the Mask/Identity Law still falls on the forbidden side of the line. The Mask/Identity Law is not a "general rule[]" because both its prohibition and its exceptions specifically "lay[] hold of" (*Johnson*, 254 U.S. at 56–57) federal "law-enforcement officer[s]" who are "engaged in the performance of [their] official duties." Va. Code § 19.2-83.6:2(B); see also § 19.2-83.6:2(C)–(D). Nor is the Mask/Identity Law's effect on "the mode of carrying out" such duties purely "incidental[]." *Johnson*, 254 U.S. at 56. Regulating

official government conduct is the only thing this law does.[6]

The Commonwealth urges us to view the Mask/Identity Law "as an exception" to "generally applicable" state law rules that restrict wearing masks in public. Virginia Opening Br. 28 & n.2. But the statute on which it relies for that assertion is a longstanding and separately codified provision that applies to "any person over 16 years of age" and defines the regulated conduct, the required mens rea, and the applicable exceptions differently. Compare Va. Code § 18.2-422, with § 19.2-83.6:2(A)–(C). Unlike the Mask/Identity Law, moreover, the other statute the Commonwealth cites does not require anyone to wear badges or otherwise identify themselves when going about in public. Cf. § 19.2-83.6:2(D). In both form and effect, the Mask/Identity Law is a different statute whose constitutionality must be analyzed separately from the Commonwealth's general anti-masking statute.

The Commonwealth also relies on later doctrinal developments. It notes that later Supreme Court decisions clarify that the intergovernmental immunity doctrine "prohibit[s]" only two types of state laws: those that "*either* regulate the United States directly *or* discriminate against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022) (alterations modified and quotation

[6] The fact that the Mask/Identity Law also regulates state and local officials does not mean it does not directly regulate the Federal Government. "The Supremacy Clause prohibits States from directly regulating federal operations even when regulating *state* operations in the same manner." *United States v. California*, No. 26-926, 2026 WL 3071018, at *5 (9th Cir. Oct. 14, 2026) (citing *Johnson*, 254 U.S. at 56–57) (emphasis in original).

marks removed and emphasis in original). The Commonwealth insists that the Mask/Identity Law does not directly regulate the Federal Government because it is "a neutral rule governing the manner of an officer's public conduct" that does not "give[] a state official authority to override [any] substantive federal decision." Virginia Opening Br. 22, 31. And although the complaint asserts an anti-discrimination claim against the Mask/Identity Law, the Commonwealth points out that the district court declined to rely on such a theory because the Federal Government's preliminary injunction motion had not raised it.

We conclude the Mask/Identity Law directly regulates the Federal Government and that the Commonwealth's contrary arguments are unavailing. Like the California law at issue in a recent Ninth Circuit case, the Mask/Identity Law "expressly applies to federal officers" "performing law enforcement operations," and it "explicitly overrides the federal government's power to determine whether, how, and when to publicly identify its officers." *United States v. California*, No. 26-926, 2026 WL 3071018, at *6 (9th Cir. Oct. 14, 2026); see Va. Code § 19.2-83.6:2(A)–(D).

The fact that the Mask/Identity Law does not go even further by purporting to control the selection of federal officers or condition the performance of federal law enforcement responsibilities on state approval makes no legal difference. Nor does it matter that the Mask/Identity Law contains exceptions that may cover many situations in which federal officers would choose to wear facial coverings or not identify themselves. Just as there is no *de minimis* exception to the rule that the Federal Government cannot "command" state officials "to administer or enforce a federal regulatory program," *Printz*

*v. United States*, 521 U.S. 898, 935 (1997), there is no *de minimis* exception to the rule that States may not regulate the Federal Government "*qua* government," *California*, 2026 WL 3071018, at *5; accord *Mayo v. United States*, 319 U.S. 441, 445 (1943).[7]

We also reject the Commonwealth's assertions that the district court's analysis of the Mask/Identity Law was insufficiently fine-grained. The Commonwealth argues the court erred by failing to separately analyze the facial covering provisions and the identification provision. It further insists that the district court overlooked exceptions to the identification requirement that were added between the date of the Mask/Identity Law hearing and the district court's opinion.

Those critiques are not well taken. Both aspects of the Mask/Identity Law suffer from the same fundamental constitutional problem (attempting to directly regulate the Federal Government) and none of the differences between them cure that problem. And although the Commonwealth complains that "[t]he district court's July 2 opinion analyzed [an] earlier version" of the identification provision, Virginia Opening Br. 41, it neither asked the district court to reconsider its opinion on that ground nor raised the issue when it sought a limited remand to permit the court to correct a statutory citation. Finally, it does not matter that "[n]o court of appeals has [previously] held that an evenhanded

[7] The Commonwealth's brief could be read as suggesting that States may directly regulate the Federal Government so long as they do so "in a neutral, nondiscriminatory way." Virginia Opening Br. 23 (quoting *Washington*, 596 U.S. at 839). Any such suggestion would be erroneous. The quoted language makes clear that the point the Court was making applies only to the "discrimination-related" strand of the intergovernmental immunity doctrine, not the direct-regulation strand. *Washington*, 596 U.S. at 839.

facial-covering prohibition like subsection B" of the Mask/Identity Law "directly regulates the federal government." Virginia Opening Br. 37. A plaintiff can establish it is likely to succeed on the merits for purposes of getting a preliminary injunction without showing the governing law is so "clearly established" that it could defeat a qualified immunity defense in a damages suit. *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982).

Our holding is limited. We reiterate that "an employee of the United States does not secure a general immunity from state law while acting in the course of his employment," *Johnson*, 254 U.S. at 56, and we make no effort to provide a full list of situations in which federal officers may or may not be prosecuted for violating state law. We also emphasize that neither the Federal Government's broad authority in immigration matters (see JA 37–39), nor "the history and context for the enactment of" the Mask/Identity Law (JA 24) play any role in our analysis. Whether the Mask/Identity Law directly regulates the Federal Government does not depend on what motivated the Commonwealth's decision to enact the law or whether its various provisions (or the practices that prompted them) represent wise policy. Finally, we do not address whether other legal requirements—including the Fourth Amendment—limit the permissible use of masked and otherwise-unidentified law enforcement officers. See, *e.g.*, *Urquilla-Ramos v. Trump*, 821 F. Supp. 3d 603, 615–30 (S.D. W. Va. 2026). We hold only that the Federal Government is likely to succeed on its claim that the Commonwealth's Mask/Identity Law cannot constitutionally be applied to federal law enforcement officials acting in the course of their official duties.

B.

The district court also did not abuse its discretion in concluding the Federal

Government satisfied the remaining *Winter* factors.

As the Commonwealth concedes, the Federal Government will suffer irreparable harm if the Mask/Identity Law directly regulates it and its officials are required to comply while the case is litigated. See Virginia Opening Br. 42–43; see also *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."). The district court found irreparable harm on that basis (see JA 49), and we affirm that determination. In so doing, we express no view about any other basis for concluding that the Federal Government would suffer irreparable harm absent a preliminary injunction. Accord *California*, 2026 WL 3071018, at *8 ("irreparable harm necessarily results from allowing California to enforce a law" that cannot constitutionally be applied to the Federal Government).

The Commonwealth's assertion that the preliminary injunction must be vacated because the district court failed to perform "an independent balance" of the final two factors also does not move the needle. Virginia Opening Br. 48. Those factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And this Court's "precedent counsels that a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc) (quotation marks removed). We thus conclude the district court did not abuse its discretion in finding those requirements

satisfied here.

* * *

In No. 26-2258, we vacate the preliminary injunction entered by the district court on August 31, 2026. In No. 26-1874, we affirm the preliminary injunction originally entered by the district court on June 30, 2026, and corrected on August 18, 2026.

*SO ORDERED*

KING, Circuit Judge, concurring in part and dissenting in part:

I readily concur in the panel majority's vacatur of the preliminary injunction that the district court interposed against the Commonwealth of Virginia's "287(g) Statute." But I am constrained to dissent from the majority's affirmance of the separate preliminary injunction that was entered against the Commonwealth's "Mask/Identity Statute." That Statute reasonably — and permissibly — imposes identification requirements and limitations on facial coverings worn by law-enforcement officers in Virginia, including federal ICE officers. In other words, I am confident that the 287(g) Statute and the Mask/Identity Statute are constitutional and should not be preliminarily enjoined.

As those of us seasoned enough to receive Social Security know, the good guys in the Western movies of our youth — played by the likes of Roy Rogers, Gene Autry, Tom Mix, and John Wayne — were always recognizable. Again, they were the heroes, the good guys. Only the bad guys — the bank robbers and the stagecoach bandits — wore masks. And the people of Virginia should not be expected to guess about whether masked men who confront them are legitimate law-enforcement officers and not robbers or common criminals. The commendable efforts of the Commonwealth to have the Mask/Identity Statute protect all persons in the Old Dominion should withstand the United States' assault in these preliminary injunction proceedings.

As I explain further in Part I of this opinion, the Mask/Identity Statute constitutes a reasonable exercise of the Commonwealth's sovereign police powers and serves very substantial and legitimate interests in protecting its citizens and preserving public safety. Moreover, as I explain in Part II, the United States has been unable to demonstrate a

likelihood of success on its challenge to the Mask/Identity Statute, rendering it ineligible for preliminary injunctive relief. I would therefore vacate the preliminary injunction against the Mask/Identity Statute and thereby afford the Commonwealth the respect to which it is entitled in our constitutional system.

I.

A.

The Commonwealth of Virginia has long exercised its traditional police powers to regulate the wearing of masks and other identity-concealing facial coverings in public. Indeed, the Commonwealth's general anti-mask statute dates back at least to 1952, when the Virginia General Assembly enacted legislation addressing public masking, intimidation, and related threats to public safety in response to concerns regarding the Ku Klux Klan. *See* 1952 Va. Acts ch. 483, at 777. That 1952 legislation, now codified at Virginia Code section 18.2-422, makes it

> unlawful for any person over 16 years of age to, with the intent to conceal his identity, wear any mask, hood, or other device whereby a substantial portion of the face is hidden or covered so as to conceal the identity of the wearer.

Put simply, the Commonwealth's regulation of public masking is thus neither a recent development nor a novel exercise of state authority. Rather, it reflects a longstanding legislative judgment in Virginia that the concealment of one's identity in public can present substantial danger to the safety and security of the good citizens, residents, and visitors of Virginia.

Against that backdrop, the Virginia General Assembly has now enacted the challenged Mask/Identity Statute. *See* Va. Code § 19.2-83.6:2. Adopted in May 2026, the Statute responds to growing public concerns regarding masked and unidentified federal ICE officers conducting immigration-enforcement operations in Virginia. As the Commonwealth has explained in its submissions here, an uptick in such operations has created circumstances where ordinary citizens cannot distinguish between legitimate law-enforcement officers and persons falsely claiming governmental authority. The Commonwealth has further identified dangers of confusion and escalation during police encounters, difficulties in holding unidentified officers accountable for misconduct, and the resulting erosion of public confidence in law enforcement generally. Those concerns implicate the most fundamental responsibilities of state government — protecting the safety of citizens and preserving public order.

Of consequence here, the Mask/Identity Statute does not prohibit ICE officers from doing their work or dictate the substantive responsibilities of federal law-enforcement officers. Instead, the Statute establishes two straightforward requirements for persons exercising law-enforcement authority. First, the Statute provides that

> no law-enforcement officer shall wear a facial covering that conceals, obscures, or otherwise covers his face while such law-enforcement officer is engaged in the performance of his official duties.

*See* Va. Code § 19.2-83.6:2(B). Second, the Statute requires officers to visibly display a badge or insignia identifying their employing agency and bearing their name or another individual identifier. *Id.* § 19.2-83.6:2(D). Although the Statute expressly encompasses

federal law-enforcement officers, its requirements apply equally to state and local officers. *Id.* § 19.2-83.6:2(A).

The public interests of the Commonwealth that underlie the Mask/Identity Statute's requirements are very substantial. When armed and unidentified masked individuals approach members of the public, assert governmental authority, and demand compliance with their commands, the ability of the public to ascertain whether those persons are legitimate law-enforcement officers is no small matter. Indeed, a concealed identity can and does generate confusion and uncertainty at precisely the moments when clarity is most essential. Such confusion can thus endanger citizens, non-citizens, and officers alike, particularly where a person approached can reasonably question whether the masked individual purporting to exercise governmental authority is a law officer or a criminal impersonator.

B.

Perhaps most significantly, the Virginia General Assembly did not impose an unqualified prohibition on facial coverings or demand that law officers reveal their identities in every conceivable circumstance. To the contrary, the Mask/Identity Statute contains an extensive collection of exceptions expressly designed to accommodate the legitimate medical, environmental, tactical, and operational needs of the law-enforcement community. *See* Va. Code § 19.2-83.6:2(C)-(E). Those exceptions readily demonstrate that the Commonwealth sought to protect its citizens and residents without impeding legitimate law-enforcement responsibilities.

1.

With respect to the masking aspect of the Mask/Identity Statute, there are 11 specific circumstances when facial coverings are permissible and legitimate. The first seven accommodate ordinary medical, protective, and environmental necessities. Officers may wear (1) translucent face shields or clear masks that do not conceal identities; (2) N95 or surgical masks to prevent disease transmission; (3) protective equipment necessary to guard against toxins, gas, smoke, severe weather, and other hazardous environmental conditions; (4) masks necessary for underwater operations; (5) motorcycle helmets and other qualifying vehicle-related protective coverings; (6) protective eyewear against retinal weapons, including lasers; and (7) facial coverings used by SWAT teams while performing official SWAT team duties. *See* Va. Code § 19.2-83.6:2(C)(1)-(7). The Virginia General Assembly thus expressly preserved a law officer's ability to utilize protective equipment when circumstances require it.

A "catch-all" provision of the Mask/Identity Statute creates four additional and important exceptions for those officers

> assigned to an undercover, drug, gang, or surveillance unit where the protection of such law-enforcement officer's identity is necessary as determined by the law-enforcement agency overseeing such unit.

*See* Va. Code § 19.2-83.6:2(C)(8). That catch-all provision is particularly significant, and it entrusts the determination of whether an officer's identity requires protection to the law-enforcement agency itself. Far from disregarding federal operational concerns, the catch-all provision specifically accommodates circumstances where the concealment of an officer's identity is essential to his duties. Thus, the Commonwealth expressly preserved

substantial discretion over masking decisions, including by entrusting the operational necessities to the law-enforcement agencies themselves.

2.

The identification requirement adopted by the Virginia General Assembly is likewise subject to reasonable qualifications. For example, an officer need not display his actual name but may instead display an "individual identifier unique to that particular law-enforcement officer." *See* Va. Code § 19.2-83.6:2(D). As such, an officer may remain individually identifiable for purposes of accountability without necessarily revealing his actual or real name to the public. Moreover, through June of 2028, the Mask/Identity Statute also exempts those officers performing SWAT or other specialized tactical duties, together with officers assigned to undercover, drug, gang, executive-protection, or surveillance units where protecting their identities is necessary. *Id.* Thus, even the Statute's identification requirement reflects the Commonwealth's legislative effort to accommodate legitimate concerns for officer safety and operational security.

* * *

Viewed as a whole, the Mask/Identity Statute reflects a careful effort by the General Assembly to reconcile two important interests: the Commonwealth's duty to protect its citizens and the legitimate operational needs of law-enforcement officers. The Statute's 11 facial-covering exceptions and additional identification exceptions substantially undermine any notion that Virginia has sought to obstruct federal immigration enforcement or exercise supervisory authority over federal officers. Rather, the Commonwealth has

Case 1:26-cv-01471-KG-LF Document 109-1 Filed 11/24/26 Page 38 of 49

imposed reasonable and limited requirements upon the face-covering conduct of law-enforcement personnel while preserving significant latitude when anonymity is warranted.

C.

There is an additional and very serious problem with the United States' position — it is entirely unable to identify any federal statute, regulation, executive order, or written agency policy requiring ICE officers to conceal their faces or identifying information during enforcement operations. Instead, the United States relies on a single sentence in a Declaration made by an ICE official describing agency-specific practices. He states that "ICE policy permits personnel to use any facial covering they feel is appropriate to meet operational needs and to protect them from health hazards." *See* J.A. 165.[1] On the other hand, the Commonwealth submitted a Declaration made by a former senior ICE official. And that former official disputes the existence of any masking policy, stating that "ICE has no formal or written policy on wearing masks or removing identification," and that "routine use of identity-concealing masks and removal of visible individual identifiers during ordinary public-facing immigration enforcement was not standard ICE practice before 2025." *Id.* at 242, 247-50.

The absence of an affirmative federal masking requirement is important — and should be controlling — to the question of whether the Mask/Identity Statute impermissibly intrudes upon a federal function. In its 1920 decision in *Johnson v.*

[1] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this matter.

*Maryland*, the Supreme Court contemplated an application of state rules to carrying out federal employment where the United States had not prescribed a contrary requirement. *See* 254 U.S. 51, 56 (1920). The United States now sponsors in this appeal the proposition that ICE can maintain and rest on an unwritten policy allowing its officers their own discretion on whether to follow a duly enacted Virginia law.

At bottom, a single ICE officer should never be able to override a duly enacted statute of the Commonwealth of Virginia in the absence of some federal law, regulation, or other valid supporting authority. Consider what purportedly conflicts with the Mask/Identity Statute. A federal statute? None. A treaty of the United States? None. A federal regulation or executive order? None. A written policy located anywhere within ICE or the Department of Homeland Security? None has been identified. What we have today is a single sentence in a Declaration asserting that individual ICE officers possess the discretion and ability to conceal their identities when they alone deem it appropriate. No supervision is at all necessary or required and the agency itself has no involvement in the ICE officer's daily decisions on whether to wear a mask. I cannot and will not accept the proposition that individualized discretion, untethered to any identifiable source of federal law, enjoys constitutional supremacy over a duly enacted statute of the Commonwealth.

D.

To be sure, the Mask/Identity Statute is also readily seen as a means for protection of Fourth Amendment rights. Relevant in this regard is the well-crafted February 2026 decision of my distinguished West Virginia colleague, Judge Joseph R. Goodwin, in

Case 1:26-cv-01471-KG-LF Document 109-1 Filed 11/24/26 Page 40 of 49

*Urquilla-Ramos v. Trump*, 821 F. Supp. 3d 603 (S.D. W. Va. 2026).[2] Therein, Judge Goodwin assessed the constitutionality of a civil immigration arrest carried out by masked and unidentified ICE agents operating from an unmarked vehicle. *Id.* at 604-05.

Judge Goodwin's analysis was particularly concerned with the Fourth Amendment's prohibition against unreasonable searches and seizures. He explained that the reasonableness of a seizure must be assessed in light of the circumstances surrounding the officer's exercise of authority, including whether the officer's identity and governmental affiliation are reasonably ascertainable. *See Urquilla-Ramos*, 821 F. Supp. 3d at 625-29. Ultimately, Judge Goodwin concluded that the combination of masked officers, unmarked vehicles, the absence of identifying information, and the lack of an adequate justification for anonymity rendered the petitioner's seizure unconstitutional under the Fourth Amendment. *Id.* at 629. His opinion thus recognized that the United States' use of masked and unidentified ICE officers in civil immigration-enforcement operations, absent a particularized justification for such anonymity, is not merely an objectionable law-enforcement practice — it violates the Fourth Amendment rights of those subjected to such governmental authority.

---

[2] Judge Goodwin's constitutional analysis in *Urquilla-Ramos* has been favorably relied on more than 25 times by other federal judges in assessing the constitutionality of federal immigration-enforcement practices. Notably, the United States has not pursued an appeal of Judge Goodwin's ruling, or any of the other court rulings which rely on his constitutional analysis. *See, e.g.*, *Guanilo Mego v. Soto*, No. 26-9827, 2026 WL 2339408, at *2 (D.N.J. Aug. 12, 2026); *Cabrera v. Joyce*, No. 26-8252, 2026 WL 2124083, at *2 (D.N.J. July 23, 2026); *Silva-Sanchez v. Blanche*, No. 26-8187, 2026 WL 2042288, at *2 (D.N.J. July 15, 2026); *Torres v. Rosa*, No. 26-cv-245, 2026 WL 1839065, at *9 n.9 (E.D. Va. May 29, 2026).

Notably, Judge Goodwin has not suggested that federal law-enforcement officers must disclose their identities in all circumstances. In fact, he expressly recognized that "concealment is never permissible" was *not* the rule he was announcing. *See Urquilla-Ramos*, 821 F. Supp. 3d at 627-29 (acknowledging that legitimate undercover investigations, dangerous enforcement operations, and other genuine exigencies may justify temporary concealment of officer's identity). Indeed, his decision emphasized the importance of distinguishing legitimate exceptions from practices that effectively eliminate the accountability accompanying the exercise of governmental power.

Of course, Judge Goodwin's decision is nearly on "all fours" with the Commonwealth's asserted positions. As explained above, the Commonwealth's Mask/Identity Statute contains 11 specific exceptions accommodating specialized tactical duties, undercover operations, and other circumstances where officer anonymity might be necessary. Like Judge Goodwin, the Commonwealth recognized that the legitimate interests of officer safety and operational security should not be disregarded. And, Judge Goodwin's decision reinforces the very substantial constitutional and public-safety interests that underlie the Mask/Identity Statute.[3]

[3] By only briefly acknowledging Judge Goodwin's decision, the panel majority downplays its significance. *See ante* 28. Where a district court of this Circuit has determined and well-explained that seizures by masked and unidentified ICE officers contravene the Fourth Amendment, we should pay attention.

Case 1:26-cv-01471-KG-LF Document 109-1 Filed 11/24/26 Page 42 of 49

II.

Turning to my views on the preliminary injunction interposed against the Mask/Identity Statute, this Court reviews an award of a preliminary injunction for abuse of discretion. *See Di Biase v. SPX Corp.*, 872 F.3d 224, 229 (4th Cir. 2017). A district court, however, abuses its discretion when its decision rests on an error of law, including when the court "misapprehends or misapplies the applicable law." *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014).

As the Supreme Court has repeatedly emphasized, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking such injunctive relief must establish four factors: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Importantly, because the party must satisfy each of the four *Winter* factors, a preliminary injunction cannot stand if the party failed to satisfy even one of the four factors. *See Pashby v. Delia*, 709 F.3d 307, 319, 321 (4th Cir. 2013).

A.

As I see it, the preliminary injunction entered against the Mask/Identity Statute should be vacated because the United States failed to demonstrate a likelihood of success on the merits of its Supremacy Clause challenge, and it thereby failed to satisfy the very first *Winter* factor. Of particular significance to my view is that the challenged Statute is a duly enacted law of the Commonwealth of Virginia. Legislative enactments by a sovereign

State traditionally enjoy a presumption of constitutionality, and a reviewing court must exercise appropriate caution before displacing legislation enacted by and for the people. *See Davis v. Dep't of Lab. & Indus.*, 317 U.S. 249, 257-58 (1942) (recognizing "presumption of constitutionality in favor of state . . . enactment" and explaining that reviewing court must resolve doubts concerning validity in favor of statute before declaring it unconstitutional). Such caution is especially warranted where, as here, the Old Dominion acted pursuant to its traditional police powers to protect the safety and security of its citizens and all others. True, the presumption of constitutionality cannot insulate a state legislative enactment from the force of the Supremacy Clause. Nevertheless, the presumption of constitutionality demands a stringent Supremacy Clause analysis.

The limited posture of these proceedings is critical. In this situation, we are not called upon to determine whether every application of the Mask/Identity Statute is consistent with the Constitution. Nor must we decide whether a particular federal law-enforcement operation might present circumstances where the Statute would impermissibly interfere with federal authority. Rather, our question is simply whether — in the context of our review of a preliminary injunction ruling — the United States has demonstrated a likelihood of success on its assertion that the challenged Statute violates the Supremacy Clause, pursuant to the so-called doctrine of intergovernmental immunity.

B.

In explaining why the United States has not made the necessary showing, I will address the constitutional principles that govern here. The Supremacy Clause, found at Article VI, Clause 2 of the Constitution, establishes that federal law is supreme over

Case 1:26-cv-01471-KG-LF Document 109-1 Filed 11/24/26 Page 44 of 49

conflicting state enactments. From that specific clause the doctrine of intergovernmental immunity has been derived by the Supreme Court, and it generally prohibits a state from directly regulating the federal government or discriminating against the federal government and those with whom it deals. *See United States v. Washington*, 596 U.S. 832, 838-39 (2022). Importantly, however, the doctrine neither prohibits nor nullifies every state law that incidentally impacts federal operations or the conduct of federal employees. Rather, the relevant inquiry is whether a state statute impermissibly subjects the federal government to the State's regulatory authority, as distinguished from imposing ordinary rules of conduct that do not interfere with the performance of federal responsibilities. *See Johnson v. Maryland*, 254 U.S. 51, 55-57 (1920).

1.

Of importance here is the 1920 decision of the Supreme Court in *Johnson v. Maryland*, 254 U.S. 51 (1920). There, the State of Maryland had prosecuted and convicted a federal postal employee for operating a government motor vehicle without first obtaining a Maryland driver's license. The Supreme Court reversed his conviction, explaining that Maryland could not condition the performance of federal duties on the postal employee's submission to a state examination and payment of a licensing fee. *Id.* at 55-57. Even so, our High Court recognized an important limitation on the immunity afforded to federal employees by the Supremacy Clause. As Justice Oliver Wendell Holmes explained, federal employment does not confer a "general immunity from state law" upon an individual performing official duties. *Id.* at 56. Indeed, his opinion contemplated that "when the United States has not spoken," federal employees may be subject to "general rules that

might affect incidentally the mode of carrying out the employment." *Id.* By way of illustration, Justice Holmes identified "a statute or ordinance regulating the mode of turning at the corners of streets" as a state regulation that could govern a federal employee's conduct, without impermissibly conditioning the performance of federal duties. *Id.* The significance of Justice Holmes' illustration is that, although compliance with traffic regulations impacts the manner in which a federal employee performs his work, those regulations are not an impermissible exercise of state authority over the federal government.

The distinction made by Justice Holmes in *Johnson* is critical here. Under *Johnson*, the Supremacy Clause does not place every aspect of a federal employee's conduct beyond the reach of state law. To the contrary, the Court recognized that the federal employee's immunity from state regulation must be distinguished from the ordinary obligations that accompany employment. *See Johnson*, 254 U.S. at 56-57. And the Court's traffic law example demonstrates that a state statute is not unconstitutional simply because compliance therewith will impact how a federal officer may perform his duties. It is that distinction — between impermissible state control over federal functions, on the one hand, and permissible incidental regulation of conduct, on the other — that should guide our resolution of this issue.

2.

Put succinctly, I am satisfied that the Mask/Identity Statute adopted by the Virginia General Assembly readily falls on the permissible side of the constitutional line. The Statute's provisions do not require any federal officers to secure a state license, submit to

any examination, obtain permission from a Virginia official, or satisfy additional professional qualifications before performing their federal responsibilities. Nor does the Statute authorize the Commonwealth to determine who may serve as a federal officer, who federal agents can investigate or arrest, where those officers may deploy, or whether a particular ICE operation may proceed. Nor does the Statute inhibit the safe and efficient exercise of federal authority. As Judge Goodwin explained, "[a] mask does not stop a bullet. It does not deflect a blow. It provides no physical protection . . . . A mask does one thing: it hides the face of the officer wearing it." *See Urquilla-Ramos v. Trump*, 821 F. Supp. 3d 603, 628 (S.D. W. Va. 2026). Rather, the Statute adopted by the Old Dominion's General Assembly regulates only a limited aspect of an officer's public conduct — whether he may conceal his face, or withhold identifying information, while exercising governmental authority.

A federal law-enforcement officer may exercise his authority by investigating suspected violations of federal law, by conducting searches, by making arrests, and by performing other responsibilities entrusted to him by the United States. The Mask/Identity Statute neither prohibits those functions nor subjects their performance to the approval of state officials. Instead, it imposes limited but legitimate requirements on the officer's appearance and identification. Just as the postal employee in *Johnson* could observe ordinary traffic regulations without surrendering his authority to deliver the mail, an ICE officer should generally be able to comply with noninvasive rules governing public identification without surrendering his authority to enforce federal immigration law. And when exceptions are warranted, they are explicitly provided for.

Nor am I persuaded that the Mask/Identity Statute becomes an impermissible direct regulation simply because it expressly includes federal law-enforcement officers in its scope. To be sure, the Statute includes employees of federal law-enforcement agencies in its definition of a law-enforcement officer. *See* Va. Code § 19.2-83.6:2(A). But that fact alone cannot resolve whether the Statute intrudes upon a constitutionally protected federal function. Otherwise, the mere inclusion of federal employees within a state enactment would become dispositive, even if it leaves the federal government's authority undisturbed. That is not what *Johnson* compels.

The Mask/Identity Statute's carefully drawn exceptions reinforce this conclusion. The Old Dominion has accommodated the circumstances where facial coverings or anonymity may be necessary for medical protection, hazardous environments, undercover investigations, and specialized tactical operations. Those accommodations are significant, and they demonstrate that the Commonwealth is not seeking to impede federal law-enforcement functions.

The Commonwealth is nevertheless entitled to its own sovereign authority to protect its citizens and preserve public safety. The Supremacy Clause and the intergovernmental immunity doctrine must respect each of those settled principles. In ruling otherwise, the panel majority extends federal immunity well beyond what the *Johnson* decision allows, and it tramples the Commonwealth's sovereignty. At bottom, the United States has not

established that it has a likelihood of success on its contention that the Mask/Identity Statute contravenes the intergovernmental immunity doctrine.[4]

* * *

In sum, the Commonwealth of Virginia has exercised its traditional police powers to protect its citizens from the very substantial dangers associated with masked and unidentified federal officers and others. In ruling that the Mask/Identity Statute is likely to contravene the Supremacy Clause, the district court misapplied the controlling law by failing to distinguish between impermissible state regulation of federal functions and permissible state regulation of the conduct of federal employees. By virtue of that error of law, the court necessarily abused its discretion in awarding preliminary injunctive relief. The United States has thus failed to satisfy the first of the four *Winter* factors, and the preliminary injunction awarded by the district court cannot stand.

I would therefore vacate the preliminary injunction and permit the Commonwealth to enforce its duly enacted Mask/Identity Statute while these proceedings continue. I respectfully dissent from the majority's failure and refusal to do so.

---

[4] Of course, the United States must satisfy each of the four *Winter* factors to obtain a preliminary injunction. Having concluded that the United States has failed to establish a likelihood of success on the merits, I would neither reach nor resolve the other three factors. Were I to reach those factors, however, I would disagree with the panel majority's assessment of each.

III.

Pursuant to the foregoing, I concur in the panel majority's disposition of appeal No. 26-2258, which relates to the Commonwealth of Virginia's 287(g) Statute. I dissent, however, from the majority's affirmance of appeal No. 26-1874, concerning the Mask/Identity Statute. I would therefore vacate both awards of preliminary injunctive relief.